William A. Markham, California State Bar No. 132970
*wm@markhamlawfirm.com*
Dorn Bishop, California State Bar No. 147994
*db@markhamlawfirm.com*
Jason Eliaser, California State Bar No. 248394
*je@markhamlawfirm.com*
LAW OFFICES OF WILLIAM MARKHAM, P.C.
550 West C Street, Suite 2000
San Diego, CA 92101
Tel: 619.221.4400

Attorneys for Plaintiffs,
Aya Healthcare Services, Inc. and Aya Healthcare Inc.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

AYA HEALTHCARE
SERVICES, INC. and AYA
HEALTHCARE, INC.,

    Plaintiffs

    Vs.

AMN HEALTHCARE, INC.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. **'17CV0205 MMA MDD**

PLAINTIFFS' COMPLAINT FOR:

1.    Unlawful Restraints of Trade
(*Per Se* Violations of 15 U.S.C. § 1)

2.    Unlawful Restraints of Trade
(Quick-Look/Rule-of-Reason
Violations of 15 U.S.C. § 1)

3.    Attempted Monopolization
(15 U.S.C. § 2)

4.    Unlawful Restraints of Trade
(California Cartwright Act)

5.    Tortious Interference with Prospective
Economic Relations

6.    Violations of California's UCL

PRAYER FOR RELIEF

DEMAND OF JURY TRIAL

# TABLE OF CONTENTS

I.   CONCISE STATEMENT OF THE CASE (FED. R. CIV. P. 8). . . . . . . . . . . -1-

AMN's No-Poaching Restraints. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

AMN's Employee Restraints.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

AMN's Misclassification of Trade Secrets. . . . . . . . . . . . . . . . . . . . . . . -5-

AMN's Invitation to Collude and Ensuing Sham Litigation. . . . . . . . . . . . . -5-

AMN's Other Anticompetitive Practices. . . . . . . . . . . . . . . . . . . . . . . . . -7-

II.   THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

III.  JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

Subject-Matter Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

Personal Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

Venue.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

IV.   COMMON ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

The Relevant Markets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

    The Relevant Service Market. . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

    The Relevant Geographic Markets. . . . . . . . . . . . . . . . . . . . . . . . -15-

    The Relevant Markets at Issue in This Case.. . . . . . . . . . . . . . . . . -17-

AMN's Market Power and Barriers to Entry and Expansion. . . . . . . . . . . . -17-

AMN's Anticompetitive Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

    AMN's No-Poaching Restraints. . . . . . . . . . . . . . . . . . . . . . . . . . -21-

    AMN's Unlawful Employee Restraints. . . . . . . . . . . . . . . . . . . . . . -25-

    AMN's Improper  Designation of Trade Secrets. . . . . . . . . . . . . . . . -27-

    AMN's Invitation to Collude.. . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

    AMN's Sham Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

    AMN's Exclusive-Provider Contracts with Hospitals. . . . . . . . . . . . . -34-

AMN's Cash-Flow Squeeze. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

AMN's Monopolistic Acquisition of Direct Rivals. . . . . . . . . . . . . . . -35-

AMN Uses Its Software and Software Licensing to Control Sales and Further Restrain Competition. . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

AMN's Miscellaneous Anticompetitive Practices. . . . . . . . . . . . . . . -37-

AMN Lacks Procompetitive Justifications. . . . . . . . . . . . . . . . . . . . . . -38-

Harm to Competition  in the Relevant Markets. . . . . . . . . . . . . . . . . . . -38-

Aya's Antitrust Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-

V.    FIRST CAUSE OF ACTION
      (Unlawful Restraints of Trade)
      (*Per Se* Violations of 15 U.S.C. § 1). . . . . . . . . . . . . . . . . . . . . . . . . . . -44-

VI.   SECOND CAUSE OF ACTION
      (Unlawful Restraints of Trade)
      (Quick-Look and Rule-of-Reason Violations of 15 U.S.C. § 1). . . . . . . . . . -48-

VII.  THIRD CAUSE OF ACTION
      (Attempted Monopolization)
      (15 U.S.C. § 2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -53-

VIII. FOURTH CAUSE OF ACTION
      (Unlawful Restraints of Trade in Violation of California's Cartwright Act)
      (Cal. Bus. & Prof. Code §§ 16720 *et seq*.). . . . . . . . . . . . . . . . . . . . . . . . . -55-

IX.   FIFTH CAUSE OF ACTION
      (Tortious Interference with Prospective Economic Relations). . . . . . . . . . . . -56-

X.    SIXTH CAUSE OF ACTION
      (Unfair Competition in Violation of California Law)
      (California Business & Professions Code §§ 17200 *et seq*.). . . . . . . . . . . . -57-

XI.   PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -57-

XII.  DEMAND OF JURY TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -59-

PLAINTIFFS' COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

# I. CONCISE STATEMENT OF THE CASE (FED. R. CIV. P. 8)

1.　　Defendant is the dominant seller in its markets and apparently believes that the best way to get ahead, stay ahead, and improve profit margins is to prevent its rivals from competing against it, while suppressing the pay and available opportunities of its own employees.

2.　　Plaintiffs bring this case to raise an antitrust challenge to Defendant's unlawful "no-poaching" practices, other trade restraints, and unilateral anticompetitive practices undertaken in an attempt to monopolize its markets.

3.　　Plaintiffs, Aya Healthcare Services, Inc. and Aya Healthcare, Inc. (collectively, "Aya"), are two affiliated temporary personnel agencies that are engaged in a highly specialized, rarified line of commerce – arranging to have medical travelers perform temporary assignments at hospitals and other healthcare facilities (collectively, "hospitals").

4.　　Medical travelers are licenced nurses and medical technicians who travel from region to region to perform temporary assignments at hospitals. Hospitals require medical travelers only when their staffing requirements cannot be met by their own employees or locally available temporary employees. Hospitals do not directly hire medical travelers, but instead engage specialized personnel agencies to do so for them. These personnel agencies ("medical-traveler providers" or "providers") are responsible for recruiting qualified medical travelers and coordinating their temporary assignment to hospitals.

5.　　Defendant, AMN Healthcare, Inc,. is a publicly traded corporation. AMN Healthcare, Inc. and its wholly owned affiliates (collectively, "AMN") operate a temporary employment agency and related businesses, and they provide various kinds of temporary medical employees to hospitals. Among other things, AMN is the dominant provider of medical travelers in the United States. It competes with Aya and other providers to furnish this service to hospitals. AMN's wholly owned affiliated entities include the following: AMN Healthcare, Inc. (Parent); AMN Services, LLC;

American Mobile Healthcare; Onward Healthcare; Nurses Rx; O'Grady Peyton International; Nurse Choice; Med Travelers; Club Staffing; Medefis, Inc.; and Shiftwise, Inc.

6.     According to AMN's own financial statements, on average AMN employs approximately 8000 temporary nurses and other healthcare professionals as well as approximately 2,550 corporate employees. AMN reports having earned more than $1 billion in annual revenue each year since 2013. In 2015, AMN reported making more than $469 million in gross profit and reported an annual net income of $81 million.

7.     Like all temporary personnel agencies, AMN trades in the services of its employees. Its overarching strategy, unfortunately, is to make use of contractual restraints and other anticompetitive practices to ensure that none of its competitors can compete to hire any of its temporary employees, even when it is not employing them. This strategy entails the use of various trade restraints, trade-secret abuse, sham litigation, and a medley of other anticompetitive practices. AMN has employed these practices to hinder and exclude its direct competitors and thereby restrict the available supply of medical travelers, impose supracompetitive prices, and deprive its hospital customers of alternative terms of service and the benefits of competitive interplay for their business.

8.     By its various trade restraints and other anticompetitive practices, AMN has been able to restrict the available supply of medical travelers in various regional submarkets and raise its prices for providing them to hospitals in these regions. AMN not only restricts supply and raises its prices, but also imposes surcharges for providing various categories of medical travelers whom it reports to be in short supply to certain hospital customers. If AMN did not restrict the available supply of available medical travelers, the prevailing prices for medical-traveler services in most regions would be generally lower by a statistically significant amount.

//

9.     By these same practices, AMN has been able to depress the pay of medical travelers and recruiters of medical travelers and restrict their employment opportunities, mobility, and access to information about employment conditions offered by rival employers.

10.     To execute its preferred strategy, AMN has exploited its market power and control of sales to prevail on smaller providers and its own employees to accept its onerous trade restraints. Below is a short summary of these matters.

11.     **AMN's No-Poaching Restraints**. AMN has been able to prevent rival providers from competing to hire its medical travelers by prevailing on them to agree to unlawful no-poaching restraints that run one way in its favor and harm both its rivals and its employees.

12.     Smaller providers of medical travelers depend on the good graces of AMN. This is because AMN has so much business that it often turns to smaller providers to help it fill its orders, asking them to furnish medical travelers to its hospital customers when it lacks available medical travelers of its own for pending assignments. Some providers depend on receiving AMN's spillover work in order to remain in business.

13.     Other providers depend on maintaining a good relationship with AMN because many hospitals use its software platforms when they wish to procure the services of medical travelers. AMN allows other providers to fill some of these orders, but only if they comply with the requirements of its software platforms and accept other contractual obligations.

14.     Many providers of medical travelers therefore depend on AMN for spillover work and software-generated sales. This circumstance gives AMN enormous power over them.

15.     Abusing this power, AMN has delegated spillover work to many providers in exchange for their acceptance of its subcontractor agreements, which include a naked restraint of trade that is not even arguably ancillary to the spillover

PLAINTIFFS' COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

work described in the subcontractor agreements. More specifically, these agreements include "no-poaching" covenants that run one way in AMN's favor and burden AMN's dependent rivals by obliging them to agree in *perpetuity* never to solicit any of its employees. These covenants constitute naked restraints of trade that eliminate one avenue of competition between employers that seek to make hires from the same pool of employees. For this reason, they are unlawful *per se* under Section 1 of the Sherman Act ("Section 1").

16. **AMN's Employee Restraints**. AMN also obliges its recruiters and medical travelers to accept onerous non-solicitation covenants and trade-secret covenants as conditions of their employment. The non-solicitation covenants forbid its former recruiters to solicit any of its "employees" for an extended duration after they leave its employ (one year or eighteen months, depending on the version of the covenants used). The trade-secret covenants specify that the mere names of AMN's employees are AMN's proprietary trade secrets. If a recruiter at AMN leaves its employ and accepts work at a rival provider, AMN's position is that this recruiter cannot solicit any of its medical travelers or other employees, since doing so will breach its non-solicitation covenants and also constitute misappropriation of its trade secrets. It takes this position even if the recruiter or rival provider that employs her has independent knowledge of the employees' names, or even if these names are generally known to professionals in the medical-traveler markets.

17. AMN enforces these covenants against its former recruiters and the rival providers that hire them in an oppressive manner. It does so to discourage its current recruiters from leaving its employ and to punish those who have left to work for a rival. As enforced, these covenants constitute unlawful restraints of trade.[1]

---

[1] Two different California courts have adjudicated AMN's non-solicitation covenants and trade-secret covenants to be unenforceable under California law to the extent they forbid its former recruiters to solicit its employees. On January 26, 2017, the second court issued a judgment that permanently enjoins AMN from using these

(continued...)

18.     **AMN's Misclassification of Trade Secrets**. To gain the most possible advantage from its trade restraints, AMN misclassifies commonly known information as its trade secrets, so that it can enforce or purport to enforce its restrictive covenants against former recruiters and rival providers that lawfully make use of this information.

19.     In particular, AMN designates as its "employees" numerous medical travelers who have no pending assignments, but are merely qualified and ready to receive assignments if AMN has any for them. This classification is improper because the persons so identified cannot be fairly characterized as its "employees," nor is it reasonable for it to treat the mere names of its employees as trade secrets. Many of these individuals can be readily identified as medical travelers on social media sites used by professionals in the medical-traveler business, and many of them are already known to professionals in the medical-traveler markets.

20.     AMN similarly treats the names and basic contact information of various hospitals as its trade secrets, even though this information is publicly available and commonly known to professionals in the medical-traveler markets.

21.     **AMN's Invitation to Collude and Ensuing Sham Litigation**. AMN recently invited Aya to collude in an unlawful antitrust conspiracy, asking Aya to agree to a reciprocal no-hire agreement under which each employer would never hire any employee of the other. AMN twice made this offer to Aya. Aya rejected it both times.

22.     Aya believes that other providers have agreed to this offer because they dare not cross AMN and risk losing its spillover work and software-generated sales. Aya therefore believes that AMN has organized an employers' cartel, acts as its ringleader and enforcer, and twice invited Aya to join it.

