**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AYA HEALTHCARE SERVICES, INC., AYA HEALTHCARE, INC.,<br><br>Plaintiffs,<br>v.<br><br>AMN HEALTHCARE, INC., AMN HEALTHCARE SERVICES, INC., AMN SERVICES, LLC, MEDEFIS, INC., and SHIFTWISE, INC.,<br><br>Defendants. | Case No.: 17cv205-MMA (MDD)<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>[Doc. No. 15] |

Plaintiffs Aya Healthcare Services, Inc. and Aya Healthcare, Inc. (collectively, "Plaintiffs") filed a First Amended Complaint ("FAC") against Defendants AMN Healthcare, Inc., AMN Service, Inc., AMN Services, LLC, MEDEFIS, Inc., and Shiftwise, Inc. (collectively, "Defendants") alleging four federal antitrust claims under the Sherman Act, 15 U.S.C. §§ 1, 2, and three California state law claims. *See* FAC. Defendants now move to dismiss Plaintiffs' FAC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Doc. No. 15. Plaintiffs filed an opposition to Defendants' motion, to which Defendants replied. *See* Doc. Nos. 17, 18. After entertaining the oral arguments of counsel, the Court took the matter under submission for further review and consideration. *See* Doc. No. 20. For the reasons set forth below, the Court affirms in part its tentative ruling and **GRANTS IN PART** Defendants' motion

to dismiss.

## BACKGROUND[1]

Plaintiff Aya Healthcare Services, Inc. is a corporation formed under Delaware law that maintains its headquarters in San Diego, California. FAC ¶ 54. Plaintiff Aya Healthcare, Inc. is a corporation formed under Delaware law that maintains its headquarters in San Diego, California. FAC ¶ 54. "Plaintiffs are affiliated companies that operate under common control and ownership." FAC ¶ 54.

Defendant AMN Healthcare, Inc. is a corporation formed under the laws of Nevada that maintains its headquarters in San Diego, California. FAC ¶ 55. Defendant AMN Healthcare Services, Inc. is a corporation formed under the laws of Delaware that maintains its headquarters in San Diego, California. FAC ¶ 56. Defendant AMN Services, LLC is a limited liability company formed under state law that maintains its headquarters in San Diego, California. Defendant Medefis, Inc. is a corporation formed under state law that maintains its headquarters in Omaha, Nebraska. FAC ¶ 58. Defendant Shiftwise, Inc. is a corporation formed under state law that maintains its headquarters in Portland, Oregon. FAC ¶ 59. Defendant AMN Healthcare Services, Inc. owns and controls Defendant AMN Healthcare, Inc. and the various affiliated companies also sued in this action. FAC ¶ 5.

Plaintiffs are two affiliated temporary personnel agencies that arrange to have medical travelers perform temporary assignments at hospitals[2] and other healthcare facilities. FAC ¶ 3. Defendants also operate a temporary employment agency, providing various kinds of temporary medical employees to hospitals. FAC ¶ 5. Defendants are the dominant provider of medical travelers in the country, and compete with Plaintiffs. FAC

---

[1] Because this matter is before the Court on a motion to dismiss, the Court must accept as true the allegations set forth in the FAC. *See Hosp. Bldg. Co. v. Trs. Of Rex Hosp.*, 425 U.S. 738, 740 (1976).

[2] "Hospitals" hereinafter refers to both hospitals and other healthcare facilities.

¶ 5.

"Medical travelers are licensed nurses and medical technicians who travel from region to region to perform temporary assignments at hospitals." FAC ¶ 4. Hospitals do not directly hire medical travelers, but utilize the services of personnel agencies like Plaintiffs and Defendants. These personnel agencies are thus responsible for recruiting qualified medical travelers and coordinating their temporary assignment to hospitals. FAC ¶ 4.

Generally, Plaintiffs allege that Defendants' strategy "is to make use of contractual restraints and other anticompetitive practices to ensure that none of its competitors can compete to hire any of its temporary employees, even when it is not employing them." FAC ¶ 7. Regarding Plaintiffs' federal claims, Plaintiffs assert that Defendants' alleged no-poaching restraints constitute a violation of Section 1 of the Sherman Act, that Defendants created an employers' cartel in violation of Section 1 of the Sherman Act, and that Defendants intend to acquire monopoly power in the medical-traveler markets in violation of Section 2 of the Sherman Act.

