DAVID H. BAMBERGER (*pro hac vice*)
david.bamberger@dlapiper.com
**DLA PIPER LLP (US)**
500 Eighth Street, NW
Washington, DC  20004
Tel:  202.799.4000
Fax:  202.799.5000

NOAH A. KATSELL (Bar No. 217090)
noah.katsell@dlapiper.com
AMANDA C. FITZSIMMONS (Bar No. 258888)
amanda.fitzsimmons@dlapiper.com
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA  92101-4297
Tel:  619.699.2700
Fax:  619.699.2701

Attorneys for Defendants
AMN HEALTHCARE, INC.,
AMN HEALTHCARE SERVICES, INC.,
AMN SERVICES LLC, MEDEFIS, INC., and
SHIFTWISE, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYA HEALTHCARE SERVICES, INC., and AYA HEALTHCARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AMN HEALTHCARE, INC., AMN HEALTHCARE SERVICES, INC., AMN SERVICES LLC; MEDEFIS, INC., and SHIFTWISE, INC. <br><br> Defendants. | CASE NO.  3:17-cv-00205 MMA (MDD) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** <br><br> **[SPECIAL BRIEFING SCHEDULE ORDERED]** <br><br> Date:          None <br> Time:          None <br> Courtroom:  3D <br> Judge:        Hon. Michael M. Anello <br><br> Complaint Filed: February 2, 2017 <br> FAC Filed:        February 24, 2017 <br> SAC Filed:        January 8, 2018 <br> Trial Date:        None Set |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1
II.   ARGUMENT ................................................................................. 3
      A.    Aya Fails to Allege Facts Showing That It Has Suffered
            Antitrust Injury .............................................................. 3
      B.    Aya's First Cause of Action Also Fails For Additional Reasons. ...... 10
            1.    The "No-Poaching Restraints" .................................. 10
            2.    The Alleged "Employers' Cartel" ........................... 16
      C.    Aya's Second Cause of Action Also Fails For Additional
            Reasons. .................................................................... 17
            1.    The Requirements For A Rule of Reason Claim..................... 17
            2.    Aya Fails to Plead Properly Defined Relevant Markets........... 18
            3.    Aya Fails to Plead Facts Showing Harm to The Process of
                  Competition. ............................................... 19
      D.    Aya's Attempted Monopolization Claim Fails To State A Claim...... 20
            1.    Aya Fails to Plead a Well-Defined Relevant Market. ............. 21
            2.    Aya Fails to Allege Exclusionary Conduct. ..................... 21
            3.    Aya Fails to Plead Facts Showing a Dangerous
                  Probability That AMN Would Succeed in Becoming a
                  Monopoly. ................................................. 23
      E.    The Court Should Dismiss Aya's State Law Claims. ................. 25
III.  CONCLUSION .......................................................................... 25

1

## TABLE OF AUTHORITIES

2

**Page**

3   **Federal Cases**

4   *Acri v. Varian Assocs., Inc.*,
5      114 F.3d 999 (9th Cir. 1997), supplemented, 121 F.3d 714 (9th Cir.
6      1997), as amended (Oct. 1, 1997) ....................................................................25

7   *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*,
      592 F.3d 991 (9th Cir. 2010) .........................................................................11
8

9   *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal &
      Prof'l Publ'ns, Inc.*,
10      108 F.3d 1147 (9th Cir. 1997) ..............................................................21, 24

11   *American Ad Mgmt., Inc. v. Gen. Tel. Co.*,
12      190 F.3d 1051 (9th Cir. 1999) ..............................................................6, 7

13   *American Ad Mgmt. Inc. v. GTE Corp.*,
14      92 F.3d 781 (9th Cir. 1996) ..............................................................17

15   *Arthur J. Gallagher & Co. v. Lang*,
16      Case No. C 14-0909 CW, 2014 WL 2195062 (N.D. Cal. May 23,
      2014) ....................................................................22

17   *Atl. Richfield Co. v. USA Petroleum*,
18      495 U.S. 328 (1990) ....................................................................3, 7

19   *Aydin Corp. v. Loral Corp.*,
20      718 F.2d 897 (9th Cir. 1983) ..............................................................7, 13, 15

21   *Bank of Am., N.A. v. Lee*,
22      Case No. CV 08-5546 CAS, 2008 WL 4351348 (C.D. Cal. Sept.
      22, 2008) ....................................................................22

23
    *Bell Atlantic Corp. v. Twombly*,
24      550 U.S. 544 (2007) ....................................................................6, 10, 16, 23

25   *Blackburn v. Sweeney*,
26      53 F.3d 825 (7th Cir. 1995) ..............................................................15

27   *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
28      941 F. Supp.2d 1227 (C.D. Cal. 2013) ..............................................................21

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ........................................................... 3, 5, 10, 17

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988) ....................................................................... 11

*Christensen v. Harris Cty.*,
529 U.S. 576 (2000) ....................................................................... 13

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,
720 F.2d 1553 (11th Cir. 1983) ...................................................... 14

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977) ......................................................................... 17

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) ....................................................................... 17

*DocMagic, Inc. v. Ellie Mae, Inc.*,
745 F. Supp. 2d 1119 (N.D. Cal. 2010)........................................... 24

*Dominion Enters. v. LinkUSystems, Inc.*,
Case No. SACV 11-1852 DOC, 2012 WL 12886502 (C.D. Cal.
Feb. 16, 2012).................................................................................. 22

*E. Portland Imaging Ctr., P.C. v. Providence Health System-Oregon*,
280 F. App'x 584 (9th Cir. 2008)..................................................... 24

*Eastman v. Quest Diagnostics, Inc.*,
Case No. 15-cv-00415-WHO, 2015 WL 7566805 (N.D. Cal. Nov.
25, 2015).................................................................................... 9, 23

*Eichorn v. AT & T Corp.*,
248 F.3d 131 (3d Cir. 2001) ........................................................... 14

*Federal Trade Comm'n v. Ind. Fed. of Dentists*,
476 U.S. 447 (1986) ....................................................................... 19

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997), *overruled on other grounds*, *Lacey
v. Maricopa Cnty.,* 693 F.3d 896 (9th Cir. 2012) ............................ 20

DLA Piper LLP (US)
San Diego

WEST\280112185

-iii-
MEMO OF PS&AS ISO DEFENDANTS' MOTION TO DISMISS SAC
CASE NO. 3:17-CV-00205 MMA (MDD)

# TABLE OF AUTHORITIES
### (continued)

                                                                                    **Page**

*In re ATM Fee Antitrust Litig.*,
   554 F. Supp. 2d 1003 (N.D. Cal. 2008)...............................................................14

*In re High-Tech Emp. Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012).....................................................5, 11, 12

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3rd Cir. 2010)................................................................................17

*Int'l Healthcare Mgt. v. Hawaii Coalition for Health*,
   332 F.3d 600 (9th Cir. 2003)................................................................................15

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008)..............................................................................16

*Landsdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne LLC*,
   2011 WL 5872885 (E.D. Va. Nov. 22, 2011)......................................................19

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) .......................................................................10, 11, 13, 15

*Lektro-Vend Corp. v. Vendo Co.*,
   660 F.2d 255 (7th Cir. 1981)..........................................................................14, 15

*Los Angeles Mem. Coliseum Com'n v. National Football League*,
   726 F.2d 1381 (9th Cir. 1984)................................................................11, 12, 14

*Lucas v. Citizens Commcn's Co.*,
   244 F. App'x 774 (9th Cir. 2007)........................................................................21

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ..........................................................................14, 15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...............................................................................................7

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988)..................................................................................5

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004) ....................................................... 9, 12

5
6

*Nat'l Collegiate Athletic Ass'n, v. Bd. of Regents of Univ. Okla.*,
    468 U.S. 85 (1984) ....................................................................... 13, 14

7
8

*Nat'l Soc'y of Prof'l Eng'rs v. U.S.*,
    435 U.S. 679 (1978) ........................................................................... 11

9
10

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ......................................................... 8, 24

11
12

*Oracle Am., Inc. v. Terix Computer Co., Inc.*,
    Case No. 5:13-cv-03385-PSG, 2014 WL 5847532 (N.D. Cal. Nov.
    7, 2014) ............................................................................................... 22

13
14

*PNY Techs., Inc. v. San Disk Corp.*,
    Case No. 11-cv-04689-WHO, 2014 WL 1677521 (N.D. Cal. April
    25, 2014) ........................................................................................... 8, 9

