# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYA HEALTHCARE SERVICES, INC., AYA HEALTHCARE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>AMN HEALTHCARE, INC., AMN HEALTHCARE SERVICE, INC., AMN SERVICES, LLC, MEDEFIX, INC., and SHIFTWISE, INC.,<br><br>Defendants. | Case No.: 17cv205-MMA (MDD)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>[Doc. No. 30] |

Plaintiffs Aya Healthcare Services, Inc. and Aya Healthcare, Inc. (collectively, "Plaintiffs" or "Aya") filed a Second Amended Complaint ("SAC") against Defendants AMN Healthcare, Inc., AMN Service, Inc., AMN Services, LLC, MEDEFIS, Inc., and Shiftwise, Inc. (collectively, "Defendants" or "AMN") alleging three federal antitrust claims: a *per se* claim under Section 1 of the Sherman Act (15 U.S.C. § 1); a quick-look and/or rule of reason claim under Section 1 of the Sherman Act; a claim for attempted monopolization under Section 2 of the Sherman Act (15 U.S.C. § 2); and three California state law claims. *See* SAC. Defendants now move to dismiss Plaintiffs' SAC pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Doc. No. 30. Plaintiffs filed an opposition to Defendants' motion, to which Defendants replied. *See* Doc. Nos. 31, 32. The Court

found the matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1.  *See* Doc. No. 33.  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.

<u>**BACKGROUND**</u>[1]

Plaintiff Aya Healthcare Services, Inc. is a corporation formed under the laws of Delaware that maintains its headquarters in San Diego, California.  SAC ¶ 16.  Plaintiff Aya Healthcare, Inc. is a corporation formed under the laws of Delaware that maintains its headquarters in San Diego, California.  *Id.*  "Plaintiffs are affiliated companies that operate under common control and ownership."  *Id.*

Defendant AMN Healthcare Services, Inc. is a corporation formed under the laws of Delaware that maintains its headquarters in San Diego, California.  *Id.* ¶ 17.  Defendant AMN Healthcare, Inc. is a Nevada corporation that maintains its headquarters in San Diego, California.  *Id.* ¶ 18.  Defendant AMN Services, LLC is a limited liability company formed under state law that maintains its headquarters in San Diego, California.  *Id.* ¶ 19.  Defendant MEDEFIS, Inc. is a corporation formed under state law that maintains its headquarters in Omaha, Nebraska.  *Id.* ¶ 20.  Defendants Shiftwise, Inc. is a corporation formed under state law that maintains its headquarters in Portland, Oregon.  *Id.* ¶ 21.  Defendant AMN Healthcare Services, Inc. owns and controls Defendant AMN Healthcare, Inc. and the various affiliated companies also sued in this action.  *See id.* ¶ 22.

Plaintiffs are two affiliated companies that "sell medical-traveler services to hospitals."[2]  *Id.* ¶ 30.  Defendants also offer these services and are the dominant providers of such services in the country.  *See id.* ¶ 3.  Defendants' "pool of travelers is by far the largest and most varied in the country."  *Id.* ¶ 35.  Moreover, Defendants operate "two

---

[1]  Because this matter is before the Court on a motion to dismiss, the Court must accept as true the allegations set forth in the SAC.  *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 740 (1976).

[2]  "Hospitals" hereinafter refers to both hospitals and other healthcare facilities.

software platforms that [their] customers can use to procure travelers from other providers." *Id.* Defendants further operate "the largest subcontractor network in the country, employing virtually all other providers in the United States as [their] subcontractors." *Id.* ¶ 35.

"Travelers are licensed nurses and medical technicians who travel from place to place in order to perform temporary assignments at understaffed hospitals." *Id.* ¶ 31. Hospitals do not directly hire medical travelers, but utilize the services of personnel agencies like Plaintiffs and Defendants. *See id.* These personnel agencies are thus responsible for recruiting qualified medical travelers and coordinating their temporary assignment to hospitals. *See id.*

Generally, Plaintiffs allege that Defendants utilize "a series of mutually reinforcing contractual restraints, including restraints that are unlawful *per se*, to orchestrate the following outcome: (1) Defendants alone will keep control of the only 'pool' of travelers that is sufficiently large and varied to meet the requirements of many or most hospital networks and large hospitals[;]" and "(2) the other rival providers, including Plaintiffs, have been prevented or greatly hindered by Defendants' restraints from developing their own traveler pools and deploying them in order to compete for the large hospitals' business and to compete in general in the medical-traveler markets." *Id.* ¶ 4. Additionally, by using these practices, Defendants have "specifically intended to acquire monopoly power in the medical-traveler markets. On present trends, there exists a dangerous probability that it will succeed in the effort unless there is an antitrust intervention." *Id.* ¶ 330. The Court summarizes the various restraints below.

## A. No-Poaching Restraints

Plaintiffs allege that Defendants oblige "all of [their] subcontractor providers and software-platform providers . . . to accept unilateral no-poaching agreements[.]" *Id.* ¶ 123. These no-poaching agreements "forbid the rival providers *in perpetuity* to initiate job offers or otherwise solicit any of AMN's designated 'employees,' no matter how or where employed, and even when not currently on assignment for AMN." *Id.* (emphasis

in original).  Each rival provider "accepts AMN's No-Poaching Restraint as an obligatory condition precedent to receiving spillover assignments or access to one of AMN's software platforms." *Id.* at 125.  Defendants have "prevailed on nearly all other providers in the United States to accept and observe [their] unilateral No-Poaching Restraints." *Id.* ¶ 124.  Plaintiffs allege that even if a rival provider agrees one time to act as AMN's subcontractor, and then that rival sends a single traveler to a remote hospital for one assignment, the "rival thereafter remains expressly forbidden to initiate at any time in the future an employment discussion for any purpose with any of AMN's 8000 travelers or 2500 recruiters and other professionals." *Id.* ¶ 132.  Defendants, on the other hand, are not subject to a reciprocal restraint.  *See id.*  As a result, Plaintiffs contend Defendants have "successfully organized a unilateral employers' cartel in the medical-traveler markets." *Id.* ¶ 124.

In order to obtain spillover work, Plaintiffs agreed to "more than twenty of AMN's subcontractor agreements, each of which includes its No-Poaching Restraints." *Id.* ¶ 129.  Plaintiffs adhered to these restraints from 2010 to May 2015, when they decided to no longer honor them.  *See id.*  During this five-year period, Plaintiffs "lost opportunities and profits[.]" *Id.* ¶ 263.  Plaintiffs assert they continue to suffer harm after ceasing to adhere to Defendants' no-poaching restraints.  For example, "[o]ther providers continually solicit Aya's recruits, but not AMN's recruiters." *Id.* ¶ 276.  Thus, Defendants' no-poaching restraints place Plaintiffs at a competitive disadvantage because they must "offer inducements to their best employees to avoid losing them to rivals," while Defendants are "insulated from this competition[.]" Doc. No. 31 at 9.

**B.    No-Hire Restraints**

Plaintiffs also allege that Defendants proposed multiple no-hire agreements to them from 2014 to 2016 in exchange for spillover assignments, but Plaintiffs "rejected each proposal." *Id.* ¶ 146.  Plaintiffs "believe[] that other direct competitors of AMN have felt constrained to accept its proposed no-hire agreements, and that AMN proposes, monitors and enforces these agreements." *Id.* ¶ 157.  In fact, Plaintiffs are aware of facts

which confirm that at least one other provider of travelers, Host Healthcare, Inc. ("Host") agreed to a unilateral no-hire agreement. *Id.* ¶¶ 158-59; 171. By enforcing the no-poaching and no-hire restraints, Defendants have "established and operated a non-reciprocal employers' cartel in the medical-traveler markets." *Id.* ¶ 297.

## C. Employee Restraints & Sham Litigation

Moreover, Plaintiffs claim that in order to reinforce their no-poaching restraints, Defendants require "all of [their] travelers, recruiters and other employees to accept broadly worded non-solicitation covenants and trade-secret covenants as conditions of their employment at AMN[.]" *Id.* ¶ 172. The alleged employee restraints provide that the names and contact information of Defendants' employees are "classified as AMN's trade secrets, and the designation applies to AMN's present employees as well as all other travelers enrolled on its rosters, including those who have no current assignment from AMN." *Id.* ¶ 173. The employee restraints also include "broad non-solicitation covenants, which forbid any former employee of AMN to solicit any of its designated 'employees' for one year or eighteen months[.]" *Id.*

Plaintiffs allege that if a recruiter working for Defendants accepts employment from a rival provider, and contacts any of the travelers they designate as their trade secrets, Defendants threaten to initiate, and on four occasions have initiated, "objectively baseless claims against both the recruiter and [their] rival[.]" *Id.* ¶ 182. In October 2015, Defendants sued Plaintiffs, and two of Defendants' former recruiters who came to work for Plaintiffs, in California state court. *Id.* ¶ 193. The Superior Court determined in April 2017 that Defendants' claims in the state court action were both "objectively baseless" and "subjectively baseless[.]" *Id.* ¶ 205.

## D. Software Platform Restraints and Exclusive Dealings Contracts

Plaintiffs further allege that Defendants use two other kinds of contractual restraints: (1) restrictive covenants in their software-platform agreements and vendor-provider agreements; and (2) mandatory exclusive-dealing contracts with large hospitals. *Id.* ¶ 226. As a result of Defendants' "exclusive-dealing contracts and software-platform

sales, AMN has foreclosed competition for 50% of all sales of medical-traveler services in several of the largest, most lucrative regional submarkets, including the Greater Los Angeles Metropolitan Area; the San Francisco Bay Area; the Greater Washington, D.C. Metropolitan Area; [and] the Greater Baltimore Metropolitan Area[.]" *Id.* ¶ 229. Additionally, Defendants have used these practices to substantially foreclose competition in the following regional submarkets: Hawaii (87% market foreclosure); Nebraska (83%); Maine (83%); Vermont (80%); Arkansas (73%); Montana (67%); Nevada (64%); and New Hampshire (61%). *Id.* ¶ 230. "These restrictive conditions exist principally to protect AMN from competitive pressures," yet the conditions "prevent rival sellers from offering innovative or more competitive terms of service and from providing more responsive service[.]" *Id.* ¶ 227.

