William A. Markham, California State Bar No. 132970
*wm@markhamlawfirm.com*
Dorn Bishop, California State Bar No. 147994
*db@markhamlawfirm.com* (Of Counsel)
Tara Burd, California State Bar No. 276676
*tb@markhamlawfirm.com* (Of Counsel)
LAW OFFICES OF WILLIAM MARKHAM, P.C.
402 West Broadway, Suite 400
San Diego, CA 92101
Tel: 619.221.4400
Attorneys for Plaintiffs,
AYA HEALTHCARE SERVICES, INC. and AYA HEALTHCARE INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYA HEALTHCARE SERVICES, INC. and AYA HEALTHCARE, INC., <br><br> Plaintiffs, <br><br> Vs. <br><br> AMN HEALTHCARE, INC. *et al.* <br><br> Defendants. | Case No. 3:17-cv-00205-MMA-MDD <br><br> DECLARATION OF WILLIAM (RE: PLAINTIFFS' MOTION TO COMPEL) <br><br> Dembin Civil Chamber Rule IV.D <br><br> Complaint Filed:   February 2, 2017 <br><br> Trial Date:         Not set <br><br> The Hon. Mitchell D. Dembin |

I, William Markham, now declare the following matters.

1.    I am over the age of eighteen and competent to give testimony in a legal proceeding. I have personal knowledge of the below-stated matters. If asked to do so, I could and would testify to each of these matters.

2.    I am an attorney-at-law, am admitted to practice law in California and the District of Columbia, and am also authorized to appear in various federal courts, including this Court.

3.    In the present case, I represent Plaintiffs, Aya Healthcare Services, Inc. and Aya Healthcare, Inc. (collectively, "Aya"). Defendants (collectively, "AMN") are five affiliated companies under common ownership and control. In this Declaration, I often refer to counsel for AMN as "AMN."

4.    **Introduction**. By this motion, Aya seeks to enforce a document-production agreement (the "AMN Production Agreement"), which was jointly negotiated by the parties, and which prescribes the documents that AMN must produce and the production schedule that it must meet in order to comply with Aya's First Set of Requests for Production of Documents (the "RPDs").

5.    The present motion is timely brought (*see* ¶¶ 84-98, *infra*). Before bringing it, Aya complied with the requirements of Rule IV.A of this Court's Civil Chamber Rules (the "Rules"). *See* ¶ 99, *infra*.

6.    **Aya Has Good Cause to Seek *Ex Parte* Discovery Relief**.

Aya brings the present discovery motion under the *ex parte* procedures set forth at Rule IV.D. It afforded AMN a meaningful opportunity to participate in the preparation of a joint motion to address the present discovery disputes, but AMN was willing to present a joint motion only on terms and conditions that were unreasonable, contrary to the most basic rudiments of due process, and calculated to subject Aya to irreparable prejudice. *See* ¶¶ 7-23, *infra*.

7.    **AMN's Unreasonable Interpretation of this Court's Rules**. According to AMN, this Court's Rules on discovery motions require the movant to prepare its

DECLARATION OF WILLIAM MARKHAM (RE: PLAINTIFFS' MOTION TO COMPEL)          -1-

part of a joint brief and all supporting papers, serve these papers on the respondent at least seven court days before the filing date, await the respondent's own part of the brief and supporting papers, and then file both sets of papers as a single joint motion.

8.    AMN further insists that, after serving its section of the brief, the movant cannot make *any* changes to its original papers, nor provide a supplemental declaration, nor in any manner comment in any way on the respondent's section of the brief and supporting papers. The movant must submit whatever it wrote seven court days earlier, along with whatever it receives from the respondent, doing so without any opportunity to revise its papers so that they address intervening developments or the respondent's papers.

9.    Since discovery opened in this case on September 20, 2018, I have served on AMN two discovery motions. Each time, AMN has obliged me to observe the above procedures. I have acquiesced until now only because AMN will not otherwise authorize me to file any joint motion at all. As required by this Court's Rules, I have tried my best to make joint submissions whenever possible.

10.    This time it was not possible to submit a joint brief: AMN was willing to authorize a joint submission only if I agreed not to comment in any manner on unfair, misleading arguments that it presented in its section of the brief. Had I agreed, I would have exposed my client to severe, irreparable prejudice, as I explain at ¶¶ 75-80, *infra*.

11.    **Request for Guidance from the Court**. I respectfully submit that AMN's interpretation of the Court's Rules on joint motion practice is unreasonable and contrary not only to their apparent purpose, but also to their express injunction, which is that the parties afford one another fair notice and jointly "participate" in the preparation of a joint statement to the Court (Rule IV.C.3).

12.    I infer that the purpose of these Rules is to oblige each side to think long and hard about its discovery arguments and to consider the other side's arguments before they are stated in a public filing and presented to this Court for adjudication. This process should tend to compel both sides to exhibit reasonableness and fair play

and to resolve as many disputes as possible on their own before finally submitting a short, succinct statement that addresses only their remaining disputes. Presumably, each side can revise its own section of the motion as the parties exchange views and reach agreement on different points. The touchstone of all such revisions must be *fair, sufficient notice* to the other side and *reasonable briefing procedures* after the movant serves its initial papers seven court days before the filing deadline. If these Rules are so intended, they would naturally promote the self-enforcing procedures of the Discovery Act.