---

[1](...continued)
covenants to try to prevent its former recruiters from soliciting its medical travelers and other employees. This injunction reaches (1) activity that AMN conducts in California and (2) activity that AMN directs against any individual or business that resides or conducts business in California.

PLAINTIFFS' COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

23.     Each time Aya rejected AMN's invitation, AMN took retaliatory acts against it. After Aya's second refusal, AMN escalated its retaliation by ceasing its hitherto profitable collaboration with Aya, by which Aya provided medical travelers to AMN's hospital clients when AMN lacked a sufficient medical travelers of its own to meet its clients' evolving requirements. Rather than continue to collaborate successfully with Aya, AMN terminated the collaboration solely to punish Aya for refusing to join its employers' cartel. In consequence, Aya immediately lost sales revenues of approximately fourteen million dollars per year.

24.     AMN's retaliation against Aya included subjecting it to sham litigation. After Aya refused AMN's first offer, AMN initiated a lawsuit against it and two of its employees. In this lawsuit, AMN asserted objectively baseless claims in order to disrupt Aya's operations, cast a chilling effect in the affected labor markets and medical-traveler markets, and force Aya's assent to its no-hire proposal. Shortly after bringing this lawsuit, AMN offered a modified version of its proposal to Aya, promising to drop the lawsuit if Aya would agree to respect its unlawful employee restraints by not permitting any former AMN recruiter in its employ to solicit any of AMN's employees, and by agreeing further not to hire specified employees of AMN. Aya refused the offer. AMN then escalated its sham litigation: it joined two more Aya employees as defendants and proceeded to litigate its baseless claims in a punitive, over-the-top manner that was disproportionate to its purported losses, which it never had any basis to claim. AMN's claims against Aya were later dismissed on summary judgment – which was a foreseeable event, since it had litigated essentially identical claims against another former recruiter and her new employer, and those claims had likewise been summarily dismissed. AMN's litigation nevertheless accomplished some of its intended purposes: it involved Aya in expense and disrupted its operations, and it contributed further to the chilling effect that AMN's practices cumulatively exert on medical travelers, recruiters and rival providers in the affected markets. AMN was unable to use this litigation to force Aya's assent to its unlawful proposals.

25.     AMN took these acts to punish Aya for refusing to join an employers' cartel, to discourage its recruiters from leaving its employ, and to discourage successful collaborations between its former recruiters and rival providers. By taking retaliatory measures against Aya that have reduced output in the medical-traveler markets, AMN has engaged in anticompetitive conduct in furtherance of an unlawful antitrust conspiracy and its related effort to monopolize its markets. Such conduct reduces output and imposes significant "social costs" in the relevant markets – a point that is explained more fully below and supported by Professor Hovenkamp's authoritative treatise on antitrust law.

26.     **AMN's Other Anticompetitive Practices**. AMN has employed various other anticompetitive practices in order to restrain trade and in an attempt to monopolize the medical-traveler markets. Its anticompetitive practices have included the following:

(1)     AMN has subjected other rivals and former recruiters to disproportionate sham litigation in order to disrupt the rivals' operations and intimidate its former and present recruiters: its aim has been to discourage the former recruiters from soliciting its medical travelers and its current recruiters from working for rival providers or starting their own firms. AMN also uses the threat of litigation and sham litigation to try to prevail on other rival providers to accept its no-hire agreement.

(2)     AMN has signed up hospitals and hospital networks to exclusive-provider contracts that have substantially foreclosed competition in key regional submarkets, including the market for Greater San Francisco Bay Area.

(3)     AMN uses two software platforms to control and profit from rival providers' sales and to ensure that these sales impose no competitive pressure on its prices, other material terms of service, or quality of service.

(4)     AMN has conducted a series of monopolistic acquisitions of other providers of medical travelers.

27.     Broadly speaking, AMN's overarching business strategy has been to use trade restraints and other anticompetitive practices to impede and prevent its rivals from soliciting its medical travelers and to discourage and prevent its recruiters from leaving its employ or collaborating with rival providers. Recruiting medical travelers is an essential, ongoing mission of a personnel agency that specializes in providing medical travelers for temporary assignments at hospitals. AMN's business strategy is to undermine its rivals' ability to perform this necessary, ongoing mission. It is a fundamentally anticompetitive strategy: rather than build a better mouse trap, AMN wants to make sure that its competitors cannot build one of their own.

28.     AMN's antitrust conduct has demonstrably harmed competitive interplay in the medical-traveler markets. In these markets, AMN has charged supracompetitive prices and imposed other unfavorable terms of service without losing substantial sales to other providers. More generally, AMN's trade restraints and other anticompetitive conduct have restricted the available supply of medical travelers, permitted AMN to charge supracompetitive prices, and increasingly insulated it from competition on price, terms of service, and quality of service.

29.     In the affected labor markets (however defined), AMN's antitrust misconduct has eliminated one form of competition between rival employers and severely restricted other kinds. These impediments to competition have had the effect of depressing the affected employees' pay, restricting their mobility and opportunities, and suppressing the exchange of information about employment opportunities, which is a further restriction of output.

30.     By its trade restraints and other anticompetitive practices, AMN has caused significant antitrust injury to Aya, a rival provider in the medical-traveler markets and rival employer in the applicable labor markets. Aya has antitrust standing to complain of these matters.

31.     Aya therefore brings the present suit against AMN for practicing unlawful restraints of trade in violation of Section 1 and California's Cartwright Act; attempting to monopolize commerce in violation of Section 2 of the Sherman Act ("Section 2"); committing tortious interference against Aya's prospective commercial relations; and violating California's Unfair Competition Law by employing business practices that are unlawful, unfair, and deceptive.

32.     Aya seeks appropriate redress for AMN's antitrust misconduct and related legal wrongs.

## II. THE PARTIES

33.     Plaintiff Aya Healthcare Services, Inc. is a corporation formed under the laws of Delaware that maintains its headquarters in San Diego, California. Plaintiff Aya Healthcare, Inc. is a corporation formed under the laws of Delaware that maintains its headquarters in San Diego, California. Plaintiffs are affiliated companies that operate under common control and ownership. They are collectively called "Aya" in this complaint.

34.     Defendant AMN Healthcare, Inc. is a corporation formed under the laws of Nevada that maintains its headquarters in San Diego, California. As pled above, AMN Healthcare, Inc. is the parent company of various affiliated and subsidiary companies that operate under various brands and under the common direction of AMN Healthcare, Inc.

## III.  JURISDICTION AND VENUE

35.     **Subject-Matter Jurisdiction**. Plaintiffs' first three causes of action complain of AMN's antitrust violations of Sections 1 and 2 of the Sherman Act, which are codified respectively at 15 U.S.C. § 1 and 15 U.S.C. § 2. Plaintiffs seek damages for these antitrust offenses under Section 4 of the Clayton Act, which is codified at 15 U.S.C. § 15, and they seek injunctive relief under Section 16 of the Clayton Act, which is codified at 15 U.S.C. § 26. This Court therefore has original and exclusive subject-matter jurisdiction over each of these claims under Section 4 of

the Clayton Act, which is codified at 15 U.S.C. § 15 (authorizing civil, private relief for violations of federal antitrust law, and vesting the federal district courts with original, exclusive subject-matter jurisdiction over private claims for violations of federal antitrust law). This Court therefore has subject-matter jurisdiction over Plaintiffs' first four causes of action under 28 U.S.C. § 1331 (vesting all federal district courts with original jurisdiction over any claim that arises under a statute of the United States) and 28 U.S.C. § 1337 (vesting all federal district courts with original jurisdiction over any claim that arises "under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.")

36.     Plaintiffs' remaining causes of action arise under the common and statutory laws of California. These causes of action arise from the same transactions, occurrences and "common nucleus of operative fact" as give rise to Plaintiffs' three federal claims. This Court can exercise supplemental subject-matter jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 (a), and it should do so in order to promote judicial economy, avoid duplicative procedures, and avert the risk of inconsistent adjudications of the same issues of fact and law.

37.     Lastly, this Court can properly exercise its pendant subject-matter jurisdiction over each of Plaintiffs' state-law claims because these claims arise from the same transactions, occurrences and "common nucleus of operative fact" as give rise to Plaintiffs' federal claims, over which this Court has original jurisdiction, as pled above. See *United Mine Workers of America v. Gibbs* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138 (1966).

38.     **Personal Jurisdiction**.  This Court has personal jurisdiction over AMN under 15 U.S.C. §§ 15 and 22 because AMN conducts business in this District and has substantial, ongoing ties to this judicial district.

39.     **Venue**.  This Court is the proper venue for the present action because (1) Defendant maintains its business headquarters in this judicial district and can be "found" here within the meaning of 15 U.S.C. §§ 15 and 22; (2) Plaintiffs maintain

their business headquarters in this judicial district and can be "found" here within the meaning of 15 U.S.C. §§ 15 and 22; (3) Defendant has engaged in the challenged business practices in this judicial district; and (4) Plaintiffs have suffered proximate losses in this judicial district.

## IV. COMMON ALLEGATIONS

40.   **The Relevant Markets**. In the United States, there exists a national market for the provision of medical travelers, as well as regional submarkets for the provision of this service. These matters are explained directly below.

41.   <u>The Relevant Service Market</u>. Medical travelers are licensed nurses and medical technicians who are employed by specialized personnel agencies ("medical-traveler providers" or "providers") and dispatched by them to various regions of the United States in order to perform temporary assignments at hospitals and other health-care facilities ("hospitals"). They perform these assignments at hospitals only when the hospitals' own employees and locally available temporary employees are unavailable to do so.

42.   In general, hospitals employ their own nurses and medical technicians. They also engage personnel agencies to send them temporary nurses and medical technicians to meet their staffing requirements when their own employees are unable to do so.

43.   A hospital's staffing requirements for nurses and medical technicians constantly evolves. During busy periods, a hospital requires more nurses and medical technicians than it does during less busy periods. To control costs, and to have greater flexibility to respond to changing staffing requirements, hospitals commonly hire temporary nurses and medical technicians to meet their staffing requirements during busier periods, and they rely on their own employees during less busy periods. In recent years, many hospitals have increased their use of temporary employees for a wide variety of purposes.

//

44.     One service offered by some personnel agencies is to send medical travelers to hospitals in order to perform temporary assignments. Hospitals require medical travelers only when its own employees and local temporary employees cannot meet their staffing requirements. This circumstance typically arises when a hospital has exceptional, episodic or seasonal periods of peak activity.

45.     For example, a hospital might hire the services of medical travelers when its region is afflicted with a flu epidemic; or when its region receives a large, seasonal influx of visitors and temporary residents during certain times of the year; or when its local nursing schools conduct graduation ceremonies; or when it must perform special tasks, such as converting its paper records into an electronic data base. There are many different reasons why a hospital might have staffing requirements that cannot be met by some combination of its own employees and locally available temporary employees. This is when a hospital turns to medical travelers to fulfill its staffing requirements.

46.     Generally speaking, hospitals must pay more for services provided by medical travelers than for comparable services provided by their own employees or locally available temporary employers. These services meet a demand that cannot otherwise be satisfied, and they are priced accordingly. It is also costly to pay for the travel and living expenses of medical travelers, and hospitals must reimburse medical-traveler providers for these costs.

47.     Many hospitals hire professional purchasing agents, or "vendor-managers," to procure the services of its temporary employees, including its medical travelers. Where this occurs, the hospital hires the vendor-manager, which then finds an appropriate provider of medical travelers for the hospital. The provider thereafter sends medical travelers to perform temporary assignments at the hospital. Sometimes the provider's contract is made with the vendor-manager, and others it is made directly with the hospital. The vendor-managers' role in these transactions is to act as a purchasing agent or referral agent for the hospitals.

48.     To provide medical-traveler services, a provider must proficiently perform the following tasks: (1) fulfill the hospitals' evolving requirements for medical travelers; (2) find, screen, and recruit qualified medical travelers; (3) identify suitable assignments for them; (4) dispatch the medical travelers, organize their schedules, and coordinate their schedules with the hospitals; (5) train medical professionals to operate as professional travelers who work on temporary assignments at different hospitals across the country; (6) identify and fulfill numerous administrative, regulatory, and logistical requirements that are incident to these assignments and that vary from state to state and sometimes from locality to locality, and ensure that the terms and conditions of the medical travelers' employment satisfy all local and federal regulatory requirements, including all applicable health-care regulations; (7) timely pay the medical travelers for their work; (8) ensure that the medical travelers' work is timely performed, satisfactory to the hospitals, and performed in compliance with all applicable professional standards; (9) confirm and produce all necessary professional credentials for medical travelers; (10) coordinate and pay for all necessary travel and temporary housing arrangements for medical travelers; and (11) perform various related and incidental tasks.