**A. <u>No-Poaching Allegations</u>**

Plaintiffs allege Defendants have successfully convinced rival providers "to agree to unlawful no-poaching restraints that run one way in its favor and harm both its rivals and its employees." FAC ¶ 12. Smaller providers "depend on the good graces" of Defendants because "AMN has so much business that it often turns to smaller providers to help fill its orders . . . when it lacks available medical travelers of its own for pending assignments. Some providers depend on receiving AMN's spillover work in order to remain in business." FAC ¶ 13. "AMN has delegated spillover work to many providers in exchange for their acceptance of its subcontractor agreements . . . [which] include "no-poaching" covenants. FAC ¶ 16. These subcontractor agreements require rival providers to "agree in perpetuity never to solicit any of its employees." FAC ¶ 16.

**B. <u>Employers' Cartel Allegations</u>**

Plaintiffs contend AMN twice invited Aya "to collude in an unlawful antitrust

conspiracy" (an employers' cartel), requesting Plaintiffs agree to a reciprocal no-hire agreement under which each employer would never hire employees of the other. FAC ¶ 17. Plaintiffs "believe[] that AMN has entered into similar no-hire arrangements with other providers of medical travelers, demanding and obtaining either unilateral or reciprocal no-hire agreements with them." FAC ¶ 18. Plaintiffs have "specific confirmation" that at least one other provider of medical travelers, Host Healthcare, Inc. ("Host") agreed to a unilateral no-hire agreement under which Host ceased to hire AMN's recruiters and other corporate employees. FAC ¶ 19. Plaintiffs claim these no-hire agreements affect medical travelers because if a provider is restrained by agreement from hiring AMN's recruiters, it is also appreciably restrained from seeking, screening, soliciting, and hiring AMN's vast pool of qualified medical travelers, even those who lack any current assignment from AMN. FAC ¶ 20.

Plaintiffs allege Defendants retaliated against them by refusing to join this employers' cartel by litigating baseless claims against it, terminating a longstanding mutually profitable collaboration, and temporarily cutting off Plaintiffs' access to certain accounts on Defendants' software platform, costing Plaintiffs lost revenue in the millions of dollars. FAC ¶ 22.

**C. Attempted Monopolization Allegations**

Finally, Plaintiffs allege Defendants intended to acquire monopoly power in the medical-traveler markets. FAC ¶ 282. Plaintiffs claim AMN is the dominant provider of the relevant service and it wields or nearly wields monopoly power in the national market as well as many of the regional submarkets including: the Greater San Francisco Bay Area; the Greater Lost Angeles Metropolitan Area; the New York City Area; the Greater Chicago Metropolitan Area; the Greater Baltimore Metropolitan Area; the Greater Washington, D.C. Metropolitan Area; the Greater Richmond Metropolitan Area; and the Greater Norfolk Metropolitan Area. FAC ¶ 283. Defendants make or substantially control at least 45% of all sales in the national market, and at least 50% of all sales in the above-referenced regional submarkets. FAC ¶ 283. Plaintiffs claim "there exists a

dangerous probability that it will succeed in the effort unless there is an antitrust intervention." FAC ¶ 282.

**D. Summary of Plaintiffs' Allegations**

In sum, Plaintiffs assert, "[t]he overall effect of [Defendants'] business strategy has been to discourage and prevent [Defendants'] rivals from considering, evaluating, soliciting and hiring qualified medical travelers." FAC ¶ 8. Thus, "AMN has successfully used unlawful restraints and other anticompetitive practices to restrain its recruiters and rivals in order to restrict the supply and circulation of qualified medical travelers." FAC ¶ 8. "AMN not only restricts supply and raises its prices, but also imposes surcharges for providing various categories of medical travelers whom it reports to be in short supply to certain hospital customers." FAC ¶ 9. Defendants have "been able to depress the pay of medical travelers and recruiters of medical travelers and restrict their employment opportunities, mobility, and access to information about employment conditions offered by rival employers." FAC ¶ 10.