15
16
17

*PNY Techs., Inc. v. SanDisk Corp.*,
    Case No. 11-cv-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2,
    2014) ..................................................................................................... 8

18
19

*Polk Bros., Inc. v. Forest City Enters. Inc.*,
    776 F.2d 185 (7th Cir. 1985) ...................................................... *passim*

20
21

*Pool Water Prods v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) ............................................................. 3

22
23

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010) .......................................................... 12

24

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ............................................................... 18

25
26

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010) ................................................................... 8

27
28

*Rebel Oil Co. Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .............................................................. 24

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

4
*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ................................................. 12, 14

5

6
*Ryoko Mfg. Co. v. Eden Servs.*,
   823 F.2d 1215 (8th Cir. 1987) ........................................................ 8

7

8
*Signature MD, Inc. v. MDVIP, Inc.*,
   Case No. CV 14-5453 DMG, 2015 WL 3988959 (C.D. Cal. Apr.
   21, 2015) ................................................................................. 7

9

10
*Snap-on Tools, Corp. v. F.T.C.*,
   321 F.2d 825 (7th Cir. 1963) ..................................................... 14, 15

11

12
*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) ................................................................ 20

13

14
*State Oil Co. v. Khan*,
   522 U.S. 3 (1997) ................................................................... 17

15

16
*Stewart v. Gogo, Inc.*,
   Case No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10,
   2013) ................................................................................. 19

17

18
*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931) ............................................................. 3, 17

19

20
*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ................................................................ 8

21

22
*Texaco, Inc. v. Dagher*,
   547 U.S. 1 (2006) ......................................................... 15, 16, 17

23

24
*Thurman Ind., Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989) ..................................................... 18

25

26
*U.S. v. Microsoft, Inc.*,
   253 F.3d 34 (D.C. Cir. 2001) ...................................................... 21

27

28
*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ................................................................. 6

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. eBay, Inc.,*
  968 F. Supp. 2d 1030 (N.D. Cal. 2013) ........................................................ 5, 12, 17

*United States v. Empire Gas Corp.,*
  537 F.2d 296 (8th Cir. 1976) ........................................................................ 14, 15

*United States v. Syufy Enters.,*
  903 F.2d 659 (9th Cir. 1990) ................................................................................ 24

*Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004) ................................................................................................ 9

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
  382 U.S. 172,177 (1965) ...................................................................................... 20

**California Cases**

*Courtesy Temp Serv., Inc. v. Camacho,*
  222 Cal. App. 3d 1278 (1990) .............................................................................. 22

*Edwards v. Arthur Anderson LLP,*
  44 Cal. 4th 937 (2008) .......................................................................................... 22

**Federal Statutes**

15 U.S.C.
  § 15b ....................................................................................................................... 6

28 U.S.C.
  § 1367(c)(3) .......................................................................................................... 25

Sherman Act
  § 1 .................................................................................................................... 10, 17
  § 2 .......................................................................................................................... 20

**Other Authorities**

American Bar Association, Antitrust Law and Economics of Product
  Distribution (ABA 2006) ........................................................................................ 8

DLA PIPER LLP (US)
SAN DIEGO

WEST\280112185

-vii-
MEMO OF PS&AS ISO DEFENDANTS' MOTION TO DISMISS SAC
CASE NO. 3:17-CV-00205 MMA (MDD)

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Antitrust Guidelines for Collaborations Among Competitors*,
  2000 WL 33534553 (F.T.C. Apr. 1, 2000)...........................................................12

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis
  of Antitrust Principles and Their Application (3d ed. 2012) ..............................7

Taladay, J., *Criminalization of wage-fixing and no-poaching
  agreements*, Competition Policy Int'l (June 2017) ............................................13

U.S. News & World Report, Immigrant Nurses: Filling the Next U.S.
  Shortage, March 29, 2017 (available at
  https://health.usnews.com/wellness/articles/2017-03-29/immigrant-
  nurses-filling-the-next-us-shortage) (last visited February 5, 2018)..................19

DLA PIPER LLP (US)
SAN DIEGO

WEST\280112185

## I.  **INTRODUCTION**

Plaintiffs' Second Amended Complaint ("SAC") demonstrates just as graphically as the First Amended Complaint ("FAC") that Aya feels it is somehow entitled to a "free ride" at AMN's expense.[1]  Aya wants to enjoy the benefits of collaborating with AMN, while, at the same time, requesting that this Court strip AMN of any means of protecting the substantial investments it has made in building a successful enterprise.  But as this Court has already recognized, the antitrust laws were intended to protect the **process** of competition for the benefit of **consumers**, not to aid one particular competitor in gaining an advantage over another.  The antitrust laws accommodate and even condone procompetitive collaborations, but the law certainly does not contemplate that a competitor must "cut[] his own throat" if it agrees to collaborate.  *Polk Bros., Inc. v. Forest City Enters. Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (Easterbrook, J.).

Aya alleges that, in order to reap the benefits of collaborating with AMN, it "acquiesced" from 2010 until May 2015 in non-solicitation restrictions required by AMN.  SAC (Doc. No. 29) at ¶¶ 10, 129, 144 n.8, 263.  No one forced Aya to collaborate with AMN, nor was AMN obliged to provide any opportunities to its competitor.  Aya does not contend, nor could it, that reasonable non-solicitation restrictions in the context of a collaboration between competitors are unlawful; it claims only that those allegedly imposed by AMN were too broad in scope to be reasonable.  In any event, Aya alleges no well-pleaded **facts** to show that, as a result of its voluntary compliance with the non-solicitation restrictions between 2010 and May 2015, it suffered any loss whatsoever.  Indeed, Aya alleges that its collaborations with AMN were "mutually profitable." *Id.* ¶ 285.

After Aya elected to terminate its collaborations with AMN in May 2015

---

[1] Plaintiffs Aya Healthcare Services, Inc. and Aya Healthcare, Inc. shall be referred to herein as "Plaintiffs" or collectively "Aya".  Defendants AMN Healthcare, Inc., AMN Healthcare Services, Inc., AMN Services, LLC, Medefis, Inc. and Shiftwise, Inc.  shall be referred to herein as "Defendants" or collectively "AMN".

(something that it had been free to do all along), it then embarked upon a campaign of aggressively raiding AMN's personnel.  Despite Aya's claim of suffering "retaliatory harm" after walking away from the relationship with AMN, Aya increasingly prospered, and did so—as it admits—largely at the expense of AMN. Since May 2015, Aya alleges it has hired 16 of AMN's recruiters and 11 other AMN corporate employees.  *Id.* ¶ 273.  According to Aya, that boosted its own pool of "travelers" and its revenues by 350%.  *Id.*  The SAC alleges that, whereas AMN's pool of recruiters has remained stable at about 200 (now representing only 50% of the recruiters in San Diego County, **down** from 70% a few years ago), Aya itself has **grown** to having a pool of 150 recruiters.  *Id.*  ¶¶ 266, 273.  Aya alleges that these recruiters are, in essence, the lifeblood of these businesses, *id.* ¶ 216, and that the size of a recruiter base is largely proportional to the size of its pool of travelers.  *Id.* ¶ 269.  Confirming this proportional relationship, Aya admits that, since May 2015, it also has developed its own "substantial pool of travelers" and even a network of sub-contract providers sufficient to "meet the needs of medium-sized hospitals and credibly bid for some work for larger hospitals."  *Id.* ¶¶ 89, 264, 269, 272-73, 279 n.12.[2]  Having enjoyed such growth and success largely at the expense of AMN, Aya has the audacity to complain that it has had to incur the "great cost" of training its own recruiters (a normal cost of doing business), because it was having difficulty hiring AMN's experienced recruiters, *id.* ¶ 268, and that it has had to offer the AMN recruiters "higher pay and benefits."  *Id.* ¶ 274.[3] Strangely, Aya seems baffled that AMN has not rewarded its raids on AMN's

---

[2] Aya also alleges that providers regularly act as subcontractors for other providers, so that, if a provider cannot fill an order from a hospital from its own pool, it can call upon a fellow provider to dispatch the needed personnel.  *Id.* ¶ 34.  This acknowledged feature of the marketplace, available to Aya and others, undercuts many of Aya's arguments (*e.g.*, AMN's "market power," barriers to expansion, exclusionary conduct).

[3] Aya acknowledges that many travelers and recruiters want to work for AMN due to AMN's success and "highly regarded pool."  *Id.* ¶ 251.  There is no alleged shortage of recruiters.  Aya would just prefer not to incur the expense of training them and instead wants to hire personnel already trained by AMN, *i.e.*, "free ride" off AMN's efforts.

personnel by continuing to offer Aya spillover collaboration opportunities, to which Aya contends, without legal basis, that it is somehow entitled. *Id.* ¶¶ 285-88.