### E.    Summary of Plaintiffs' Allegations

In sum, Plaintiffs assert that the "cumulative effect of AMN's no-poaching restraints and Employee Restraints is pernicious and exclusionary for AMN's rivals: the rivals cannot solicit any of AMN's employees, and AMN's recruiters, who are best placed to solicit these employees, dare not leave AMN to work for any rival." *Id.* ¶ 219. "There is therefore a chronic, worsening shortage of available travelers and only one conspicuously large pool of them—AMN's pool." *Id.* ¶ 221. Defendants have utilized "unlawful trade restraints and baseless litigation to prevent and discourage [their] rivals from seeking to make hires from this pool. [Their] purpose is to remain the only provider that can offer such as pool." *Id.*

<u>**PROCEDURAL HISTORY**</u>

Plaintiffs commenced the instant action on February 2, 2017. *See* Doc. No. 1. Defendants previously moved to dismiss Plaintiffs' First Amended Complaint ("FAC"). *See* Doc. No. 15. The Court held a hearing on Defendants' motion on July 14, 2017 and entertained the oral arguments of counsel. *See* Doc. No. 20. The Court took the matter under submission for further review and consideration, and issued an order granting in part Defendants' motion to dismiss Plaintiffs' FAC. *See* Doc. No. 22. Specifically, the

Court found that Plaintiffs failed to sufficiently allege antitrust standing, a requisite element of their Sherman Act claims. *See id.* at 8. The Court deferred ruling on Plaintiffs' state law claims until Plaintiffs could sufficiently allege a federal claim. *See id.*[3]

On January 8, 2018, Plaintiffs filed their SAC asserting six causes of action for: (1) *per se* violations of Section 1 of the Sherman Act; (2) quick-look/rule of reason violations of Section 1 of the Sherman Act; (3) attempted monopolization in violation of Section 2 of the Sherman Act; (4) violations of the California Cartwright Act; (5) Tortious Interference with Prospective Economic Relations; and (6) violations of California's Unfair Competition Law ("UCL"). *See* SAC. On February 5, 2018, Defendants filed the instant motion, seeking to dismiss Plaintiffs' SAC with prejudice. *See* Doc. No. 30.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2). However, plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard thus demands more than a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth

---

[3] Because the Court determined that Plaintiffs failed to sufficiently allege antitrust standing in their FAC, the Court did not address the merits of Plaintiffs' claims. The parties now wish to incorporate by reference arguments made in their respective briefs regarding Plaintiffs' FAC. As such, the Court cites to such documents where relevant.

of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court need not take legal conclusions as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.*; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects in the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

## DISCUSSION

Defendants move to dismiss Plaintiffs' SAC in its entirety, arguing that Plaintiffs fail to allege facts showing that they suffered antitrust injury, and that Plaintiffs fail to sufficiently plead each of their six causes of action. *See* Doc. No. 30-1. The Court addresses Defendants' arguments in turn.

### A. Antitrust Injury

As a threshold matter, Defendants argue that Plaintiffs have again failed to allege antitrust injury. *See* Doc. No. 30-1 at 3. The Court previously found Plaintiffs' allegations regarding antitrust injury insufficient. *See* Doc. No. 22. Plaintiffs assert that they have cured these deficiencies in their SAC by alleging two types of harm: (1) exclusionary harm; and (2) retaliatory harm. *See* SAC ¶ 262.

"Private suits to enforce the Sherman Act are authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15(a), which provides that 'any person who shall be injured in

his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . .'" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000). The Supreme Court has interpreted "any person" to mean any person who has suffered an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis in original)). "An injury caused by an antitrust violation will not count as an antitrust injury 'unless it is attributable to an anti-competitive aspect of the practice under scrutiny.'" *Int'l Longshore and Warehouse Union v. ICTSI Or., Inc.*, 863 F.3d 1178, 1186 (9th Cir. 2017) (quoting *Atl. Richfield Co.*, 495 U.S. at 334). "If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).

In determining whether a plaintiff has antitrust standing, the Ninth Circuit has outlined various factors for courts to consider: (1) whether the plaintiff's injury is of "the type the antitrust laws were intended to forestall;" (2) the directness of the injury; (3) the speculative nature of the harm; (4) the risk of duplicative recovery; and (5) the complexity of apportioning damages. *Knevelbaard Dairies*, 232 F.3d at 987. "A showing of the first factor—antitrust injury—is 'necessary, but not always sufficient, to establishing standing under [section] 4 [of the Clayton Act].'" *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 862 (C.D. Cal. 2015) (citing *Am. Ad Mgmt. Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (internal quotation marks and citation omitted)). The Ninth Circuit also requires "that the injured party be a participant in the same market as the alleged malefactors." *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985). "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d

367, 372 (9th Cir. 2003) (citation omitted).

## 1. **Exclusionary Harm**

Plaintiffs first contend that Defendants utilize various anticompetitive practices to impede their rivals, including Plaintiffs.[4]  Defendants argue that Plaintiffs fail to allege antitrust standing because Plaintiffs' allegations are conclusory and speculative, Plaintiffs stand to gain from the challenged practices, and Plaintiffs' injury does not flow from any anticompetitive aspect of conduct prohibited under the laws.  *See* Doc. No. 30-1 at 5-10.

Here, contrary to Defendants' contention that Plaintiffs' allegations are "conclusory" and "speculative," the Court finds that Plaintiffs have alleged with the requisite specificity facts sufficient to support antitrust injury.  Doc. No. 30-1 at 5; *cf. Twombly*, 550 U.S. at 555 (noting a plaintiff cannot merely rely on "labels and conclusions.").  For example, Plaintiffs allege that from 2010 to May 2015, Defendants' "restraints appreciably compromised and hindered Aya's efforts to form a large, varied pool of travelers that could compete for large contracts and compete generally in the medical-traveler markets."  *Id.* ¶ 263.  As a result, Plaintiffs "lost opportunities and profits" during this five-year period of time.  *Id.*  Plaintiffs also claim they continue to suffer harm after ceasing to adhere to Defendants' no-poaching restraints because "[o]ther providers continually solicit Aya's recruits, but not AMN's recruiters."  *Id.* ¶ 276.  Thus, Defendants' no-poaching restraints place Plaintiffs at a competitive disadvantage because they must "offer inducements to their best employees to avoid losing them to rivals," while Defendants are "insulated from this competition[.]"  Doc. No. 31 at 9.[5]

---

[4]  Defendants do not address Plaintiffs' cumulative exclusionary effect argument, but rather address each of the challenged practices in isolation.

[5]  Defendants assert that Plaintiffs cannot show injury-in-fact, as Plaintiffs have alleged no facts to show that they suffered any loss prior to May 2015, and, after that date, Plaintiffs refused to abide by the restrictions.  Doc. No. 30-1 at 3 n.4.  The Court disagrees.  Plaintiffs specifically allege that they lost opportunities and profits from 2010 to May 2015, and continue to suffer harm because other providers solicit Plaintiffs' recruiters, while Defendants are immune from such solicitations.  *See* SAC ¶¶ 263,

Moreover, Plaintiffs allege that Defendants enforce employee restraints and conduct sham litigation in order to: (1) disrupt rivals' operations and subject them to unreasonable litigation costs; (2) cast a chilling effect on employees and rival providers in the affected markets; and (3) force rivals to assent to unlawful demands. *See id.* ¶ 208. Plaintiffs claim that through Defendants' "exclusive-dealing contracts and software-platform sales, AMN has foreclosed competition for 50% of all sales of medical-traveler services in several of the largest, most lucrative regional submarkets[.]" *Id.* ¶ 229. These conditions "prevent rival sellers from offering innovative or more competitive terms of service and from providing more responsive service[.]" *Id.* ¶ 227. As such, Plaintiffs' allegations are sufficiently detailed.

Further, Defendants' argument that Plaintiffs stand to gain from the challenged practices is unavailing. *See* Doc. No. 30-1 at 6-7. The Ninth Circuit has indicated that "[t]here can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1056. However, Plaintiffs expressly allege that Defendants' no-poaching restraints prevent rivals, including Plaintiffs, from offering traveler pools that can meet the requirements of large customers and compete against Defendants' pool. *See* SAC ¶¶ 126-28, 145. Moreover, Defendants enforce their employee restraints and conduct sham litigation not to improve their services, but to "disrupt" their "rivals' operations and undermine their ability to recruit qualified travelers." *Id.* ¶ 213. Defendants charge major hospital networks and large hospitals "prices that are significantly and durably higher than competitive prices, yet [their] customers largely do not turn to other providers because they believe that they require access to [their] pool of medical travelers, software platforms, and subcontractor network." *Id.* ¶ 97. As such, the Court is "satisfied that [Plaintiffs] stand to suffer, not gain," from Defendants' conduct. *Am. Ad. Mgmt., Inc.*, 190 F.3d at 1056.

---

276. As such, the Court finds that Plaintiffs' allegations relating to the no-poaching restraints are sufficient to show injury-in-fact.

Finally, Defendants contend that Plaintiffs' alleged injury does not flow from an anticompetitive aspect of conduct prohibited by the antitrust laws. *See* Doc. No. 30-1 at 6. However, Plaintiffs claim that the various trade restraints "have prevented or hindered other providers from developing their own competitive pools of medical-travelers." SAC ¶ 260. As a result, "AMN calls the shots, the large hospitals must submit to its pricing and other terms, its employees become its captive, and numerous smaller rivals are deprived of the opportunity to cobble together better prices, alternative terms and alternative service arrangements for the same pool of qualified travelers." *Id.* "AMN has used a medley of trade restraints in ways that have harmed competition and reinforced its market power." *Id.* ¶ 261. "[T]he central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition . . . that these statutes recognize as vital to the public interest." *Knevelbaard Dairies*, 232 F.3d at 988. Because Plaintiffs allege that Defendants' restraints and practices "prevent competition," Plaintiffs have sufficiently demonstrated that their injury is of the type that the antitrust laws were intended to prevent. Doc. No. 31 at 2.