13.    I further infer that if both sides are truly unwilling to compromise, the Rules require them to state their respective positions succinctly and promptly, after which their statements are jointly presented to this Court on a short calendar, so that their dispute can be efficiently adjudicated. In this manner, the Rules promote the swift judicial resolution of discovery disputes when the parties are unable to make progress on their own.

14.    AMN's interpretation of these Rules facilitates none of these objectives. Instead, it obliges the movant to become a victim of its own motion. Specifically, the movant must present its discovery grievances to the respondent and thereafter remain silent until this Court rules on the matter. In the meantime, the respondent has every incentive to announce unilateral discovery measures that are likely to be unsatisfactory to the movant, comment on these discovery measures in its section of the motion, argue that the movant's points are now moot and superseded by recent developments, and make whatever misleading and unfair statements it cares to supply, since the movant will lack any opportunity to offer the least objection or reply. That is precisely what has happened here, as I relate immediately below.

15.    On November 23, 2018, I served the predecessor version of the present motion on AMN, seeking to enforce the same discovery agreement that I seek to enforce by the present motion – the AMN Production Agreement.

//

DECLARATION OF WILLIAM MARKHAM (RE: PLAINTIFFS' MOTION TO COMPEL)          -3-

16.     In response, AMN made significant document productions on November 30 and December 1, 2018. These productions, although welcome, neither satisfied AMN's production obligations, nor resolved all of the disputes raised by my original motion. On the contrary, the productions were late, incomplete, and missing entire categories of the most important documents and data in this case.

17.     Nevertheless, AMN variously requested and demanded that I withdraw the original motion, asserting that it had been superseded by events and would be "misleading" to the Court if it were filed. At the same time, AMN was adamant that I could *not* revise the original motion, but must instead prepare and serve a new motion if I wished to obtain relief for the remaining discovery disputes.

18.     Unsure how to respond to such an unfair interpretation, I finally agreed to prepare the present motion. On December 12, 2018, I served on AMN Aya's section of the present motion, along with two supporting declarations and exhibits.[1]

19.     On December 21, 2018, AMN provided its section of the brief and supporting declarations. AMN's papers were misleading. By them, AMN sought leave to produce flawed, incomplete data in lieu of the carefully negotiated data that it is obliged to produce under the AMN Production Agreement. Had Aya been obliged to make do with this limited data, its experts would like have been unable to establish definitive proof of various points on which Aya carries the burden. *See* ¶¶ 75-79, *infra*. In its part of the motion, AMN also urged the Court to make a discovery ruling that would have deprived Aya of evidence it requires to prove one of its claims under the usual standard used to prove the claim. *See* ¶¶ 80, *infra*. If the Court finds cause to make such rulings, it should first consider Aya's arguments concerning them. This was what AMN could not abide.

20.     As before, AMN expected me simply to file my opening papers and its ensuing papers as a single brief and not to comment on its contributions despite the

---

[1]     On the following day, I added a section to one of these declarations (my own) and afforded AMN one additional court day to respond.

above problems with them. I therefore filed the joint submission on December 21, 2018 as a separate docket entry (Dkt. 54), exactly as AMN required me to do. After doing so, I prepared a supplemental declaration that succinctly explained the above points, and I filed it in support of the motion as a separate docket entry (Dkt. 55).

21.    On December 22, 2018, AMN contacted me, demanded that I withdraw the supplemental declaration, and threatened to bring a motion for sanctions against me if I did not comply. I declined to comply and explained my reasoning. Appended to this Declaration as Exhibit 1.1 is a true and correct copy of my e-mail exchange with AMN on these points.

22.    On December 24, 2018, I was notified by the ECF clerk of this Court that I had filed the joint motion (Dkt. 54) without providing an electronic signature for AMN's counsel of record. I was therefore instructed to withdraw the submission and re-file it with the necessary signature. *See id*. (clerk's notation). AMN had authorized me to provide this signature and file the motion, but by inadvertence I omitted to supply it.

23.    In light of AMN's comments that my submission of a supplemental declaration was sanctionable, I concluded that it was resolved to prevent me from commenting on the misleading statements in its section of our joint brief. I therefore decided to bring the present *ex parte* motion for discovery relief immediately after the Christmas holiday. I respectfully submit that it is appropriate for me to do so under the circumstances, and that I have proper cause to do so under Rule IV.D.

24.    **Aya's RPDs**. On August 22, 2018, Aya served its RPDs on AMN.. By operation of law, Aya's RPDs were deemed served on August 27, 2018, which is when the parties conducted their telephone conference in accordance with Fed. R. Civ. P. 26(f). True and correct copies of these RPDs are appended to this Declaration as Exhibit 1.

25.    On September 20, 2018, the Court conducted the initial case management conference, whereupon fact discovery commenced. *See* Dkt. 45.

26.    **The AMN Production Agreement**. AMN timely served its responses to Aya's RPDs on September 26, 2018, stating objections to all twenty of Aya's production requests, and agreeing only to make productions that I regarded as minor and inconsequential (e.g., its organization charts). The parties exchanged prolific meet-and-confer correspondence from October 4 onward, reached agreement on specific RPDs from October 9 onward, met in person on October 16, 2018, and finally reached agreement on all points by a series of exchanges from October 17 to October 19, 2018. True and correct copies of these meet-and-confer exchanges (the "AMN Production Agreement") are appended as Exhibit 2 to this Declaration.

27.    I was closely involved in nearly every stage of these negotiations and composed all of the e-mails for Aya that appear in the AMN Production Agreement.