49.     Providers of medical travelers employ professional recruiters, attorneys, other corporate employees, and a pool of available medical travelers. The recruiters are responsible for finding, screening, and recruiting qualified medical travelers. Their work is indispensable to medical-traveler providers.

50.     When a provider has work for a medical traveler, it dispatches her to the hospital that requires her temporary services. When it lacks assignments, it offers no work. A medical-traveler provider is responsible for general oversight of work performed by its medical travelers, while the hospital customer generally performs day-to-day supervision of the medical travelers' care for patients and performance of other medical duties. The provider must make sure that its medical travelers are qualified, arrive timely, remain on assignment as required, and meet the requirements

of the hospital customers. Under a typical agreement between a medical-traveler provider and a hospital (or its vendor-manager), the provider and the hospital each have authority to request the dismissal of a medical traveler for specified misconduct or poor performance, and in some cases either of them can dismiss a medical traveler without making a request in advance; in addition, the hospital can unilaterally re-assign certain medical travelers to a different unit or location, but subject to various regulatory limitations and professional guidelines (*e.g.*, the medical traveler's qualifications and experience, regulatory requirements, hospital policy, professional criteria concerning which kinds of medical travelers can perform which medical services in which kinds of facilities, etc.).

51.     For antitrust purposes, medical-traveler services constitute a relevant service market: when hospitals require these services, there is no other service that they can use instead, since by definition they use the services of medical travelers only when their staffing needs cannot be met by their own employees or locally available temporary employees. When a hospital faces exceptional, episodic or seasonal staffing requirements that it cannot meet on its own, and when locally available temporary nurses and/or medical technicians are already on assignment or otherwise unavailable, the hospital must hire a medical-traveler provider to send medical travelers to it to perform temporary assignments. There is no other service, nor any other kind of employee that can fulfill the hospitals' requirement for medical travelers under such circumstances. Only medical travelers can fulfill this demand.

52.     There is therefore no cross-elasticity of demand for medical-traveler services and any other service. If a hypothetical monopolist were to make all sales of medical-traveler services, it could raise its prices by a statistically significant amount for a non-transitory period without losing so many sales as to make the price-increase unprofitable – *i.e.*, it could profitably impose a SSNIP.[2] Hospitals would find

---

[2]     The SSNIP is the pricing test most often used by antitrust authorities in order to ascertain the relevant product and geographic markets in antitrust cases. This test is
(continued...)

themselves largely constrained to submit to the monopolist's price increase and to continue employing medical travelers at the higher prices for want of any suitable alternative.

53.     The provision of medical travelers therefore constitutes a distinct service market for purposes of antitrust review.

54.     Many medical-traveler providers compete with one another to provide this service. AMN is the dominant provider of this service. Aya is a smaller, rising competitor.

55.     <u>The Relevant Geographic Markets</u>. The provision of medical travelers is a service that is provided in a nationwide market across the United States and in various regional submarkets in the United States.

56.     Some providers, including AMN and Aya, dispatch medical travelers on assignments to hospitals located in every region of the country. They compete with one another in a nationwide market for the provision of medical travelers.

57.     There also exist various regional submarkets (or smaller markets) for medical-traveler services, owing to the following commercial circumstances:

(1)     Each regional submarket has distinctive regulatory requirements imposed by state, county and/or municipal authorities. Hospitals and staffing agencies must observe these distinctive regional regulatory requirements when assigning medical travelers, and medical travelers must be licensed and otherwise qualified to render their services in accordance with the regulatory requirements of each regional submarket.

(2)     Many medical travelers are qualified to render services only in certain regions, and many specify that they are willing to travel only to specified regions, so that not every region attracts the same pool of medical

---

[2](...continued)
also called the "hypothetical monopolist's test" and is explained at great length in the *DOJ/FTC Guidelines for Horizontal Mergers of 2010* at § 4. Many federal courts have applied this test in antitrust cases.

travelers. On the contrary, the pool of available medical travelers largely varies from region to region.

(3)     In each regional submarket, hospitals pay distinct prices for medical traveler services, have distinct staffing requirements, and must address unique seasonal and fluctuating circumstances.

(4)     Providers' marketing strategies tend to vary from region to region.

58.     If a hypothetical provider of medical travelers were to control the pool of medical travelers qualified and willing to accept assignments in any given geographic submarket, this provider usually could profitably raise its prices for these assignments by a statistically significant amount for a non-transitory period – *i.e.*, it could impose this price-increase without losing so many sales to a rival provider as to make the price-increase unprofitable. Instead, hospitals in this regional submarket would find themselves largely unable to turn to other providers to provide the same service or to find a suitable substitute service. A hospital requires medical-traveler services only when its own employees and other locally available employees cannot meet its peak staffing requirements. If one provider were to control those medical travelers qualified and willing to travel to its region to perform the required services for the hospital, this provider could impose the price-increase without losing substantial sales. Each regional submarket is therefore a distinct geographic submarket for antitrust purposes.

59.     Broadly speaking, the regional submarkets for medical travelers correspond to the greater metropolitan regions of the United States and to other major population centers. For example, the relevant regional submarkets for medical travelers include the following regions: the Greater San Francisco Bay Area; the Greater Los Angeles Metropolitan Area; the Greater San Diego Metropolitan Area; the Greater Sacramento Region; the Greater Riverside/San Bernardino Region; the Greater Seattle Metropolitan Area; the Greater New York City Metropolitan Area; the Greater Chicago Area; the Greater Baltimore Metropolitan Area; the Greater Washington, D.C. Metropolitan Area; the Greater Houston Metropolitan Area; the

Orange County Region; the Greater Minneapolis Metropolitan Area; the Greater Richmond Metropolitan Area; and the Greater Norfolk Metropolitan Area.

60. In less populous regions of the United States, regional submarkets are circumscribed by state boundaries. For example, Montana, Idaho, Nevada, Arizona, Utah, Colorado, Iowa, Nebraska, Kansas, and Oklahoma each constitute a distinct regional submarket for the provision of medical travelers.

61. No regional submarket is larger than a single state, since each state has its own regulatory and licensing requirements.

62. The existence of distinct regional submarkets for medical-traveler services is broadly recognized by all market participants. It is within the different regional submarkets that providers compete with one another to furnish medical travelers to hospitals. Within each regional submarket, hospitals seek medical travelers only from staffing agencies that can dispatch them to the region.

63. The Relevant Markets at Issue in This Case. For purposes of antitrust review, there exists in the United States a national market for the provision of medical travelers, as well as various regional submarkets for the provision of this service. These are the relevant markets at issue in this case. In these markets, the sellers are the medical-traveler providers, and the customers are the hospitals (*i.e.*, individual hospitals, hospital networks, other healthcare providers, and their purchasing agents).

64. **AMN's Market Power and Barriers to Entry and Expansion**. AMN is the dominant provider of medical-traveler services in the United States. In the national market, AMN makes or controls at least 45% of overall sales. In some regional submarkets, AMN makes or controls at least 50% of medical-traveler services. These markets include the Greater San Francisco Bay Area; the Greater Los Angeles Metropolitan Area; the Greater New York City Metropolitan Area; the Greater Chicago Metropolitan Area; the Greater Baltimore Metropolitan Area; the Greater Washington, D.C. Metropolitan Area; the Greater Richmond Metropolitan Area; and the Greater Norfolk Metropolitan Area. In these markets, AMN has been increasing its

market shares in recent years by means of its below-described anticompetitive practices.

65.    AMN's market positions in these markets arise from its direct sales, its affiliates' sales, and sales that it controls. More particularly, in these markets AMN directly sells medical-traveler services and also owns or controls corporate affiliates that sell medical-traveler services. It also substantially controls sales that other providers make on its proprietary software platforms or in accordance with its vendor-management programs.

(1)    Two of AMN's wholly owned affiliates ("AMN's Affiliates") each operate a software platform that hospitals use to procure medical-traveler services. AMN allows rival providers to fill orders on these platforms, but only under licensing agreements and related contractual arrangements that give the AMN and its two affiliates substantial control over their sales. For each such sale, the rival provider must pay a substantial fee to AMN's affiliate, and it must also accept the contractual terms that AMN requires for the sale, even though the contracts themselves state that they are made between the rival provider and the hospital. Under these contracts, the rival provider must agree *inter alia* not to have direct communications with the hospital it serves, other than to provide necessary information on the software platform itself. The participating provider must also agree to additional restrictive covenants. The cumulative effect of these requirements is that rival provider makes sales only nominally, but in practice AMN's affiliates control all communications with the hospital (with limited exceptions), dictate the contractual terms, and earn a substantial profit or fee for each sale. The names of the two software platforms operated by AMN's affiliates are as follows: Shiftwise and Medefis.

//

(2)     AMN also acts as a vendor-manager for many hospitals, some of which occasionally request medical-traveler services from another provider. When this occurs, AMN requires the rival provider to abide by contractual restrictions that afford it a fee on each sale and prevent the rival from having any direct interaction or communication with the hospital (with limited exceptions).

66.     Owing to the fees that AMN collects from rivals when they make sales on its software platforms, it is able to prevent rival sellers from charging discount prices on its software platforms. It thereby insulates itself from price-competition that these sales might otherwise impose. The rival providers must absorb AMN's fees when making these sales and therefore are ill-placed to charge prices for these sales that can impose competitive discipline on AMN's prices. Nor can these rival providers distinguish themselves in these sales by superior responsiveness to their hospital customers, since they are largely forbidden to have direct communications with the hospitals. Nor can they propose alternative or better terms of sale, since they are forbidden to vary the contracts provided by AMN's affiliates. When making these sales, the rival providers cannot impose significant competitive discipline on price, terms of sale, or quality of service.

67.     AMN therefore makes and substantially controls a large percentage of overall sales in the national market and in various regional markets. Its market shares in these markets are substantial or dominant and have been steadily increasing. Its market shares are also protected by substantial barriers to entry and expansion, most of which arise from its anticompetitive conduct.

68.     In the affected markets, AMN's position is protected by the following barriers to entry and expansion, some of which AMN has illicitly established, and others of which, although not unlawful, protect its market positions and market power:

(1)     AMN has signed up many hospitals and hospital networks to renewable exclusive-provider contracts that in practice are *de facto* long-term

exclusive-provider contracts. These exclusive-provider contracts have foreclosed a substantial share of overall sales in some regional submarkets. AMN holds a nearly monopoly position in each of these regional submarkets.

(2)   AMN employs a medley of unlawful trade restraints and other anticompetitive practices in order exclude rival providers and discourage expansion and entry. One of these practices is its above-pled use of exclusive-supplier contracts. It also uses unlawful trade restraints, an employers' cartel, anticompetitive retaliation, sham litigation, monopolistic acquisitions, and other anticompetitive practices in order to hinder and exclude existing providers and prevent others from entering the relevant markets. These practices are fully described at ¶¶ 73-145, infra.

(3)   A provider of medical-traveler services requires substantial capital funding so that it can conduct its operations and continually pay its medical travelers for their work months before being paid by hospital customers for services rendered.

(4)   A provider of medical-traveler services must establish a well-recognized brand that is trusted by hospitals, vendor-managers, medical travelers, and recruiters.

(5)   A provider of medical-traveler services requires rarified expertise and professional contacts in order to perform its various operations, which are described at ¶¶ 49-50, supra.

69.   The foregoing barriers to entry and expansion are significant, especially the anticompetitive practices that AMN has employed in order to deter entry and expansion.

70.   AMN therefore wields substantial market power in the relevant markets. This circumstance can be inferred from its market shares and the existence of

significant barriers to entry and expansion. This circumstance is also confirmed by AMN's actual conduct: among other things, it obliges its customers to accept onerous exclusive-provider contracts, supracompetitive prices, and inferior and less accommodating service as well as limited rosters of available medical travelers. If AMN faced viable competition from its rivals in the relevant markets, it could not impose these trading terms on its customers.

71.     AMN has derived its market power in large measure from its unlawful restraints of trade and other anticompetitive conduct.

72.     **AMN's Anticompetitive Conduct.** AMN has employed trade restraints and other anticompetitive practices in order to hinder and exclude rival providers and deter entry and expansion. These practices are summarized directly below.

73.     <u>AMN's No-Poaching Restraints.</u>

Since at least 2010, AMN has entered into subcontractor agreements (the "Subcontractor Agreements") with many smaller providers of medical-traveler services (the "Subcontractor Providers"). It has done so because it often has more work than it can perform on its own, and it therefore hires Subcontractor Providers to send their medical travelers to its customers. These arrangements are governed by its Subcontractor Agreements.