Defendants move to dismiss Plaintiffs' FAC pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. No. 15. Defendants argue Plaintiffs' allegations "boil down to a single theory: that Aya is somehow entitled to enjoy a free ride on AMN's business acumen and the benefits of collaborating with AMN, while blissfully violating with impunity the non-solicitation clauses binding on former AMN personnel." Doc. No. 15-1 at 2. "To the extent this theory is supported by any alleged facts, these facts do not show an unreasonable restraint of trade—let alone conduct susceptible to the *per se* standard." *Id.*

## LEGAL STANDARDS

**A. Request for Judicial Notice**

Generally, a court must take judicial notice if a party requests it and supplies the court with the requisite information. Fed. R. Evid. 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready

determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see Mack v. South Bay Beer Distributors*, 798 F.2d 1279, 1282 (9th Cir. 1986) (citing *Sears, Roebuck & Co. v. Metropolitan Engravers, Ltd.*, 245 F.2d 67, 70 (9th Cir. 1956)). While a court may take judicial notice of matters of public record, it may not take judicial notice of a fact that is subject to reasonable dispute. Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). For example, "when a court takes notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." *Lee*, 250 F.3d at 690.

**B. Rule 12(b)(6)**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2). However, plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard thus demands more than a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). The court need not take legal conclusions as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.*; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects in the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

## DISCUSSION

### I. Plaintiffs' Request for Judicial Notice

Plaintiffs request that the Court take judicial notice of various documents filed in a civil action between the same parties in the Superior Court for the County of San Diego (*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, Case No. 37-2015-00033229-CU-BT-CTL) ("AMN's State Court Action"). *See* Doc. No. 17-1. Specifically, Plaintiffs request the Court take judicial notice of: (1) the state court's order rending summary judgment against AMN on all of its claims on November 4, 2016 (Exhibit 1); (2) a stipulation listing the issues to be tried at the trial in the state court action (Exhibit 2); (3) the state court's order granting judgment in favor of Aya Healthcare, Inc. and the four Aya employees on January 26, 2017 (Exhibit 3); and (4) the state court's award of attorneys' fees and costs (Exhibit 4). *See* Doc. Nos. 17-1, 17-2. Defendants oppose Plaintiffs' request for judicial notice, asserting counsel "goes well beyond requesting judicial notice, characterizing and purporting to summarize the state court litigation." Doc. No. 18 at 10 n.6.

Plaintiffs request the Court take judicial notice of these documents for the sole purpose of establishing that the filings were made in AMN's State Court Action, and not to establish the truth of the matters asserted therein. *See id.* Accordingly, the Court **GRANTS** Plaintiffs' request for judicial notice. *See In re Bare Escentuals, Inc. Sec.*

*Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010) ("[t]he court may take judicial notice of the existence of unrelated court documents, although it will not take judicial notice of such documents for the truth of the matter asserted therein.").

**II. Defendants' Motion to Dismiss**

The FAC asserts four federal statutory claims and three California statutory claims. Specifically, the FAC asserts: three claims under § 1 of the federal Sherman Act; one claim under § 2 of the federal Sherman Act; one claim under the California Cartwright Act; one claim for tortious interference with prospective economic relations; and one claim under the California Unfair Competition Law ("UCL"). *See* Doc. No. 11-1. Defendants move to dismiss the FAC in its entirety, arguing Plaintiffs fail to state a claim for relief on all seven causes of action. *See* Doc. No. 15-1. For the reasons stated below, the Court finds that Plaintiffs fail to sufficiently allege antitrust injury.

***1. Sherman Act Claims: Antitrust Injury***

"Private suits to enforce the Sherman Act are authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15(a), which provides that 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . .'" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000). The Supreme Court has interpreted "any person" to mean any person who has suffered an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *Knevelbaard Dairies*, 232 F.3d at 987. "An injury caused by an antitrust violation will not count as an antitrust injury 'unless it is attributable to an anti-competitive aspect of the practice under scrutiny.'" *Int'l Longshore and Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1186 (9th Cir. 2017) (quoting *Atl. Richfield Co.*, 495 U.S. at 334). "If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se." *Rebel Oil*

*Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).

In determining whether a plaintiff has antitrust standing, the Ninth Circuit considers various factors: (1) whether the plaintiff's injury is of "the type the antitrust laws were intended to forestall;" (2) the directness of the injury; (3) the speculative nature of the harm; (4) the risk of duplicative recovery; and (5) the complexity of apportioning damages. *Knevelbaard Dairies*, 232 F.3d at 987. "A showing of the first factor—antitrust injury—is 'necessary, but not always sufficient, to establishing standing under [section] 4 [of the Clayton Act].'" *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 862 (C.D. Cal. 2015) (citing *Am. Ad Mgmt. Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (internal quotation marks and citation omitted)). The Ninth Circuit also requires "that the injured party be a participant in the same market as the alleged malefactors." *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985). "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (citation omitted).