Aya argues that it has suffered "antitrust injury" as a result of this alleged conduct. Yet any injury to the **competitive process** is not at all apparent. Of the dozens of providers participating in the alleged relevant market, *id.* ¶ 84, not a single competitor is alleged to have been excluded or prevented from entering, and Aya itself has expanded dramatically. This belies any notion that the competitive process has been adversely impacted by the conduct alleged in the SAC. Indeed, Aya's growth and success shows that, at least from its perspective, the market is operating quite well, and competition is robust.

## II.   ARGUMENT

### A.   Aya Fails to Allege Facts Showing That It Has Suffered Antitrust Injury.

To recover for an antitrust violation, it is not enough for the plaintiff to show that it has been injured, even if it also can prove that its injury was causally linked to that violation. *Pool Water Prods v. Olin Corp.*, 258 F.3d 1024, 1033 (9th Cir. 2001).[4] Rather, Aya must plead and ultimately prove **antitrust** injury—*i.e.*, injury of the type that the antitrust laws were intended to address and that flows from the anticompetitive aspect of the challenged conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-88 (1977); *Atl. Richfield Co. v. USA Petroleum*, 495 U.S. 328, 334 (1990) ("ARCO").[5]

In its December 6, 2017 Order (Doc. No. 22), this Court found that Aya had failed to allege any facts to support its claim of exclusionary harm leading to higher prices and reduced output. *Id.* at 10-11. In the SAC, Aya now alleges

---

[4] Aya has not even alleged injury-in-fact resulting from the non-solicitation restrictions, a required element for its claims. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). There are no facts alleged to show that it suffered any loss prior to May 2015, and, after that date, Aya refused to abide by the restrictions.
[5] Aya purports to allege "harm to competition," SAC ¶¶ 240-61, but those allegations are insufficient, as explained more fully below. Moreover, Aya must show that its own alleged injury **flows from** an anticompetitive aspect of the challenged conduct, and this it also has failed to show.

supracompetitive pricing to "large" hospitals, but the only facts alleged to support this contention are "Aya's data" and some sort of "survey," both relating to a single hospital network (Kaiser) dating from 2015, SAC ¶ 99, as well as what Aya "is informed and believes." *Id.* ¶¶ 101-02. Aya further states that it is "informed and believes" that AMN's prices to "large" hospitals in Maryland are "at least 20% higher on average" than prices paid by "smaller" hospitals to other providers. *Id.* These sketchy "facts" still fail to show supracompetitive pricing in the marketplace(s) generally, or that Aya has suffered any injury as a result. Even if assumed true, these alleged pricing effects hypothetically might impact some of the **customers** (hospitals) who pay the prices, but not Aya, a **seller** of services.[6]

The Court also found in its Order that Aya's claim of reduced output was conclusory and not supported by well-pleaded facts. The Court noted, in particular, Aya's allegations that it has a "*substantial pool of highly qualified medical travelers*" and that AMN has had to subcontract with other providers for contracts it was "*unable to fulfill on its own*." Order at 10 (emphasis added by the Court). Aya has toned down these allegations somewhat in the SAC, but the substantive gist remains the same. *See* SAC ¶¶ 34, 89, 264, 269, 272-73, 279 n.12. Additionally, although Aya now alleges a nationwide shortage of nurses, this is concededly attributable to factors unrelated to AMN. *Id.* ¶¶ 107-08. There also are no facts alleged to show that the overall number of nurses available to hospitals in any particular market has been reduced as a result of alleged conduct by AMN. Even if there hypothetically were "reduced output," that might affect **customers** of staffing companies, but the increased demand likely would **benefit** Aya, a supplier.

---

[6] Aya's conclusory assertion that there should be "economies of scale" in providing services to larger, more administratively complex institutions is implausible. *Id.* ¶ 225. As Aya itself notes (*id.* ¶¶ 291-92), this business is not like that of a widget manufacturer (where, for example, one plausibly might save on shipments by the truckload or by purchasing raw materials in bulk). Aya also acknowledges that there are differences in the way larger and smaller hospitals purchase services, and this easily could affect pricing. *See, e.g., id.* ¶¶ 54, 56 (smaller hospitals prefer to purchase from providers that do not offer "the full cluster" of services).

As to Aya's claim of retaliatory harm, Aya still alleges that AMN terminated Aya's subcontract relationships with AMN and temporarily suspended Aya's access to certain accounts on one of AMN's software platforms. *Id.* ¶¶ 155, 194. These allegations remain largely conclusory and, of course, are entirely speculative in regard to AMN's motivations.  In any event, whatever harm Aya may claim to have incurred as an individual competitor, there are no facts alleged to show that any such termination or temporary suspension of collaborations with Aya impacted the market-wide process of competition.  The antitrust laws were enacted for the protection of competition (*i.e.*, the competitive process itself), not competitors. *Brunswick Corp.*, 429 U.S. at 488; *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988) ("It is injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant.").  A brief overview of the specific forms of conduct alleged by Aya shows in more detail why its claim of antitrust injury is unsupportable:

**"No-Poaching" Restraints**:  This case does not involve a freestanding horizontal "no-poaching" agreement, such as the ones in *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1115 (N.D. Cal. 2012) and *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1036 (N.D. Cal. 2013).  But, to the extent such cases are even relevant, it is noteworthy that they have been brought either by the government (*eBay*) or by the affected employees (*In re High-Tech*), not by competitors.  AMN has not been able to find even a single "no-poaching" case brought by a competitor, which is not surprising, as any potential economic impact of such agreements would be felt by employees and customers, not competitors.

Aya alleges that, prior to May 2015, it acquiesced in the restrictions, and it claims injury in the form of lost profits when it terminated its collaborations with AMN, allegedly to free itself of the restrictions.  SAC ¶¶ 10, 129, 144 n.8, 263. Such alleged losses do not flow from an anticompetitive aspect of AMN's conduct. There was no duty on the part of AMN to subcontract with Aya in the first place.

1  Firms, even those with substantial market power, are free to exercise their own

2  discretion as to the parties with whom they will deal.  *See United States v. Colgate*

3  *& Co.*, 250 U.S. 300, 307 (1919).  Moreover, Aya does not allege facts showing

4  that it lost any specific opportunities as a result or that AMN took any sort of

5  enforcement action during that pre-May 2015 time frame.[7]  In fact, Aya describes

6  the collaboration with AMN as "mutually profitable," and the gist of its argument

7  seems to be that it might have done even better had it begun to raid AMN's

8  personnel sooner.  This sort of vague, conclusory speculation does not suffice to

9  state a claim under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

10      As to the non-solicitation restraints allegedly contained in subcontracts

11  between AMN and rivals other than Aya, the alleged disadvantage to those other

12  rivals actually would benefit Aya in its competition with them for personnel.

13  Accordingly, there is no antitrust injury.  *American Ad Mgmt., Inc. v. Gen. Tel. Co.*,

14  190 F.3d 1051, 1056 (9th Cir. 1999) ("There can be no antitrust injury if the

15  plaintiff stands to gain from the alleged unlawful conduct.").

16      Aya's assertion that it is at a "competitive disadvantage" because other rivals

17  seek to recruit Aya's personnel and not AMN's as a result of the rivals being bound

18  by AMN's non-solicitation restrictions is conclusory speculation.  There are no

19  facts showing that Aya lost any personnel at all to those unidentified rivals, and,

20  even if it had, the suggestion that AMN's personnel would have been targeted and

21  successfully recruited instead is utterly speculative.  In any event, having to

22  compete with rivals to hire, train, pay and retain personnel is not injury that flows

23  from an anticompetitive aspect of conduct prohibited by the antitrust laws.

24      **The "Employers' Cartel"**:  As to the "employers' cartel" supposedly

25  involving AMN and other rivals of Aya, SAC ¶ 124, if such a thing existed, it

26

27  ────────────

28  [7] To the extent that Aya seems to be claiming damages for that time frame, much of that claim also would be barred by the Clayton Act's four-year statute of limitations in any event.  15 U.S.C. § 15b.

would not harm Aya's own ability to recruit medical personnel.[8]  In fact, Aya

would stand to benefit from fewer providers competing to woo the same personnel.