In sum, Plaintiffs have sufficiently alleged that as a consequence of the alleged restraints, Plaintiffs and other rival suppliers have been prevented from developing their own traveler pools, and are thus unable to compete for business in the medical-traveler markets. *See* Areeda ¶ 348a[6] ("[A] rival clearly has standing to challenge the conduct of rival(s) that . . . tends to exclude rivals from the market, thus leading to reduced output and higher prices."); *Am. Ad. Mgmt., Inc.*, 190 F.3d at 1057 ("[C]onsumers and competitors are most likely to suffer antitrust injury"). Accordingly, viewing these allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have satisfied the antitrust standing requirement on the basis of exclusionary harm. *See*

---

[6] Citations to "Areeda" refer to PHILLIP E. AREEDA & HERBERT HOVENKAMP, AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (4th ed. 2013).

*Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (concluding that a rival suffers antitrust injury when a defendant's "[a]nticompetitive conduct . . . tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1035-36 (C.D. Cal. 2007) (finding competitor sufficiently pleaded antitrust injury where the defendant's conduct "rendered competitors less competitive" and had a "dangerous probability of stifling innovation in the market.") (internal quotation marks and alterations omitted).

## 2. **Retaliatory Harm**

Plaintiffs also assert that they have suffered retaliatory harm. Specifically, Defendants have prevailed on "virtually all rival providers" to accept their no-poaching restraints in exchange for spillover work. Doc. No. 31 at 13. Plaintiffs claim that they have "broken ranks with this *de facto* employers' cartel." *Id.* As a result, Defendants subjected Plaintiffs to "costly retaliatory measures to make an example[.]" *Id.* Defendants assert Plaintiffs' amended allegations are insufficient to sufficiently allege retaliatory harm. *See* Doc. No. 32 at 5.

Plaintiffs rely primarily on a decision from the Seventh Circuit, wherein the court stated that "[l]osses inflicted by a cartel in retaliation for an attempt by one member to compete with the others are certainly compensable under the antitrust laws, for otherwise an effective deterrent to successful cartelization would be eliminated." *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 783 (7th Cir. 1994); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) (noting that retaliation by a cartel member against one member attempting to compete is compensable). The Seventh Circuit later clarified that *Hammes* "holds that antitrust damages may result if a cartel inflicts damage on *one of its own members* in retaliation for that member's attempt to undercut the cartel's prices and therefore lower consumer prices." *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 401 (7th Cir. 2006) (emphasis added). The Seventh Circuit went on to note that in the case at bar, the heart

of the plaintiff's claim "is that it was never a member of the cartel in the first place;" thus, "[t]he *Hammes* case is . . . inapplicable here." *Id.*

Here, Plaintiffs allege in their SAC that they previously were a member of Defendants' alleged employers' cartel until they decided to compete on the merits with Defendants—a point that Plaintiffs had not sufficiently clarified in the FAC. *See* SAC ¶¶ 263-73. Plaintiffs explain that after they ceased adhering to the no-poaching restraints, Defendants "subjected Aya to various kinds of retaliatory conduct" including: (1) terminating all subcontractor agreements with Plaintiffs; (2) interfering with Plaintiffs' dealings with existing and prospective customers; and (3) litigations "objectively baseless claims" against Plaintiffs and four of Plaintiffs' employees. *Id.* ¶ 281. Accordingly, in light of Plaintiffs' allegations that they were a member of Defendants' alleged cartel, and because retaliation by a cartel member against a member's attempt to compete is compensable, the Court finds that Plaintiffs have also sufficiently alleged antitrust injury on the basis of retaliatory harm. *See Big Bear Lodging Ass'n*, 182 F.3d at 1102.[7]

## B.    Sherman Act Section 1 and Cartwright Act Claims

Plaintiffs assert two claims pursuant to Section 1 of the Sherman Act: a *per se* claim (first cause of action) and a quick-look/rule of reason claim (second cause of action). *See* SAC. Plaintiffs further assert a Cartwright Act claim pursuant to California Business & Professions Code §§ 16720 *et seq.* based on the same conduct that allegedly violates Section 1 of the Sherman Act (fourth cause of action).[8] *See id.*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form

---

[7]  In light of the Court's conclusion that Plaintiffs have sufficiently alleged antitrust injury, the Court need not address Plaintiffs' third theory of antitrust injury mentioned in Plaintiffs' opposition to the instant motion. *See* Doc. No. 31 at 14.

[8]  "[T]he analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). "Thus, if Plaintiffs plead a valid Sherman Act claim, they likewise plead a valid Cartwright Act claim." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1114 (N.D. Cal. 2012).

of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations. . . ." 15 U.S.C. § 1; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (noting that § 1 of the Sherman Act outlaws unreasonable restraints of trade). To establish liability under § 1, a plaintiff must show: "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade . . .; and (3) the restraint affected interstate commerce." *Am. Ad Mgmt. Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996). Defendants focus exclusively on the second element—whether Plaintiffs have sufficiently alleged an unreasonable restraint of trade.

"To sufficiently plead an unreasonable restraint, a plaintiff must include allegations showing that the restraint will fail under one of three rules of analysis: the rule of reason, per se, or quick look." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013). First, the rule of reason is the default level of analysis, requiring courts to examine "a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). "The rule of reason requires the factfinder to decide whether under all the circumstances of the case the agreement imposes an unreasonable restraint on competition." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1387 (9th Cir. 1984) (citing *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 343 (1982)). The purpose of the analysis is to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 886.

Second, in limited circumstances, however, such a detailed inquiry under the rule of reason analysis is unnecessary, where the restraint at issue is "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5, 8 (2006) (quoting *Nat'l Soc. Of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). A restraint will only be considered

*per se* unreasonable if it "always or almost always tend[s] to restrict competition and decrease output" and lacks redeeming value. *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 886 (internal quotations omitted). Such restraints are illegal *per se*, and once established, do not require any industry analysis otherwise required under the rule of reason.

Third, "[f]alling between the rule of reason and per se condemnation, the 'quick look' analysis is an abbreviated form of the rule of reason that may be used when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question could have an anticompetitive effect on customers and markets." *eBay*, 968 F. Supp. 2d at 1037 (citing *Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 770 (1999)).

Defendants argue that the Court should dismiss Plaintiffs' claims arising under Section 1 of the Sherman Act because Plaintiffs' allegations are insufficient to state a claim under all three rules of analysis. *See* Doc. No. 30-1 at 10, 17. The Court addresses Plaintiffs' *per se* claims before turning to Plaintiffs' quick-look and/or rule of reason claims.

### 1. *Per Se* Claims

Plaintiffs allege that Defendants' conduct constitutes two separate *per se* violations of Section 1 of the Sherman Act. SAC ¶¶ 295-97. First, Plaintiffs claim that Defendants' no-poaching restraints are unlawful *per se*. *See id.* ¶ 295. Second, Plaintiffs contend that Defendants have prevailed on at least one rival to accept a unilateral no-hire agreement, which is also unlawful *per se*. *See id.* ¶ 296. "By enforcing these restraints, AMN has established and operated a non-reciprocal employers' cartel in the medical-traveler markets." *Id.* ¶ 297. Defendants argue that the no-poaching restraints and alleged employers' cartel do not fall within the *per se* category; thus, Plaintiffs' first cause of action should be dismissed with prejudice. *See* Doc. No. 30-1 at 10.

#### A. *No-Poaching Restraints*

Plaintiffs allege that Defendants require their subcontractor providers and

software-platform providers "to accept unilateral no-poaching agreements[.]" SAC ¶ 123. The no-poaching restraints "forbid the rival providers *in perpetuity* to initiate job offers or otherwise solicit any of AMN's designated 'employees,' no matter how or where employed, and even when not currently on assignment for AMN." *Id.* (emphasis in original). "Although these restraints appear in contracts that memorialize legitimate business collaborations, they are not 'ancillary' to the collaborations in question." Doc. No. 31 at 17.

Defendants assert that the alleged no-poaching restrictions must be analyzed under the rule of reason standard for three reasons. *See* Doc. No. 30-1 at 11. First, the no-poaching restraints are part of vertical agreements. *See id.* Second, "the rule of reason is the standard for testing restrictive covenants ancillary to a legitimate transaction." *Id.* Third, "[c]ourts do not apply the *per se* standard in cases where the economic impact of the practice is not immediately obvious." *Id.* at 15. The Court proceeds by: (i) analyzing the character of the subcontractor agreements; and (ii) analyzing the character of the no-poaching restraints.

### i. Characterizing the Subcontractor Agreements

Defendants argue that the subcontractor agreements are "collaboration agreements" which are which are part of "essentially vertical arrangements[.]" *Id.* at 15, 11. In their SAC, Plaintiffs argue that the subcontractor agreements are properly characterized as joint ventures.[9] *See* SAC ¶¶ 136-145. As the parties acknowledge, the characterization of the agreements in question impacts which rule of analysis applies.