28.    **AMN's "Core Documents."** By the AMN Production Agreement, AMN agreed *inter alia* to produce the following "Core Documents" on or shortly after November 15, 2018:

(a)    <u>Provider Contracts</u> (requested by RPD No. 1): All contracts (including addenda, exhibits, schedules, amendments, etc.) between AMN and other providers, made or performed at any time since January 1, 2010 *in the United States*. *See* Ex. 2 (pdf pp. 7, 21, 24, 31, 36-37) (highlighted).

(b)    <u>Sales Data</u> (requested by RPD No. 9): Specified sales data from AMN's sales of traveler services *in the United States*; some specified data to be given from January 1, 2010 onward and other specified sales data to be given from September 11, 2013 onward. *See* Ex. 2 (pdf pp. 4, 7, 11, 22, 25, 33) (highlighted).

(c)    <u>Profit-and-Loss Statements</u> (Requested by RPD No. 16): Financial records that show the revenues that AMN has generated and the costs that it has incurred by its sales of traveler services in the United States since January 1, 2010, with sufficient disclosures to explain the costs. *See* Ex. 2 (pdf pp. 4, 7, 12,

35, 41) (highlighted).[2]

29.    The above-listed categories of AMN's "Core Documents" were carefully negotiated by attentive counsel. *First,* Aya provided rigorous definitions for each category in its RPDs. *See* Ex. 1, *passim*. *Second*, the parties agreed at AMN's request to limit some of these definitions as follows.

(a)    No Successor Liability/Production of Documents of ShiftWise and Medefis. The parties agreed that AMN need not produce any contract made by a predecessor company unless AMN had assumed or ratified the contract. *See* Ex. 2 (pdf p. 31) (highlighted). This principle was applied to two of the AMN Defendants as follows: Defendant ShiftWise, Inc. ("ShiftWise") and Defendant Medefis, Inc. ("Medefis"), which both operate electronic platforms that sell traveler services, were obliged to produce documents only from the time each was acquired by AMN – since 2013 for ShiftWise and since 2015 for Medefis, *See id*. (pdf p. 46, 37, 31, 24) (highlighted in light red).

(b)    Limitation of Certain Sales Data. The parties further agreed that AMN would produce some of its Sales Data for sales from January 1, 2010 onward and the remaining Sales Data for sales from September 11, 2013 onward. *See* Ex. 2 (pdf pp. 4, 7, 11) (highlighted).

30.    **ShiftWise and Medefis Are Required to Produce Their Provider Contracts and Sales Data Nationwide.** AMN now argues that ShiftWise and Medefis agreed to produce their Provider Contracts and Sales Data only for the Regional Submarkets. This assertion lacks any reasonable basis.

//

---

[2]    AMN appears to have produced the remaining categories of its Core Documents, and so I have not listed them above. Briefly, these documents are as follows: (1) the templates for AMN's employment contracts (RPD No. 3); (2) AMN's cease-and-desist correspondence to former employees and rival providers (RPD Nos. 5-6); (3) AMN's market and industry reports (RPD No. 17); and (4) basic disclosures of the following matters: (a) AMN's acquisitions of other providers (RPD No. 11); AMN's interlocking directorships with other providers (RPD No. 12); and AMN's past litigations against former employees and rival providers (RPD No. 14).

DECLARATION OF WILLIAM MARKHAM (RE: PLAINTIFFS' MOTION TO COMPEL)        -7-

31.     On the contrary, the parties never agreed to limit Provider Contracts to those made or performed in the Regional Submarkets, but instead understood that AMN must produce *all* of its Provider Contracts, including those made by its platform operators, ShiftWise and Medefis. *See* Ex. 2 at pdf pp. 7-8, 10, 24, 31, 37, 44.

32.     The parties further agreed that AMN would provide the specified Sales Data for its assignments of travelers *in the United States*, including those made on its two platforms – ShiftWise and Medefis. *See* Ex. 2 at pdf pp. 2, 7-8, 11, 33, 46.

33.     The AMN Production Agreement is very clear on these points. This clarity of purpose stands in contrast to the parties' equally clear agreement that AMN would produce its contracts with customers (hospitals) only for the Regional Submarkets. *Cf.* Ex. 2 pdf pp. 9-11, 22, 25, 33) (highlighted in blue).

34.     Indeed, the parties specifically agreed *not* to limit the Provider Contracts or Sales Data to the Regional Submarkets. On October 17, 2018, AMN asked Aya whether it (AMN) could produce Provider Contracts and Sales Data only for the Regional Submarkets. *See* Ex. 2 (pdf pp. 9, 13) (highlighted). On the same day, Aya specifically rejected this request, stating the matter as follows:

> We respectfully decline to limit RPS Nos. 1 [Provider Contracts] and 9 [Sales Data] to the regional submarkets in question. Aya has also alleged a national market and raised a rule-of-reason challenge to AMN's use of restraints in the national market as well as in the regional submarkets. Also, request no. 1 concerns documents that implicate Aya's per se challenge, and Aya's experts require the national data in order to analyze not only trends in the national market but pricing differences that concern whether or not in practice there are discernible regional markets.

*See* Ex. 2 (pdf p. 8) (highlighted).

35.     Later on the same day, October 17, 2018, AMN acquiesced in Aya's position and expressly agreed to produce its Provider Contracts and Sales Data accordingly. *See* Ex. 2 pdf p. 7.