74.     Many Subcontractor Providers vitally depend on receiving spillover work from AMN and could not remain in business without it. At one time Aya depended on this work. Other providers must remain in AMN's good graces in order to make sales on its software platforms. Aya is one such provider.

75.     AMN's Subcontractor Agreements establish legitimate joint collaborations between AMN and its Subcontractor Providers and impose various contractual restrictions that are reasonably ancillary to these collaborations or that are enforced in practice in a manner that is reasonably ancillary to these collaborations.

76.     AMN's Subcontractor Agreements also include contractual restraints (the " No-Poaching Restraints") that *permanently* forbid the Subcontractor Providers to

make employment solicitations to any of AMN's employees, even after the Subcontractor Agreement has expired or been terminated. AMN's No-Poaching Restraints last in perpetuity, and AMN has indicated that it intends to enforce them accordingly.

77.     AMN's No-Poaching Restraints are non-reciprocal: they benefit AMN and impose burdens on the Subcontractor Providers, which by these restraints are permanently deprived of the opportunity to solicit any of AMN's recruiters or any of the numerous medical travelers across the country whom AMN has placed on its rosters of medical travelers.

78.     Since AMN and the Subcontractor Providers compete to hire the same kinds of employees, whom they engage in order to compete to sell the same service in the same markets, AMN's No-Poaching Restraints are horizontal restraints that eliminate competition between direct competitors. See *Areeda and Hovenkamp, Fundamentals of Antitrust Law* (2015 Supp.) at § 19.02(B) ("An arrangement is said to be 'horizontal' when (1) its participants are either actual or potential rivals at the time the agreement is made; and (2) the agreement eliminates some avenue of rivalry among them.")

79.     AMN's No-Poaching Restraints are not reasonably ancillary to the joint collaborations established by the Subcontractor Agreements. Rather, AMN's No-Poaching Restraints impose blanket restraints that last in perpetuity, forbidding the restrained providers ever to solicit any of AMN's employees, even after their joint collaboration has ended. These restraints are therefore "naked" restraints made between direct competitors that restrain and disfavor the Subcontractor Providers and protect and favor AMN, ensuring that its rivals will never solicit any of its employees, including its recruiters and medical travelers.

80.     To derive the maximum possible benefit from its No-Poaching Restraints, AMN designates as its "employees" all medical travelers who are enrolled on its rosters, even those who have no current assignment from it. Its recruiters and

1   other corporate employees are also covered by these restraints.

2       81.     AMN has signed up many rival providers to its Subcontractor

3   Agreements, providing spillover work in exchange for their acceptance of its non-

4   reciprocal, injurious No-Poaching Restraints, which insulate its employees from their

5   solicitations.

6       82.     In the medical-traveler markets, a provider's most valuable resource is its

7   employees – its recruiters and medical travelers. AMN uses its No-Poaching

8   Restraints to protect itself from competitive solicitations for the services of its

9   employees.

10      83.     To obtain spillover work from AMN, Aya was obliged to agree to more

11  than twenty of AMN's Subcontractor Agreements, each of which includes its No-

12  Poaching Restraints. Aya is therefore restrained by these No-Poaching Restraints and

13  permanently forbidden under them to make any employment solicitation to any of

14  AMN's employees.

15      84.     The Subcontractor Agreements between Aya and AMN (or an AMN

16  subsidiary) were variously denominated "Associate Vendor Agreements,"

17  "Subcontract Staffing Agreements," and "Program Agreements." Each such

18  agreement established a collaboration by which Aya would dispatch medical travelers

19  to specified hospitals, doing so under AMN's complete direction and control and

20  without directly communicating with the hospitals (save for specified exceptions). The

21  purpose of these agreements was to have Aya provide medical travelers to hospitals so

22  that AMN could fulfill its contractual obligations to them. Here is a partial list of these

23  agreements, stating the hospital served and the year when the agreement was formed:

24      (1)   Kaiser Foundation Hospitals (January 1, 2010, and renewed on

25            September 23, 2012);

26      (2)   MedStar Health, Inc. (October 1, 2012);

27      (3)   New York and Presbyterian Hospitals (September 21, 2011);

28      (4)   Providence Health and Services (February 21, 2012);

PLAINTIFFS' COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

(5)   The University of Chicago Medical Center (February 16, 2015).

85.   Each of AMN's Subcontractor Agreements includes onerous confidentiality provisions that purport to forbid Aya to disclose certain of its terms and conditions. To the extent that AMN wishes to invoke these confidentiality provisos to shield its illegal trade restraints from public disclosure or antitrust review, the confidentiality provisos are void and unenforceable on grounds of public policy. At a later stage of these proceedings, Aya will move to file under seal the Subcontractor Agreements that it has made with AMN and AMN's wholly-owned affiliates. Aya will also move for leave to file on the public docket redacted versions of these agreements, which will disclose AMN's No-Poaching Restraints without disclosing any legitimate information that can be properly classified as confidential.

86.   AMN's No-Poaching Restraints have directly harmed Aya. These restraints have deprived Aya of the opportunity to make employment overtures and unsolicited employment offers to a large number of highly qualified medical travelers, recruiters and other professionals in the medical-traveler industry. Aya therefore has antitrust standing to complain of AMN's No-Poaching Restraints.

87.   AMN's No-Poaching Restraints hinder and eliminate competition between employers to solicit and hire employees in the affected labor markets, however defined. They also deprive employees of the benefit of competitive solicitations for their services and suppress the dissemination of information to employees about possible employment opportunities and pay. See *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038–39 (N.D. Cal. 2013) (Davila, J.) (government sufficiently stated *per se* claim for market-allocation by alleging that employers agreed not to solicit one another's employees, even though it did not specifically define the employment market that was allocated; it was sufficient that rival employers, who hired the same kinds of employees, agreed not to solicit one another's employees); *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122–23 (N.D. Cal. 2012) (Koh, J.) (plaintiffs stated *per se* claim by alleging that

defendants had agreed not to solicit one another's "skilled employees," thereby eliminating competition among employers in a nationwide market for skilled employees; nor was it necessary for them to establish the precise parameters of the relevant labor market, since they had alleged a *per se* market allocation of the applicable labor market).

88.     AMN's No-Poaching Restraints are horizontal, naked restraints of competition and are unlawful *per se* under Section 1 and California's Cartwright Act, as is more fully explained at ¶¶ 74-89, <u>supra</u>, ¶¶173-190 and n.3, <u>infra</u>.

89.     <u>AMN's Unlawful Employee Restraints</u>. AMN obliges its employees to accept its standard employment contracts and ancillary agreements, which include covenants that improperly restrict their ability to work in the medical-traveler industry after leaving its employ. It imposes these covenants as a condition of employment. These covenants impose onerous non-solicitation obligations and trade-secret obligations on all of AMN's employees (collectively, "AMN's Employee Restraints").

90.     AMN's employment contracts and ancillary agreements include onerous confidentiality provisions that purport to forbid anyone to disclose certain of their terms. To the extent that AMN wishes to invoke these confidentiality provisos to shield its illegal trade restraints from public disclosure or antitrust review, the confidentiality provisos are void and unenforceable on grounds of public policy. At a later stage of these proceedings, Aya will move to file under seal one of AMN's employment contracts and ancillary agreements that AMN made with one of its employees. Aya will also move for leave to file on the public docket redacted versions of these agreements, which will disclose AMN's Employee Restraints without disclosing any legitimate information that can be properly classified as confidential.

91.     AMN's Employee Restraints treat the simple names of AMN's employees as its proprietary trade secrets and forbid AMN's former employees to solicit or confer with any AMN "employee" about employment matters for either one year or eighteen months after leaving AMN's employ, depending on the version of the

covenants used.

92.     To give further effect to its Employee Restraints, AMN wrongly designates as its "employees" all medical travelers who have signed up to receive assignments from it or any of its affiliates, even when these "employees" lack any pending assignment from AMN or any of its affiliates.

93.     AMN enforces its Employee Restraints against its former recruiters and their new employers in a hyper-aggressive, oppressive manner, so as to ensure that these recruiters and their new employers cannot approach its "employees" for an extended duration. These restraints are intended to prevent AMN's former recruiters from approaching or conferring with many qualified medical travelers, many of whom have no pending assignment from AMN.

94.     In consequence, many of AMN's present recruiters are discouraged from working for rival providers or starting their own staffing agencies, while its former recruiters are hindered or prevented from performing their work. Another consequence is that rival providers are discouraged from hiring recruiters who have worked at AMN during the past year or eighteen months, which in turn hinders their ability to find and hire qualified medical travelers.

95.     AMN uses these restrictive covenants to prevent rival providers from hiring qualified medical travelers and recruiters.

96.     As drafted and enforced, AMN's Employee Restraints constitute *per se* violations of California's prohibition against non-compete covenants, which is codified at California Business & Professions Code § 16600 ("Section 16600").

97.     Two different California courts have already adjudicated that AMN cannot enforce these covenants because they violate Section 16600. See *AMN Services LLC v. Grubaugh*  (Cal. Sup. Ct., S.D., 2014, Case No. 37-2014-00024257) (Minute Order of June 19, 2015) (dismissing AMN's claims on summary judgment); *AMN Healthcare Inc. v. Aya Healthcare Services, Inc.* (Cal. Sup. Ct., S.D., Case No. 37-2015-00033229) (Minute Order of November 4, 2016) (dismissing AMN's claims

on summary judgment).

98.     On January 26, 2017, one of these California courts court issued a final judgment that permanently enjoins AMN from "using, enforcing, or attempting to enforce any contract or employment agreement in the State of California which purports to restrain its former employees from directly or indirectly soliciting or inducing, or causing others to solicit or induce, any employee of AMN to leave the service of AMN." See *AMN Healthcare Inc. v. Aya Healthcare Services, Inc.* (Cal. Sup. Ct., S.D., Case No. 37-2015-00033229) (Judgment of January 26, 2017). AMN has announced that it intends to appeal from this judgment.

99.     AMN's Improper  Designation of Trade Secrets. AMN has compiled listings of the names and contact information of medical travelers and hospitals known to it, including the following: (1) qualified medical travelers who have no present assignment from AMN, but who are enrolled on its rosters of available travelers and are willing to accept assignments from it; and (2) hospitals that have present openings or recurring requirements for medical travelers.

100.    The names and contact information of many of these medical travelers and customers are otherwise known to many providers in the medical-traveler industry because of their own outreach efforts and/or because this information appears in public social media networks or is otherwise publicly available.

101.    AMN nevertheless designates these names and contact information as its propriety trade secrets that are entitled to protection under California and federal law, and it systematically enforces its purported trade-secret rights in a manner that is calculated to impair its rivals' operations, as is explained directly below.

102.    AMN's Invitation to Collude. On or around October 9, 2014, Mr. Landry Seedig, who is President of AMN's Nursing Division, spoke by telephone with Alan Braynin, who is the Chief Executive Officer of Aya. During this call, Mr. Seedig made the following offer to Mr. Braynin, doing so on behalf of AMN: AMN would agree never to solicit or hire any of Aya's employees, and in exchange Aya would

agree never to hire any of AMN's employees. On behalf of Aya, Mr. Braynin rejected this offer. Mr. Seedig repeated this offer to Mr. Braynin during another telephone call on or around May 29, 2015. Mr. Braynin again declined the offer.

103.   AMN's offer to Aya constituted an unlawful invitation to collude, by which AMN asked a direct competitor, Aya, to agree to a perpetual no-hire agreement.

104.   To retaliate against Aya for refusing this offer and questioning the legality of its No-Poaching Restraints, AMN ceased to refer spillover work to it and terminated its Subcontractor Agreements with it, while insisting that its No-Poaching Restraints were permanently binding on Aya and survived the termination of its Subcontractor Agreements.

105.   Aya believes that other direct competitors of AMN have felt constrained to accept its bilateral no-hire agreements, and that AMN enforces these agreements. Aya believes that in this manner AMN has organized and is the ringleader of an employers' cartel in the affected labor markets (however defined).

106.   Aya has suffered significant harm because AMN has retaliated against it for refusing to accept its invitation to collude and to participate in an employers' cartel.

107.   <u>AMN's Sham Litigation</u>. If a recruiter working for AMN accepts employment from a rival provider, and if the recruiter then contacts any of the medical travelers whose names AMN has improperly designated as its trade secrets, AMN threatens to litigate objectively baseless claims against both the recruiter and its rival, alleging that the recruiter has breached its (unlawful) Employee Restraints, that the recruiter and the rival have misappropriated its (improperly designated) trade secrets, and that by so doing they have also committed numerous other legal wrongs.

108.   To this end, AMN routinely sends cease-and-desist letters to any of its former recruiters who work for a rival and have recruited any of AMN's claimed medical travelers.