Plaintiffs contend that they have made the requisite showing of antitrust injury by alleging two types of harm: (1) exclusionary harm; and (2) retaliatory harm. *See* Doc. No. 17 at 23-25. Defendants contend the FAC "is bereft of any ***facts*** that plausibly show either any impact on competition in a well-defined relevant market or that Aya suffered injury as a result of any anticompetitive effects." Doc. No. 15-1 at 1 (emphasis in original). Rather, Defendants assert "the FAC repetitively recites the same conclusory allegations about 'reduced output' and 'supracompetitive prices,' not providing a single specific factual example of such supposed market effects." *Id.*

Regarding exclusionary harm, Plaintiffs assert that Defendants' alleged anticompetitive practices restrain and exclude Plaintiffs and other rivals so that Defendants can "maintain and enhance [their] dominant position in the relevant markets, restrict the circulation and supply of medical travelers, contrive shortages, charge supracompetitive prices, and generally insulate [themselves] from competitive pressures

that its rivals would impose in markets unhindered by [their] trade restraints[.]" Doc. No. 17 at 23; *see* FAC ¶ 207. Plaintiffs claim "[t]he overall effect of AMN's business strategy has been to discourage and prevent AMN's rivals from considering, evaluating, soliciting and hiring qualified medical travelers." FAC ¶ 8. Plaintiffs "believe[] that AMN's various anticompetitive practices have caused it to lose profits of at least $250,000 in 2013, at least $250,000 in 2014, at least $750,000 in 2015, and at least $3 million [in] 2016. On present trends, these losses will persist and worsen in 2017 and future years." FAC ¶ 216.

Here, Plaintiffs' exclusionary harm allegations are insufficient to demonstrate antitrust injury. Throughout the FAC, Plaintiffs repeatedly claim Defendants' alleged conduct resulted in higher prices (FAC ¶¶ 7, 9, 49, 96, 179, 207, 284) and reduced output (FAC ¶¶ 28, 50, 128-129, 150, 195, 207, 225, 268). However, Plaintiffs do not allege facts or anecdotal evidence supporting this contention. For example, Plaintiffs do not allege that prices increased from $X to $Y amount as a result of the alleged conduct. As Defendants remarked at the hearing, Plaintiffs are "in the industry," and thus are in a position to detect and allege specific facts supporting higher prices. Doc. No. 21 at 28.

Moreover, Plaintiffs' assertion that "there have been fewer available medical travelers for assignments" is conclusory. FAC ¶ 129. Plaintiffs do not allege that the number of available medical travelers decreased to a certain number, or that Plaintiffs are unable to fill temporary assignments at hospitals, as a result of the alleged conduct. In fact, Plaintiffs admit that they have a "*substantial pool of highly qualified medical travelers* . . . ." FAC ¶ 129 (emphasis added). Plaintiffs also claim Defendants have "stultified competition in the medical-traveler markets and maintained its stranglehold over the circulation of the largest pool of qualified medical travelers in the industry," thereby restricting supply. Doc. No. 17 at 1. Yet, Plaintiffs concede that the purpose of the subcontractor agreements is to provide medical travelers to Defendants' customers "for assignments that AMN was *unable to fulfill on its own*." FAC ¶ 128 (emphasis added). Defendants assert "Aya's whole theory of injury makes no economic sense."

Doc. No. 18 at 7.

Further, Defendants argue that even if there actually were reduced output that could affect customers of staffing companies, the increased demand would likely benefit suppliers like Plaintiffs. Doc. No. 15-1 at 11. *See Rebel Oil Co.*, 51 F.3d at 1433. Defendants claim that Plaintiffs would stand to benefit from fewer agencies competing to woo the same medical personnel. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986) (noting a competitor stands to gain from a conspiracy among its competitors to raise market prices). In response, Plaintiffs contend that "Aya's losses . . . belong to a long-recognized category of antitrust injury—exclusionary harm to a competitor." Doc. No. 17 at 24. The Court is well aware that "a rival clearly has standing to challenge the conduct of rival(s) that . . . tends to exclude rivals from the market, thus leading to reduced output and higher prices." Areeda ¶ 348a[3]; *see also Am. Ad. Mgmt., Inc.*, 190 F.3d at 1057 ("[C]onsumers and competitors are most likely to suffer antitrust injury"). However, a plaintiff cannot merely rely on "labels and conclusions." *Twombly*, 550 U.S. at 555. As noted above, Plaintiffs do not allege any facts to show exclusionary harm as a result of the challenged conduct, i.e., higher prices or reduced output. *See* Areeda ¶ 337a ("In order to survive a motion to dismiss, the plaintiff must allege not only that the antitrust laws have been violated; it must also allege facts concerning how its own injuries resulted."). As such, Plaintiffs' allegations are insufficient to allege antitrust injury on the basis of exclusionary harm. *Cf. Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1035-36 (C.D. Cal. 2007) (finding competitor sufficiently pleaded antitrust injury where the defendant's conduct "rendered competitors less competitive" and had a "dangerous probability of stifling innovation in the market.") (internal quotation marks omitted).