*See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

583 (1986) (competitor stands to gain from a conspiracy among its competitors to

raise market prices); *ARCO*, 495 U.S. at 337 (same); *American Ad Mgmt., Inc.*, 190

F.3d at 1056 (no antitrust injury if the plaintiff stands to gain from the alleged

unlawful conduct).

     **The Employee Restraints**:  Aya alleges that AMN included in contracts

with its own employees non-solicitation restrictions for one year or eighteen

months and "trade-secret covenants."  SAC ¶¶ 172-73.  Aya concedes, nevertheless,

that it has managed to assemble a "substantial pool" of travelers.  *Id.* ¶¶ 89, 264,

269, 272-73, 279 n.12.[9]  To the extent that other rivals would have had difficulty

recruiting from AMN due to the alleged employee restraints, that would help Aya

from a competitive standpoint, and, again, Aya would suffer no antitrust injury.

     **The "Exclusive Contracts"**:  Aya alleges that AMN has entered into

"exclusive-dealing contracts" with large hospitals or hospital networks in several

regions of the country and that this has resulted in certain percentages of

---

[8] The use of the term "cartel" by Aya is obviously intended for effect, but the characterization makes no sense and is not supported by the facts.  At most, Aya alleges that AMN had a no-hire agreement with one company, Host, SAC ¶¶ 158-71, and it only speculates that AMN may have had others.  *Id.* ¶¶146, 157.  There are no facts to suggest that these phantom parties had any agreements with (or even knowledge of) each other, as would be the case in a true cartel.

[9] Aya acknowledges that such restraints are not being imposed on California employees but alleges that AMN employees elsewhere continue to be bound.  There is no suggestion that the use of such restraints is unlawful in any of those other jurisdictions, nor are such restrictions normally considered a violation of the antitrust laws.  Restrictions in employee contracts are vertical, ancillary, and addressed under the rule of reason.  Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 2418 at 392 (3d ed. 2012).  They protect an employer's investment in the employee, as well as confidential information that would be valuable to rivals, such as customer lists and business methods.  *Id.*, ¶ 2134 at 231.  As recognized by the Ninth Circuit, and the district courts in this Circuit and elsewhere, the vast majority of such restraints, when evaluated under the rule of reason, are found to be lawful.  *Id.*, ¶ 2134 at 230-31.  *See, e.g., Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983); *accord Signature MD, Inc. v. MDVIP, Inc.*, Case No. CV 14-5453 DMG (SSx), 2015 WL 3988959 at *6 (C.D. Cal. Apr. 21, 2015).

1   "foreclosure." SAC ¶¶ 228-32.[10] Aya does not specify the terms of any alleged

2   exclusive-provider contracts. It just states its speculative "belief" that the contracts

3   have "renewable" terms and argues on that basis that the alleged contracts are "*de*

4   *facto* long-term" contracts. *Id.* ¶¶ 111, 232. Such non-specific and conclusory

5   allegations cannot show substantial foreclosure, especially in light of case law

6   finding exclusive contracts ranging from one to even five years reasonable. *PNY*

7   *Techs., Inc. v. San Disk Corp.*, Case No. 11-cv-04689-WHO, 2014 WL 1677521, at

8   *5 (N.D. Cal. April 25, 2014). *See also PNY Techs., Inc. v. SanDisk Corp.*, Case

9   No. 11-cv-04689-WHO, 2014 WL 2987322, at *5-7 (N.D. Cal. July 2, 2014).

10          To the extent exclusive contracts are alleged to foreclose competition in

11   certain metropolitan areas and regions, SAC ¶¶ 229-30, the allegations are still

12   insufficient to show substantial foreclosure, pursuant to the criteria set forth in

13   *Tampa Electric*. As discussed below, Aya's so-called "adjusted" market share

14   allegations are unsupportable on their face. But Aya also uses those same numbers

15   to assert percentages of "foreclosure" for its alleged regional "markets." *Compare*

16   SAC ¶¶ 82-83 *with* SAC ¶¶ 229-30. Aside from the fact that the shares are padded

17   and bogus, the fact that a company has a 50% market share simply does not equate

18   to that market being 50% unavailable to competition. As to Aya's allegations of

19   AMN's exclusive contracts with certain hospitals, SAC ¶ 231, a contract with any

20   particular hospital in a huge metropolitan area like New York, Los Angeles or

21   Chicago, is, on its face, insufficient to foreclose competition throughout the area.

22   Such conclusory allegations are implausible and insufficient to state a claim for

---

23   [10] Exclusive dealing contracts are not disfavored by the antitrust laws and, in many
24   circumstances, they can be highly efficient. *Race Tires Am., Inc. v. Hoosier Racing
     Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010). They enhance inter-brand competition.
     *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).
25   Moreover, they can prevent a competitor like Aya from free-riding on the
     investments of another competitor, like AMN. *See Ryoko Mfg. Co. v. Eden Servs.*,
26   823 F.2d 1215, 1234 n.17 (8th Cir. 1987); *see also* American Bar Association,
     Antitrust Law and Economics of Product Distribution, at 249-50 (ABA 2006)
27   (cataloguing procompetitive aspects of exclusive dealing arrangements). Such
     agreements are vertical and are judged by the rule of reason. *See Omega*, 127 F.3d
28   at 1162. They are not unlawful in the absence of substantial foreclosure of the
     relevant market. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961).

1    exclusive dealing.  *See, e.g., PNY Techs., Inc.*, 2014 WL 1677521, at *6-7.  There

2    are insufficient facts alleged to show any anticompetitive effects from these alleged

3    contracts, let alone that Aya has suffered injury as a result of market foreclosure.[11]

4        **Software Licensing**:  Aya alleges that certain hospitals use software

5    marketed by AMN for managing their staffing needs, and Aya claims that the

6    license agreements that it and other staffing vendors are required to sign in order to

7    use the software contain certain restrictions and require the payment of certain fees.

8    SAC ¶¶ 22, 72, 77.[12]  There is no allegation that hospitals use this software for any

9    reason other than its efficiencies.[13]  If Aya chooses voluntarily to provide staffing to

10   hospital facilities that have chosen to use the software (which AMN has no legal

11   duty to make available in the first instance, *see Verizon Commc'n Inc. v. Law*

12   *Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004)), the associated fees

13   are simply a cost of doing business and do not flow from any restraint of

14   competition.  No facts are alleged, nor could they be, to show that Aya experienced

15   higher costs as a result of other AMN rivals using the software.

16       **Acquisitions**:  As to AMN's acquisitions, SAC ¶¶233-34, Aya alleges no

17   facts to show that they caused any injury to competition (or to Aya in particular).

18   *See Eastman v. Quest Diagnostics, Inc.*, Case No. 15-cv-00415-WHO, 2015 WL

19   7566805, at *13 (N.D. Cal. Nov. 25, 2015) (dismissing complaint where plaintiff

20   failed to plausibly allege any specific anticompetitive effects of acquisitions).  In

21   any event, the merger of competitors likely would result in **stronger** competition,

22   so any "injury" would not be the result of **diminished** competition (antitrust

---

23   [11] Aya acknowledges that hospitals prefer to purchase staffing services from a
     single provider.  SAC ¶ 36.  Indeed, the value of retaining a staffing company is the

24   efficiency of having a single point of contact for their temporary personnel needs.
     [12] As in the case of the subcontract arrangements discussed above, vendors are not

25   coerced by AMN to use its software.  They are perfectly free to choose not to enter
     into arrangements that require such licensing.

26   [13] Non-compete provisions that prevent a licensee from competing with a licensor
     of intellectual property are recognized as serving the legitimate objective of
     controlling free-riding by competitors of the licensor.  *See Polk Bros. Inc.*, 776 F.2d

27   at 190; *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1298 (11th Cir.
     2004) (prevention of free-riding "constitutes a legitimate pro-competitive reason for

28   imposing a restriction").

injury).  *See Brunswick Corp.*, 429 U.S. at 487-88.

**"Sham" Litigation**:  This issue will be discussed more fully in the section dealing with Aya's Third Cause of Action.  Insofar as antitrust injury is concerned, however, there are simply no well-pleaded facts to show that competition has been diminished because of the litigation.  Aya's speculative assertions about AMN's supposed motivations, SAC ¶¶ 208-11, do not pass muster under *Twombly*, and the notion that competition as a whole has suffered because of two state court litigations (only one was against Aya) is inherently implausible.

**"Cash Flow Squeeze"**:  The allegations concerning this supposed conduct, *Id.* ¶¶ 235-38, are all conclusory and speculative, devoid of well-pleaded facts showing any injury to competition.  Moreover, to the extent any competitors would have been adversely affected by this alleged conduct, that would only help Aya.