"[T]he Supreme Court has distinguished between agreements made up and down a

---

[9] In opposition to the instant motion, Plaintiffs indicate that they have "always acknowledged that the agreements between AMN and its subcontractors/rival providers can be characterized as vertical arrangements[.]" Doc. No. 31 at 19. However, Plaintiffs explain in their SAC that a joint venture "is any agreement, *vertical* or horizontal, by which two independent businesses collaborate on a commercial venture in order to develop or furnish products and/or services." SAC ¶ 136 n.7 (emphasis added). As such, the Court does not read Plaintiffs' statement as an admission that Plaintiffs believe the agreements in question are in fact, vertical agreements. *See also* Doc. No. 17 at 2 ("AMN and rival providers participate in legitimate joint-ventures[.]").

supply chain, such as between a manufacturer and a retailer ('vertical agreements'), and agreements made among competitors ('horizontal agreements')." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015). A horizontal agreement or restraint is "[a]n agreement among competitors on the way in which they will compete with one another." *Nat'l Collegiate Athletic Ass'n v. Bd. Of Regents of the Univ. of Okla.*, 468 U.S. 85, 99 (1984) (hereinafter "*NCAA*"); *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints"). Unlike horizontal agreements among competitors, "vertical agreements between actual or would-be suppliers and customers are everywhere." Areeda ¶ 1437a. "[B]y definition vertically related firms exist in a buyer-seller relationship, and agreements are essential to buying and selling." Areeda ¶ 1902d. A third category, referred to as a joint venture, is "a form of organization in which two or more firms agree to cooperate in producing some input that they would otherwise have produced individually, acquired on the market, or perhaps done without." Areeda ¶ 2100(a). Importantly, "Section 1 prohibits agreements that unreasonably restrain trade, no matter the configuration they take or the labels we give them." *In re Musical Instruments*, 798 F.3d at 1192.

Here, taking Plaintiffs' allegations as true, the Court finds that the subcontractor agreements entered into by Defendants and various rival providers can plausibly be characterized as joint ventures. Notably, Plaintiffs allege that "AMN prevails on its subcontractors (rival providers) to accept its trade restraints because many depend upon it for 'spillover' assignments (assignments that AMN refers to another provider when its own travelers are otherwise engaged)[.]" SAC ¶ 119. Unlike agreements made up and down a supply chain between buyers and sellers, Defendants use their no-poaching restraints in their "contracts with virtually all other providers, thereby compromising their ability to compete freely to hire qualified travelers and sell medical-traveler services to hospitals." *Id.* ¶ 143. Further, "in a purely vertical contract the parties to the agreement are not competitors." Areeda ¶ 1902d. Plaintiffs explain that in order to remain in

business, "[m]any of the rival providers depend on AMN's spillover assignments and/or software platform assignments and could not survive without them." SAC ¶ 144 n.8.

Accordingly, the Court finds that Plaintiffs have sufficiently alleged that the agreements in question can plausibly be characterized as joint ventures. Therefore, dismissal on the basis that the subcontractor agreements are vertical agreements is improper.

### ii.   Joint Venture Analysis

Defendants contend that courts "have always evaluated restraints related to collaborations, joint ventures or transactions under the rule of reason." Doc. No. 30-1 at 13. Plaintiffs, in opposition, claim that legitimate joint venture agreements sometimes include naked[10] restraints of trade—i.e., restraints within legitimate joint venture agreements that (1) foreclose some form of direct competition between the parties, but (2) are not reasonably ancillary to their lawful joint-venture. Doc. No. 31 at 17. As explained in Plaintiffs' opposition to Defendants' previous motion to dismiss, "a naked restraint, even though included in a legitimate joint-venture agreement, can be condemned as a *per se* violation of Section 1." Doc. No. 17 at 7; *see also In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1012 (N.D. Cal. 2008) (citing *NCAA*, 468 U.S. at 113-15).

"Antitrust law doesn't frown on all joint ventures among competitors—far from it. If a joint venture benefits consumers and doesn't violate any applicable per se rules, it will often be perfectly legal." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1157 (9th Cir. 2003). "When a plaintiff challenges the joint venture itself, the venture must be judged under the rule of reason standard." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d at 1012 (citing *Dagher*, 547 U.S. at 6 n.1). However, "[w]hen a plaintiff challenges a provision or practice of the venture as anticompetitive, then per se review

---

[10] "Naked" restraints have "no purpose except stifling of competition." *White Motor v. United States*, 372 U.S. 253, 263 (1963).

may be appropriate depending on the circumstances." *Id.*

Specifically, when a plaintiff challenges a particular restraint of a joint venture that is not economically integrated (i.e., where individual firms function as an economic unit or single entity),[11] the analytical framework is as follows: first, courts consider whether the challenged restraint is a core activity or function of the joint venture (if yes, rule of reason applies); second, if not, courts consider whether the restraint is of a type that is potentially subject to *per se* treatment (if not, rule of reason applies); third, if the restraint is of a type potentially subject to *per se* treatment, courts consider whether the restraint is necessary or reasonably ancillary to achieving a procompetitive objective of the joint venture (if yes, rule of reason applies; if not, *per se* rule applies). *See id.* at 1012-1016; *see also Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, No. 12-CV-26, 2017 WL 3433131, at *14 (S.D. Ohio Aug. 9, 2017) (diagraming analytical framework for joint venture analysis). "Thus, the Supreme Court permits plaintiffs to disaggregate particular conduct from the venture as a whole, and submit that conduct to individual scrutiny." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d at 1012; *see also* Areeda ¶ 2100(f) (explaining the disaggregation of joint venture provisions).

Here, Plaintiffs challenge the no-poaching provisions of the subcontractor agreements—not the joint ventures themselves. In fact, Plaintiffs refer to the joint ventures as "legitimate business collaborations." Doc. No. 31 at 17. As such, Plaintiffs seek to disaggregate specific conduct from the ventures as a whole, and submit that conduct to scrutiny by the Court. Contrary to Defendants' contention, "[t]he Court cannot therefore hold that because the [no-poaching restraints were] established through a joint venture, ergo rule of reason applies." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d at 1012. "Rather, the Court must go further, and inquire into the nature of the venture and the role of the restraint." *Id.*

/ / /

---

[11] The parties do not argue that Defendants and their rivals function as a unit or single entity.

### a. Core Function of Joint Ventures

The Supreme Court has indicated that the *per se* standard is not appropriate if a plaintiff challenges "the core activity of the joint venture itself[.]" *Dagher*, 547 U.S. at 7. In *Dagher*, the plaintiffs challenged two oil companies' agreement to set a unified price for their gasoline, a practice identified as the venture's core activity. *See id.* at 6-7. Thus, the Supreme Court applied the rule of reason analysis. *See id.*

Here, though not specifically addressed by either party, Plaintiffs do not challenge the core function of the joint ventures. As noted above, Plaintiffs concede that the various agreements are "legitimate" and ensure that the staffing needs of hospitals are met. Doc. No. 31 at 17. Plaintiffs instead challenge the no-poaching restraints, included in these legitimate agreements, as "unlawful restraints of competition between rival employers[.]" *Id.* As such, the Court proceeds to analyze the character of the no-poaching restraints.

### b. Characterizing the No-Poaching Restraints

Plaintiffs allege that the no-poaching restraints are horizontal restraints of trade because they permanently eliminate one kind of direct rivalry between competitors. *See* Doc. No. 31 at 19.

Horizontal market allocation agreements typically constitute a *per se* violation of Section 1. *See United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972); *United States v. Brown*, 936 F.2d 1042, 1044-45 (9th Cir. 2001) ("A market allocation agreement between two companies at the same market level is a classic per se antitrust violation."). "An agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service division agreement, analogous to a product division agreement." Areeda ¶ 2013b. "Such arrangements must be distinguished from noncompetition agreements that prevent an employee from seeking employment from a rival for a given period after the employee's present employment relationship is terminated. These arrangements are purely vertical, for they involve a single employer's agreement with one or more employees." *Id.*

Here, the Court finds that Plaintiffs' allegations concerning the no-poaching restraints are sufficient to allege that the restraints are of a type that are subject to *per se* treatment. *See Med. Ctr. at Elizabeth Place, LLC*, 2017 WL 3433131, at *14. For example, Plaintiffs allege that Defendants collaborate with smaller, rival providers of medical travelers to deliver their services, which are governed by the subcontractor agreements. SAC ¶ 123. Although the subcontractor agreements are "legitimate," Plaintiffs claim that the non-poaching restraints are not reasonably ancillary to the agreements in which they appear. *Id.* ¶ 133. The no-poaching restraints "permanently prevent nearly all of AMN's direct competitors in the United States from soliciting any of its numerous employees for any purpose." *Id.* ¶ 134. These restraints are non-reciprocal; thus, Defendants are immune from these indefinite restraints. *See id.* Plaintiffs explain that Defendants' no-poaching restraints result in an agreement among rivals about how they will compete for employees.

Accordingly, in disaggregating the no-poaching restraints from the joint ventures, the Court finds that Plaintiffs' allegations, taken as true, are sufficient to allege a type of restraint subject to *per se* treatment. *See eBay*, 968 F. Supp. 2d at 1039. Thus, dismissal on this basis is inappropriate.

c.  Whether the No-Poaching Restraints are Reasonably Ancillary to a Procompetitive Business Purpose

Defendants contend the no-poaching restraints are ancillary to legitimate business transactions, and thus must be analyzed under the rule of reason standard. *See* Doc. No. 30-1 at 11. In opposition, Plaintiffs assert that the restraints, "as worded and enforced, vastly exceed any possible scope or purpose of the collaborations in question and exist to prevent AMN's rivals from ever approaching anyone in its pool, even after the collaborations in question have ended." Doc. No. 31 at 19. Moreover, in their SAC, Plaintiffs provide the following hypothetical of Defendants' no-poaching restraints:

Suppose a rival provider agrees one time to act as AMN's subcontractor. To

do so, it must sign one of AMN's standard subcontractor agreements, which invariably include AMN's unilateral No-Poaching Restraint. Suppose AMN gives this rival only one assignment, say in 2010, and the rival performs it by sending a single traveler to a remote hospital in the Kansas prairie. Shortly afterwards, AMN terminates the agreement, or perhaps the rival does so. The rival thereafter remains expressly forbidden to initiate at any time in the future an employment discussion for any purpose with any of AMN's 8000 travelers or 2500 recruiters and other professionals, who are scattered across the United States. AMN, in contrast, labors under no reciprocal restraint.

SAC ¶ 132.