36.     **The Timing of AMN's Productions**. In the AMN Production Agreement, the parties agreed that AMN would produce certain Core Documents on

November 1, 2018, others on November 15, and the remainder as soon thereafter as possible. *See* Ex. 2 (pdf pp. 2, 4-5, 7-9). The AMN Production Agreement also contemplated that AMN would make rolling productions of responsive documents yielded by search-term queries (mostly e-mails). *See id.* (pdf p. 7).

37.    **AMN's Breaches of the AMN Production Agreement**. On November 1, 2018, AMN produced 503 documents in all, doing so in response to RPD Nos. 3-5, 9, 11, 14, 16, 19 and 20.

38.    On November 15, 2018, AMN failed to make its required production of specified documents, all of which AMN had expressly *represented* it would produce on this date in the AMN Production Agreement itself. *See* Ex. 2 (pdf p. 7).

39.    AMN's failure to deliver these documents on November 15, 2018 constituted an immediate, material and irreparable breach of the AMN Production Agreement. *See id.* Aya made valuable discovery concessions in exchange for obtaining the specified documents no later than November 15, 2018.

40.    I was already concerned by mid-October 2018 that, in light of the Court's original scheduling order (Dkt. 45), AMN was taking far too long to meet and confer with me about its compliance with the RPDs, which I had taken care to draft as concisely as possible. *See* Ex. 1, *passim*. Per the original scheduling order (Dkt. 45), Aya's initial expert reports were due on January 22, 2018, so that even if AMN had delivered the above documents on November 15, 2018, Aya would have received them *eighty-five days* after propounding its RPDs and only *sixty-eight days* before its expert reports were due, leaving Aya very little time to review and organize the documents, depose witnesses about them, share its findings with its experts, and continue to receive further necessary documents from AMN. But AMN did not produce these documents on November 15, 2018.

41.    **The Original Version of the Present Motion/AMN's Ensuing Productions**. On November 23, 2018, I prepared and served on AMN a joint discovery motion, seeking an order to compel AMN's compliance with the AMN

Production Agreement. AMN thereafter made substantial productions on November 30 and December 1, 2018 and demanded that I withdraw the discovery motion, stating that the motion would be "misleading" to the Court if it were submitted. After repeated exchanges with AMN, I agreed to do so, and the parties further agreed that if I were to bring a new motion to compel AMN's compliance with the AMN Production Agreement, the motion would be timely made.

42. **AMN Continues to Withhold Entire Categories of Its Core Documents**. AMN was not clear about what it produced in its productions of November 30 and December 1, 2018, and as before it declined to respond clearly to my repeated inquiries on this point. I later determined that its new productions lacked the following documents: (1) Provider Contracts made on AMN's platforms anywhere in the United States other than the Regional Submarkets (which are comprised of eight sparsely populated states and seven metropolitan regions); (2) Sales Data for sales made on its platforms anywhere in the United States other than the Regional Submarkets; (3) Provider Contracts and Sales Data subject to non-party objections (explained further below); and (4) documents sufficient to complete its disclosure of the agreed-upon Profit-and-Loss Statements.

43. I further determined that the Sales Data produced by AMN lacked three data fields which it had expressly agreed to produce in the AMN Production Agreement, and which my experts require to prepare their antitrust reports.

44. **Which Provider Contracts Has AMN Produced?** On November 30, 2018, I attended a discovery conference in the offices of AMN's counsel. During this conference, and in follow-up correspondence, AMN's counsel argued that AMN owed no obligation under the AMN Production Agreement to produce Provider Contracts made or performed outside of the Regional Submarkets. AMN's argument on this point is stated in their follow-up correspondence of November 30, 2018, a true and correct copy of which is appended to this Declaration as Exhibit 3 (pdf p. 2, highlighted in red). This contention is directly contradicted by the AMN Production

1  Agreement itself, whose pertinent passages I have cited above, and which I have

2  appended in full as Exhibit 2 to this Declaration.

3        45.    In this same correspondence, AMN confirmed that it would produce only

4  Provider Contracts and Sales Data for the Regional Submarkets, referring to its

5  production as being "regional" in scope. *See* Ex. 3 (pdf p. 2, highlighted in blue).

6        46.    Later on the same day, November 30, 2018, AMN produced *inter alia*

7  Provider Contracts and numerous other papers, all intermingled. The production was

8  accompanied by an index that indicated that AMN had produced these documents in

9  response to Aya's RPD No. 1, which requests the Provider Contracts. *See* Ex. 1 at

10  RPD No. 1.

11        47.    On December 7, 2018, AMN served its Amended Responses to Aya's

12  First Set of Interrogatories. Its Amended Response to Aya's Interrogatory No. 4

13  affirms that AMN has now produced all of AMN's Provider Contracts that include

14  provisions that in some manner or other forbid AMN's counterparty to solicit AMN's

15  employees, except that AMN has excluded from this production Provider Contracts

16  made by Medefis or ShiftWise outside of the Regional Submarkets, and it has further

17  excluded Provider Contracts withheld because of Non-Party Objections. Appended to

18  this Declaration as Exhibit 4 are true and correct copies of AMN's Amended

19  Responses to Aya's First Set of Interrogatories.

20        48.    On December 11, 2018, AMN's counsel suggested in meet-and-confer

21  correspondence that AMN had produced only Provider Contracts made or performed

22  in the Regional Submarkets. Appended to this Declaration as Exhibit 5 is a true and

23  correct copy of this correspondence.

24        49.    At a minimum, AMN has not clearly explained the foregoing matters to

25  me. I therefore lack a clear, specific understanding of which Provider Contracts AMN

26  has produced and which Provider Contracts it has withheld.