//

109.   In most cases, or perhaps in all of them, the recruiter and rival provider have done nothing more than solicit and hire one of AMN's designated medical travelers after finding her by using either (1) publicly available information or (2) information that is commonly known in the medical-traveler industry. Such conduct is lawful, pro-competitive bidding by a rival employer, not actionable misconduct. AMN cannot treat its employees as chattels that exclusively belong only to it.

110.   Such competitive bidding is also an essential business practice for providers of medical travelers. Their very business is to find, recruit, and assign medical travelers. AMN, seeking to protect its market positions, seeks to suppress this conduct. Indeed, it is the suppression of this conduct that lies at the heart of many of AMN's anticompetitive practices, including its No-Poaching Restraints.

111.   AMN's cease-and-desist letters and related oral communications typically set forth oppressive demands that have no basis in law: in these letters, AMN has typically insisted that its former recruiter and her new employer must specifically agree to honor its unlawful Employee Restraints, by which its former recruiters cannot solicit any of its employees for either one year or eighteen months after leaving its employ. In Aya's case, moreover, AMN further demanded that Aya fire both the recruiter who had left AMN to work for Aya, as well as the former AMN employees whom this recruiter had recruited to work for Aya.

112.   AMN's cease-and-desist letters have been effective. The targeted rivals typically acquiesce rather than endure costly litigation that AMN can easily fund, but whose expense and disruption are unaffordable for them.

113.   If the rival provider resists its unlawful demands, AMN sues it and its former recruiter without regard for the outcome of its litigation and without any intention of obtaining compensatory relief. Rather, it litigates these claims in order to disrupt its rivals' operations and to cast a chilling effect among market participants in the medical-traveler markets and related labor markets.

//

114.    In at least one such litigation, AMN quickly reached a settlement because the rival provider was unprepared to undergo a costly, disruptive litigation. Under this settlement, AMN received a stipulated judgment for substantial money damages against its former recruiter, but AMN and the recruiter also agreed confidentially that AMN would accept a nominal payment from the recruiter as full satisfaction of its judgment. AMN then showed the judgment to its employees (including its current recruiters) in order to communicate to them that it had successfully sued its former recruiter and obtained a large money judgment against her because she had hired or tried to hire its medical travelers.

115.    Aya is a rival provider that has been a victim of AMN's sham litigation. In June, 2015, Aya hired a former recruiter of AMN, Kylie Stein, who subsequently hired two medical travelers who had been employed by AMN. The names and contact information for these two employees were already in Aya's database when Aya hired Ms. Stein. In response, AMN contacted Aya and threatened to sue it unless it agreed to do the following: (1) fire the recruiter, Ms. Stein, as well as the two former AMN employees whom she had recruited; and (2) accept a bilateral no-hire agreement, under which each party would agree never to hire the other's employees. Aya rejected this offer.

116.    Thereafter, on October 2, 2015, AMN sued Aya, Ms. Stein, and another employee of Aya who previously had worked at AMN. It brought this lawsuit in the California Superior Court for San Diego County, where it is still pending. The name of this case is *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc. et al.* (Cal. Sup. Ct., 2015, Case No. 37-2015-00033229 -CU-BT-CTL) ("AMN's State Court Action"). AMN later amended its complaint to name two additional Aya employees who had previously been its employees.

117.    In AMN's State Court Action, AMN asserted eleven causes of action, all of which arose from the following contentions:  (1) its former recruiter could not solicit any of its "employees" or make use of their contact information; (2) by doing

so, its former recruiter had breached its Employee Restraints; and (3) by doing so, its former recruiter and Aya were liable to AMN for misappropriation of its trade secrets as well as numerous other legal wrongs. AMN also asserted related claims against the three other Aya employees whom it joined as defendants.

118.   On November 4, 2016, the California Superior Court entered summary judgment against AMN on all of its claims in its State Court Action, ruling that they arose from non-solicitation covenants and trade-secret covenants (AMN's Employee Restraints) that are unenforceable under Section 16600 to the extent that they the purport to forbid AMN's former recruiters to solicit AMN's employees. AMN has indicated that it intends to appeal from this ruling.

119.   On March 8, 2016, Aya asserted cross-claims in AMN's State Court Action, requesting declaratory relief and a permanent injunction that would prevent AMN from enforcing its Employee Restraints against its employees (*i.e.*, its use of non-solicitation and trade-secret covenants to try to prevent its former recruiters from soliciting its employees). These cross-claims were tried in California Superior Court on January, 2017. The basis for these cross-claims was that in practice AMN's Employee Restraints serve as *de facto* non-compete covenants that prevent AMN's former employees from exercising their profession and pursuing the careers. Such non-compete agreements are unlawful *per se* under Section 16600.

120.   On January 26, 2017, the California Superior Court entered a judgment in favor of Aya after the trial of its cross-claims. This judgment permanently enjoins AMN from "using, enforcing, or attempting to enforce any contract or employment agreement in the State of California which purports to restrain its former employees from directly or indirectly soliciting or inducing, or causing others to solicit or induce, any employee of AMN to leave the service of AMN." See *AMN Healthcare Inc. v. Aya Healthcare Services, Inc*. (Cal. Sup. Ct., S.D., Case No. 37-2015-00033229) (Judgment of January 26, 2017). AMN has announced that it intends to appeal from this judgment.

121.   As pled above, another California Superior Court dismissed essentially identical claims that AMN brought against a former recruiter and the rival provider that had employed her. In this case too, the court dismissed the claims on summary judgment on the ground that AMN's Employee Restraints were unlawful *per se* under Section 16600. See *AMN Services LLC v. Grubaugh*  (Cal. Sup. Ct., S.D., 2014, Case No. 37-2014-00024257) (Minute Order of June 19, 2015) (dismissing AMN's claims on summary judgment).

122.   AMN has litigated its claims against former recruiters and their new providers in an aggressive, excessive manner, ensuring that its litigations are costly and disproportionate to the underlying harm it claims to have suffered. At least some of its claims in these cases have been objectively baseless, and AMN has litigated them for improper ulterior motives: namely, to obtain the opposing parties' assent to unlawful demands.

123.   AMN has litigated such claims against other former recruiters and their new employers in at least in the following civil actions:

(1)   *Amn Services, LLC v. Grubaugh and Trinity Health Staffing Group, Inc*. (Cal. Sup. Ct., S.D. Cty., 2014, Case No. 37-201400024257);

(2)   *AMN Services, LLC v. Katz and Onward Health Care, Inc*. (S.D. Fla., 2010, Case No. 0:10-cv-61759).

(3)   *AMN Services, LLC v. Katz and Onward Health Care, Inc*. (S.D. Fla., 2010, Case No. 0:10-cv- 0:10-cv-61718).[3]

124.   AMN litigated the State Court Action against Aya and its former employees in order to disrupt Aya's operations.

125.   AMN also appears to conduct these litigations to send a message to rival providers and all other market participants in the medical-traveler markets and related

---

[3]      The two *Katz* cases appear to concern the same controversy, but are different civil actions. AMN is best situated to explain why it filed two similar or identical complaints in the federal Northern District of Florida at around the same time in order to complaint of the same wrongs against the same parties.

labor markets: "Other providers should not hire our former recruiters. If a provider does so, it must not permit our former recruiter to solicit any of our designated medical travelers, even when she or the provider can contact them by using their own information or publicly available information. If a provider hires our former recruiter, and if this recruiter then solicits any of our designated medical travelers, we will sue the provider, the recruiter personally, and other former employees of ours whom the provider has hired. We will then conduct disproportionate, costly litigation. Stay away from our recruiters and medical travelers."

126.   AMN apparently aims by these litigations to cast a chilling effect in the medical-traveler markets and related labor markets: it seeks to discourage rival providers from collaborating with its former recruiters or hiring its designated medical travelers, and it also seeks to intimidate its current recruiters, so that they will be reluctant or unwilling to accept employment at a rival provider or attempt to start a firm of their own.

127.   In this manner, AMN conducts disproportionate litigation and asserts objectively baseless claims in order to disrupt its rivals' operations and undermine their ability to recruit qualified medical travelers. AMN's litigations against its rivals and former recruiters therefore qualify as "sham litigation" that is not entitled to antitrust immunity under the *Noerr-Pennington* doctrine.

128.   AMN also uses its sham litigation to accomplish another improper purpose. Shortly after filing the State Court Action, AMN offered to drop it, if in exchange Aya would (1) agree not to hire specified AMN employees whom AMN would list, and (2) agree further to observe AMN's Employee Restraints - *i.e.*, ensure that former AMN recruiters in its employ would not solicit any of AMN's employees for either one year or eighteen months (depending on which version of the AMN covenants each such recruiter had signed while employed at AMN). Aya rejected this offer.

//

129.   AMN thus conducted sham litigation against Aya for the additional improper purpose of trying to coerce it into accepting an unlawful no-hire agreement.

130.   <u>AMN's Exclusive-Provider Contracts with Hospitals</u>. AMN has entered into exclusive-provider contracts with various major hospitals and hospital networks in the busiest regional submarkets for medical travelers, including the following regions: the Greater San Francisco Bay Area; the Greater Los Angeles Metropolitan Area; the Greater New York City Metropolitan Area; the Greater Chicago Metropolitan Area; the Greater San Diego Metropolitan Area; the Greater Baltimore Metropolitan Area; the Greater Washington, D.C. Metropolitan Area; the Greater Richmond Metropolitan Area; and the Greater Norfolk Metropolitan Area.

131.   By these exclusive-provider contracts, AMN has locked down a substantial percentage of available assignments in many regional submarkets, including the above-listed ones, and it has thereby foreclosed a large share of competition for the provision of medical travelers in these markets. By so acting, it has deprived  potential rivals of sufficient opportunities to establish themselves as viable providers in these markets.

132.   AMN's exclusive-provider contracts substantially foreclose competition in the regional submarkets in which they are used, thereby shielding AMN from competitive pressures. In these markets, AMN is able to charge supracompetitive prices, offer less responsive service, and provide fewer staffing options, in part because its major customers have accepted exclusive-supplier contracts and in part because AMN has hindered and excluded rival providers by its other anticompetitive practices.

133.   <u>AMN's Cash-Flow Squeeze</u>. AMN imposes a cash-flow squeeze on its Subcontractor Providers, doing so as follows. AMN's Subcontractor Agreements oblige the Subcontractor Providers to furnish medical travelers to AMN's hospital clients when AMN lacks enough available medical travelers of its own to do so. The Subcontractor Providers must pay its medical travelers at short intervals, typically

once per week, once every other week, or twice per month. AMN then bills the hospitals for the medical-travelers' services. Hospitals typically pay these bills within one to three months after receiving them. Upon receiving these payments, AMN pays itself a fee and forwards the remainder to the Subcontractor Provider.

134.   Although AMN promptly bills hospitals for its own medical-traveler services, it delays billing them for medical-traveler services provided by its Subcontractor Providers. In consequence, hospitals typically pay bills for work done by the Subcontractor Providers' medical travelers only three to six months after the Subcontractor Providers have paid their medical travelers for their labor. AMN disburses payments to the Subcontractor Providers slowly and sometimes in increments, withholding sums on the basis of one asserted issue or another.

135.   In other words, AMN obliges its Subcontractor Providers to finance its medical-traveler services (by having them pay for the medical travelers whom they furnish in order to fulfill AMN's contractual obligations). AMN then subjects these providers to unnecessary financial strain (by failing to bill hospitals promptly for their medical-traveler services and by disbursing their payments slowly). AMN can engage in this conduct because it controls so much of the available work in the medical-traveler markets.

136.   For many Subcontractor Providers, the only way to remain in business or continue placing medical travelers at key hospitals is to accept these contractual arrangements with AMN. Aya received such spillover work until AMN terminated its Subcontractor Agreements to retaliate against it for refusing its invitation to join an employers' cartel.

137.   AMN's Monopolistic Acquisition of Direct Rivals. During the past several years, AMN has acquired various providers of medical travelers as well as their brands, and it has integrated these rival operations into its own operation while preserving its affiliates' names and brands. It has also acquired vendor-management software that it has persuaded many hospitals to use to procure medical-traveler

services. The rival providers and software platforms that AMN has acquired include the following, with the type and date of each acquisition in parentheses:

        (1)     Onward Health Care (rival provider, 2015);

        (2)     Nursefinders (rival provider, 2010);

        (3)     Rx Pro Health (rival provider, 2007);

        (4)     NursesRx (rival provider, 2000);

        (5)     Medefis (software platform, 2015); and

        (6)     ShiftWise (software platform, 2013).