Regarding retaliatory harm, Plaintiffs allege that when they declined to collude in

---

[3] Citations to "Areeda" refer to PHILLIP E. AREEDA & HERBERT HOVENKAMP, AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (4th ed. 2013).

Defendants' employers' cartel, Defendants punished Plaintiffs by terminating their subcontractor agreements (i.e., the spillover contracts), temporarily cutting off Plaintiffs' access to certain accounts on one of their key software platforms, and initiating sham litigation in state court. FAC ¶¶ 210-11. In opposition, Defendants argue Plaintiffs' lost profits allegedly attributable to the spillover opportunities withdrawn by AMN "might be asserted in a breach of contract case, but they do not give rise to ***antitrust injury***, as they do not flow from any impact of the *competitive process*." Doc. No. 15-1 at 11 (emphasis in original). A party unilaterally may determine with whom it will deal. *See United States v. Colgate*, 250 U.S. 300, 307 (1919). Thus, Defendants assert Plaintiffs have no right to collaboration with AMN, and Plaintiffs suffer no injury from the loss of such collaboration. Doc. No. 18 at 6.

Here, Plaintiffs' retaliation allegations are similarly insufficient to demonstrate antitrust injury. Plaintiffs rely primarily on a decision from the Seventh Circuit, wherein the court stated that "[l]osses inflicted by a cartel in retaliation for an attempt by one member to compete with the others are certainly compensable under the antitrust laws, for otherwise an effective deterrent to successful cartelization would be eliminated." *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 783 (7th Cir. 1994). Plaintiffs' reliance on *Hammes*, however, is misplaced. The Seventh Circuit later clarified that *Hammes* "holds that antitrust damages may result if a cartel inflicts damage on *one of its own members* in retaliation for that member's attempt to undercut the cartel's prices and therefore lower consumer prices." *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 401 (7th Cir. 2006) (emphasis added). The Seventh Circuit went on to note that in the case at bar, the heart of the plaintiff's claim "is that it was never a member of the cartel in the first place;" thus, "[t]he *Hammes* case is . . . inapplicable here." *Id.* Because Plaintiffs similarly claim Aya was never a member of the alleged cartel, *Hammes* is

inapplicable.[4] Therefore, based on the current record, Plaintiffs have not sufficiently alleged antitrust injury on the basis of retaliatory harm.

In viewing Plaintiffs' allegations in the light most favorable to Plaintiffs, the Court finds that, as currently pleaded, the FAC does not sufficiently demonstrate that Plaintiffs have suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co.*, 495 U.S. at 334. Because antitrust injury is an element of each of Plaintiffs' federal causes of action, the Court **GRANTS IN PART** Defendants' motion and **DISMISSES** Plaintiffs' claims under the Sherman Act **without prejudice**.

***2. State Law Claims***

In light of the Court's finding that Plaintiffs fail to sufficiently allege antitrust injury, a requirement for Plaintiffs' federal claims, the Court **DEFERS** ruling on Plaintiffs' state law claims.

## CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** Defendants' motion and **DISMISSES** Plaintiffs' Sherman Act claims **without prejudice**. Plaintiffs may file a Second Amended Complaint ("SAC") that cures the pleading deficiencies identified in this Order on or before **January 5, 2018**.

**IT IS SO ORDERED.**

Dated: December 6, 2017

HON. MICHAEL M. ANELLO
United States District Judge

---

[4] Plaintiffs also cite *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999), which generally stands for the proposition that retaliation by a cartel member against one member attempting to compete is compensable. *See id.* However, Plaintiffs do not allege Defendants retaliated for trying to compete with the cartel's members. Rather, Plaintiffs seek "lost profits that run in the millions of dollars" from Defendants' decision to not continue collaborating with Plaintiffs. Doc. No. 17 at 25. As such, *Big Bear* is inapposite.