Despite being provided an opportunity to amend its allegations to demonstrate antitrust injury, Aya still has failed to make that showing.  Because antitrust injury is an essential element of all of Aya's antitrust claims, they should be dismissed with prejudice.

### B.   Aya's First Cause of Action Also Fails For Additional Reasons.

The rule of reason is the accepted standard for testing whether a business practice violates § 1 of the Sherman Act.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).  The *per se* standard is confined to restraints that always or almost always restrict competition, decrease output and lack "**any** redeeming virtue." *Id.* at 886 (emphasis supplied).  The "no-poaching restraints" and "employers' cartel" alleged in Aya's First Cause of Action do not fall within that category for the reasons discussed below.

### 1.   The "No-Poaching Restraints"

The SAC alleges that AMN is a party to what Aya labels "no-poaching" agreements with other companies.  However, these alleged agreements are part of subcontracts; they are not freestanding agreements.  *See, e.g.*, SAC ¶ 123.  As such,

-10-

they are legitimate collaborations between AMN and other vendors, including at times Aya, that serve procompetitive purposes (ensuring adequate staffing for hospitals). *Id.* ¶ 34. Indeed, Aya admits that this sort of collaboration increases output, *id.* ¶ 255, and it even admits that many joint venture and collaboration agreements include non-solicitation clauses, which can be "reasonable" and "ancillary" to such a venture. *Id.* ¶¶ 134, 136-37. Aya thus implicitly concedes that this **type** of restriction, if lesser in scope, would be judged by the rule of reason.[14]

There are at least three reasons why the so-called "no-poaching" restrictions must be judged by the rule of reason. First, they are part of essentially **vertical** arrangements, and the standard applied in assessing such arrangements is the rule of reason. *See Leegin*, 551 U.S. at 886-87. A non-solicitation requirement in a vertical arrangement is thus fundamentally different from one that is a freestanding horizontal agreement, as in *In re High-Tech*.[15] Aya no longer expressly admits (as it did in the FAC) that these arrangements are vertical, but Aya's deletion of that admission does not change the vertical nature of the subcontractor relationship. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988) (vertical agreements are not subject to *per se* treatment, even if they have horizontal effects).

Second, the Supreme Court repeatedly has held that the rule of reason is the proper standard for testing restrictive covenants ancillary to a legitimate transaction. *Nat'l Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 689 (1978). As the Ninth Circuit explained in *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*:

> Generally, the effect of a finding of ancillarity is to "remove the *per se* label from restraints otherwise falling within that category." . . . The

---

[14] There is no allegation that providers who have participated in these arrangements, including Aya, were coerced to do so. Nor is there any allegation that vendors have tried to negotiate the scope of the challenged restrictions but that AMN rejected such efforts. Providers are also perfectly free not to participate at all in collaborations with AMN. *See Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1002 (9th Cir. 2010) (absent evidence of compulsion, the only rational inference that could be drawn from hospitals' adoption of new technology was that they regarded it to be a superior product).
[15] Note that even in *In Re High-Tech*, the court did not rule on the issue of *per se* vs. rule of reason. 856 F. Supp. 2d at 1115 n.9, 1122.

-11-

> ancillary restraint must then be tested under the rule of reason, . . . the relevance of ancillarity being it "increases the probability that the restraint will be found reasonable."

726 F.2d 1381, 1395 (9th Cir. 1984) (internal citations omitted).  Restraints that are ancillary to collaborations between competitors for procompetitive purposes (such as assuring that the staffing needs of hospitals are met), or those that are ancillary to an employment contract, are recognized as fundamentally different from "naked" horizontal restraints, such as those at issue in the cases cited by Aya.[16]

In *Polk Bros.*, Judge Easterbrook described the role of ancillarity by distinguishing the situation in which two people just meet one day and decide not to compete with each other from the situation in which A hires B as a salesman and shares customer lists with B but requires a covenant not to compete in return.  776 F.2d at 189.  The latter restraint is "ancillary" and must be evaluated under the rule of reason because it contributes to the success of a cooperative venture that promises greater productivity and output.  *Id.*; *see also Antitrust Guidelines for Collaborations Among Competitors*, 2000 WL 33534553, at *1-2, 5 (F.T.C. Apr. 1, 2000) (discussing the procompetitive aspects of competitor collaborations); *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1336 (Fed. Cir. 2010) (". . . agreements not to compete that might be suspect standing alone are regarded as reasonable when they are ancillary to 'a larger endeavor whose success they promote'") (quoting *Polk Bros. Inc.*, 776 F.2d at 189).  Here, the alleged covenant is pro-competitive, because it allows AMN to engage in a collaboration with a potential competitor without "cutting its own throat."  *Polk Bros.* at 190 ("The Supreme Court has recognized that the control of free riding is a legitimate objective . . . .");  *see also Morris Commc'ns*, 364 F.3d at 1295-96; *Rothery Storage*

---

[16] Even in the case of naked "no-poaching" restraints, the courts have hesitated to apply a *per se* standard.  *See In re High-Tech*, 856 F. Supp. 2d at 1117, 1122 (agreements "were not related to a collaboration between defendants;" yet the court still deferred deciding whether to apply a *per se* or rule of reason analysis); *eBay*, 968 F. Supp. 2d at 1039 (court could not determine from the pleadings alone whether the agreement was ancillary to a "legitimate procompetitive business purpose": the service of an Intuit executive on eBay's board).

WEST\280112185                                    MEMO OF PS&AS ISO DEFENDANTS' MOTION TO DISMISS SAC
                                                  CASE NO. 3:17-CV-00205 MMA (MDD)

1    *& Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 228 (D.C. Cir. 1986).

2          Aya essentially admits that this **type** of restraint would be ancillary (and

3    judged by the rule of reason) if it were only narrower in scope and duration.  SAC

4    ¶¶ 134, 136-37.  But, Aya argues that its scope and duration make it subject to *per*

5    *se* scrutiny.  That is where Aya's legal argument goes off the rails.  Aya's mistake

6    is to conflate two separate issues: (1) whether a restriction is the **type** of restriction

7    that can be reasonable when part of a collaborative venture, and (2) whether the

8    restriction is too broad.  AMN is unable to find **even a single case** holding that a

9    non-solicitation covenant included in a subcontract or joint venture arrangement (of

10   **any** scope or duration) is *per se* unlawful.  The accepted standard of review for

11   such arrangements is the rule of reason.  This is not surprising, as courts are

12   reluctant to extend the categories of *per se* restraints beyond a very limited few.

13   *Aydin Corp.*, 718 F.2d at 900; *Leegin*, 551 U.S. at 886-87.[17]

14         Numerous cases from the Supreme Court, the Ninth Circuit and other circuits

15   have **always** evaluated restraints related to collaborations, joint ventures or

16   transactions under the **rule of reason**.  Most notably, the Supreme Court, in *Nat'l*

17   *Collegiate Athletic Ass'n*, *v. Bd. of Regents of Univ. Okla.*, 468 U.S. 85 (1984),

18   applied the rule of reason, even though the provision at issue there (1) restrained the

19   ability of members to compete on both price and output, (2) was **not "necessary"**

20   to market the product, and (3) was "**not even arguably tailored**" to serve the

21   proffered justification.  *Id*. at 103, 114, 117-19 (emphasis added).  Similarly, in

22   *Aydin*, the Ninth Circuit held, in regard to a non-solicitation provision in an

23

24   ────────────
     [17] Aya cites the Antitrust Guidance for Human Resource Professionals, published
25   by the DOJ Antitrust Division and the FTC in October 2016 for the proposition that
     no-poaching agreements are *per se* illegal if they are "not reasonably necessary" to
     a legitimate collaboration.  SAC ¶ 140.  But the law is established by Congress and
26   not by agency enforcement guidelines.  *See generally Christensen v. Harris Cty.*,
     529 U.S. 576, 587 (2000) (enforcement guidelines lack the force of law and are
27   "entitled to respect" only to the extent persuasive).  It is worth noting that the
     Guidance has been the subject of sharp academic criticism on precisely this point.
28   *See, e.g.,* Taladay, J., *Criminalization of wage-fixing and no-poaching agreements*,
     Competition Policy Int'l (June 2017).