The Court's determination that Plaintiffs have sufficiently alleged that the no-poaching restraints, considered in isolation, are of a type subject to *per se* treatment "does not in and of itself indicate that per se treatment is imminent." *eBay*, 968 F. Supp. 2d at 1039. In order to make a rule determination, the Court must determine whether no-poaching restraints are ancillary to a procompetitive business purpose. *See id.* (citing *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-22 (1979)); *see also* Areeda ¶ 2013a (explaining that if agreements among employers not to compete for employees "are 'naked' and not immunized, they are illegal per se. . . ."). "[A] challenged restraint must have a reasonable procompetitive justification, related to the efficiency-enhancing purposes of the joint venture[.]" *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment). "If none exists, the challenged restraint must be evaluated on its own and may be per se illegal even if the remainder of the joint venture is entirely lawful." *Id.*

Additionally, "[t]o be ancillary, and hence exempt from the per se rule, an agreement eliminating competition must be subordinate and collateral to a separate, legitimate transaction," i.e., the restraint "serves to make the main transaction more effective in accomplishing its purpose." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986). "If [the restraint] is so broad that part of the restraint suppresses competition without creating efficiency, the restraint is, to that extent,

not ancillary." *Id.* As the Third Circuit has indicated,

> [t]he quintessential example of an ancillary restraint is a restrictive agreement that is an integral part of a joint venture. An agreement by two competing manufacturers to price a product identically, for instance, would be ancillary if manufacture of the product were a collaborative effort between the two firms and the pricing agreement could reasonably be viewed as a necessary condition of the joint venture, which increased output.

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 345 (3d Cir. 2010); *see also Freeman*, 322 F.3d at 1151. The doctrine of ancillary restraints "seeks to distinguish between those restraints that are intended to promote the efficiencies of a joint venture and those that are simply unrelated." *Salvino, Inc.*, 542 F.3d at 338-39.[12]

Moreover, the Court is mindful that the joint guidelines announced by the Department of Justice, Antitrust Division and the Federal Trade Commission in October 2016, make clear that an agreement made between rival employers not to solicit one another's employees will be prosecuted as a criminal violation of Section 1 if it "is separate from or not reasonably necessary to a larger legitimate collaboration between the employers." *Joint Guidelines of the Department of Justice, Antitrust Division and the Federal Trade Commission* (October 2016).

Plaintiffs urge the Court to follow the district court's ruling in *eBay*. There, the government alleged that eBay and Intuit entered into a no-solicitation/no-hire agreement

---

[12] The Court notes that Defendants assert that Plaintiffs have "no response to *NCAA* . . ., where the Supreme Court applied the rule of reason, even though the challenged provision restrained the ability of the members to compete on both price and output and was not 'necessary' to market the product." Doc. No. 32 at 7. As explained by the court in *In re ATM Fee Antitrust Litig.*, however, "the Ninth Circuit has since limited the reach of the *NCAA* decision" in *Freeman*. 554 F. Supp. 2d at 1015. The Ninth Circuit has imposed "an additional burden on defendants, who must now prove not only that their venture requires horizontal restraints, but also that the particular restraint challenged is ancillary to the venture's legitimate aspects." *Id.*; *see also Freeman*, 322 F.3d at 1157. For the reasons discussed below, the Court is unable to determine at this stage of the proceedings whether the challenged restraints are ancillary to the venture's legitimate aspects.

17cv205-MMA (MDD)

with each other.  *See* 968 F. Supp. 2d at 1038.  The alleged agreement arose out of conversations between eBay executives and Scott Cook, founder of Intuit, who also served on eBay's board.  *See id.* at 1033-34.  The court found that the government had sufficiently alleged a horizontal market allocation agreement.  *Id.* at 1039.  The defendants argued that the agreement, though horizontal, was ancillary to a legitimate procompetitive business purpose (i.e., Mr. Cook's service on eBay's board), and therefore not amenable to *per se* treatment.  *Id.*  The government argued the agreement constituted a naked restraint of trade.  *Id.*  The court noted that just because the government labeled the agreement as "naked" did not make it so; but by the same token, the defendants' claim that the agreement is ancillary similarly does not make it so.  *Id.* The court declined to determine at the pleading stage whether to apply the *per se* or rule of reason analysis.  The court stated, "[t]hough the parties supply substantial legal argument to support their respective positions, they do so without the benefit of discovery, and thus without sufficient factual evidence to support their contentions."  *Id.* at 1039-40.  Thus, taking the plaintiff's allegations as true, the court could not determine as a matter of law that *per se* treatment would be inappropriate.  *Id.*

Here, the Court finds the district court's reasoning in *eBay* to be persuasive. Defendants assert that the alleged agreement in *eBay* did not involve "any form or joint venture, sub-contract or collaboration."  Doc. No. 32 at 7.  While the alleged agreement did not involve a joint venture, the defendants in *eBay* did claim that the challenged restraint was ancillary to procompetitive business purposes.  *See* 968 F. Supp. 2d at 1039. Further, a plaintiff challenging a provision or practice of a joint venture can disaggregate such conduct and challenge it in isolation.  *See In re ATM Litig.*, 554 F. Supp. 2d at 1012. In doing so, courts "must consider the reasonably anticipated impact of the particular agreement under scrutiny—measured, of course, against the environment created by the joint venture.  If the reasonably intended impact of an agreement is to reduce market output, then that agreement is naked notwithstanding its association with other productive joint activity."  Areeda ¶ 1908b.

Defendants further argue that Plaintiffs essentially admit "that this **type** of restraint would be ancillary (and judged by the rule of reason) if it were only narrower in scope and duration." Doc. No. 30-1 at 13 (emphasis in original). Defendants are unable "to find **even a single case** holding that a non-solicitation covenant included in a subcontract or joint venture arrangement (of any scope of duration) is *per se* unlawful." *Id.* (emphasis in original). However, courts have addressed the scope of restraints within the context of a larger agreement. In *Hanger v. Berkley Group, Inc.*, the district court distinguished *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012), and *eBay*. No. 13-CV-113, 2015 WL 3439255, at *7 (W.D. Va. May 28, 2015). The *Hanger* court noted that the challenged restraint at issue is "one piece of a global settlement agreement" ("GSA"), and "[i]t is clear from the terms of the GSA and the context in which it arose that [the challenged restraint] exists to keep the parties from becoming embroiled in future lawsuits[.]" *Id.* The court examined the language of the challenged restraint, which unlike *In re High-Tech Emp. Antitrust Litig.* and *eBay*, "did not contain a blanket, no cold calling or no solicitation agreement." *Id.* Instead, the language reflected an agreement to "honor each other's non-competition, non-solicitation and confidentiality agreements of which they have actual knowledge that are contained in written agreements that have not been held unenforceable by a court of competent jurisdiction as to the particular employee." *Id.* The court made a point to note that "because the restrictive covenants in the Berkley Group employment contracts *are narrowly drawn* in terms of substantive *scope, time and geography*, the alleged restraint posed by the GSA is correspondingly narrow." *Id.* (emphasis added).

Unlike *Hanger*, Plaintiffs allege that the no-poaching restraints last in perpetuity, thereby surviving termination of the joint venture agreements. SAC ¶ 123. The restraints bar rivals forever from soliciting any of Defendants' employees—including recruiters, corporate employees, and medical travelers, despite the fact that the purpose of these subcontractor agreements is for rival providers to send their medical travelers to Defendants' customers. *See id.* ¶¶ 124-28. Lastly, Plaintiffs allege that the no-poaching

restraints apply to all of Defendants' "designated 'employees,' no matter how or where employed, and *even when not currently on assignment for AMN*[,]" while Defendants are not bound by the same restraint. *Id.* ¶ 123 (emphasis added).

In disaggregating the alleged no-poaching restraints here, the Court is unable to determine with certainty whether the restraints are ancillary to procompetitive business purposes, or "so broad that part of the restraint suppresses competition without creating efficiency." *Rothery Storage & Van Co.*, 792 F.2d at 224; *see also Blackburn v. Sweeney*, 53 F.3d 825, 828-29 (7th Cir. 1995) (noting that the defendants' argument that the advertising agreement is "a legitimate covenant not to compete, ancillary to the dissolution of the partnership, is further undermined by the Agreement's infinite duration. . . . There is no time limit attached to the advertising restrictions. . . . The restriction on advertising is thus naked, not ancillary, and per se illegal to boot."); *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 282 (6th Cir. 1898), modified and aff'd, 175 U.S. 211 (1899) ("[I]f the restraint exceeds the necessity presented by the main purpose of the contract, it is void . . . ."). As a result, the Court is unable to determine at this stage in the litigation "the level of analysis to apply." *eBay*, 968 F. Supp. 2d at 1040. "The court must instead make that determination based on factual evidence relating to the agreement's formation and character." *Id.* The parties do not have the benefit of discovery or factual evidence to support their contentions. The decision about which rule to apply "is more appropriate on a motion for summary judgment." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1122; *see also* Areeda ¶ 305e ("Often, however, the decision about which rule is to be employed will await facts that are developed *only in discovery*.") (emphasis added).

Accordingly, taking Plaintiffs' allegations as true, the Court finds that Plaintiffs have sufficiently pleaded the existence of a restraint on trade of a type that is subject to *per se* treatment. *See eBay*, 968 F. Supp. 2d at 1040. Thus, the Court is unable to determine as a matter of law that *per se* treatment will be inappropriate with respect to the no-poaching restraints in the context of the joint ventures. *See id.*

## B. No-Hire Agreement & Employers' Cartel

Plaintiffs further allege that Defendants' unilateral no-hire agreement with Host is unlawful *per se* under Section 1 of the Sherman Act. *See* SAC ¶ 296. Plaintiffs believe "Host acquiesced in AMN's demand because it required spillover work from AMN in order to develop its business and remain commercially viable." *Id.* ¶ 166. Plaintiffs claim that Defendants also "proposed various no-hire agreements to Aya at different times from 2014 to 2016, but Aya rejected each proposal." *Id.* ¶ 146. Plaintiffs allege that in order to "retaliate" against them for refusing the no-hire offers and breaching the no-poaching restraints, Defendants filed "objectively baseless claims" against Plaintiffs in state court, terminated their subcontractor agreements with Aya, and temporarily withdrew Plaintiffs' access to "certain accounts on one of [Defendants'] software platforms." *Id.* ¶ 155. Defendants then offered to "drop" their lawsuit against Plaintiffs "if in exchange Aya would agree to . . . enforce . . . an agreement not to hire specified employees for a five-year term." *Id.* ¶ 156. Plaintiffs believe that Defendants have proposed "and possibly concluded no-hire agreements with other providers." *Id.* By enforcing their no-poaching restraints and no-hire agreement, Defendants have "established and operated a non-reciprocal employers' cartel in the medical-traveler markets." *Id.* ¶¶ 297.