27        50.    On repeated occasion, I have asked AMN to provide a status report of its

28  production of its Core Documents, which were the focus of nearly all of our

negotiations of the AMN Production Agreement: the Provider Contracts; the Customer Contracts; the Sales Data; the P&Ls; templates of all of AMN's employment contracts since January 1, 2010; specified cease-and-desist correspondence; a disclosure of AMN's interlocking directorships with other providers; and a disclosure of its past lawsuits against former employees and other providers.

51.    On November 9, 2018, I wrote to AMN's counsel to ask AMN to specify no later than November 16, 2018 which of its Core Documents it had produced on November 1 and 15, 2018. I stated the query as follows:

> For each category of documents that AMN agreed to provide on either November 1 or on November 15, 2018, please disclose whether AMN has produced all of the promised documents, some of them, or none at all. For partially produced categories, please disclose by when AMN will complete its production of the category of documents or confirm that it cannot provide a date certain.

I specifically asked AMN to respond to this correspondence no later than November 16, 2018. I repeated the same query on November 19, 2018 and I did so again on November 28, 2018, when I also attached a chart that listed these categories, so that AMN could reply by annotating the chart. I have appended as Exhibit 6 to this Declaration a true and correct copy of my correspondence and production chart of November 28, 2018.

52.    AMN purported to answer this query in e-mail correspondence on November 19, 2018, but its comments largely did not answer the query. Instead, AMN explained how its production batches corresponded to different RPDs, rather than explain to what extent if any it had produced its Core Documents – i.e., the categories of documents listed at ¶¶ 8-9, n. 1, *supra*. I have attached a true and correct copy of AMN's elusive reply to my query as Exhibit 7 to this Declaration (pdf p. 3, highlighted in red).

53.    **AMN's Dilatory Administration and Improper Handling of Non-Party Objections**. Shortly after October 31, 2018, Aya learned that on October 31,

2018 AMN had sent discovery notices concerning Aya's RPDs to numerous businesses that sell or purchase traveler services on AMN's electronic platforms (ShiftWise and Medefis).

54.    AMN's discovery notices informed each recipient that Aya had requested from AMN documents that might disclose the recipient's commercial information. Each notice was accompanied by a copy of this Court's Protective Order of October 16, 2018 (Dkt. 47) (the "Protective Order").

55.    Each discovery notice further explained that the recipient could prevent the disclosure of its information by giving notice of its objection by e-mail/regular mail to AMN. If AMN were to receive any objection or request for information from a recipient (a "Non-Party Objection") it would not produce the recipient's information to Aya unless it were ordered to do so by this Court.

56.    On November 2, 2018, I asked AMN to disclose the recipients of these notices. On November 5, 2018, AMN refused to do so.

57.    On November 8, 2018, my co-counsel Tara Burd conferred in person about these matters with one of AMN's attorneys. She has provided a declaration in which she recounts what AMN announced to her at the time: essentially, AMN would indefinitely withhold all documents subject to the Non-Party Objections it had solicited and collected; it would not agree to any protocol for administering these Non-Party Objections; it might "consider" agreeing to a protocol if it were to receive "many" Non-Party Objections; it would continue to accept Non-Party Objections until November 15, 2018; and it must therefore postpone its production of Provider Contracts, Sales Data and other documents that might become subject to Non-Party Objections. *See* Declaration of Tara Burd ("Burd Decl.") ¶ 6.

58.    On the following day, November 9, I wrote to AMN's counsel to protest and demand explanations for these untimely, private procedures, which directly contravened this Court's Protective Order § 11, and whose certain consequence was that Aya would never have sufficient time to develop its claims on the present case

1  calendar.

2      59.    On November 15, 2018, I wrote again to AMN's counsel to request

3  AMN's legal basis for using the above procedures. I repeated this request in follow-up

4  correspondence on November 16 and again on November 19, 2018.

5      60.    AMN's counsel provided AMN's response to this query on November

6  19, 2018, stating that AMN was merely honoring its contractual obligation not to

7  disclose its counterparties' confidential information without first given them notice

8  and an opportunity to object. *See* Ex. 7 (pdf p. 4, highlighted in blue).

9      61.    On November 30, 2018 AMN's counsel disclosed to me that AMN had

10  collected approximately twenty objections and fifty requests for information from

11  recipients of its notices. *See* Ex. 3 (pdf p. 2, highlighted in blue). AMN accordingly

12  determined that it would withhold from production all affected Provider Contracts,

13  customer contracts, and Sales Data, and would continue to do so until this Court ruled

14  on the matter.

15      62.    In the meantime, AMN refused my request that it provide a privilege log

16  for the withheld documents, even though it had withheld them on the basis of a legal

17  privilege – a non-party's conditional right to protect its confidential commercial

18  information from disclosure in a civil action. *See* Ex. 7 (pdf p. 4, highlighted in

19  green).

20      63.    By so refusing, AMN breached the parties' stipulated discovery protocol,

21  which *requires* the withholding party to provide specified information about all

22  documents that it withholds from production on the ground of a legal privilege or

23  immunity.[3]

24  _____

25      [3]    On October 4, 2018, AMN and Aya stipulated to a carefully negotiated "Agreed Protocol Governing Discovery Matters and the Production of Electronically

26  Stored Information" (the "Discovery Protocol"). A true and correct copy of the Discovery Protocol is appended to this Declaration as Exhibit 8. Among other things, the

27  Discovery Protocol obliges the parties to list in a privilege log specific information about all documents withheld on the ground of a claimed privilege or immunity. *See* Ex. 8 § 9.