        138.   <u>AMN Uses Its Software and Software Licensing to Control Sales and Further Restrain Competition</u>. As pled above, two of AMN's wholly owned subsidiaries, the AMN Affiliates, have each acquired a vendor-manager software platform ("AMN's Software Platforms"). AMN's Software Platforms are valuable to many hospitals. Hospitals use them to hire outside service-providers to perform various services, including the provision of medical travelers for temporary assignments.

        139.   AMN permits hospitals to use its Software Platforms to request medical travelers from a rival provider: it does not always have a sufficient number of the medical travelers requested by a hospital, and hospitals would not use its Software Platforms if they could not procure medical-traveler services from other providers when AMN cannot fill their orders.

        140.   When a hospital uses an AMN Software Platform to hire medical travelers, or when a rival provider does so in order to fill a hospital's order, both the hospital and the rival provider usually must accept AMN's obligatory contractual terms and end-user agreements for these sales ("AMN's Software Sales Agreements").

        141.   AMN's Software Sales Agreements confer on AMN substantial control over any sale made by a rival providers on its Software Platforms. Every time a rival provider makes such a sale, it must pay a substantial fee to an AMN affiliate – an

obligation that increases the rival's costs and therefore impedes or prevents it from competing against AMN on price. Moreover, all sales made by rival providers on AMN's Software Platforms must be done in accordance with AMN's Software Sales Agreements, whose terms and conditions are dictated by AMN and the AMN Affiliates. In addition, rival providers that make these sales are largely forbidden to have direct communications with the hospitals that they serve.

142.    AMN and the AMN Affiliates use their substantial control over these sales to impair rival providers' ability to compete with AMN on price, terms of service, or quality of service. Owing to the fees that the rival providers must pay for each sale, they have increased costs and are unable to offer discount prices that could serve as competitive check against AMN's prices. Since the rival providers cannot alter the terms and conditions of their sales (which instead are dictated by AMN), they cannot offer better or alternative terms to win business from hospitals. Since the rival providers usually cannot communicate with the hospitals that they serve, they are largely unable to provide more responsive service than AMN offers.  For these sales, the AMN Affiliates earn profits (the providers' fees), dictate the terms of sale, and conduct all or most communications with the hospitals. AMN thus exercises substantial control over these sales to ensure that (1) they are profitable to AMN, and (2) they do not expose AMN to competitive pressures on price, other material terms, or quality of service.

143.    <u>AMN's Miscellaneous Anticompetitive Practices</u>. AMN employs various other anticompetitive practices in furtherance of its apparent business strategy of monopolizing the markets in which it operates.

144.    Broadly speaking, AMN's business culture appears to be suffused with anticompetitive spirit. Rather than strive to offer better services at lower prices, AMN connives to exclude its rivals and subdue its "employees," so that it can capture its customers and charge them supracompetitive prices while offering them less accommodating service and a lesser number of medical travelers.

145.  **AMN Lacks Procompetitive Justifications**. AMN lacks legitimate, pro-competitive justifications for any of its above-pled anticompetitive practices, each of which it employs for the purpose of monopolizing and restraining commerce in the relevant markets. Any pro-competitive purpose that it might assert is either a pretext for anticompetitive conduct or could be readily accomplished by less restrictive measures.

146.  **Harm to Competition  in the Relevant Markets**. AMN's anticompetitive practices have harmed competitive processes in the national market for medical-traveler services and in various regional submarkets for this service.

147.  AMN's No-Poaching Restraints impede AMN's restrained rivals from finding and recruiting qualified medical travelers and recruiters, who are the lifeblood of every provider of medical-traveler services. The restrained rivals are therefore hindered from improving their services and becoming or remaining viable competitors in the medical-traveler markets. This impediment to competition reduces competitive interplay in these markets and tends to insulate the dominant provider, AMN, from competition on price and quality of service.

148.  AMN's invitation to Aya to participate in an illegal antitrust conspiracy and its subsequent retaliation against Aya after it declined to do so constitute anticompetitive conduct that imposes "social costs" in the medical-traveler markets. To retaliate against Aya, AMN ended pro-competitive collaborations with it that increased output in the medical-traveler markets, thereby reducing output. It has also devoted its own resources to seeking to establish an employer's cartel and to punishing those that refuse to join. These expenditures of its resources are anticompetitive "social costs."  See *Hovenkamp, Federal Antitrust Policy: the Law of Competition and Its Practice* (1994, Thomson West) at § 4.3 ("The Social Cost of Collusion").

149.  AMN's Employee Restraints discourage its present recruiters from accepting employment elsewhere or establishing their own firms. These restraints also

impede its former recruiters from (1) accepting employment with rival providers, (2) establishing their own staffing agencies, or (3) successfully performing their work after leaving AMN's employ. These restraints therefore lessen the ability of rival providers to recruit qualified medical travelers and thereby become or remain viable competitors in the medical-traveler markets. This impediment to competition reduces competitive interplay in these markets and tends to insulate the dominant provider, AMN, from competition on price and quality of service.

150.   AMN's misuse of trade-secret designations and sham litigation disrupt the targeted rivals' operations and business development and cast a pervasive chilling effect on all market participants: in the medical-traveler markets, it is an open secret that AMN's recruiters and medical travelers are beholden to AMN, and that any former AMN recruiter who merely tries to perform her regular work by relying upon her own knowledge and independent contacts will land herself and her new employer in ruinous litigation with AMN. AMN's designated medical travelers are strictly off limits to any rival provider that employs a former AMN recruiter, unless the provider and its former employees are prepared to endure an unremitting, costly litigation of spurious claims. AMN's mis-designation of trade-secrets and its sham litigation have lessened the ability of rival providers to recruit qualified medical travelers and thereby become or remain viable competitors in the medical-traveler markets. This impediment to competition reduces competitive interplay in these markets and tends to insulate the dominant provider, AMN, from competition on price and quality of service.

151.   These impediments to competition are exacerbated because AMN designates as its "employees" numerous medical travelers across the country who are merely *eligible* to accept work from it, but are not employed by it. AMN then treats their names as its trade-secrets, and it aggressively enforces its trade-secrets by threats of litigation and costly litigation.

//

152.   Using its Software Platforms and vendor-manager operations to control the sale of medical-traveler services to hospitals, AMN has prevented rival providers from communicating directly with the hospitals that they serve. This suppression of information constitutes a further restriction of output in the relevant markets, particularly several regional submarkets where AMN's software-generated sales constitute a substantial or dominant percentage of overall sales.

153.   AMN has also used its control over rivals' sales on its Software Platforms to dictate the contractual terms of these sales: it does not permit the rivals to vary these terms or offer more advantageous terms to hospitals in order to gain more orders from them. This trade restraint has repressed competition to offer better terms of service, which is also a restriction of output. This restraint of competition has insulated AMN from competitive pressure to offer better terms of service in several regional submarkets where its software-generated sales constitute a substantial or dominant percentage of overall sales.

154.   By imposing substantial mark-ups on rivals' sales made on its Software Platforms, AMN has increased its rivals' costs by a substantial measure, thereby preventing them from making sales on its Software Platforms at discount prices that would impose competitive pressure in the affected medical-traveler markets. This impediment to competition has insulated AMN from competition on price in several regional submarkets where its software-generated sales constitute a substantial or dominant percentage of overall sales.

155.   AMN has signed up major hospital networks and many other hospitals to exclusive-provider contracts, which have foreclosed a substantial part of overall sales in several regional submarkets. In these markets, rival providers lack any opportunity to establish a foothold and attain economies of scale and scope that they require to become viable competitors that can impose competitive discipline on AMN. In some submarkets, AMN's use of both exclusive-provider contracts and its Software Platforms have severely impeded competitive conditions for the provision of medical

travelers.

156.   Among others, AMN has signed up the following major hospital networks to exclusive-provider contracts:

(1)   Kaiser Foundation Hospitals (Greater San Francisco Bay Area; Greater Los Angeles Metropolitan Area; Greater San Diego Metropolitan Area; other regions of California).

(2)   Medstar, Inc. (Greater Baltimore Metropolitan Area; Greater Washington, D.C. Metropolitan Area).

(3)   New York and Presbyterian (Greater New York Metropolitan Area).

(4)   Providence Health and Services (Greater Los Angeles Metropolitan Area, and other regions of California).

(5)   University of Chicago Medical Center (Greater Chicago Metropolitan Area;

(6)   Catholic Healthcare Initiatives (various regions in Texas); and

(7)   St. Joseph's Health (Greater San Francisco Bay Area; Greater Los Angeles Metropolitan Area; and other regions in Northern California).

157.   Aya believes that AMN's exclusive-provider contracts have renewable terms, but that AMN acts as the vendor-manager for some of these hospitals and has assigned staff to assist other hospitals choose their preferred vendor of medical services. AMN can therefore renew some of its own exclusive-provider contracts at the end of each term, rendering them *de facto* long-term exclusive-provider contracts. For its remaining exclusive-provider contracts, its assigned staff influence the hospitals to renew them at the end of each term, rendering them *de facto* long-term exclusive-provider contracts.

158.   Owing to AMN's trade restraints and other anticompetitive practices, competition has been diminished in the medical-traveler markets: hospitals (broadly defined) find themselves increasingly deprived of the benefits of competitive interplay and vigorous competition on price, terms of service, and quality of service. These lost

benefits include the following: lower prices, better terms of service, improved quality of service, a larger pool of medical travelers, and a greater choice of providers that can fulfill the hospitals' evolving staffing requirements.

159.   By its above anticompetitive practices, AMN has also suppressed the pay, employment opportunities, and mobility of its own recruiters and medical travelers, and it has suppressed the dissemination of information about these matters to these employees. These same practices have also directly harmed rival providers because they cannot make employment overtures to any "employee" of AMN.

160.   Cumulatively, AMN's trade restraints and other anticompetitive practices have restricted the supply of available medical travelers, allowing AMN to charge supracompetitive prices for their services, impose surcharges during contrived shortages of specific kinds of medical travelers, and insulate itself from competition on terms of service and quality of service.

161.   **Aya's Antitrust Injury**. Aya has suffered proximate damages because of the anticompetitive character and effects of AMN's anticompetitive practices, all of which AMN has directed against its existing and potential rivals, including Aya.

162.   Owing to AMN's No-Poaching Restraints, which AMN obliged Aya to accept, Aya has been permanently prevented from soliciting any of AMN's "employees" – a circumstance that has hindered its efforts to hire recruiters and recruit medical travelers, who are the lifeblood of its business.

163.   AMN invited Aya to collude in an antitrust conspiracy that would have constituted a *per se* violation of Section 1. When Aya declined the invitation, AMN retaliated against it by terminating its Subcontractor Agreements. This loss of work has caused significant damages to Aya.

164.   AMN wrongly attempted to enforce its Employee Restraints against former recruiters who now work for Aya, hindering them from recruiting medical travelers to work at Aya. In furtherance of this effort, AMN brought sham litigation against Aya and four of its employees, asserting objectively baseless claims against

them and involving them in costly, disruptive litigation.

165.   AMN's aggressive enforcement of its Employee Restraints against its former employees discourages or prevents its current employees from accepting employment at Aya. It also hinders Aya's efforts to recruit qualified medical travelers and work successfully with any recruiters who worked at AMN during the preceding year or year and one-half.

166.   When hiring Aya to provide subcontractor services, AMN has purposefully postponed its billing to hospitals and disbursements to Aya, thereby subjecting Aya to avoidable financial strain. In this manner, AMN has imposed burdens on Aya's cash-flow with an anticompetitive intent.

167.   AMN has used its control of sales to hospitals in order to prevent Aya from (1) communicating directly with hospitals, (2) earning ordinary returns on AMN's software-generated sales and vendor-manager referrals; and (3) charging discount prices that would generate more sales and impose competitive pressure on AMN to lower its own prices.

168.   AMN has employed the above anticompetitive practices and related practices against Aya specifically for the purpose of impairing and undermining Aya's ability to compete in the relevant markets. These practices have resulted in substantial proximate losses to Aya.

169.   On very conservative estimates, and subject to further econometric review, Aya believes that AMN's various anticompetitive practices have caused it to lose profits of at least $250,000 in 2013, at least $250,000 in 2014, at least $750,000 in 2015, and at least $3 million 2016. On present trends, these losses will persist and worsen in 2017 and future years.

170.   At a later stage of these proceedings, Aya will provide an expert quantification of the likely loss in profits that it has suffered and will continue to suffer because of AMN's anticompetitive practices.

//

# V. FIRST CAUSE OF ACTION
### (Unlawful Restraints of Trade)
### (*Per Se* Violations of 15 U.S.C. § 1)

171.    Aya re-pleads and incorporates by reference each of the preceding allegations.

172.    AMN has obliged its Subcontractor Providers to accept its No-Poaching Restraints, which forbid the Subcontractor Providers in perpetuity to solicit any of AMN's "employees."