1   employee termination agreement, that "the courts have had inadequate experience

2   with noncompetition and noninterference covenants to warrant a *per se*

3   categorization." 718 F.2d at 900; *see also Eichorn v. AT & T Corp.*, 248 F.3d 131,

4   144 (3d Cir. 2001) (courts uniformly have found no-hire agreements associated

5   with the sale of a business subject to the rule of reason); *Consultants & Designers,*

6   *Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1561-62 (11th Cir. 1983) ("[T]he

7   validity of covenants not to compete under the Sherman Act must be analyzed

8   under the rule of reason," and whether there is a legitimate business purpose in

9   enforcing the restriction is "precisely the sort of issue which is suitable to rule of

10  reason determination."); *Rothery Storage*, 792 F.2d at 228-29 (horizontal restraints

11  were lawful under the rule of reason where elimination of free riding was an

12  efficiency justification); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542

13  F.3d 290, 334 (2d Cir. 2008) ("*MLB*") (rule of reason applied to exclusivity

14  agreements related to intellectual property licensing); *In re ATM Fee Antitrust*

15  *Litig.*, 554 F. Supp. 2d 1003, 1016 (N.D. Cal. 2008) (rule of reason applied to

16  horizontal price-fixing because the arrangement was part of a valid joint venture).

17       Claims of overbreadth, such as Aya's here, routinely are adjudicated as part

18  of the rule of reason analysis.  For example, the Ninth Circuit, in *Los Angeles Mem.*

19  *Coliseum Com'n v. National Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984),

20  held that whether the putative benefits can be achieved by less restrictive means is

21  part of the rule of reason inquiry.  The other circuits that have addressed the issue

22  agree.  *See Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 267 (7th Cir. 1981)

23  (overbroad language was irrelevant; courts enforce restrictions to the extent

24  reasonable); *Snap-on Tools, Corp. v. F.T.C.*, 321 F.2d 825, 837 (7th Cir. 1963)

25  (even if unreasonable in geographic scope, the restriction was not a *per se* violation

26  and would be enforced to the extent reasonable); *United States v. Empire Gas*

27  *Corp.*, 537 F.2d 296, 307-08 (8th Cir. 1976) (rule of reason applied to contracts

28  with non-compete covenants that were alleged to be unnecessarily restrictive in

time and area); *MLB*, 542 F.3d at 340 n.9 (Sotomayor, J., concurring) (issue of less restrictive alternative should be part of the rule of reason analysis).[18]

Aya cites *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) in support of the *per se* standard. SAC ¶ 123. But there the market allocation agreement between the parties was unrelated to any transaction or venture, as the parties entered into it **after** their partnership already had been dissolved. *Blackburn*, 53 F.3d at 828-29. In contrast, here, the non-solicitation provision was part and parcel of the collaboration agreements and, pursuant to the uniform holdings of all courts that have adjudicated the issue, the rule of reason is the proper standard.[19]

There is yet a third reason why *per se* treatment is inappropriate here. Courts do not apply the *per se* standard in cases where the economic impact of the practice is not immediately obvious. They do so only after they have had considerable experience with the form of business relationship and no elaborate study of the industry is needed. *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Aydin Corp.*, 718 F.2d at 900; *Leegin*, 551 U.S. at 886-87; *see also Int'l Healthcare Mgt. v. Hawaii Coalition for Health*, 332 F.3d 600, 605 (9th Cir. 2003) ("Per se categories are not to be expanded indiscriminately to new factual situations.") (citations omitted). The healthcare staffing industry is a highly specialized and complex line of commerce, much more so than manufacturing and other service businesses. The dynamics of supply and demand are far from obvious. For example, unlike typical manufacturing industries in which labor costs are an input (*i.e.*, employee wages are part of the cost of manufacturing widgets), labor is an output for staffing

---

[18] Aya seems to suggest that the duration of a restriction must be strictly limited to the length of the collaboration. SAC ¶¶ 134, 137. That is not the law. As discussed in *Lektro-Vend, Co.*, *Snap-on Tools, Corp.*, and *Empire Gas Corp.*, regardless of the language of the restriction, the courts will enforce restrictions to the extent "reasonable," which depends on the circumstances, and that must be determined under the rule of reason.

[19] *See Polk Bros., Inc.*, 776 F.2d at 189-90 (In assessing the competitive impact of an ancillary restraint, the focus must be when the venture was formed. "A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the Rule of Reason . . . ")

companies.  It is by no means obvious how any contractual restraint between staffing companies could affect how much nurses/technicians are paid by hospital clients, which have their own economic circumstances to consider that have nothing to do with the staffing companies.  Accordingly, Aya is not only asking this Court to break new ground and become the first court **anywhere** to hold that a non-solicitation provision in a collaboration agreement is *per se* unlawful, but it invites the Court to do so in a highly complex and unusual industry.  This flies in the face of Supreme Court jurisprudence.

### 2.      The Alleged "Employers' Cartel"

Aya also alleges that AMN engaged in an "employers' cartel" with other providers.  The alleged **facts**, however, describe what is just a two-party subcontract arrangement between AMN and Host Healthcare.  SAC ¶¶ 158-71.  The SAC also alleges that AMN invited Aya to agree to a mutual "no-hire" agreement but that Aya refused.  *Id.* ¶¶ 149, 151.  On this flimsy factual predicate, Aya "surmises" and "believes" that AMN "possibly" entered into no-hire agreements with others.  *Id.* ¶ 146, 157.  On its face, the term "cartel" is an obvious misnomer, as Aya alleges no facts to show any agreement among the hypothetical participants, all of which are unidentified other than Host.  The label is undoubtedly being used in a disingenuous attempt to bolster Aya's argument for application of the *per se* standard.  Aya also fails to identify what the unidentified members of the "cartel" agreed to and when and how they came to such an agreement, which types of employees supposedly were involved, or any other factual information.  Speculative allegations of this sort are precisely the types of allegations that the Supreme Court found insufficient in *Twombly*.  550 U.S. at 554-57; *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008) (affirming dismissal for failure to plead evidentiary facts in support of the conclusory allegations).

For these additional reasons, Aya's first claim fails and should be dismissed with prejudice.  As the Supreme Court ruled in *Texaco, Inc.*, it is up to the plaintiff

-16-

1    to plead its case, and if it chooses to specify only a *per se* claim (as Aya has done

2    here) and cannot support that, then dismissal of the claim as a matter of law is the

3    proper result.  547 U.S. at 7 n.2 (declining rule of reason review where only a *per se*

4    claim was pleaded and it was dismissed); *see also In re Ins. Brokerage Antitrust*

5    *Litig.*, 618 F.3d 300, 317 (3rd Cir. 2010); *eBay*, 968 F. Supp. 2d at 1038.[20]

6    **C.   Aya's Second Cause of Action Also Fails For Additional Reasons.**

7    **1.   The Requirements For A Rule of Reason Claim**

8    Aya's Second Cause of Action alleges that various agreements between

9    AMN and others violate § 1 of the Sherman Act, pursuant to the rule of reason.

10   Whether a restraint is unreasonable under this standard is determined by weighing

11   all of the circumstances, *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36,

12   49 (1977), including specific information about the relevant business and the

13   restraint's history, nature and effect.  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

14   In judging the effects of the restraint, the Court must consider whether the business

15   has market power and the market's structure, in order to ascertain the restraint's

16   actual effect.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768

17   (1984).  Any anticompetitive effects must be balanced against any justifications or

18   procompetitive effects.  *American Ad Mgmt. Inc. v. GTE Corp.*, 92 F.3d 781, 789

19   (9th Cir. 1996).  To state a claim, the plaintiff also must allege and ultimately prove

20   injury in fact, *Story Parchment*, 282 U.S. at 563, as well as "antitrust injury,"

21   *Brunswick Corp.*, 429 U.S. at 489, and damages.

22   _____

23   [20] Apparently cognizant of being on thin ice in regard to application of the *per se*
     standard, Aya also included the same conduct alleged in the First Cause of Action

24   in its Second Cause of Action, which seeks review under the "quick look" or rule of
     reason standard.  SAC ¶¶ 316-17.  For the same reasons discussed above in regard

25   to the *per se* standard, the "quick look" standard would not apply here.  *See Texaco,*

26   *Inc.*, 547 U.S. at 7 n.3 (joint venture case where the economic impact of the
     practices was not obviously injurious to competition upon a cursory examination;

27   "for the same reasons that *per se* liability is unwarranted here, we conclude that

28   petitioners cannot be held liable under the quick look doctrine").