Defendants assert that Plaintiffs fail to "identify what the unidentified members of the 'cartel' agreed to and when and how they came to such an agreement, which types of employees supposedly were involved, or any other factual information." Doc. No. 30-1 at 16. A close reading of the SAC reveals that Plaintiffs are not relying on the formation of an employers' cartel as the basis for their *per se* claims. Rather, Plaintiffs assert that the no-poaching restraints and no-hire agreement are each independently unlawful *per se* under Section 1. *See* SAC ¶¶ 296-97. Thus, Plaintiffs' failure to identify the members of

this alleged cartel is irrelevant to the inquiry at bar.[13]  The questions before the Court are similar to those raised in the previous section—whether the alleged no-hire agreement is the type of restraint potentially subject to *per se* treatment, and whether the no-hire agreement is plausibly necessary or ancillary to achieving a procompetitive business purpose.  *See In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d at 1014.  Aside from summarily stating Plaintiffs' allegations describe "just a two-party subcontract agreement between AMN and Host Healthcare," Defendants do not address either question.  Doc. No. 30-1 at 16.

Here, similar to no-poaching restraints, the Court finds that Plaintiffs' allegations concerning the no-hire agreement with Host, and proposed no-hire agreements with Plaintiffs, are sufficient to allege that the restraints are of a type that are subject to *per se* treatment.  *See eBay*, 968 F. Supp. 2d at 1039 (finding that the government's allegations regarding eBay's no-solicitation/no-hire agreement are sufficient to state a horizontal market allocation agreement); *see also* Areeda ¶ 2013b ("An agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service division agreement, analogous to a product division agreement.").  Moreover, Plaintiffs assert that Defendants' "no-hire agreements are not reasonably ancillary to any collaboration to which they might refer. Rather, they are naked restraints of trade that are unlawful *per se* under Section 1."  *Id.* ¶ 147.  However, just because Plaintiffs label the restraints as "naked" does "not make it so." *eBay*, 968 F. Supp. 2d 1030 at 1039.  For the reasons set forth in the previous section, the Court is unable to determine with certainty, whether the no-hire restraints are ancillary to procompetitive business purposes in the context of the joint ventures.  *See*

---

[13]  The Court notes that in the FAC, Plaintiffs specifically alleged that the "employers' cartel constitutes an ongoing, *per se* violation of Section 1[.]"  FAC ¶ 239.  This allegation differs from the SAC, wherein Plaintiffs claim that by enforcing the no-poaching restraints and no-hire agreement, Defendants have "established and operated a non-reciprocal employers' cartel in the medical-traveler markets."  SAC ¶ 297.  Plaintiffs do not allege in the SAC, unlike in the FAC, that the alleged employers' cartel in and of itself constitutes a *per se* violation of Section 1.

*Rothery Storage & Van Co.*, 792 F.2d at 224.

Accordingly, taking Plaintiffs' allegations as true, the Court finds that Plaintiffs have sufficiently pleaded the existence of a restraint on trade of a type that is subject to *per se* treatment. Thus, the Court is unable to determine as a matter of law that *per se* treatment will be inappropriate with respect to the no-hire restraints. *See eBay*, 968 F. Supp. 2d at 1040.

### 2. **Quick-Look/Rule of Reason Claim**

In the alternative, Plaintiffs assert that "[i]f for any reason AMN's No-Poaching Restraints" and no-hire restraints "are not unlawful *per se* under Section 1, they nevertheless unreasonably restrain trade and violate Section 1 under the quick-look standard and/or the rule-of-reason standard." SAC ¶¶ 316, 317. Additionally, *all* of Defendants' agreements, including the software platform agreements, employee restraints, and exclusive dealing agreements, "unreasonably restrain trade in the medical-traveler markets. Cumulatively, they have permitted AMN to perpetuate and enlarge its market power, which it has exercised by charging supracompetitive prices and imposing onerous trade restraints on all market participants in the medical-traveler markets." *Id.* ¶ 318. Defendants assert any quick-look claim fails for the same reasons Plaintiffs' *per se* claim fails. *See* Doc. No. 30-1 at 17 n.20. Defendants further contend that a rule-of-reason claim fails because Plaintiffs fail to properly define the relevant markets and plead facts showing harm to competition. *See id.* at 18-19.

As noted above, courts use the quick-look analysis when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question could have an anticompetitive effect on customers and markets." *Cal Dental Ass'n*, 526 U.S. at 770. Moreover, "[w]here a practice has obvious anticompetitive effects . . . there is no need to prove that the defendant possesses market power. Rather, the court is justified in proceeding directly to the question of whether the procompetitive justifications advanced for the restraints outweigh the anticompetitive effects under a 'quick look' rule of reason." *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1020

(10th Cir. 1998).

Under the "rule of reason" analysis, the factfinder "must analyze the anti-competitive effects along with any pro-competitive effects to determine whether the practice is unreasonable on balance." *Bhan*, 929 F.2d at 1413. This analysis employs shifting burdens of proof. First, a plaintiff "must show that the activity is the type that restrains trade and that the restraint is likely to be of significant magnitude. Ordinarily, a plaintiff to do this must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly." *Id.* (internal citations omitted). Second, if the plaintiff makes the above showing, the burden shifts to the defendant to justify the restraint by showing that the restraint furthers a legitimate commercial purpose. *See id.* Third, the plaintiff "must then try to show that any legitimate objectives can be achieved in a substantially less restrictive manner." *Id.* "Finally, the court must weigh the harms and benefits to determine if the behavior is unreasonable on balance." *Id.*

Here, Defendants' arguments rest on the assumption that the Court should apply a rule of reason analysis. However, as discussed in the previous section, the Court need not decide which standard applies at this time. "Indeed, that decision is more appropriate on a motion for summary judgment." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1122. Plaintiffs have sufficiently pleaded the existence of restraints on trade of types that are subject to *per se* treatment. As such, Plaintiffs have also sufficiently pleaded "the existence of the type of restraint that may fall under the ambit of the quick look" and rule-of-reason standards. *eBay*, 968 F. Supp. 2d at 1040. "[T]he Court need not engage in a market analysis until the Court decides whether to apply a *per se* or rule of reason analysis." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1122. Because the Court cannot "at this early stage make a determination as to which rule will apply," the Court cannot find as a matter of law that the quick-look and/or rule of reason standards will not apply to the challenged restraints in this case. *eBay*, 968 F. Supp. 2d at 1040.

/ / /

### 3. **Summary**

In sum, taking Plaintiffs' allegations as true, which the Court must do at this stage of the proceedings, the Court finds that Plaintiffs have sufficiently pleaded the existence of restraints on trade of types that are subject to *per se* treatment. *See id.* The Court, however, "cannot determine with certainty the nature of the restraint[s], and by extension, the level of analysis to apply." *Id.* Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' first, second, and fourth causes of action.

## C. **Sherman Act Section 2 Claim**

In their third cause of action, Plaintiffs assert an attempted monopolization claim under Section 2 of the Sherman Act. Plaintiffs allege that through Defendants' anticompetitive practices, Defendants "intended to acquire monopoly power in the medical-traveler markets." SAC ¶ 330.

"To establish a Sherman Act § 2[14] violation for attempted monopolization, a private plaintiff seeking damages must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power'; and (4) causal antitrust injury." *Rebel Oil Co.*, 51 F.3d at 1432-33 (citing *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 811 (9th Cir. 1988)).

Defendants argue the Court should dismiss Plaintiffs' Section 2 claim for three reasons: (1) Plaintiffs fail to plead well-defined relevant markets; (2) Plaintiffs fail to allege exclusionary conduct; and (3) Plaintiffs fail to plead facts showing a dangerous probability that Defendants will succeed in becoming a monopoly. *See* Doc. No. 30-1 at 21-23. Because the Court has already concluded that Plaintiffs have sufficiently alleged exclusionary conduct with respect to antitrust standing, the Court proceeds to address

---

[14] Section 2 of the Sherman Act provides, "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize ... trade shall be guilty" of an antitrust violation. 15 U.S.C. § 2.

Defendants' remaining arguments regarding the relevant markets and probability of success in becoming a monopoly.

## 1. <u>Well-Defined Relevant Markets</u>

Plaintiffs assert that they have properly pled the markets, explaining why there is no "reasonably interchangeable substitute" for medical-traveler services and "why these services are sold in both a national market and various regional submarkets." Doc. No. 31 at 21. Defendants argue that Plaintiffs fail to sufficiently define the relevant service and geographic markets. *See* Doc. No. 30-1 at 18. The Court addresses the relevant markets in turn.

### A. Service Market

With respect to the service market, Defendants contend that "medical-traveler services" is "vague on its face" and ambiguous. Doc. No. 30-1 at 18. "[C]ircumstantial evidence of market power requires that the plaintiff, at the threshold, define the relevant market." *Rebel Oil Co.*, 51 F.3d at 1434. "[A] 'market' is the group of sellers or producers who have the 'actual or potential ability to deprive each other of significant levels of business.'" *Id.* (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)). "The goods and services that sellers or producers offer provide the best indicia of who competes in the same market. Thus, a product market is typically defined to include the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability and use of cross-elasticity of demand." *Thurman Indus., Inc.*, 875 F.2d at 1374. "Market definition is crucial. Without a definition of the relevant market, it is impossible to determine market share." *Rebel Oil Co.*, 51 F.3d at 1434.