28  AMN has refused, however, to provide a privilege log for the contracts and sales data that

                      (continued...)

64.    AMN's refusal to provide a privilege log matters. If AMN provides the required privilege log, Aya will immediately ascertain *the number of contracts* and *volume of Sales Data* that AMN has withheld. Otherwise, it will have no way of ascertaining this information, but will merely have a list of counterparties that sheds no light on the extent of their transactions with AMN. Aya's experts would thus know only that there is a gap in their data, but they would not know how large a gap.

65.    AMN's counsel also disclosed on November 30, 2018 that AMN sent its discovery notices only to its counterparties in the Regional Submarkets, which consist of eight sparsely populated states and seven metropolitan areas. *See* Dkt. 37 ¶¶ 68-69 (listing the submarkets that Aya alleges AMN has monopolized or nearly monopolized). Everywhere else in the country, AMN's counterparties have not received notices as of November 30, 2018 (*see* Ex. 3, pdf p. 2, highlighted in yellow), and AMN is unwilling to produce any Provider Contract or Sales Data that discloses any of their confidential commercial information until it bestirs itself to send the notices and administer the ensuing Non-Party Objections in accordance with a protocol that it has never described and has made no effort to establish.

66.    Not coincidentally, fact and expert discovery approach their end just a few months from now (March 29, 2019) under the current scheduling order (Dkt. 53). Yet Aya still lacks a substantial part of the Core Documents that it requested by its RPDs on August 22, 2018, and it is not even certain to what extent it lacks them because AMN has refused to clarify the above matters sufficiently.

67.    **AMN's Other Dilatory Tactics**. Ever since the Court announced a very short calendar for this case at the CMC on September 20, 2018, AMN has employed a variety of tactics that necessarily lead only to one possible inference: it means to "run out the clock" by withholding key evidence from Aya until it is too late to be of any use in this case.

---

[3](...continued)
it has withheld.

68.     By mid-November, 2018, I concluded that AMN had no intention of cooperating reasonably on procedures in this case and meant simply to run out the clock for our exceptionally short case calendar, then argue that Aya had failed to adduce proofs sufficient to make a prima facie showing for any of its claims.

69.     I therefore prepared and served on AMN a joint motion to amend the current scheduling order. In Aya's section of the motion, I described at great length and the many dilatory tactics that AMN had employed until then, and I documented such practice with declarations and exhibits. In response, AMN agreed to submit a joint motion to amend the scheduling order, so long as I rewrote the motion so that it was cast in "neutral" language. I agreed, and the parties submitted a joint motion to amend the scheduling order (Dkt. 48), which the Court granted on December 13, 2018 (Dkt. 53).

70.     If AMN forthwith produces its remaining Core Documents, and if it cooperates on procedures in good faith from this time forward, Aya will likely have no occasion to request any further amendment of the scheduling order. Aya likely requires two and one-half months after it obtains all of AMN's Core Documents to review them, depose witnesses about them, and share its findings with its experts. I respectfully ask that the Court bear in mind this circumstance if for any reason AMN is afforded more time to produce its Core Documents. Under the current scheduling order, Aya's initial expert reports are due on April 18, 2019, and Aya therefore must have AMN's Core Documents in full no later than the end of January, 2019.

71.     **AMN's Incomplete Sales Data**. Stating that it wished to avoid counterparty issues, AMN proposed during our discovery conference on November 30, 2018 to produce its Sales Data in an anonymous format. I asked it to state its proposal in writing and indicated that I would show it to my experts, who might then have questions about it. AMN agreed to answer their questions and to work with me to reach agreement on its alternative manner of producing its Sales Data. AMN repeated this proposal in its correspondence to me of November 30, 2018. *See* Ex. 3

1    (pdf p. 2) (highlighted in yellow).

2        72.    Shortly thereafter, I wrote follow-up correspondence to AMN to ask

3    further questions about the anonymous version of the Sales Data. I wished to know in

4    particular which data fields AMN would remove or alter in order to render the Sales

5    Data anonymous. AMN did not respond to these questions.

6        73.    Instead, on December 13, 2018, AMN announced to me that it intended

7    to produce its Sales Data in an anonymous format and made vague, unsatisfactory

8    references to the matters that it would exclude from the agreed-upon Sales Data. A

9    true and correct copy of this announcement is appended to this Declaration as

10   Exhibit 9.

11       74.    Thereafter, I made repeated queries about which specific fields AMN

12   would no longer provide. AMN avoided these queries, but I persisted, and at length it

13   obliged me. Specifically, I sent an e-mail to AMN on December 19, 2018 in order to

14   repeat my request for further information about AMN's anonymous data. In this e-

15   mail, I listed *verbatim* the data fields AMN was obliged to provide under the AMN

16   Production Agreement. These were the data fields that constituted the Sales Data. The

17   parties had carefully negotiated them. I had worked closely with my experts on this

18   matter, and they were the ones who specified the data fields that they reasonably

19   required in order to prepare their expert report on antitrust issues. On December 20,

20   2018, AMN returned my e-mail to me with strikethrough applied to the fields that it

21   had removed from the Sales Data. A true and correct copy of this e-mail exchange is

22   appended to this Declaration as Exhibit 10.

23       75.    In this manner, Aya learned that AMN's anonymous data omits not only

24   the identities of counterparties, but also three data fields that Aya's experts require to

25   prepare their antitrust reports. I have highlighted the three fields in question in Ex. 10

26   to this Declaration.