173.    AMN's No-Poaching Restraints are set forth in its Subcontractor Agreements, under which AMN hires Subcontractor Providers to provide medical-traveler services to hospitals on its behalf, so that it can fulfill its contractual obligations to provide these hospitals. Aya has furnished additional information about these restraints at ¶¶ 74-89, supra.

174.    It is not clear whether the Subcontractor Agreements establish a horizontal or vertical relationship between AMN and the Subcontractor Providers. Regardless, the No-Poaching Restraints are not vertical restraints, but horizontal ones, since they suppress or eliminate direct competition between the Subcontractor Providers and AMN to solicit a specified category of employees – namely, all of AMN's employees for the rest of time. These restraints therefore eliminate competition between rival employers in the affected labor markets (however defined).[4]

_____

[4]      The Subcontractor Agreements arguably establish a vertical relationship between AMN and its providers in which the providers furnish an input (available medical travelers) that AMN requires in order to render its own medical-traveler services to the hospitals. This characterization is superior because AMN structures these transactions so that its providers have no interaction with the hospitals. They merely furnish the medical travelers, and AMN controls all aspects for their assignment and otherwise acts as the provider of medical-traveler services to the hospital. If however the providers actually coordinate these assignments with AMN, then the proper characterization of these agreements is that they establish a joint-venture undertaken by providers of medical-travelers (the Subcontractor Agreements disclaim that they establish joint-venture, but it is always the substance of an agreement that determines what it is, not the name that the parties give to it). Whatever the proper characterization of the Subcontractor Agreements, it has no bearing on Aya's antitrust challenge to AMN's No-Poaching Restraints: they are not reasonably ancillary to the Subcontractor Agreements or to any arrangement established by them, but are instead naked restraints of trade, by which the Subcontractor Providers are forbidden in perpetuity to compete with AMN to

(continued...)

175.   The Subcontractor Providers not only provide medical travelers to AMN, but also assign them to hospitals. They are therefore rival providers of medical-traveler services in the medical-traveler markets. In these markets, they compete directly against AMN to furnish medical travelers to hospitals. Aya is one such provider bound by AMN's No-Poaching Restraints.

176.   The Subcontractor Providers require medical travelers and recruiters in order to render their medical-traveler services, and they therefore also compete directly with AMN to hire the exact same kinds of employees – medical travelers and professional recruiters of medical travelers. Indeed, the competition between them to hire these employees is critical to their business fortunes, since they are engaged in the business of hiring medical travelers and arranging for their temporary assignment to hospitals. AMN's No-Poaching Restraints impair this direct competition by permanently forbidding the Subcontractor Providers to make any employment solicitations to any of AMN's "employees," who include its recruiters and numerous medical travelers, many of whom lack current assignments but are listed as AMN's "employees".

177.   AMN's No-Poaching Restraints are therefore horizontal restraints that impair and eliminate direct competition between AMN and the Subcontractor Providers to find and hire medical travelers and recruiters in affected labor markets, however defined.

178.   By eliminating direct competition between employers, AMN's No-Poaching Restraints serve to suppress the pay, employment opportunities, and

---

[4](...continued)
solicit a specified pool of employees. Such restraints directly eliminate competition in the affected labor markets (however defined) and are unlawful *per se* under Section 1. See *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038–39 (N.D. Cal. 2013) (Davila, J.) (government sufficiently stated *per se* claim for market-allocation by alleging that employers agreed not to solicit one another's employees, even though it did not specifically define the employment market that was allocated; it was sufficient that rival employers, who hired the same kinds of employees, agreed not to solicit one another's employees); *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122–23 (N.D. Cal. 2012) (Koh, J.)

mobility of AMN's employees and arguably all medical travelers and recruiters in the affected labor markets. In addition, AMN's No-Poaching Restraints directly suppress the exchange of information between its employees and prospective employers, which is a further restriction of output in the affected labor markets.

179.   AMN's No-Poaching Restraints also impair direct competition between AMN and the Subcontractor Providers in the medical-traveler markets, since they significantly lessen the Subcontractor Providers' options for finding, recruiting and assigning qualified medical travelers and recruiters. AMN is the leading provider in the medical-traveler markets, and it has tried by its unlawful No-Poaching Restraints to place its medical travelers and recruiters beyond the reach of rival providers that might wish to solicit them. These restraints are not insignificant in scope or effect.

180.   Crucially, AMN's No-Poaching Restraints are naked restraints of trade. They are not even arguably ancillary to the Subcontractor Agreements in which they appear. They are not narrowly tailored so as to promote a procompetitive joint venture or vertical supply chain. For example, they are not limited to preventing a Subcontractor Provider from soliciting those of AMN's employees who come into direct contact with its own employees while working on a joint-venture, in which case the restraint might be said to be ancillary to the joint-venture and narrowly tailored for this purpose. Rather, AMN's No-Poaching Restraints impose a non-reciprocal, blanket ban that lasts in perpetuity and forbids the Subcontractor Providers ever to solicit any of AMN's "employees."  The duration of this ban is not reasonably limited in time, but is perpetual; nor is its scope reasonable, since it is not limited to AMN employees who have direct dealings with a Subcontractor Provider's employees during a collaboration, but instead encompasses *all* of AMN's employees, including those whom it mis-classifies as its employees.  AMN's No-Poaching Restraints are therefore naked restraints of trade, not ancillary restraints.

181.   AMN's No-Poaching Restraints are therefore naked, horizontal restraints of trade that impair and eliminate direct competition between employers to make hires

from the same pool of employees. As such, AMN's No-Poaching Restraints are unlawful *per se* under Section 1.

182.   The law therefore presumes that AMN's No-Poaching Restraints cause harm to competition. By using and enforcing them, AMN has unlawfully restrained trade in violation of Section 1.

183.   AMN's No-Poaching Restraints are non-reciprocal: they protect AMN, harm its employees, and restrain and harm its Subcontractor Providers. AMN has used its No-Poaching Restraints to impair the ability of the Subcontractor Providers to find and employ qualified medical travelers and recruiters – a circumstance that in turn has significantly impaired the Subcontractor Providers' ability to furnish medical travelers and thereby remain viable competitors in the medical-traveler markets.

184.   Until AMN retaliated against it, Aya was one of these Subcontractor Providers. It is a direct competitor of AMN in the medical-traveler markets as well as an employer that competes against AMN to hire medical travelers and recruiters in the affected labor markets. Aya has been a victim and intended target of AMN's No-Poaching Restraints, as is pled more fully at ¶¶ 74-89.

185.   Aya has suffered quantifiable losses in direct consequence of the anticompetitive aspects and effects of AMN's No-Poaching Restraints, as is pled more fully at ¶¶ 162-171. Aya has therefore suffered antitrust injury caused by AMN's No-Poaching Restraints.

186.   At a later stage of these proceedings, Aya will quantify its probable losses because of AMN's unlawful use of the No-Poaching Restraints.

187.   The harm caused to Aya because of AMN's unlawful use of the No-Poaching Restraints is not the same harm as has been caused to the affected employees or other Subcontractor Providers. It is direct harm specifically borne by Aya and proximately caused by AMN's anticompetitive misuse of the No-Poaching Restraints. There is no special difficulty in apportioning damages among the different victims of these restraints – the affected employees and the Subcontractor Providers.

188.   For all of the above reasons, Aya has antitrust standing to challenge the legality of AMN's No-Poaching Restraints under Section 1 and to seek antitrust remedies under 15 U.S.C. §§15 and 26.

189.   AMN has used and enforced its No-Poaching Restraints in interstate commerce and in a manner that has had a substantial effect on interstate commerce.

WHEREFORE, Aya seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

### VI. SECOND CAUSE OF ACTION
#### (Unlawful Restraints of Trade)
#### (Quick-Look and Rule-of-Reason Violations of 15 U.S.C. § 1)

190.   Aya re-pleads and incorporates by reference each of the preceding allegations.

191.   For purposes of antitrust review, there exists a service market for the provision of medical travelers. The geographic boundary of this market is limited to the United States. Within this market, there exist regional submarkets that largely correspond to major urban population centers and state boundaries in less populous regions, as is pled more fully at ¶¶ 41-64, supra.

192.   In these markets, AMN is the dominant provider of the relevant service (the provision of medical travelers), and it wields significant market power in the national market and in many of the regional submarkets, including the following ones: the Greater San Francisco Bay Area; the Greater Los Angeles Metropolitan Area; the Greater New York City Metropolitan Area; the Greater Chicago Metropolitan Area; the Greater Baltimore Metropolitan Area; the Greater Washington, D.C. Metropolitan Area; the Greater Richmond Metropolitan Area; and the Greater Norfolk Metropolitan Area. These matters are pled more fully at ¶¶ 65-72, supra.

193.   AMN's No-Poaching Restraints, which are set forth in the Subcontractor Agreements made between AMN and its Subcontractor Providers, constitute a "contract, combination or conspiracy" within the meaning of Section 1. These restraints are described more fully at ¶¶ 74-89, 173-190, supra.

PLAINTIFFS' COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

194.   AMN's Subcontractor Agreements with its Subcontractor Providers constitute a "contract, combination or conspiracy" within the meaning of Section 1. These agreements are described more fully at ¶¶ 74-89, supra.

195.   AMN's Software Sales Agreements, which are made between AMN or an AMN Affiliate and rival providers, constitute a "contract, combination or conspiracy" within the meaning of Section 1. These agreements are described more fully at ¶¶ 139-143, supra.

196.   AMN's Employee Restraints are set forth in AMN's employment contracts and ancillary agreements, which AMN and its affiliates make with their employees. These restraints constitute a "contract, combination or conspiracy" within the meaning of Section 1. These restraints are described more fully at ¶¶ 90-99, supra.

197.   AMN's exclusive-provider agreements with various hospitals and their purchasing agents constitute a "contract, combination or conspiracy" within the meaning of Section 1. These agreements are described more fully at ¶¶ 131-133, supra.

198.   If for any reason AMN's No-Poaching Restraints are not unlawful *per se* under Section 1, they nevertheless unreasonably restrain trade and violate Section 1 under the quick-look standard and/or the rule-of-reason standard.

199.   AMN's No-Poaching Restraints impose blanket prohibitions in perpetuity that forever forbid rival providers of medical travelers to solicit any of AMN's "employees," including those whom it merely lists on its rosters but does not actively employ. These blanket restrictions harm AMN's rivals by impeding their ability to screen and make hires from AMN's large pool of medical travelers and recruiters. These blanket restrictions also deprive AMN's employees of competitive bidding for their labor and therefore deprive them of higher pay, more opportunities, increased mobility, and more information about their career options. These matters are explained more fully at ¶¶ 74-79, 173-190, supra.

//

200.   As enforced, AMN's Subcontractor Agreements unreasonably restrain trade in the medical-traveler markets. They oblige AMN's Subcontractor Providers to furnish medical travelers to AMN's hospital customers, timely pay these travelers for their labor at short intervals, and await payment from AMN for three to six months. They also forbid the Subcontractor Providers to communicate with the hospitals served by their medical travelers. On balance, the effects of AMN's Subcontractor Agreements are more anticompetitive than pro-competitive. These matters are explained more fully at ¶¶ 74-79, 173-190, supra.

201.   Two affiliated companies of AMN (Shiftwise and Medefis) operate two different software platforms (the AMN Software Platforms) that many hospitals use to place orders for medical travelers. These AMN affiliates have contractual and licensing agreements with the hospitals that use their software platforms. They also have agreements with various independent providers of medical travelers, one of which is Aya. These agreements (AMN's Software Sales Agreements) allow rival providers to sell medical-traveler services to hospitals on AMN's Software Platforms, but only on terms that give the AMN affiliates substantial control over these sales: the providers are generally not permitted to communicate with the hospitals that purchase their services; the AMN affiliates dictate the terms and conditions of these sales in contracts that they prepare and refuse to modify; and for each sale the providers must pay a substantial fee to one or the other AMN affiliate.

202.   Owing to these contractual restraints, rival providers that make these sales cannot offer prices lower than AMN's prices: the AMN affiliates raise their costs by imposing a substantial fee on each sale, so that the providers cannot compete with AMN on price when making these sales; nor can they offer better terms of service, since they are not permitted to modify the contracts that AMN's affiliates prepare for these sales; nor can they exchange information about their medical-traveler services with the hospitals that they serve, which is a restriction of output.

//

203.   Rival providers make sales on these software platforms only because so many hospitals use them, and AMN makes such a large percentage of all remaining sales that many rival providers cannot afford to forgo sales generated by AMN's Software Platforms.