## 2.     Aya Fails to Plead Properly Defined Relevant Markets.

To show that a restraint is unreasonable under the rule of reason, the plaintiff must identify and sufficiently define the relevant market.  In regard to the product or service at issue, the market must be defined with reference to the rule of reasonable interchangeability (one product or service within the market is roughly equivalent to another), or else dismissal will be granted.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997).  In this regard, the service market alleged by Aya, "medical-traveler services" (SAC ¶ 51), is vague on its face and not supported by factual allegations.  Aya purports to include licensed nurses and medical technicians within the same alleged relevant market, *id.* ¶¶ 51-53, but it fails to provide any facts demonstrating, for example, that licensed nurses are substitutable for medical technicians and vice versa.  Further, there is no explanation why only technicians and no other types of temporary medical personnel (such as physical therapists, pharmacists, or physicians) would be included.  Aya also alleges in conclusory fashion that hospitals purchase only from providers that can offer a "full cluster" of undefined "complementary services," but Aya pleads no facts supporting or explaining the basis for that assertion.  *Id.* ¶ 54; *see also Thurman Ind., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1377 (9th Cir. 1989) ("[A] cluster approach is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately.").  There is also an ambiguity throughout the SAC as to whether the purported service market for medical services provided by the "medical travelers" includes services provided by those who recruit "medical travelers."  To the extent that the latter are intended to be part of a separate relevant market, there are no facts alleged to show that all recruiters of "medical travelers" are indeed substitutable or why recruiters of medical personnel are not substitutable for recruiters of other professionals.  For all of these reasons, Aya fails to define the relevant service market(s) adequately.

To avoid dismissal, a plaintiff also must plead a plausible geographic relevant market that includes the "full range of selling opportunities reasonably open to [competitors.]"  *Stewart v. Gogo, Inc.*, Case No. C-12-5164 EMC, 2013 WL 1501484, at *4 (N.D. Cal. Apr. 10, 2013); *see also Landsdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne LLC*, 2011 WL 5872885, at *4-6 (E.D. Va. Nov. 22, 2011) (dismissing complaint that defined the geographic market in an unreasonably and implausibly narrow manner).  Here, Aya alleges that it and AMN compete throughout the U.S. and that the entire nation is a relevant market.  SAC ¶ 58.  However, Aya also claims that there are "various regional submarkets in the United States," *id.* ¶¶ 60-64, which it characterizes as comprising "greater metropolitan regions" and, in "less populous regions," state-wide markets.  *Id.* ¶¶ 62-63.  Aya's rationale for submarkets rests on vague references to "distinct regulatory requirements," the allegation that some "medical travelers" are qualified in (or willing to travel to) only certain regions[21] and the suggestion that hospitals in different regions pay different prices and have different staffing requirements.  *Id.* ¶ 60.  Aya alleges in conclusory fashion that "the pool of available travelers largely varies from region to region," *id.* ¶ 60(2), but Aya provides no supporting facts.  These vague submarket allegations are not sufficiently definite to support a claim under the rule of reason.

**3.     Aya Fails to Plead Facts Showing Harm to The Process of Competition.**

The burden is on the plaintiff to plead facts showing harm to competition either by (1) direct evidence or (2) a combination of market power and a likelihood of harm to competition.  *Federal Trade Comm'n v. Ind. Fed. of Dentists*, 476 U.S. 447,460-61 (1986).  As to direct effects (reduced output and/or higher prices), Aya

---

[21] The allegations do not contravene the fact that the pool of personnel who may be willing to travel to meet medical staffing needs is at least national, if not global.  *See* U.S. News & World Report, Immigrant Nurses: Filling the Next U.S. Shortage, March 29, 2017 (available at https://health.usnews.com/wellness/articles/2017-03-29/immigrant-nurses-filling-the-next-us-shortage) (last visited February 5, 2018).

1  has alleged a shortage of nurses, but that shortage is attributable to a variety of

2  alleged supply factors unrelated to AMN's conduct.  SAC ¶¶ 107-08.  As for

3  pricing, as discussed previously, Aya claims that AMN is charging higher prices to

4  **large** hospitals than what other providers charge **smaller** hospitals, *id.* ¶¶ 98-99,

5  225.  But the facts alleged to support this contention are insufficient to show any

6  market-wide effects.  Additionally, there is no rationale provided for this apples-to-

7  oranges comparison.[22]  In any event, as noted, higher prices actually benefit Aya as

8  a seller of services.

9        In regard to market power, the SAC provides more specific market share

10  allegations than the FAC for various proposed regional markets.  But Aya's

11  methodology for arriving at the proffered market share percentages remains totally

12  opaque.  What is clear is that Aya is not providing readily available third-party

13  market share data, but rather an "Aya internal market analysis," whereby Aya

14  "adjusts" the shares in some undefined manner to account for sales by other

15  providers that AMN supposedly "controls."  SAC ¶¶ 66-91.  This gerrymandering

16  is not a recognized approach to market share metrics and, as discussed further

17  below, is an obvious device to pad AMN's supposed shares.

18       **D.**     **Aya's Attempted Monopolization Claim Fails To State A Claim.**

19        To state a claim for attempted monopolization under § 2 of the Sherman Act,

20  a plaintiff must plead that: (1) the defendant engaged in predatory/exclusionary

21  conduct; (2) with a specific intent to monopolize; and (3) there was a dangerous

22  probability that the attempt would be successful.  *Spectrum Sports, Inc. v.*

23  *McQuillan*, 506 U.S. 447, 456 (1993).  Such claims are assessed under the rule of

24  reason, and an indispensable element of the claim is a well-defined relevant market.

25  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172,177

26  (1965); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997), *overruled on*

27

28

---

[22] Aya alleges repeatedly, but without any factual specifics, that large hospitals
"believe" they have no other options due to the scope and size of AMN's pool of
travelers.  *Id.* ¶¶ 96, 224, 246, 248-49, 260.

1  *other grounds*, *Lacey v. Maricopa Cnty.*¸ 693 F.3d 896 (9th Cir. 2012).

2          **1.**      **Aya Fails to Plead a Well-Defined Relevant Market.**

3        The pleading deficiencies discussed above in regard to the definition of the

4  relevant service and geographic markets also infect Aya's claim for attempted

5  monopolization and are incorporated here by reference.  *See Blizzard Entm't Inc. v.*

6  *Ceiling Fan Software LLC*, 941 F. Supp.2d 1227, 1231 (C.D. Cal. 2013) ("relevant-

7  market inquiry does not differ for Section 1 and Section 2 of the Sherman Act").

8          **2.**      **Aya Fails to Allege Exclusionary Conduct.**

9        To be condemned as exclusionary, an act "must have an 'anticompetitive

10  effect.'  That is, it must harm the competitive *process* and thereby harm consumers.

11  In contrast, harm to one or more *competitors* will not suffice."  *U.S. v. Microsoft,*

12  *Inc.*, 253 F.3d 34, 58 (D.C. Cir. 2001); *see also Lucas v. Citizens Commcn's Co.*,

13  244 F. App'x 774, 776 (9th Cir. 2007) (plaintiff's claims were "fundamentally

14  flawed because he fails to allege and prove harm, not just to a single competitor, but

15  to the competitive process, *i.e.,* to competition itself") (internal quotation omitted);

16  *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l*

17  *Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) ("We therefore insist on a

18  preliminary showing of significant and more-than-temporary harmful effects on

19  *competition* (and not merely upon a competitor or customer) before these practices

20  can rise to the level of exclusionary conduct.") (internal quotations omitted).

21        Aya alleges several unilateral forms of conduct that it calls "exclusionary."[23]

22  First, Aya claims that AMN has pursued "sham litigation" against it.  SAC ¶¶ 182-

23  218.  In regard to such claims, a plaintiff must allege facts showing that the lawsuit

24  is "objectively baseless," *i.e.*, that no reasonable litigant could expect success on the

25  merits.  Only then may a court examine a litigant's subjective motivation to

26  determine if the lawsuit conceals an attempt to interfere with the business

27

28  _____
[23] AMN already has explained that Aya has failed to show any impact on the **process** of competition from AMN's alleged contractual restraints.

relationships of a competitor through the *use* of the governmental process (as opposed to through the *outcome* of that process).  *Oracle Am., Inc. v. Terix Computer Co., Inc.*, Case No. 5:13-cv-03385-PSG, 2014 WL 5847532, at *7 (N.D. Cal. Nov. 7, 2014) (conclusory allegations that the lawsuits are "pretextual" insufficient).  Applying these standards here, it should be noted first that California law is unsettled in regard to the validity of employee non-solicits,[24] so the single state court lawsuit against Aya referenced in the SAC, which is now on appeal, cannot be said to be objectively baseless.  Additionally, there are no ***facts*** (as opposed to speculation) alleged to show that AMN has attempted to interfere with Aya's business by the *process* of the litigation itself (as opposed to AMN simply seeking the relief sought).  Aya's characterizations of AMN as litigating in an "aggressive, excessive" or "disproportionate" manner, SAC ¶¶ 208, 213, are conclusory and of no legal significance.  There are also no well-pleaded facts to show that the single lawsuit against Aya has impacted the process of competition.