Here, the Court finds that Plaintiffs have sufficiently defined the relevant service market as "[t]he provision of travelers." SAC ¶ 53. For example, Plaintiffs expressly allege that "[t]ravelers are licensed nurses and medical technicians who travel from place to place in order to perform temporary assignments at understaffed hospitals." *Id.* ¶ 31. The travelers work for staffing companies, such as AMN and Aya, "which make all

necessary arrangements for them, and which charge fees to the hospitals for their services." *Id.* The "medical-traveler services constitute a relevant service market: when hospitals require these services, there is no other service that they can use instead, since by definition they use the services of travelers only when their staffing needs cannot be met by their own employees or locally available temporary employees." *Id.* ¶ 51. "There is no other service, nor any other kind of employee that can fulfill the hospitals' requirement for travelers under such circumstances." *Id.*

Further, unlike *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, a case relied upon by Defendants, where the Third Circuit determined that "the dough, tomato sauce, and paper cups . . . used by Domino's stores are interchangeable with dough, sauce and cups available from other suppliers and used by other pizza companies" (124 F.3d 430, 438 (3d Cir. 1997)), Plaintiffs assert that there is "no cross-elasticity of demand for medical-traveler services and any other service" (SAC ¶ 52). "If a hypothetical monopolist were to make all sales of medical-traveler services, it could raise its prices by a statistically significant amount for a non-transitory period without losing so many sales as to make the price-increase unprofitable[.]" SAC ¶ 52. "Hospitals would find themselves largely constrained to submit to the monopolist's price increase and to continue employing travelers at the higher prices for want of any suitable alternative." *Id.* Such allegations are sufficient at this stage of the proceedings.

Defendants also claim there is "ambiguity throughout the SAC as to whether the purported service market for medical services provided by the 'medical travelers' includes services provided by those who recruit 'medical travelers.'" Doc. No. 30-1 at 18. The Court disagrees. While Plaintiffs explain that providers of travelers "employ professional recruiters" whose work "is indispensable to medical-traveler providers[,]" Plaintiffs clearly articulate that the relevant service market consists of the sale of medical-traveler services to understaffed hospitals. SAC ¶¶ 49, 51-53.

Accordingly, because the relevant market includes the groups of sellers "who have actual or potential ability to deprive each other of significant levels of business[,]" and in

viewing the allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently defined the relevant service market. *Thurman Indus., Inc.*, 875 F.2d at 1374; *see also Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997) ("Ultimately what constitutes a relevant market is a factual determination for the jury.").

### B. Geographic Markets

Regarding the relevant geographic markets, Defendants assert Plaintiffs' submarket allegations are vague and insufficient to support a claim. *See* Doc. No. 30-1 at 19. "In defining the relevant market, a court must look at the 'full range of selling opportunities reasonably open to [competitors], namely all the product and geographic sales they may readily compete for.'" *Stewart v. Gogo, Inc.*, No. 12-cv-5164 EMC, 2013 WL 1501484, at *4 (N.D. Cal. Apr. 10, 2013) (quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)). The Supreme Court has indicated that "within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*[15]

Here, Plaintiffs allege that the "provision of travelers is a service that is provided in a nationwide market across the United States and in various regional submarkets." SAC ¶ 58. Defendants take issue with only the alleged regional submarkets. Plaintiffs explain that some providers, including AMN and Aya, dispatch travelers to perform assignments

---

[15] "Although *Brown Shoe* involved the challenge of a merger under Section 7 of the Clayton Act, courts have recognized that its submarket analysis is equally applicable to claims brought under the Sherman Act." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 984-85 (C.D. Cal. 2012) (citing *Thurman Indus., Inc.*, 875 F.2d at 1375 n.1).

at hospitals across the country.  *Id.* ¶ 59.  Additionally, there are "various submarkets (or smaller markets) for medical-traveler services[.]"  *Id.* ¶ 60.  Contrary to Defendants' argument that Plaintiffs' allegations are "conclusory" or "not sufficiently definite" (Doc. No. 30-1 at 19), Plaintiffs assert that each submarket "has distinctive regulatory requirements imposed by state, county and/or municipal authorities" (SAC ¶ 60(1)). "Many travelers are qualified to render services only in certain regions" and "the pool of available travelers largely varies from region to region."  SAC ¶ 60(2).  Moreover, in each regional submarket, "hospitals pay distinct prices for traveler services, have distinct staffing requirements, and must address unique seasonal and fluctuating circumstances." *Id.* ¶ 60(3).  Further, "[i]t is within the different regional submarkets that providers compete with one another to furnish travelers to hospitals."  *Id.* ¶ 64.  The Court finds that Plaintiffs have sufficiently alleged how the provision of services can vary in the numerous submarkets due to state, county and/or municipal regulatory requirements, individual preferences, distinct prices, and the unique circumstances of hospitals across the country.  *See DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1135 (N.D. Cal. 2010) (noting that "there is no contradiction between the existence of a national . . . market and the simultaneous existence of local . . . markets that compete only at the regional level.").

Accordingly, the Court finds that taking Plaintiffs' allegations as true, Plaintiffs have sufficiently defined the relevant geographic markets: a national market for the provision of travelers, as well as various regional submarkets for the provision of these services.  *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1051 (9th Cir. 2008) (finding that the plaintiff's complaint "sufficiently alleges that IKON customers constitute a submarket according to all of those practical indicia" outlined by the Supreme Court in *Brown Shoe*).

## 2. __Dangerous Probability of Success__

Plaintiffs claim "there exists a dangerous probability that [Defendants] will succeed in the effort unless there is an antitrust intervention."  SAC ¶ 330.

"To establish a dangerous probability of success, plaintiffs must . . . (1) [ ] define the relevant market and (2) [ ] demonstrate that substantial barriers to entry protect that market." *United States v. Microsoft Corp.*, 253 F.3d 34, 81 (D.C. Cir. 2001); *see also Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 455-56 (1993) (indicating that a court's evaluation of an attempted monopolization claim must include a definition of the relevant market and the defendant's market share). "The determination whether a dangerous probability of success exists is a particularly fact-intensive inquiry." *Microsoft Corp.*, 253 F.3d at 80. The Sherman Act does not specify which activities constitute an attempted monopolization; thus, "the court 'must examine the facts of each case, mindful that the determination of what constitutes an attempt, as Justice Holmes explained, 'is a question of proximity and degree.''" *Id.* (quoting *United States v. Am. Airlines, Inc.,* 743 F.2d 1114, 1118 (5th Cir.1984); *Swift & Co. v. United States,* 196 U.S. 375, 402 (1905)).

Plaintiffs allege Defendants are "the dominant provider of the relevant service (the provision of travelers)." SAC ¶ 331. Defendants make or control "at least 37% of all sales" nationally, and in some regional submarkets, Defendants make or control "at least 50% of all sales." *Id.* ¶¶ 67-68. Defendants contend that Plaintiffs allegations concerning market power and barriers to entry are insufficient to state a claim for attempted monopolization. *See* Doc. No. 30-1 at 23. The Court addresses Defendants' arguments in turn.

### A. Market Power

Defendants first argue that Plaintiffs' market power allegations "are obviously padded" and insufficient. *Id.* The Ninth Circuit has indicated that "[m]arket power may be demonstrated through either of two types of proof." *Rebel Oil Co.*, 51 F.3d at 1434. The first type of proof is "direct evidence of the injurious exercise of market power." *Id.* "The more common type of proof is circumstantial evidence pertaining to the structure of the market." *Id.* "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing

competitors lack the capacity to increase their output . . . ." *Id.* "Measurement of market share is necessary to determine whether the defendant possesses sufficient leverage to influence marketwide output." *Id.* at 1437. "Market power need not be pled with specificity, and whether a defendant actually possesses market power is a factual question." *DocMagic*, 745 F. Supp. 2d at 1136 (citing *Newcal*, 513 F.3d at 1045, 1051). The Ninth Circuit has held that in an attempt-to-monopolize claim, a "market share of 44 percent is sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output[.]" *Rebel Oil Co.*, 51 F.3d at 1438. The Ninth Circuit, however, cautioned that "[c]ourts should be 'wary of the numbers game of market percentage' when considering attempt-to-monopolize claims." *Id.* n.10 (quoting *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 533 n.18 (5th Cir. 1982)).

Here, Plaintiffs plead circumstantial evidence that Defendants already "wield[] monopoly power in six regional submarkets and ha[ve] come dangerously close in several others." Doc. No. 31 at 25. Specifically, Plaintiffs allege Defendants are the "dominant provider of medical-traveler services" in the country. SAC ¶ 66. Nationally, Defendants make or control "at least 37% of all sales." *Id.* ¶ 67. In the following regional submarkets, Defendants make or control at least 50% of all sales: (1) the Greater Los Angeles Metropolitan Area; (2) the San Francisco Bay Area; (3) the Greater Washington, D.C. Metropolitan Area; (4) the Greater Baltimore Metropolitan Area; (5) the Greater Richmond Metropolitan Area; and (6) the Greater Norfolk Metropolitan Area. *Id.* ¶ 68. Moreover, in other regional submarkets, Defendants make or control "a commanding percentage of overall sales: Hawaii (87% market foreclosure); Nebraska (83%); Maine (83%); Vermont (80%); Arkansas (73%); Montana (67%); Nevada (64%); and New Hampshire (61%)." *Id.* ¶ 69.

Defendants contend that the market share percentages are based on Plaintiffs' internal market analysis—not third-party industry data—and that the percentages are "padded" to account for sales that Defendants control. *See* Doc. No. 30-1 at 23.