27       76.    These three data fields were included in the Sales Data and are as

28   follows: for each assignment performed by a traveling nurse, (1) the "total number of

hours worked;" (2) the "total amount paid to the medical traveler;" and (3) the "Business Relationship [sic] of supplier to facility (e.g., Direct – Standard, Exclusive, Subcontractor, etc."). *See* Ex. 2 (pdf pp. 4, 7, 11, 22, 25, 33, highlighted).

77.    It is not clear why these three data fields must be removed in order to render the Sales Data anonymous. Two of these fields provide information in database format about AMN's *costs for core inputs*, which Aya's experts can use along with other data to calculate AMN's *marginal costs*. This calculation in turn is required to show whether and to what extent AMN has profitably charged *supracompetitive prices* – which is a key issue of fact for four of Aya's claims. *See* Dkt. 37 ¶¶ 97-103, 225, 245-247. The third missing data field discloses information in database format about the *functional relationship* of the provider to AMN (e.g., a subcontractor). This data should permit Aya's experts to determine the extent to which other providers depend on receiving assignments from AMN, which is also a disputed issue of material fact in this case. *See* Dkt. 37 ¶¶ 7, 119, 125, 129, 144, n.8, 146, 238.

78.    I have since learned that the Sales Data that AMN has produced to date likewise lacks these three data fields.

79.    Aya has no objection to receiving the Sales Data in an anonymous format, so long as the above three fields are restored and produced.

80.    Of equal importance, AMN apparently intends to exclude from its Sales Data all such data for sales made on its two platforms outside of the Regional Submarkets. That is contrary to the parties' express agreement. *See* Ex. 2 (pdf pp. 2, 4, 7-8, 11, 33-34, 39-40). It is also insufficient, since Aya likely requires the national platform data to prove one of its antitrust challenges – its rule-of-reason claim against AMN for restraining trade unlawfully in the national market for traveler services. *See* Dkt. 37 ¶¶ 308-328 (Aya's second cause of action).

81.    **Aya's Discovery Proposals**. On behalf of Aya, I now offer two discovery proposals that I believe are reasonable resolutions of the parties' two largest disputes. I discuss each proposal in turn.

82.   <u>Aya's Proposed Resolution of the Sales Data Dispute</u>. In lieu of the Sales Data, Aya will accept the anonymous sales data that AMN proposes to provide, subject to the following terms and conditions: AMN must provide the data fields set forth in Exhibit 1 hereto at p. 3, including the data fields that have been stricken and highlighted; and these data fields must be furnished for (1) all traveler assignments made by AMN and its subcontractors, (2) all traveler assignments made on the Medefis platform since AMN acquired it in 2015, and (3) all traveler assignments made on the ShiftWise platform since AMN acquired it in 2013. Lastly, AMN may provide the anonymous identifiers in its sales data, doing so in the manner explained by its counsel in Ex. 1, provided that the three stricken, highlighted fields must be *included* in AMN's anonymous data, not excluded from it. Aya remains willing to meet and confer with AMN to resolve any technical complications arising from this proposal and to consider *reasonable* alternatives.

83.   <u>Aya's Proposed Resolution of the Provider-Contract Dispute</u>. In lieu of all of the Provider Contracts made by Medefis since 2015 and by ShiftWise since 2013, Aya will accept a template for every version of their respective master contracts with providers during the stated periods, so long as each template is accompanied by an exhibit that discloses (1) every provider in the United States that was or has been a party to such an agreement during the above timelines; and (2) for each such provider, the date when it became a party to such an agreement and the date, if any, when the agreement was terminated or lapsed. In addition, AMN must stipulate to the admission in evidence of each template along with its accompanying exhibit, and with respect to the agreements disclosed by these templates/exhibits, AMN cannot seek to contradict their terms, but can explain them. Lastly, AMN must also produce every contract between AMN and any other provider that includes a no-hire provision and has been made or performed in the United States at any time since January 1, 2010.

84.   **Timing of the Present Motion**: On five separate grounds, the present motion is timely brought in accordance with this Court's Civil Chamber Rule IV.C.2.

85. *First*, Aya seeks *inter alia* to compel the production of AMN's Sales Data for the regions of the United States *that do not lie within the Regional Submarkets*. Under the AMN Production Agreement, AMN was required to produce those documents either on November 15, 2018 *or* as soon thereafter as possible, but with *no date certain* for the production. *See* Ex. 2 (pdf p. 2, highlighted).

86. *Second*, Aya seeks *inter alia* to compel the production of the following documents from Medefis and ShiftWise (two subsidiaries of AMN that operate its two electronic platforms): Customer Contracts (limited to the Regional Submarkets); Provider Contracts (nationwide); and Sales Data (nationwide). Under the AMN Production Agreement, AMN was required to produce those documents in good faith and as soon as possible on some date after November 15, 2018, but with *no date certain* for the production.