204.   On balance, the effects of AMN's Software Sales Agreements are more anticompetitive than pro-competitive. These matters are explained more fully at ¶¶ 139-143, supra.

205.   AMN's Employee Restraints unreasonably restrain trade in the medical-traveler markets. They discourage and prevent AMN's recruiters from working for other providers or starting their own medical-traveler agencies. They discourage and prevent rival providers from hiring or successfully collaborating with AMN's former recruiters and from improving their operations and services by hiring AMN's "employees." On balance, the effects of these covenants are more anticompetitive than pro-competitive. These matters are explained more fully at ¶¶ 90-99, supra.

206.   AMN's exclusive-provider agreements unreasonably foreclose a substantial part of competition in the regional submarkets in which they are used. They prevent AMN's rivals from attaining economies of scope or scale sufficient to emerge as viable competitors of AMN for the provision of medical travelers to large hospital networks. They tie down the hospitals' choice of provider. On balance, their effects are more anticompetitive than pro-competitive. These matters are explained more fully at ¶¶ 131-133, 156-158, supra.

207.   Cumulatively, all of the above-pled contractual restraints (the "Contractual Restraints") have harmed competitive processes in the medical-traveler markets, which are defined and explained at ¶¶ 41-64, supra. The anticompetitive effects of these Contractual Restraints in these markets is fully pled at ¶¶ 147-161, supra.

208.   AMN has used and enforced the Contractual Restraints in order to further its anticompetitive aims. Any business justification that it might offer for these

restraints is either a pretext or could be readily accomplished by less restrictive measures.

209.   Aya is AMN's existing and/or potential rival in the national market and regional submarkets for medical-traveler services. Aya has been a victim and intended target of AMN's anticompetitive Contractual Restraints, by which AMN has sought to hinder Aya's operations and impair its ability to compete for sales in the medical-traveler markets.

210.   Aya has suffered quantifiable losses in direct consequence of the anticompetitive aspects and effects of AMN's Contractual Restraints, as is pled more fully at ¶¶ 162-171.

211.   The harm caused to Aya because of AMN's unlawful use of these Contractual Restraints is not the same harm as has been caused to the affected employees or other rival providers. It is direct harm specifically borne by Aya and proximately caused by AMN's anticompetitive use of its Contractual Restraints. There is no special difficulty in apportioning damages among the different direct victims of these restraints – the affected employees and rival providers.

212.   Aya has suffered antitrust injury because of AMN's use of its Contractual Restraints, and it has antitrust standing to complain of them.

213.   At a later stage of these proceedings, Aya will quantify its probable losses because of AMN's unlawful use of these Contractual Restraints.

214.   AMN has used and enforced its Contractual Restraints in interstate commerce, doing so in a manner that has had a substantial effect on interstate commerce.

WHEREFORE, Aya seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

//

//

//

## VII. THIRD CAUSE OF ACTION
### (Attempted Monopolization)
### (15 U.S.C. § 2)

215.    Aya re-pleads and incorporates by reference each of the preceding allegations.

216.    AMN has employed various anticompetitive practices, all of which are described at ¶¶ 73-145, <u>supra</u>. By these practices, AMN has specifically intended to acquire monopoly power in the medical-traveler markets, which are defined and explained at ¶¶ 41-64, <u>supra</u>. On present trends, there exists a dangerous probability that it will succeed in the effort unless there is an antitrust intervention.

217.    AMN is the dominant provider of the relevant service (the provision of medical travelers), and it wields or nearly wields monopoly power in the national market as well as many of the regional submarkets for this service, including the following ones: the Greater San Francisco Bay Area; the Greater Los Angeles Metropolitan Area; the Greater New York City Metropolitan Area; the Greater Chicago Metropolitan Area; the Greater Baltimore Metropolitan Area; the Greater Washington, D.C. Metropolitan Area; the Greater Richmond Metropolitan Area; and the Greater Norfolk Metropolitan Area. In the national market it makes or substantially controls at least 45% of all sales, and in the above-listed regional submarkets it makes or substantially controls at least 50% of all sales. Its market shares and market positions in these markets are inexorably increasing and are effectually protected by significant barriers to expansion and entry, as is pled more fully at ¶¶ 65-72, <u>supra</u>.

218.    The above-pled barriers to expansion effectually prevent existing rival providers from quickly or significantly expanding their current output in response to AMN's supracompetitive prices and lesser output, including its less responsive services and restricted offerings. These matters are explained more fully at ¶¶ 65-72, <u>supra</u>.

//

219. The above-pled barriers to entry effectually prevent potential rivals from entering the affected markets in response to AMN's supracompetitive prices and lesser output, including its less responsive services and restricted offerings. These matters are explained more fully at ¶¶ 65-72, supra.

220. By its above-pled anticompetitive practices, AMN has undermined or threatened to undermine competitive processes in the medical-traveler markets that it has attempted to monopolize.

(1)   The customers (hospitals and their purchasing agents) increasingly find themselves constrained to pay supracompetitive prices for fewer and inferior medical-traveler services, but would pay lower, competitive prices for better and more varied medical-traveler services if the markets for them were competitive and unburdened by AMN's trade restraints and other anticompetitive practices.

(2)   Rivals providers, including Aya, have been hindered and prevented from competing on the merits for sales, and in consequence they have lost sales and profits that they likely otherwise would have made.

Aya will present expert and percipient evidence of each of these matters at the appropriate stages of this civil litigation. These matters are explained more fully at ¶¶ 147-161, supra.

221. AMN has employed each of the above-alleged anticompetitive practices in furtherance of its attempt to monopolize the medical-traveler markets. For each such practice, any business justification that it might offer is either a pretext or could be readily accomplished by less restrictive measures that did not impose the same restraints and exclusionary burdens on the affected employees or rival providers.

222. Aya is a direct competitor of AMN in the national market and regional submarkets for medical-traveler services. Aya has been a victim and intended target of AMN's anticompetitive practices. AMN has sought to exclude Aya from competing for sales in these markets.

223.   Aya has suffered quantifiable losses in direct consequence of the anticompetitive aspects and effects of AMN's above-pled anticompetitive practices.

224.   The harm caused to Aya because of AMN's use of these anticompetitive practices is not the same harm as has been caused to hospitals or other rival providers. It is direct harm, borne by Aya and proximately caused by AMN's anticompetitive practices. There is no special difficulty in apportioning damages among the different direct victims of these anticompetitive practices – the customers (those who purchase medical-traveler services) and AMN's rival providers in the medical-traveler markets.

225.   Aya has suffered antitrust injuries because of AMN's anticompetitive practices, and it has antitrust standing to complain of AMN's attempted monopolization of the medical-traveler markets.

226.   At a later stage of these proceedings, Aya will quantify its probable losses because of AMN's anticompetitive practices.

227.   AMN's anticompetitive conduct and attempted monopolization have been employed in interstate commerce and have affected interstate commerce. They are therefore subject to review under the antitrust laws of the United States.

WHEREFORE, Aya seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

### VIII. FOURTH CAUSE OF ACTION
**(Unlawful Restraints of Trade in Violation of California's Cartwright Act)**
**(Cal. Bus. & Prof. Code §§ 16720 *et seq*.)**

228.   Aya re-pleads and incorporates by reference each of the preceding allegations.

229.   Each of AMN's Contractual Restraints that has violated Section 1 has also violated California's Cartwright Act, which is codified at California Business & Professions Code §§ 16720 *et seq*.

230.   Each of these trade restraints has had a substantial, detrimental effect on those of AMN's rivals that conduct business in California and those of its customers that are located in California. AMN maintains its headquarters in California and sells

medical-traveler services throughout the state. It is the dominant provider in most or all of the regional submarkets in California, including the following ones: the Greater San Francisco Bay Area, the Greater Los Angeles Metropolitan Area, and the Greater San Diego Metropolitan Area.

231.   Aya also maintains its business headquarters in California and sells medical-traveler services throughout the state. It has suffered antitrust injury because of AMN's trade restraints, as is explained more fully at ¶¶ 162-171, supra.

232.   Aya has antitrust standing to complaint of these restraints, as is explained more fully at ¶¶ 162-171, 188-89, supra.

WHEREFORE, Aya seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

### IX. FIFTH CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Relations)

233.   Aya re-pleads and incorporates by reference each of the preceding allegations.

234.   AMN is specifically aware that Aya must cultivate, develop, and maintain ongoing relationships with recruiters, medical travelers, hospitals, and vendor-managers in order to become and remain a viable provider of medical travelers in the medical-traveler markets. AMN is aware of these matters because it is engaged in the same kind of work and must do the same in order to succeed in these very same markets.

235.   By its above-pled antitrust violations, which constitute violations of the law, AMN has deliberately and effectually interfered with Aya's prospective relationships with recruiters, medical travelers, hospitals and vendor-managers.

236.   By this interference, AMN has disrupted relationships that Aya has tried to develop with various recruiters, medical travelers, hospitals, and vendor-managers.

237.   In consequence of the foregoing, AMN has successfully interfered with these prospective commercial relationships, which Aya seeks to establish and requires

in order to remain a viable competitor in the affected markets.

238.   Aya has suffered past and ongoing losses in proximate consequence of AMN's interference with these relationships, which AMN has accomplished by conduct that is unlawful under the antitrust laws. At a later stage of these proceedings, Aya will provide a quantification of the extent of these losses.

239.   AMN's conduct in this matter has been fraudulent, oppressive and malicious within the meaning of Section 3294 of the California Civil Code.

WHEREFORE, Aya seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

**X. SIXTH CAUSE OF ACTION**
**(Unfair Competition in Violation of California Law)**
**(California Business & Professions Code §§ 17200 *et seq.*)**

240.   Aya re-pleads and incorporates by reference each of the preceding allegations.

241.   By each of its anticompetitive practices, which are described at ¶¶ 72-145, <u>supra</u>, AMN has employed conduct that is unfair, unlawful and/or deceptive. By each of these practices, AMN has caused quantifiable harm to Aya, which therefore seeks appropriate relief under Section 17200 of the California Business and Professions Code.

WHEREFORE, Aya seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

**XI. PRAYER FOR RELIEF**

Aya now prays to this Court for the following redress for each of the legal wrongs that it has alleged against AMN:

**First Cause of Action: *Per Se* Violations of 15 U.S.C. § 1**

1.   Compensatory damages, trebled under 15 U.S.C. § 15.

2.   Pre-judgment interest.

3.   Costs of suit.

4.   Reasonable attorney's fees, as authorized by 15 U.S.C. § 15.

5.    Injunctive relief under 15 U.S.C. § 26.

6.    Such other relief as the Court deems appropriate and just.

**Second Cause of Action: Quick-Look and Rule-of-Reason Violations of 15 U.S.C. § 1**

1.    Compensatory damages, trebled under 15 U.S.C. § 15.

2.    Pre-judgment interest.

3.    Costs of suit.

4.    Reasonable attorney's fees, as authorized by 15 U.S.C. § 15.

5.    Injunctive relief under 15 U.S.C. § 26.

6.    Such other relief as the Court deems appropriate and just.

**Third Cause of Action: Attempted Monopolization Under 15 U.S.C. § 2**

1.    Compensatory damages, trebled under 15 U.S.C. § 15.

2.    Pre-judgment interest.

3.    Costs of suit.

4.    Reasonable attorney's fees, as authorized by 15 U.S.C. § 15.

5.    Injunctive relief under 15 U.S.C. § 26.

6.    Such other relief as the Court deems appropriate and just.

**Fourth Cause of Action: Violations of the Cartwright Act**

1.    Compensatory damages, trebled under California Business & Professions Code § 16750.

2.    Pre-judgment interest.

3.    Costs of suit.

4.    Reasonable attorney's fees, as authorized by California Business & Professions Code § 16750.

5.    Injunctive relief under California Business & Professions Code § 16750.

6.    Such other relief as the Court deems appropriate and just.

//

**Fifth Cause of Action: Tortious Interference**

1. Proximate damages.

2. Pre-judgment interest.

3. Costs of suit.

4. Punitive damages, as authorized under California Civil Code § 3294.

5. Such other relief as the Court deems appropriate and just.

**Sixth Cause of Action: Unfair Competition**

1. Injunctive relief, as authorized for violations of California Business & Professions Code §§ 17200 *et seq.*

2. Such other relief as the Court deems appropriate and just.

## XII. DEMAND OF JURY TRIAL

So far as the law allows, Plaintiffs demand that a jury of their peers try their claims against AMN.

DATED:  February 2, 2017        Respectfully submitted,

/s/ William Markham

By:   William A. Markham,
LAW OFFICES OF WILLIAM MARKHAM, P.C.
Attorneys for Plaintiffs.