Aya also claims that AMN imposed a "cash flow squeeze" on its subcontractors, but the allegations are all conclusory.  SAC ¶¶ 235-38.  Indeed, Aya alleges in only the vaguest terms that unidentified payment delays are based on

---

[24] Some courts have held that the California Supreme Court in *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937, 946 n.4 (2008) overruled pre-existing case law that such clauses were valid if reasonable, even though *Edwards* expressly declined to address the validity of employee non-solicits.  Other courts have continued to find employee non-solicits valid notwithstanding *Edwards*.  *See, e.g., Arthur J. Gallagher & Co. v. Lang*, Case No. C 14-0909 CW, 2014 WL 2195062, at *4 (N.D. Cal. May 23, 2014) ("the provision of the agreement prohibiting Lang from recruiting Gallagher's employees is not void"); *Dominion Enters. v. LinkUSystems, Inc.*, Case No. SACV 11-1852 DOC (ANx), 2012 WL 12886502, at *6 (C.D. Cal. Feb. 16, 2012) ("The only plausible reading of Dominion's complaint is that Durment allegedly violated a non-solicitation agreement prohibiting co-worker solicitation.  California case law establishes the enforceability of such agreements.").  Furthermore, the "trade secret exception to § 16600 still applies. Nothing in *Edwards* is to the contrary." *Bank of Am., N.A. v. Lee*, Case No. CV 08-5546 CAS (JWJx), 2008 WL 4351348, at *6 (C.D. Cal. Sept. 22, 2008) (internal quotation omitted).  In the state court case, AMN asserted that Aya had used *inter alia* its confidential travel nurse lists, which are protectable trade secrets, contrary to the ruling in the state court case cited by Aya.  *Courtesy Temp Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1291 (1990) (information provided in confidence about a recruiting company's clients and candidates constitute trade secrets of the employer).

1  "one asserted issue or another," *id.* ¶ 236, and fails to identify any supposed victim

2  of this alleged practice or any particulars, such as when, where, in what amount, on

3  which account, etc.  No well-pleaded facts are alleged to show how this alleged

4  "cash flow squeeze" has impacted the process of competition.

5         Finally, in regard to the so-called "monopolistic" acquisitions, Aya alleges a

6  grand total of six acquisitions by AMN over a 17-year period (two software

7  companies and four "rival providers"), *id.* ¶ 233-34, hardly a record of excessive

8  acquisitiveness, on its face.  More importantly, Aya alleges no facts showing the

9  purported competitive impact of these acquisitions on the alleged relevant market.

10 *See Eastman*, 2015 WL 7566805, at *13.  There is thus no factual basis for Aya's

11 characterization of these acquisitions as "exclusionary."  Indeed, Aya has failed to

12 show that any of the alleged conduct has had any impact on competition as a whole.

13
            **3.    Aya Fails to Plead Facts Showing a Dangerous Probability**
            **That AMN Would Succeed in Becoming a Monopoly.**
14

15        A starting point for assessing whether there is a dangerous probability that an

16 attempted monopolization would succeed is the defendant's market share.  As

17 noted, the market share percentages alleged by Aya are based on "Aya's internal

18 market analysis," SAC ¶ 79, rather than easily available third-party industry data,

19 and the percentages also are obviously padded by unquantified "adjustments,"

20 supposedly to account for sales that AMN does not make but purportedly

21 "controls."  *Id.* ¶¶ 67-69, 71, 78-79, 82.  Aya's motive to inflate the shares is

22 transparent, and the alleged percentages resulting from this data manipulation are

23 not actual facts; they are merely conclusions based upon undisclosed assumptions

24 and are therefore not entitled to a presumption of truth.  *See Twombly*, 550 U.S. at

25 555 (courts need not accept as true conclusions couched as facts).

26        Additionally, Aya fails to show that there are any legally significant barriers

27 to entry or expansion by competing firms.  A mere showing of substantial or even

28 dominant market share is insufficient if the plaintiff has not shown also that rivals

cannot enter the market and that existing competitors could not expand in response to higher prices. *Rebel Oil Co. Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995); *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1138 (N.D. Cal. 2010) (even with 60% share, dismissing claim because there were no barriers to entry in the market as a whole).[25]  Here, Aya describes itself as a "rising" competitor, which has expanded exponentially in recent years (by 350%) and boasts 150 recruiters and a "substantial pool" of medical travelers.  SAC ¶¶ 89, 264, 269, 272-73, 279 n.12.  Additionally, as previously noted, providers like Aya (and AMN) can and regularly do expand their capacity by subcontracting with other providers to fill orders when unable to fill a hospital's order from their own pool. *Id.* ¶ 34.  Aya admits that most of the supposed barriers to entry are garden variety requirements that any business would encounter and do not even involve conduct on the part of AMN.  *Id.* ¶ 106.  These ordinary requirements include capital requirements (unspecified by Aya), brand value, administrative expertise and professional contacts.  *Id.* ¶¶ 112-14.[26]  Other than these ordinary requirements faced by virtually every business, the only other "barriers" Aya identifies are the nursing shortage, *id.* ¶¶ 107-08, which is not attributable to AMN, and AMN's allegedly unlawful restraints.  For reasons already discussed above, none of those restraints are legally significant barriers to entry.  For all of these reasons, Aya's

_____

[25] Hypothetically, if additional potential competitors were unable to enter the market, that would help Aya, further undermining its claim of antitrust injury.
[26] As to brand considerations, it is well-established that reputation is not an entry barrier.  *United States v. Syufy Enters.*, 903 F.2d 659, 669 (9th Cir. 1990) ("We fail to see how the existence of good will achieved through effective service is an impediment to, rather than the natural result of, competition."); *Am. Prof'l Testing*, 108 F.3d at 1154 ("[R]eputation alone does not constitute a sufficient entry barrier in this Circuit."); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) (the presence of a competitor with a proven product and strong reputation is not anticompetitive; it is the essence of competition).  As to capital requirements, there are no allegations of long-run costs that were not or will not be incurred by incumbent providers.  *See E. Portland Imaging Ctr., P.C. v. Providence Health System-Oregon*, 280 F. App'x 584, 586 (9th Cir. 2008); *Syufy*, 903 F.2d at 666-67 (contrasting circumstances there with those in which there are "onerous front-end investments that might deter competition from all but the hardiest and most financially secure investors").  As to expertise and professional contacts, there is no allegation that Aya or any of the other providers have had any particular difficulty establishing themselves in that regard.

third claim for attempted monopolization should be dismissed with prejudice.

### E.   The Court Should Dismiss Aya's State Law Claims.

Plaintiffs also assert three state law claims based on the same conduct addressed above.  The Court may decline to exercise supplemental jurisdiction over pendent state law claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  "While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the . . . values of economy, convenience, fairness, and comity." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (internal quotation omitted), supplemented, 121 F.3d 714 (9th Cir. 1997), as amended (Oct. 1, 1997).  Here, the contractual restraints upon which the SAC is premised are typically matters addressed by state courts.  Further, the case is only in the pleading stage, which means that the values of economy and convenience would be served by dismissal.  Thus, the Court should decline to exercise supplemental jurisdiction and dismiss the state law claims.  If jurisdiction were to be exercised, however, dismissal also would be warranted on the merits of the state law claims for the reasons stated in AMN's motion to dismiss the FAC (Doc. No. 15 at 22:3-25:18), which AMN incorporates herein by reference.

## III.   CONCLUSION

For the foregoing reasons, AMN respectfully requests that the Court dismiss Aya's Second Amended Complaint without leave to amend.

Dated:  February 5, 2018            **DLA PIPER LLP (US)**

By */s/Noah A. Katsell*
DAVID H. BAMBERGER
NOAH A. KATSELL
AMANDA C. FITZSIMMONS

Attorneys for Defendant
AMN HEALTHCARE, INC., AMN
HEALTHCARE SERVICES, INC.,
AMN SERVICES LLC, MEDEFIS,
INC., and SHIFTWISE, INC.