Defendants do not point to, nor is the Court aware of, any binding authority requiring a plaintiff to present third-party industry data at this stage of the litigation in asserting an attempt-to-monopolize claim. Moreover, Plaintiffs expressly state that they have "adjusted each stated market share downward by 5%" to "compensate for possible error." SAC ¶ 79. Plaintiffs indicate that their internal market analysis is what they can "provide at present without the benefit of discovery." *Id.* ¶ 82. As such, the Court finds that Plaintiffs have provided sufficient factual allegations describing Defendants' position to plausibly conclude that Defendants have "sufficient leverage to influence marketwide output." *Rebel Oil Co.*, 51 F.3d at 1437.

## B. Entry Barriers

Defendants next argue that Plaintiffs fail "to show that there are any legally significant barriers to entry or expansion by competing firms." Doc. No. 30-1 at 23. Entry barriers are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir.1993). "A mere showing of substantial or even dominant market share alone" is insufficient if the plaintiff has not shown that rivals cannot enter the market and that existing competitors could not expand in response to higher prices. *Rebel Oil Co.*, 51 F.3d at 1439; *see also Spectrum Sports,* 506 U.S. at 456 ("In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider . . . the defendant's ability to lessen or destroy competition in that market."). "The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." *Rebel Oil Co.*, 51 F.3d at 1439. In assessing entry barriers, courts focus on the ability not to constrain those already in the market, but "those who would enter but are prevented from doing so." *Id.* (quoting *United States v. Syufy Enter.*, 903 F.2d 659, 672 n.21 (9th Cir. 1990)).

17cv205-MMA (MDD)

Here, the Court finds Plaintiffs' allegations regarding barriers to entry are sufficient at this stage of the litigation. Plaintiffs assert that Defendants protect their position in the affected markets by utilizing numerous barriers to entry and expansion. *See* SAC ¶ 106. Specifically, Plaintiffs allege the following market barriers: (1) the nursing shortage; (2) Defendants' trade restraints and alleged anticompetitive conduct; (3) brand recognition; (4) regulatory and administrative expertise; and (5) capital requirements. *See id.* at ¶¶ 106-115.

With respect to the alleged trade restraints, Defendants note that rival providers, like Plaintiffs, can and do expand their capacity by subcontracting with other providers, and that Plaintiffs' business is experiencing growth. *See* Doc. No. 30-1 at 24. Thus, Defendants assert the trade restraints do not constitute a barrier to entry. Defendants' argument, however, is misplaced as Plaintiffs allege that due to Defendants' trade restraints, "potential entrants and existing rivals cannot develop their own *comparable* pools to compete against AMN." SAC ¶ 110 (emphasis added). Additionally, as noted previously, Plaintiffs and other rivals "have been prevented or greatly hindered . . . from developing their own traveler pools and deploying them in order to compete for the large hospitals' business and to compete in general in the medical-traveler markets." *Id.* ¶ 4.

Regarding brand recognition, Defendants assert that "it is well-established that reputation is not an entry barrier." Doc. No. 30-1 at 24. The case relied upon by Defendants pre-dates the Ninth Circuit's decision in *Rebel Oil Co.*, which makes clear that "entrenched buyer preferences for established brands" is a market barrier. 51 F.3d at 1439. Additionally, at the hearing on Defendants' motion to dismiss Plaintiffs' FAC, Plaintiff's counsel explained to the Court that Defendants have "a highly recognized brand[.]" Doc. No. 21 at 24. "In order to enter this market, you [the sellers of traveler services] have to develop a sufficiently trusted brand so that hospitals [the buyers] will hire your medical travelers[.]" *Id.*

Further, Plaintiffs sufficiently allege that providers of medical-traveler services require a certain level of expertise in order to perform their operations (SAC ¶ 113), and

that the provision of medical-traveler services "requires substantial capital funding" so that providers can "continually pay [their] travelers for their work months before being paid by hospital customers for services rendered" (*Id.* at ¶ 114). Plaintiffs also assert that the nursing shortage constitutes a market barrier. *See id.* ¶ 107-108. Plaintiffs recognize that the nursing shortage is the result of: (1) accredited nursing schools being unable to accommodate all qualified applicants; and (2) many qualified nurses retiring. *Id.* ¶ 107. However, Plaintiffs indicate that the nursing shortage affects both potential entrants and existing competitors. *See id.* Therefore, the Court finds that Plaintiffs have plausibly alleged that there are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *L.A. Land Co.*, 6 F.3d at 1427-28.

### 3. <u>Summary</u>

In sum, the Court finds that Plaintiffs have sufficiently defined the relevant service market and geographic markets, and that Plaintiffs have sufficiently alleged a dangerous probability that Defendants will succeed in becoming a monopoly. Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' third cause of action.

## D. Tortious Interference with Prospective Economic Relations Claim

In their fifth cause of action, Plaintiffs contend that Defendants, through use of their various trade restraints, "deliberately and effectually interfered with Aya's prospective relationships with recruiters, travelers, hospitals and vendor-managers." SAC ¶ 349. As a consequence, Defendants "successfully interfered with [Aya's] prospective commercial relationships, which Aya seeks to establish and requires in order to remain a viable competitor in the affected markets." *Id.* ¶ 351. Defendants argue dismissal of Plaintiffs' tortious interference claim is appropriate because the relationships Plaintiffs allege Defendants interfered with are "undefined, conclusory and speculative in

nature." Doc. No. 15-1 at 23.[16]

The California Supreme Court set forth the standard for determining whether a plaintiff has stated a claim for tortious interference with prospective business relations in *Buckaloo v. Johnson,* 537 P.2d 865 (Cal. 1975). The elements for such a claim are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (internal citations and quotation marks omitted).

Here, Plaintiffs' allegations of tortious interference are insufficient to state a claim. For example, Plaintiffs allege that Defendants have "disrupted relationships that Aya has tried to develop with various recruiters, travelers, hospitals, and vendor-managers." SAC ¶ 350. However, while Plaintiffs need not provide the actual names of such individuals and/or companies, Plaintiffs "must allege a relationship with 'a specific, alebit unnamed' third party." *R Power Biofuels, LLC v. Chemex LLC*, No. 16-cv-716-LHK, 2016 WL 6663002, at *16 (N.D. Cal. Nov. 11, 2016) (quoting *Ramona Manor Convalescent Hosp. v. Care Enterps.*, 177 Cal. App. 1120, 1133 (Ct. App. 1986)). Moreover, "it is essential that the Plaintiff allege facts showing that Defendant interfered with Plaintiff's relationship with a particular individual." *Damabeh v. 7-Eleven, Inc.*, No. 12-cv-1739-LHK, 2013 WL 1915867, at *10 (N.D. Cal. May 8, 2013). Because Plaintiffs fail to provide any details about the relationships with specific individuals and/or companies, and because it is impossible to determine how many such relationships existed, the Court

---

[16] Defendants also argue that dismissal is appropriate because Plaintiffs' claim is predicated on antitrust violations, which Plaintiffs have "failed to plead sufficiently." *Id.* However, for the reasons set forth above, the Court disagrees and finds Defendants' argument unpersuasive.

finds that Plaintiffs fail to state a claim for tortious interference with prospective economic advantage.

Accordingly, the Court **DISMISSES** Plaintiffs' fifth cause of action for tortious interference with prospective economic relations **with leave to amend**.

**E.    UCL Claim**

Finally, Plaintiffs allege a cause of action for violations of California's UCL because through Defendants' "anticompetitive practices," Defendants have "employed conduct that is unfair, unlawful and/or deceptive."  SAC ¶ 355.

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  The UCL provides a separate theory of liability under each of the three prongs: "unlawful," "unfair," and "fraudulent."[17]  *Stanwood v. Mary Kay, Inc.*, 941 F. Supp. 2d 1212, 1222 (C.D. Cal. 2012) (citing *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007)).

With respect to the "unlawful" prong, for the reasons discussed above, the Court finds Plaintiffs sufficiently allege conduct that falls within the unlawful prong of the UCL.  Section 17200 "borrows" violations from other laws by making them independently actionable as unfair competitive practices.  *Korea Supply Co.*, 29 Cal. 4th at 1143.  Because Plaintiffs allege unlawful conduct under Section 1 and Section 2 of the Sherman Act, Plaintiffs also adequately allege a violation of the UCL's unlawful prong.

With respect to the "unfair" prong, the California Supreme Court has adopted the following test in the antitrust context: "[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200," unfair in

---

[17]  The Court notes that in the SAC, Plaintiffs claim Defendants have "employed conduct that is unfair, unlawful and/or deceptive."  SAC ¶ 355.  The Court does not construe Plaintiffs' SAC as asserting a claim under the UCL's fraudulent prong, especially in light of the fact that Plaintiffs do not mention "fraud" or "fraudulent" conduct in support of this cause of action, nor do Plaintiffs respond to Defendants' arguments regarding the fraudulent prong of the UCL.

section 17200 means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). Here, as discussed in great detail above, Plaintiffs have sufficiently alleged conduct that "threatens or harms competition." *Id.* Plaintiffs allege Defendants' trade restraints have an exclusionary effect on Defendants' rivals: "the rivals cannot solicit any of AMN's employees, and AMN's recruiters, who are best placed to solicit these employees, dare not leave AMN to work for any rival." SAC ¶ 219. Moreover, Defendants have utilized "unlawful trade restraints and baseless litigation to prevent and discourage [their] rivals from seeking to make hires from this pool. [Their] purpose is to remain the only provider that can offer such as pool." *Id.* at ¶ 221. Thus, Plaintiffs also sufficiently allege a violation of the UCL's unfair prong.

Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' sixth cause of action.

### CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss Plaintiffs' SAC. The Court **DISMISSES** Plaintiffs' tortious interference with prospective economic relations claim **without prejudice**. Plaintiffs may file a third amended complaint that cures the deficiencies addressed herein with respect to the tortious interference with prospective economic relations claim on or before **June 29, 2018**.

**IT IS SO ORDERED.**

Dated: June 19, 2018

HON. MICHAEL M. ANELLO
United States District Judge