87. *Third*, AMN seeks to compel the production of Customer Contracts, Provider Contracts and Sales Data from the Regional Submarkets that AMN has withheld because of the Non-Party Objections. This Court has not yet received these objections. *See* ¶¶ 53-66, *supra*. The delay in presenting them to the Court was caused by AMN. *See id*. Regardless, there is already in place a proper protocol for resolving these objections. It appears at § 11 (c) of the Protective Order (Dkt. 47) and unambiguously obliges AMN to produce all of the withheld documents because of the following two circumstances: (1) AMN did not "promptly" give notice to its counterparties after being served with the RPDs on August 22, 2018, but instead gave notice to its counterparties in the Regional Submarkets on October 31, 2018 and still has not given notice to any of its other counterparties (so far as I know) and acknowledged not having given any such notice on November 30, 2018 (*see* Ex. 3, pdf p. 2, highlighted in yellow); and (2) none of the counterparties notified by AMN on October 31, 2018 applied in this Court for a protective order within fourteen days of being notified; their last day to apply for a protective order in this Court was November 14, 2018. Therefore, this Court's Protective Order requires AMN to turn

1  over all documents that it has withheld on the basis of the Non-Party Objections. *See*

2  Protective Order (Dkt. 47) § 11(b)-(c).

3      88.    *Fourth*, I served an earlier version of this motion on November 23, 2018

4  after my colleague Tara Burd met in person with AMN's counsel on November 8,

5  2018. *See* Burd Decl. ¶ 6. I initially planned to file the earlier version on December 4,

6  2018 in accordance with this Court's Civil Chambers Rule IV.C.2. Thereafter, I gave

7  notice of successive postponements of the filing deadline in order to accommodate my

8  own minor editing of the motion and while the parties continued to negotiate AMN's

9  document production. Finally, I planned to submit the earlier version on December 14,

10  2018.

11      89.    I met in person with AMN's counsel on November 30, 2018. AMN made

12  substantial productions later that day and on December 1, 2018. These productions

13  resolved some but not all of the disputes that were addressed by the earlier version of

14  this motion. AMN's counsel, however, believed that I should withdraw the earlier

15  version because it had been superseded by events, and they stated that I would

16  "mislead[]" the Court by presenting it. Subsequently, AMN's counsel variously

17  demanded and requested that I withdraw the original motion.

18      90.    For my part, I was uncertain how to proceed: the underlying facts had

19  changed, but several issues presented in the earlier version of this motion remained

20  unresolved, and AMN remained in breach of the AMN Production Agreement. My

21  own view was that I should have the liberty to revise Aya's section of the motion so

22  that it conformed to the new facts, but AMN insisted that I could not do so, and that I

23  must bring a new motion.

24      91.    I respectfully submit that the Court's Civil Chamber Rules should be

25  construed to promote meaningful, ongoing exchanges between the parties while they

26  jointly prepare a discovery motion, so long as each side has sufficient notice of the

27  other's arguments.

28  //

92.     At all events, AMN's counsel did not respond to my request that they show me AMN's section of the motion, and they would not agree that I could revise Aya's section of the motion to conform to the new facts.

93.     Concerned about this Court's "Thirty-Day Rule," but also concerned that the original version of this motion had been superseded by events, I floated various briefing proposals to AMN.

94.     In the end, AMN and Aya agreed that (1) Aya would initiate a new discovery motion (which relates back to the original motion); and (2) this motion would be deemed timely.

95.     *Fifth*, although AMN has by now produced voluminous documents, it has avoided responding to my queries about which of the Core Documents it has produced. *See* ¶¶ 50-52, *supra*. voila For the Profit-and-Loss Statements that it was obliged to produce (*see* ¶ 28(c)), AMN disclosed only that it had produced documents AMN0000006555 - AMN0000008537 in response to RPD No. 16 (Profit-and-Loss Statements).

96.     Since AMN's counsel would not tell me whether these documents included the necessary documents that AMN had agreed to produce as its Profit-and-Loss Statements, I sought input and guidance from my staff and also from my expert consultant on Aya's damages. It was difficult for us to discern whether the above documents, which are the only ones that AMN states it has produced in response to RPD No. 16, constitute what AMN was obliged to produce, which is the following:

> Thus, in order to comply with [RPD No. 16], Defendants will produce a report sufficient to identify for the period of January 1, 2010 to the present the following information, to the extent such information exists: (I) the revenues Defendants have generated by selling and arranging to sell medical-traveler services, and (ii) the costs it has incurred to do so with sufficient detail to explain the costs.

Ex. 2 (pdf p. 4, highlighted in blue).

97.     By examining the documents that AMN in fact produced, we were able to discern that its production did not include the above documents. Had AMN timely

DECLARATION OF WILLIAM MARKHAM (RE: PLAINTIFFS' MOTION TO COMPEL)          -22-

and directly responded to my queries, I would have been alerted to this problem at an earlier date and would have sought appropriate relief. AMN should not be rewarded for failing to cooperate reasonably in the fulfillment of its production obligations.

98.    For all of these reasons, and on grounds of equity, the Court should find that the present motion has been timely made.

99.    **Compliance with this Court's Civil Chamber Rule IV.A**. Before bringing this motion, Aya's counsel and AMN's counsel met and conferred extensively by e-mail and twice in person. On November 8, 2018, my co-counsel Tara Burd met with one of AMN's attorneys, Amanda Fitzsimmons. *See* Burd Decl. ¶ 6. On November 30, 2018, I met with Ms. Fitzsimmons while another of AMN's attorneys, David Bamberger, participated by telephone with my approval.

I declare under penalty of perjury under the laws of California that the foregoing matters are true and correct to the best of my information, knowledge and belief.


Dated: December 26, 2018          LAW OFFICES OF WILLIAM MARKHAM, P.C.

                                  /s/ William Markham
                        By:       _____
                                  WILLIAM A. MARKHAM
                                  DORN G. BISHOP
                                  TARA BURD
                                  Attorneys for Plaintiffs
                                  AYA HEALTHCARE SERVICES, INC. and AYA
                                  HEALTHCARE, INC.