William A. Markham, California State Bar No. 132970
*wm@markhamlawfirm.com*
Dorn Bishop, California State Bar No. 147994 (Of Counsel)
*db@markhamlawfirm.com*
LAW OFFICES OF WILLIAM MARKHAM, P.C.
402 West Broadway, Suite 400
San Diego, CA 92101
Tel: 619.221.4400

Kenneth M. Fitzgerald, California State Bar No. 142505
*kfitzgerald@fitzgeraldknaier.com*
FITZGERALD KNAIER LLP
402 West Broadway, Suite 1400
San Diego, CA 92101
Tel. 619.241.4810

Attorneys for Plaintiffs,
AYA HEALTHCARE SERVICES, INC. and AYA HEALTHCARE INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYA HEALTHCARE SERVICES, INC. and AYA HEALTHCARE, INC., | Case No. 3:17-cv-00205-MMA-MDD |
| Plaintiffs | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Vs. | **REDACTED VERSION** |
| AMN HEALTHCARE, INC. *et al.* Defendants. | [SPECIAL BRIEFING SCHEDULE ORDERED AT DKT. 87] |
| | The Hon. Michael M. Anello District Court Judge |
| | Complaint Filed:   February 2, 2017 Trial Date:          Not set |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iv-

    Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iv-

    Statutes and Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -vi-

    Other Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -vi-

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

III.   ESTABLISHED FACTS THAT SUPPORT AYA'S CLAIMS . . . . . . . . . . . -4-

    A.     The Travel-Nurse Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

    B.     Aya and AMN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

    C.     AMN's Trade Restraints and Other Anticompetitive Conduct . . . . . . . -8-

         1.     AMN's Employee Restraints . . . . . . . . . . . . . . . . . . . . . . . . -8-

         2.     AMN's No-Poaching Restraints. . . . . . . . . . . . . . . . . . . . . . -9-

         3.     AMN's Platform Restraints . . . . . . . . . . . . . . . . . . . . . . . . -10-

         4.     AMN's Exclusivity Restraints . . . . . . . . . . . . . . . . . . . . . . . -12-

         5.     No Plausible Justification. . . . . . . . . . . . . . . . . . . . . . . . . . -12-

    D.     How AMN Enforces Its Trade Restraints . . . . . . . . . . . . . . . . . . . -12-

         1.     AMN's Enforcement of Its Employee Restraints: Its "Reminders" to Departing and Former Employees. . . . . . . . . . -12-

         2.     AMN's Undeclared Enforcement of Its No-Poaching Restraints Against Rivals: Reinforcing No-Hire Pacts, Sham Litigation, and Blacklisting . . . . . . . . . . . . . . . . . . -13-

         3.     AMN's Enforcement of Its Platform Restraints . . . . . . . . . . . -17-

IV.   AYA HAS SUFFERED TWO KINDS OF COMPENSABLE ANTITRUST INJURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

    A.     Aya's Exclusionary Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

    B.     AMN's Arguments on Exclusionary Damages Lack Merit. . . . . . . . . -20-

C.  Aya's Calculation of Its Retaliatory Damages . . . . . . . . . . . . . . . . . . -22-

    1.  Aya's Retaliatory Losses Are Allowed Under *Hammes* . . . . . . -22-

    2.  Aya's Retaliatory Losses Are Allowed Under *Aspen Skiing* . . -23-

D.  AMN's Argument on Retaliatory Damages Lacks Merit . . . . . . . . . . -24-

    1.  This Is Not a Hub-and-Spoke Case. . . . . . . . . . . . . . . . . . . . . . . -24-

V.  AYA'S EVIDENCE SUPPORTS ITS PER SE CHALLENGE UNDER
    SECTION 1 OF THE SHERMAN ACT . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

A.  Elements of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

B.  Aya Can Challenge Contracts that AMN Required It to Accept. . . . . -25-

C.  Aya's Evidence Supports Its Per Se Challenge. . . . . . . . . . . . . . . . . -26-

VI. AYA'S EVIDENCE SUPPORTS ITS QUICK-LOOK CHALLENGE
    UNDER SECTION 1 OF THE SHERMAN ACT . . . . . . . . . . . . . . . . . . . . -27-

A.  Elements of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

B.  The Evidence Supports Aya's Quick-Look Claim . . . . . . . . . . . . . . . -28-

VII. AYA'S EVIDENCE SUPPORTS ITS RULE-OF-REASON
     CHALLENGE UNDER SECTION 1 OF THE SHERMAN ACT . . . . . . . . -28-

A.  Elements of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

B.  Aya's Evidence Establishes a Section 1 Claim Under the
    Structured Rule of Reason . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

    1.  Direct Proof of Harm to Competition . . . . . . . . . . . . . . . . . . . . -30-

    2.  Circumstantial Proof of Harm to Competition . . . . . . . . . . . . . -30-

    3.  AMN Must Justify Its Restraints, After Which Aya Can
        Rebut . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

VIII. AYA'S EVIDENCE SUPPORTS ITS CLAIMS FOR
      MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION . . . . . . . -33-

A.  Elements of the Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

B.  The Evidence Supports Aya's Claims for Monopolization and
    Attempted Monopolization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

//

IX.     AMN HAS NOT CHALLENGED AYA'S DEMAND FOR
        INJUNCTIVE RELIEF, AND AYA'S STATE-LAW CLAIMS SHOULD
        BE PRESERVED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

X.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

# TABLE OF AUTHORITIES

Unless otherwise indicated, internal citations and quotations have been omitted from each citation given in this memorandum.

**Cases**

*Pierce v. Ramsey Winch Co.*,
    753 F.2d 416 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . -20-, -21-

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . . . . . . . -20-

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) . . . . . . . . . . . . . . . . . . . . . -3-, -22--24-, -35-

*Bhan v. NME Hosps., Inc.*,
    929 F.2d 1404 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . -29-, -33-

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . -22-

*Blackburn v. Sweeney*,
    53 F.3d 825 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

*Cal. Computer Prods., Inc. v. Int'l Bus. Machines Corp.*,
    613 F.2d 727 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

*Catch Curve, Inc. v. Venali, Inc.*,
    519 F. Supp. 2d 1028 (C.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . -18-

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

*City & Cty. of San Francisco v. Sessions*,
    349 F. Supp. 3d 924 (N.D. Cal. 2018). . . . . . . . . . . . . . . . . . . . . . -4-

*Consol. Gold Fields PLC v. Minorco, S.A.*,
    871 F.2d 252 (2d Cir.), *amended*, 890 F.2d 569 (2d Cir. 1989) . . . . . -19-, -22-

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . -35-

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

*Hammes v. AAMCO Transmissions, Inc.*,
    33 F.3d 774 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . -3-, -22--24-

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
    627 F.2d 919 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . -2-, -20-, -33-, -34-

*In re High-Tech Empl. Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012). . . . . . . . . . . . . . . . . . . . . . . -27-

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   998 F.2d 1144 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . -21-

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*,
   481 F.2d 122 (9th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . -35-

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . -24-

*James Cape & Sons Co. v. PCC Constr. Co.*,
   453 F.3d 396 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . -22-

*Knutson v. Daily Review, Inc.*,
   548 F.2d 795 (9th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . -21-

*Kottle v. Nw. Kidney Centers*,
   146 F.3d 1056 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . -34-

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998). . . . . . . . . . . . . . . . . -25-, -28-, -29-

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
   833 F.3d 172 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . -30-

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . -30-

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
   967 F. Supp. 2d 1347 (N.D. Cal. 2013). . . . . . . . . . . . . . . -31-, -32-

*Pool Water Prods. v. Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . -28-

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995). . . . . . . . . . . . . . . . . . -25-, -33-, -34-

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . -26-

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

*Suture Express, Inc. v. Owens & Minor Distrib., Inc.*,
   851 F.3d 1029 (10th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . -31-

*Systemcare, Inc. v. Wang Labs. Corp.*,
    117 F.3d 1137 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

*United States v. eBay, Inc.*,
    968 F. Supp. 2d 1030 (N.D. Cal. 2013). . . . . . . . . . . . . . . . . . . . . . . . -27-

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43, 48-49 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
    857 F.2d 55 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*,
    561 F.3d 1004 (9th Cir. 2009), *opinion withdrawn and superseded on
    unrelated ground*, 588 F.3d 659 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . -32-

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-


**Statutes and Rules**

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . -1-, -19-, -21-, -22-, -25--29-, -31-, -33-, -35-

15 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-, -3-, -33--35-

15 U.S.C. § 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-


**Other Authorities**

Areeda and Hovenkamp,
    *Fundamentals of Antitrust Law* (3d. ed. 2010) . . . . . . . . . -24-, -26-, -27-, -29-

Hovenkamp, *Federal Antitrust Policy* (3d. ed. 2005). . . . . . . . . . . . . . . . -18-, -19-

# I. INTRODUCTION

The present case is an antitrust challenge that arises in a distinct line of commerce known as the travel-nurse industry. Plaintiffs (collectively, "Aya") and Defendants (collectively, "AMN") are rival employers and rival providers in this industry, and in addition they used to collaborate to provide travel nurses to AMN's customers.

Specifically, Aya has asserted claims under Section 1 of the Sherman Act (15 U.S.C. § 1) ("Section 1"), Section 2 of the Sherman Act (15 U.S.C. § 2) ("Section 2"), and related California laws. By these claims, Aya has challenged AMN's use of interrelated contractual restraints with its own staffing professionals and rival employers/rival providers. Those restraints have been marketwide in reach, binding travel-nurse providers that have accounted for 71% to 92% of travel-nurse placements in the United States since 2013, depending on the restraint and the year. (*See* pp. 8-12 *infra*.) These restraints have also been strategic in impact: they have discouraged and prevented AMN's rivals from (1) soliciting or hiring travel-nurse recruiters who work for AMN and (2) placing travel nurses whose names and contact information are stored in AMN's database. (*See* pp. 12-17, *infra*.) Those impediments have raised the rivals' cost of doing business, resulting in generally higher prices for travel-nurse services in markets where AMN has substantial market power. (*See* p. 30, *infra*.) Aya has also challenged AMN's recent acquisitions and misuse of two leading electronic platforms in order to exert ever greater control over the travel-nurse industry. (*See* pp. 10-12, 17.) Aya suffered modest losses when it heeded AMN's unlawful no-poaching restraints, then very large losses when it ceased to do so and endured costly retaliation from AMN. Aya now seeks damages and permanent injunctive relief. (*See* pp. 18-22, 35, *infra*.)

By its present motion, AMN seeks to have these claims dismissed on summary judgment. Its principal argument is that Aya has been profitable since 2013 and so cannot have suffered any loss, let alone compensable antitrust injury. That premise is

mistaken: an antitrust plaintiff can earn profits in a market, yet still suffer compensable antitrust injury if it earns less profits because of the defendant's antitrust violations. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) ("Juries may award damages to profitable businesses for lost sales as the result of anticompetitive behavior.")

More fundamentally, AMN appears to have misunderstood Aya's challenge, which is as follows. First, Aya was modestly profitable from 2010 to 2015, but during this time it suffered some impairment of its operations because it complied with AMN's unlawful no-poaching restraints. Those losses are Aya's *exclusionary losses* and qualify as compensable antitrust injury. Aya seeks only the part of those losses that fall within the statute of limitations. (*See* pp. 18-19, *infra*.) Second, Aya became much more profitable after it ceased to respect these restraints in mid-2015. In response, AMN subjected Aya to costly retaliation. Aya's ensuing losses are its *retaliatory losses*, which on the facts presented also qualify as compensable antitrust injury. (*See* pp. 22-23, *infra*.) Lastly, Aya seeks permanent injunctive relief. (*See* p. 35, *infra*.) Those are the remedies that Aya seeks. It has explained these points to AMN during discovery and by its expert disclosures, but AMN has made its various arguments out of context and without regard to Aya's explanations.

In addition, AMN argues that Aya's calculation of its exclusionary damages is fatally flawed because the calculation does not show what would have been Aya's losses from 2013 to 2015, if AMN had used lawful trade restraints rather than the unlawful ones it actually used. This argument is doubly mistaken. First, Aya's exclusionary losses would be *exactly the same* even if AMN's preferred benchmark were used. (*See* pp. 20-21, *infra*.) Second, the law does not oblige an antitrust plaintiff to make such difficult assumptions and calculations in order to prove its losses. Rather, an antitrust plaintiff must first prove that its claimed losses qualify as antitrust injury ("the fact of antitrust injury"). After doing so, it becomes entitled to prove the "extent" of its losses under a "relaxed standard." That rule is intended to

promote the vigilant enforcement of antitrust law. (*See id.*)

AMN's next argument is that Aya cannot recoup its claimed retaliatory losses under the doctrine of law announced in *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 783 (7th Cir. 1994). AMN reasons that it never organized an employers' cartel, and that the *Hammes* doctrine is therefore inapplicable to this case. But Aya's evidence proves the contrary. It shows that AMN has used trade restraints, blacklisting, threats of litigation, sham litigation, and lucrative spillover assignments to "cartelize" labor markets: most rival employers in the travel-nurse industry, numbering in the hundreds and accounting for the great majority of travel-nurse placements, have permanently desisted from soliciting or hiring AMN's travel-nurse recruiters, even though such recruiters are the core employees for each provider, and AMN has by far the largest grouping of them in the country. Three of these rivals, including Aya, agreed to AMN's arrangement but later began to hire AMN's travel-nurse recruiters in substantial numbers. AMN took swift retaliatory measures against all three. Only one other substantial rival defied the ban, and AMN concluded and enforced a separate, unlawful no-hire pact with it. On these facts, which are demonstrated below at pp. 8-17, Aya is entitled under *Hammes* to recover losses occasioned by AMN's retaliation against it. (*See* pp. 22-23, *infra*.)

AMN also asserts that (1) it is not a monopolist, so that (2) Aya cannot prevail on its Section 2 claims or recover its retaliatory losses under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605-11 (1985). But Aya's evidence shows that AMN has acquired near-monopoly and monopoly positions in numerous regional markets for the sale of travel-nurse services to hospitals.[1] (*See* pp. 4-7, 34-

---

[1] AMN has characterized its market positions by referring to industry reports that show overall revenues of different staffing agencies from placing travel nurses not only in hospitals, but also in other travel-nurse providers' programs. AMN's own antitrust expert, John Johnson, conceded that those reports do not concern viable antitrust markets. *See* Declaration of William Markham ("Markham") Ex. 1. Aya's findings, in contrast, are limited to each provider's share of *placements of travel nurses in hospitals*, which constitute the relevant service market for purposes of antitrust review. *See* Markham Ex.

(continued...)

35, *infra*.)

AMN's remaining arguments are likewise unavailing. Aya has not abandoned its per se challenge, and Aya can challenge trade restraints set forth in its contracts with AMN. Nor need Aya prove a hub-and-spoke conspiracy: that is a mere confusion of issues. Lastly, Aya's state-law claims remain viable so long as it can prove any of its federal antitrust claims. (*See* pp. 25-35, *infra*.)

AMN's present motion thus fails to carry its burden. It should be denied.

## II. STANDARD OF REVIEW

A court should decide a claim on summary judgment only when the movant shows that the opposing party cannot establish an element necessary to its claim (or defense) and therefore cannot prevail on the claim (or successfully defend against it). *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (explaining standard for ruling on motions for summary judgment). When ruling, the Court should draw "all reasonable factual inferences in favor of the non-movant." *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 941 (N.D. Cal. 2018).[2]

## III. ESTABLISHED FACTS THAT SUPPORT AYA'S CLAIMS

Aya's claims are supported by substantial evidence, whose main points are summarized below.

### A. The Travel-Nurse Markets

This case concerns an antitrust challenge that arises in a distinct line of commerce – the *travel-nurse industry*. (Markham Exs. 2-3.) Travel nurses are nurses

---

[1](...continued)
81 ¶ 99, Appx. C. ¶¶ 7-18.

[2] In some antitrust cases, but not this one, a plaintiff must meet a special standard for summary judgment: namely, an antitrust plaintiff that challenges an *alleged antitrust conspiracy* cannot survive summary judgment if its only evidence of the conspiracy is *circumstantial* and as readily supports an inference of independent, pro-competitive conduct as it does an inference of an anticompetitive conspiracy to restrain trade. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). That rule is inapplicable here: Aya does not challenge a secret antitrust conspiracy whose existence must be inferred from circumstantial evidence, but rather express contractual restrictions.

and technicians assigned to nursing units who travel from place to place to perform temporary, medium-term assignments at understaffed hospitals and other healthcare facilities (collectively, "hospitals"). (Markham Ex. 3.) Hospitals use travel nurses only when they lack any other alternative. *See id.* Exs. 2-3; Markham Ex. 81 ¶ 99, Appx. C. ¶¶ 7-18; Ex. 83 ¶¶ 18-20, 36-51; Declaration of Alan Braynin ("Braynin") ¶ 6. For purposes of antitrust review, there therefore exists a relevant service market for *the sale to hospitals of the temporary labor of travel nurses* ("travel-nurse services"). (Markham Ex. 81 ¶ 99, Appx. C. ¶¶ 7-18.)

Hospitals procure the temporary labor of travel nurses from *specialized staffing agencies* ("agencies") (Markham Ex. 4) as well as *managed service providers* ("MSPs") and *electronic platforms* ("platforms") (*Id*. Ex. 3 pdf p. 7; Markham Ex. 81 ¶¶ 30-32; Markham Ex. 83 ¶¶ 60-62; Braynin ¶ 9). MSPs and platforms, which are usually operated by agencies, fulfill all of their hospital customers' requirements for travel nurses by referring hospitals' requests for travel nurses to their own agencies and/or to other agencies. (Markham Ex. 83 ¶¶ 22-23, 62-71; Markham Ex. 81 ¶¶ 34-35; Braynin ¶¶ 10-12, 16-18).[3] When a hospital chooses to have an MSP or platform meet its travel-nurse requirements, it chooses the MSP or platform as its provider of travel nurses. (Markham Ex. 83 ¶¶ 23, 65-67; Markham Ex. 81 ¶ 34. Braynin ¶ 12.) Agencies that serve these MSPs and platforms act as subcontractors of the MSPs and platforms, not as direct providers to the hospitals. (Markham Ex. 83 ¶¶ 23, 65; Markham Ex. 81 ¶ 34. Braynin ¶¶ 12, 14.)

Providers of travel nurses (agencies, MSPs, and platforms) compete to make sales to hospitals in numerous regional markets – a point confirmed by the following commercial realities. First, each region attracts a distinct mix of travel nurses who are willing and qualified to perform temporary assignments in hospitals located there.

---

[3] A few platforms, but not AMN's, are genuinely "vendor neutral" and merely offer a passive technology used by hospitals and agencies. Most platforms, especially AMN's, function in practice as MSPs (they provide the same services as do MSPs). (Markham Ex. 83 ¶¶ 62-71; Braynin ¶¶ ¶¶ 10-12, 16-18.)

(Markham Ex. 5; Markham Ex. 83 ¶¶ 73, 76). Second, *demand for travel nurses* varies greatly by region, as do *prices for travel-nurse services* and *pay rates for travel nurses*. (Markham Exs. 6-7; Markham Ex. 81 Appx. C ¶¶ 19-22.) Third, market participants, including AMN, recognize that travel-nurse services are sold in regional markets. (Markham Ex. 7; Markham Ex. 83 ¶¶ 74-75.)[4]

Lastly, the core work of an agency is performed by its *staffing professionals* and in particular by its *travel-nurse recruiters*, who develop and maintain long-term relationships with travel nurses and also find appropriate placements for them in hospitals and through MSPs and platforms. (Markham Ex. 83 ¶¶ 22-29, 53-58, 77-79; Markham Ex. 81 ¶¶ 40-46; Markham Ex 11; Braynin ¶ 33.)

## B. Aya and AMN

Aya operates an agency, MSP programs, and two platforms. Aya has been a resilient, successful provider of travel nurses and, more recently, of other kinds of temporary healthcare professionals. (Braynin ¶¶ 71-76; Markham Ex. 81 ¶ 49.)

AMN operates the same kinds of businesses, but is a much larger competitor. (Markham Ex. 83 ¶¶ 80-83; Markham Ex. 81 ¶¶ 38, 47-48.) A publicly traded corporation, AMN generates more than $2 billion per year from its placement of temporary healthcare professionals in hospitals. (Markham Ex. 12.) It is by far the largest employer among travel-nurse providers, temporarily employing between ███ and ███ travel nurses per year in recent years, and permanently employing more than ███ healthcare staffing professionals at present, including ███ travel-nurse recruiters. (*Id*. Ex. 13.) AMN's staffing professionals work in its numerous offices

---

[4]     Contrary to AMN's assertion, Aya has *not* defined its geographic markets according to how many sales AMN makes in a given region. (Markham Ex. 8.) Rather, Aya's expert identified the effective areas of competition among providers of travel nurses (i.e., it defined the relevant geographic markets) in accordance with the authoritative DOJ-FTC Horizontal Merger Guidelines, using in particular its recommended test called "Geographic Markets Based on the Locations of Customers." (Markham Ex. 81 Appx. C ¶ 20; Markham Exs. 9-10.) After completing this exercise, Aya's expert analyzed numerous regional markets in which AMN makes at least 30% of overall placements. (Markham Ex. 8.) Aya's expert also compared prices in these markets to prices in markets where it makes a lesser percentage of overall placements. (Markham Ex. 82 ¶¶ 11-19.)

"scattered throughout the country" (AMN's own words). (*Id*. Ex. 14.) AMN also offers by far the largest "pool" of travel nurses to whom it can refer assignments, as well as the largest network of subcontractor providers of travel nurses. (Markham Ex. 81 ¶ 48.) In recent years, AMN has acquired two leading platforms, called ShiftWise and Medefis, which procure travel nurses from more than 1,200 agencies and provide them to more than 2,000 hospitals, including many of the largest hospital systems in the country. (Markham Ex. 81 ¶ 48; Markham Ex. 83 ¶ 82.) No other firm comes close to matching AMN's customer base, employee pools, or subcontractor network. (Markham Ex. 81 ¶¶ 38, 47-48; Markham Ex. 83 ¶¶ 80-83.)

In particular, AMN is by far the largest provider of travel nurses to hospitals in the United States, holding market shares for this service that range from 86.7% to 67.4% in 6 regional markets, from 56.6% to 44.9% in 17 others, and 30% or higher in 27 regional markets in all. (Markham Ex. 81 Ex. V-2.) Indeed, AMN recognizes its "dominant" market position (AMN's own words). (Markham Ex. 15.)

Aya and AMN compete against one another and numerous other agencies to hire staffing professionals and travel nurses in the same labor markets. Aya and AMN also compete against one another and numerous other providers to sell travel-nurse services (the temporary labor of travel nurses) to hospitals in the same service markets. (Markham Ex. 83 ¶¶ 30, 75-76, 83; Markham Ex. 81 ¶¶ 48-49, 113-117; Braynin ¶¶ 13-18, 45, 71-76). Aya and AMN are therefore rival employers/providers in the same labor and service markets, as are numerous other agencies. (Markham Ex. 83 ¶¶ 30, 75-76, 83; Markham Ex. 81 ¶¶ 48-49, 113-117; Braynin ¶¶ 13-18, 45, 71-76.) AMN not only competes against these rivals, but collaborates with most of them and used to collaborate with Aya. (Markham Ex. 83 ¶¶ 70, 82-83; Markham Ex. 81 ¶¶ 33-35, 41, 48-49, 119; Braynin ¶¶ 19-26.) ███████████████████████████████
██████████████████. (Markham Exs. 16-17; Braynin ¶¶ 24-25; Declaration of Dan Walter ("Walter") ¶ 8.)

//

## C. AMN's Trade Restraints and Other Anticompetitive Conduct

Aya's antitrust challenge is that AMN has unlawfully restrained and monopolized trade in the above labor markets and service markets by using contractual restraints, sham litigation, opportunistic acquisitions, and related practices. The evidence now discloses the following about these matters.

### 1. AMN's Employee Restraints

AMN requires all of its travel-nurse recruiters to accept its standard agreement on confidentiality and non-disclosure ("AMN's Employee Restraints"). (Markham Exs. 18-19.)[5] These restraints have two principal features: (1) a provision that protects AMN's "Confidential Information"; and (2) a provision that forbids employee solicitations. (Markham Ex. 20 §§ 1.2, 2, 3.2.)

If a staffing professional leaves AMN, she cannot afterwards "use" any of AMN's "Confidential Information," which *inter alia* includes the names of AMN's travel nurses. (*Id*. Ex. 20 §§ 1.2, 2.) That restraint is permanent and has no time limitation. (*Id.* Ex. 21.) AMN treats all of these names as its own "Confidential Information" (*id*. 21-22), doing so without regard to whether a former employee obtained them from its database or some other source. (*id.* Ex. 23, Ex. 24 pdf pp. 21-22.) When enforcing this provision, AMN has taken the position that its "Confidential Information" includes *inter alia* the names of *hundreds of thousands* of travel nurses kept in AMN's database, including the names of travel nurses who (1) have no pending assignment from AMN; (2) previously applied to AMN but never received any assignment from it; (3) were terminated by AMN; and (4) asked AMN not to contact them. (*Id.* Ex. 24.)

AMN's non-solicitation provision is a related restraint. After a staffing professional leaves AMN, she cannot solicit any of its "employees" for stated duration

---

[5]     *See also* Declaration of Kylie Stein ("Stein") ¶ 8; Declaration of Alexis Ogilvie ("Ogilvie") ¶¶ 5-6; Declaration of Kat Grumet-Hernandez ("Grumet") ¶ 6; Declaration of Kristi Black ("Black") ¶ 5; Declaration of Meredith Brooks ("Brooks") ¶ 4.

(typically, 12 or 18 months). (*Id*. Ex. 20 § 3.2.) AMN interprets this provision to cover all of its staffing professionals and travel nurses. (*Id.* Exs. 24-25.)

2. <u>AMN's No-Poaching Restraints</u>. AMN routinely collaborates with many other agencies, which at its request provide travel nurses to customers in its MSP programs. Any agency that wishes to receive this work (AMN's spillover assignments) must assent to ███████████████████████████████████████ ██████████████████████████████████████ (Markham Exs. 26-29, Ex 30 (p.5); Braynin ¶ 21). ████████████████████ ███████████████████████████████████████████████.
███████████████████████

3.   AMN's Platform Restraints

In recent years, AMN has acquired two leading electronic platforms for providing travel nurses to hospitals: one is called "ShiftWise" and the other "Medefis." (Markham Ex. 83 ¶¶ 80, 82, Ex. 3; Markham Ex. 33.) On each platform, hospitals place online orders for travel nurses (and other temporary healthcare professionals), and their orders are filled by AMN or one of the other agencies that also serve the platform. (Markham Ex. 33, 33.1) AMN treats hospitals that use its platforms as its own customers, and it treats the agencies that serve its platforms as subcontractors in all but name. (Markham Ex. 83 ¶¶ 22-23, 65-66, 82; Markham Ex. 81 ¶¶ 31, 34; Markham Exs. 34, 37.)

In all, ███████████████████████████ (hospital systems), whose orders are filled by AMN itself ██████████████; AMN's ███████████████████████████████████ ███████████████████. (Markham Ex. 83 ¶ 82; Markham Ex. 34 pdf p. 8.)

On both platforms, AMN uses mutually reinforcing, standard contracts with its customers (hospitals) and suppliers (other agencies). (Markham Ex. 81 ¶¶ 19(c), 62-78, Ex. H-3; Markham Exs. 35-36, 38-40.)

//



//

AMN's Platform Restraints are marketwide in reach. Collectively, AMN and the agencies bound by these restraints account for ███████████████████ in the United States. (Markham Ex. 81 ¶ 13 Table 1.)

4.  AMN's Exclusivity Restraints

████████████████████████████████████████████████████████████████ ██████████████████████████████████. (Markham Ex. 83 ¶¶ 32, 67, 83, 114; Markham Ex. 81 ¶¶ 19(d), 32, 66, 79; Markham Ex. 35 § 3.1; Ex. Ex. 36 § 5.a; 38 § 4(a); Ex. 44; Ex. 45 § 5(a).)

5.  No Plausible Justification. AMN cannot articulate any reasonable justification for its Employee Restraints, No-Poaching Restraints or Platform Restraints, all of which are reinforced by its Exclusivity Restraints. (Markham Ex. 81 ¶¶ 158-173; Markham Ex. 83 ¶¶ 84-114.) Its purported business justifications (streamlined procurement, promoting productive collaborations with other agencies, etc.) could be easily accomplished by lesser restrictions. (Braynin ¶¶ 101-111.)

**D.  How AMN Enforces Its Trade Restraints**

AMN neither expects nor obtains perfect compliance with its foregoing trade restraints, but instead uses them to *signal its expectations* and *induce broad compliance* in the same way that, say, the State of California induces compliance with speeding laws by posting speed-limit signs on all California highways and episodically prosecuting offenders. AMN's efforts along these lines have been surprisingly successful, as is shown by the below evidence.

1.  AMN's Enforcement of Its Employee Restraints: Its "Reminders" to Departing and Former Employees

Because of AMN's Employee Restraints, AMN's staffing professionals, in particular its travel-nurse recruiters, are reluctant to leave AMN to work for any of its rivals. They generally understand that these restraints, if enforced vigorously, would prevent them from recruiting travel nurses proficiently for another agency. (Ogilvie ¶¶ 7-16; Grumet ¶¶ 7-14; Black ¶¶ 7-12; Brooks ¶¶ 5-9; Declaration of Jeff Piersons

("Piersons") ¶¶ 24-28, 30-32.

When a travel-nurse recruiter resigns from AMN, she is typically "reminded" of her obligations under AMN's standard provisions on confidentiality and non-solicitation (summarized above). To this end, AMN often conducts "exit interviews" with departing employees, during which it explains to them the broad reach of these provisions and how the departing employees must not breach them. (Markham Ex. 24 pdf pp. 8-9; Ogilvie ¶¶ 19-21; Black Decl ¶ 18; Brooks ¶ 12.)

AMN routinely has its attorneys send formal, threatening legal correspondence to former travel-nurse recruiters, "reminding" them of their legal obligation not to use its "Confidential Information" or breach its non-solicitation provisions. (Markham Exs. 46-48; Stein ¶ 21.) Before revising his answer after a recess, AMN's designated deponent testified that AMN sends such correspondence to 25% of its former travel-nurse recruiters. (*Id*. Ex. 47.)

As a scare tactic, AMN's management also publicizes misleading information to its present travel-nurse recruiters about its lawsuits against former ones (*Id*. Ex. 49; Ogilvie ¶¶ 8-12; Grumet ¶ 9; Black Decl ¶¶ 9, 18; Brooks ¶¶ 8, 12.). AMN sometimes communicates to its travel-nurse recruiters that they cannot work as travel-nurse recruiters anywhere else in the travel-nurse industry because of their contractual obligations under its Employee Restraints. (Brooks ¶¶ 12, 16).

AMN has thus used its Employee Restraints to *discourage its travel-nurse recruiters from leaving or performing the same work for any rival*. AMN also invokes these restraints when it wishes to *retaliate against a rival* for breaching its No-Poaching Restraints, as is explained directly below.

2. <u>AMN's Undeclared Enforcement of Its No-Poaching Restraints Against Rivals: Reinforcing No-Hire Pacts, Sham Litigation, and Blacklisting</u>

AMN never overtly enforces its No-Poaching Restraints, which it understands are unlawful, but by other means it enforces them with severity and supplements them where possible. This inference is fairly drawn from the following evidence:

(A)   Mindful of their illegality (see below), ████████████████████████
████████████████████████████████████████████████████████████████
████████████    *See* Markham ¶ 4.

(B)   At the same time, AMN tries when possible to supplement and reinforce its No-Poaching Restraints, which would be unnecessary if it meant to enforce them by legal means. When doing so, AMN has impliedly conceded to its counterparties that these agreements are unlawful.

– In 2014, AMN prevailed on an agency called Host Healthcare ("Host") to accept a unilateral, blanket no-hire agreement in exchange for AMN's willingness to enter into an AV Agreement with Host. Host thus agreed not to *hire* any of AMN's staffing professionals. (*Id*. Exs. 50-51.) On the advice of its attorneys, AMN refused to state this agreement in writing. (Markham Ex. 52.)

– In 2015, AMN entered into a written, mutual, blanket no-poaching covenant with ███████████████████ (*id*. Exs. 53-54), which already was bound by numerous AV Agreements. (*Id*. Ex. 27). The no-poaching agreement between AMN and ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████ (*id*. Ex. 55). ████████████████████████████████████████████████████
████████████████████████████. (*Id*. Ex. 56.) ██████████████████████
████████████████████████████████████████████. (*Id*. Ex. 57.)

– When Aya began to solicit and hire AMN's travel-nurse recruiters, AMN threatened to sue unless Aya agreed to fire the ones it had hired, cease giving assignments to travel nurses recruited by them, and agree to a mutual no-hire agreement that would cover one another's staffing professionals. (Braynin ¶¶ 43-57.) Aya repeatedly rejected this offer, and AMN then sued Aya, but did not invoke its No-Poaching Restraints in that case. (*Id*.; Markham Ex. 58.)

//

1   – When AMN settled its below case against another agency called Trinity

2   Health Staffing Group, Inc. ("Trinity"), it obliged Trinity in a confidential agreement not

3   to hire a long list of named travel nurses for the next five years. (Markham Ex. 59 § 5(c).)

4       (C)    The only time AMN brings suit to enforce its Employee Restraints is when

5   a rival agency breaches its No-Poaching Restraints ██████████████████████████

6   ████████████████████████. In each such case, AMN's essential grievance has been

7   that the rival has been hiring its former recruiters, who in turn know the names of travel

8   nurses kept in its database. Even so, AMN never invokes the No-Poaching Restraints, but

9   only alleges a conspiracy to breach the Employee Restraints.

10      – Of the *hundreds* of agencies that have assented to AMN's No-Poaching

11  Restraints, AMN identified *only 4* that had hired its travel-nurse recruiters in substantial

12  numbers: Aya, Host, Trinity, and Travel Nurses Across America ("TNAA"). (*Id*. Ex. 60.)

13  AMN took decisive action against all 4: AMN resolved its grievance with Host by a

14  unilateral no-hire pact. (*Id*. Exs. 50-51.) AMN sent intimidating "reminder"

15  correspondence directly to TNAA (*id*. Ex. 61) and to several travel-nurse recruiters who

16  went to work for it. (*Id*. Ex. 61.1.**)** As for Trinity and Aya, AMN sued and blacklisted

17  them.

18      (D)    AMN's retaliation against Trinity was swift and brutal. Trinity offered

19  travel-nurse recruiters better pay and work conditions. (*Id*. Exs. 62-63.) Several from

20  AMN decided to join it in late 2013 and 2014. (*Id*. Ex. 64.) AMN sent "reminder"

21  correspondence to at least one former recruiter who had joined Trinity (*id*. Ex. 65), then

22  it sued her and Trinity. At the same time, AMN blacklisted Trinity from AMN's MSP

23  programs, as follows:

24      – In 2014, AMN brought suit against Trinity and one of its former recruiters

25  who had joined Trinity (Caitlin Grubaugh), alleging a conspiracy to misappropriate its

26  trade secrets and related claims. (*Id.* Ex. 66.) Trinity quickly demonstrated that it had not

27  possibly caused any harm to AMN, but AMN persisted in the litigation (*id*. Ex. 67, Ex.

28  68 pdf pp.15, 19) and subjected Trinity to singularly onerous discovery tactics that

rendered the case disruptive to Trinity's operations and stressful to its chief operating officer as well as its travel-nurse recruiters. (*Id*. Exs. 68-69.) AMN subsequently lost its claims against Trinity on summary judgment after the court (San Diego Superior Court) found that they were legally baseless. (*Id*. Ex. 70.)[6]

–      Around the same time, AMN blacklisted Trinity from its MSP programs and cut off Trinity's access to Trinity's own nurses placed with AMN's customers, even though until then Trinity had been a successful, productive AV in these programs. (*Id*. Ex. 52.) Trinity's chief operating officer understood that AMN did so to retaliate against Trinity for having hired its travel-nurse recruiters. (*Id*. )

(E)      AMN's retaliation against Aya was similar. In mid-2015, Aya began to solicit and hire AMN's travel-nurse recruiters, offering them better pay, work conditions, and support. (Braynin ¶¶ 49-54; Piersons ¶¶ 16-17, 35, Ex. 1.) In response, AMN made various threats and demanded that Aya agree to a mutual no-hire agreement. (Braynin ¶¶ 55-56.) When Aya refused, AMN conducted sham litigation and blacklisted Aya, as follows:

–      On October 2, 2015, AMN sued Aya and two of its former travel-nurse recruiters who had joined Aya (Markham Ex. 71), and it later joined two other such recruiters (*id*. Ex. 72). In that case, AMN did not invoke the No-Poaching Restraints (*id*. Exs. 71-72), but AMN's real grievance was that Aya had solicited and hired several of its travel-nurse recruiters. (Braynin ¶¶ 41-57.) The court (San Diego Superior Court) dismissed AMN's claims on summary judgment (Markham Ex. 73) and found that these

_____

[6]      After AMN's claims against Trinity were dismissed, AMN threatened to appeal, then quickly settled its threatened appeal and (weak) claims against the former recruiter in exchange for the following: (1) a stipulated *public judgment* against Ms. Grubaugh in the amount of $50,000; (2) a *confidential payment* of $5,000 (paid by Trinity) as payment in full of its public judgment against Ms. Grubaugh; and (3) Trinity's confidential agreement not to recruit a long list of named travel nurses. Under this settlement, Trinity and Ms. Grubaugh cannot disclose the foregoing terms, publicly discuss the court's dismissal of AMN's claims against Trinity, or "disparage" AMN. (*Id*. Exs. 59-59.1.) AMN publicized to its travel-nurse recruiters misleading information about the outcome of the case that was intended to intimidate them and discourage them from working for other agency. (Ogilvie ¶¶ 8-10; Grumet ¶ 9; Black Decl ¶¶ 9, 18; Brooks ¶¶ 8, 12; Markham Exs. 49, 59.1.)

claims were "objectively specious," litigated in "bad faith," and litigated to "intimidate its competitor [Aya]." (*Id*. Ex. 74.) That ruling was upheld on appeal. (*Id*. Ex. 75.)

– At around the same time, AMN blacklisted Aya from its MSP programs. Its internal documents and 30(b)(6) testimony in this case confirm that it did so only because Aya had begun to solicit and hire its travel-nurse recruiters. (*Id*. Ex. 76; Braynin ¶¶ 62-70.) At the time, Aya was AMN's largest, most successful AV provider of travel nurses. (Markham Ex. 16-17; Braynin ¶¶ 24-25; Walter ¶ 8.) Several customers, including Johns Hopkins in searing e-mails, complained of a severe, unexpected disruption in service because of AMN's blacklisting of Aya. (*Id*. Exs. 77-78; Braynin ¶¶ 65-66; Walter ¶¶ 9-13). AMN has acknowledged that Johns Hopkins complained to it about this very matter. (*Id*. Exs. 77-78.)[7]

By taking these retaliatory measures, *and* by offering lucrative spillover assignments, AMN has elicited broad, marketwide compliance with its No-Poaching Restraints and reinforcing no-poaching pacts. ███████████████████ ████████████████████████████████████████████████ ██████████████ (Markham Ex. 81 ¶ 13, Table 1; Ex. H-1; Markham Ex. 83 ¶ 90.)

That is remarkable: an agency that accepts AMN's No-Poaching Restraints *harms* its own operations by ██████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████. (Markham Ex. 79; Braynin ¶¶ 29, 32-40.)

3.    AMN's Enforcement of Its Platform Restraints

These restraints are the easiest for AMN to enforce. ███████████████ ████████████████████████████████████████████████ ████████████████████████████ That is a sufficient deterrent by itself, since

---

[7]    Aya did not initiate the termination of its dealings with AMN. Rather, AMN confirmed that it would provide no further spillover assignments to Aya and cut off Aya's access to Aya's own travel nurses on assignment in hospitals operated by AMN's customers. In response, Aya requested a formal memorialization that AMN had terminated its dealings with Aya. (Braynin ¶¶ 62-63, 67.)

agencies depend on access to AMN's platforms to make sales and remain in business. (Markham Ex. 80; Markham Ex. 83 ¶ 83.)[8]

The foregoing facts, all supported by admissible evidence, support each of Aya's antitrust claims, as is explained below.

## IV. AYA HAS SUFFERED TWO KINDS OF COMPENSABLE ANTITRUST INJURY

AMN has devoted most of its motion to arguing that Aya lacks any compensable antitrust injury and therefore cannot pursue any of its claims. While arguing this matter, AMN has included numerous asides that affirm or imply that it has not committed any antitrust violation.[9] Aya therefore addresses AMN's arguments on antitrust injury in this section, then explains below how AMN has committed antitrust violations.

### A. Aya's Exclusionary Damages

Exclusionary damages are a recognized category of antitrust harm. They are damages caused by a defendant's exclusionary practices against one or more rivals in furtherance of an antitrust violation and in order to impair or prevent them from competing against it. *See generally* Hovenkamp, *Federal Antitrust Policy*, "Damages for Exclusionary Practices" (3d. ed. 2005) § 17.6; *see also Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1035-36 (C.D. Cal. 2007) (a competitor can suffer antitrust injury when it is "rendered less competitive" by practices that the defendant employs to impede rivals rather than to improve its own offerings).

Aya's evidence shows that AMN's practices caused it to suffer exclusionary harm from 2010 to 2015. Aya suffered this harm because it acquiesced in AMN's No-Poaching

---

[8] ████████████████████████████████████████████████████████

[9] That approach is improper and tends to confuse issues. *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 n. 9 (2d Cir. 2013) ("When assessing antitrust injury, we assume that the practice at issue is a violation of the antitrust laws....").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT -18-

Restraints and therefore ███████████████████████████████████,
who mostly lived in the same city where Aya maintains its headquarters (San Diego), and
who were the natural and best source of talented staffing professionals for Aya's business.
(Piersons ¶¶ 15, 35, Ex.1; Braynin ¶¶ 31, 34.) That restraint stunted Aya's business
development for years, exactly as AMN intended, and while Aya heeded these restraints,
its profits remained less ███████████████, which is small amount in this industry.
(Braynin ¶¶ 34-40; Piersons ¶¶ 15, 35, Ex. 1; Markham Ex. 81 ¶¶ 26, 124-149, 174, 176,
182-189.) Because of the applicable statute of limitations, Aya seeks to recover only part
of those damages – those borne from 2013 to 2015. (Markham Ex. 81 ¶ 182.)

To measure these damages, Aya's expert analyzed Aya's profits before and after
it ceased to respect AMN's No-Poaching Restraints. This analysis controlled for all other
variables and shows how much impairment was specifically caused to Aya's business
development from 2013 to 2015 because of Aya's inability to solicit and hire AMN's
travel-nurse recruiters. Those damages work out to approximately $300,000 before
antitrust trebling. (Markham Ex. 81 ¶¶ 182-189, Table 3, Appx. F, Ex. VII-2.) The
analysis specifically considers that Aya was earning some profits during this time and
concludes that it would have earned greater profits if it had not been wrongly forbidden
to █████████████████████████████████████. (*Id.*)

This analysis thus shows exclusionary harm caused to Aya's business by AMN's
No-Poaching Restraints, which AMN has always enforced in tandem with its Employee
Restraints (*see* pp. 12-17, *supra*.) That harm qualifies as compensable antitrust injury.
*See generally* Hovenkamp, *Federal Antitrust Policy*, "Damages for Exclusionary
Practices" § 17.6. *See also Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252,
258 (2d Cir.), *amended*, 890 F.2d 569 (2d Cir. 1989) ("[A] member of a section 1
conspiracy has standing to challenge the restraint upon its freedom to compete....").

//

//

//

**B.  AMN's Arguments on Exclusionary Damages Lack Merit**

AMN argues that Aya cannot prove any injury in this case because it has earned profits since 2013.[10] But that is not the law. On the contrary, an antitrust violation can harm a plaintiff by *lessening its profits. See Image Tech. Servs.* 125 F.3d at 1222 ("Juries may award damages to profitable businesses for lost sales as the result of anticompetitive behavior."); *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 436-37 (5th Cir. 1985) (plaintiff can establish antitrust injury by showing that it would have earned an even higher profit but for antitrust injury); *see also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 52 (S.D.N.Y. 2016) (antitrust plaintiffs entitled to proceed after alleging that they had earned lower profits on the affected transactions because of defendants' antitrust violations).

AMN also argues that Aya's proof of exclusionary damages is fatally flawed because its calculations do not consider what Aya's damages would have been if AMN used lawful contractual restraints. That argument is mistaken.

First, Aya's exclusionary losses would be *the same* even if AMN's preferred benchmark were used: AMN's No-Poaching Restraints prohibited Aya from ███████ ██████████████████████████ (*see* pp. 20-22, *supra*). That was the cause of Aya's harm during this period. (Braynin Decl ¶¶ 32-40; 71-76; Piersons ¶¶ 15, 35, Ex. 1.) It was also a gratuitous restraint, unrelated to any AV's collaboration with AMN. (Markham Ex. 81; Braynin ¶ 30.) Reasonable restraints would have permitted Aya to solicit and hire AMN's travel-nurse recruiters. Aya's calculation of its exclusionary harm therefore would be the same if it were to incorporate an assumption that AMN used reasonable restraints.

Regardless, a plaintiff is not obliged to show what its losses would have been if the defendant acted lawfully. Instead, an antitrust plaintiff must first show that its claimed

---

[10]    Aya seeks exclusionary losses for the period from 2013 to 2015, when it earned only modest profits and was burdened by AMN's No-Poaching Restraints. Aya acknowledges that its business fortunes improved dramatically after it ceased to heed AMN's No-Poaching Restraints in mid-2015, but that is when AMN subjected it to costly retaliation. (*See* pp. 16-17, *infra*.)

losses qualify as antitrust injury ("the fact of its antitrust harm"), and once this showing is made it can prove the "extent of its antitrust harm" under a "relaxed" standard of proof. *See Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811-12 (9th Cir. 1976) ("The Supreme Court has also established a relaxed standard for proving the amount of damages in an antitrust case once the fact of damage has been shown."); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993) (same). This "relaxed" standard of proof promotes sound antitrust policy. *See Pierce*, 753 F.2d at 434-35 ("Antitrust damages are often difficult to prove.... An exacting burden of proof on antitrust damages, therefore, would render nugatory the value of private enforcement of the antitrust laws and would reward antitrust violators.... Once the fact of damage has been established, plaintiff enjoys a relaxed burden with respect to the amount of damages. Under this relaxed burden, a jury verdict may stand on less evidence than is normally required to support a damage award in civil cases.").

Disregarding this rule, AMN urges this Court to adopt a contrary standard and require Aya to show (1) what contractual restraints AMN could have lawfully used; (2) what would have been Aya's profits from 2013 to 2015 if AMN had used such restraints during that time; and (3) how much harm Aya suffered because AMN did not use these lawful restraints. No law supports this position. Aya has shown that AMN used unlawful restraints for the purpose of impeding its ability to compete, and that it suffered some harm in consequence within the period of statutory limitations (from 2013 to 2015). That is all that it is required to demonstrate compensable exclusionary harm. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 (1969) (To recover damages in an antitrust case, "[i]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury....").[11]

---

[11]    By its above arguments, AMN has conflated two distinct issues: (1) the extent of Aya's exclusionary damages; and (2) Aya's rebuttal of AMN's procompetitive justifications. Aya must provide the rebuttal not to show the extent of its losses, but as its last burden to prove AMN's violation of Section 1 under the structured rule of reason. Aya has made this very showing in the present submission. (Braynin ¶¶ 101-111.) That
(continued...)

## C.  Aya's Calculation of Its Retaliatory Damages

Aya seeks retaliatory damages under the doctrines of law announced in *Hammes*, 33 F.3d at 783 and *Aspen Skiing*, 472 U.S. at 605-11. These doctrines are explained directly below.

### 1.  Aya's Retaliatory Losses Are Allowed Under *Hammes*.

*Hammes* permits the recovery of retaliatory losses on policy grounds. If, as here, the ringleader of an antitrust conspiracy punishes a defector, the losses borne by the defector are compensable antitrust losses. *See Hammes*, 33 F.3d at 783 ("Losses inflicted by a cartel in retaliation for an attempt by one member to compete with the others are certainly compensable under the antitrust laws, for otherwise an effective deterrent to successful cartelization would be eliminated...."); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) (same); *cf. James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 401 (7th Cir. 2006) (*Hammes* is controlling where a competitor belonged to a cartel and broke ranks with it in order to compete on the merits, in which case it suffers compensable antitrust injury when the cartel takes retaliatory measures against it); *see also Consol. Gold Fields*, 871 F.2d at 258 ("[A] member of a section 1 conspiracy has standing to challenge the restraint upon its freedom to compete...."); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 67-68 (2d Cir. 1988) ("[T]o the extent a cartel member credibly asserts that it would be better off if it were free to compete – such that the member's interest coincides with the public interest in vigorous competition – we believe that the individual cartel member satisfies the antitrust injury requirement. We therefore hold that a cartel member has antitrust standing to challenge the cartel to which it belongs....").

Aya's losses fall within the ambit of this doctrine. Its evidence shows that AMN cartelized labor markets: most rival employers/rival providers in the travel-nurse industry have agreed ████████████████████████████████████████████████████████

---

[11](...continued)
showing, however, is not necessary to its damages calculation.

██████████████████████████. This arrangement has been successfully enforced and reinforced by supplemental no-poaching and no-hire pacts. (*See* pp. 12-17, *supra*.) For a time, Aya too abided by these restraints, but then ceased to do so. (Braynin ¶¶ 27-33, 49-54.) In response, AMN pressured it to resume compliance, threatened it, sued it baselessly, cut off its platform access until customers complained, and blacklisted it from receiving further spillover assignments. (*Id*. ¶¶ 55-70.) The loss of these spillover assignments alone has caused Aya significant losses, which its expert has calculated. (Markham Ex. 81 ¶¶ 174-175, 178-181.) Those losses are compensable antitrust injury under *Hammes*. *See* 33 F.3d at 783.

AMN can draw meaningless distinctions between the two cases, but the judicial policy remains the same in both – to provide "an effective deterrent to successful cartelization." *See id.* Aya chose to compete rather than collude, suffered losses in consequence, and has come forward to expose AMN's regimentation of labor markets in a staffing industry. On these facts, it is entitled to seek losses fairly attributable to AMN's retaliation against it. *See id.*

> 2. Aya's Retaliatory Losses Are Allowed Under *Aspen Skiing*.

*Aspen Skiing* affords an independent ground for the same relief. The rule of *Aspen Skiing* is that a monopolist is liable for harm caused to its smaller rival, if (1) the monopolist pursues an anticompetitive scheme by terminating a longstanding collaboration with the rival in order to harm the rival; and (2) by so doing, the monopolist forgoes profitable dealings with the rival and diminishes the quality of its own offerings. *See* 472 U.S. at 605-11 (establishing this doctrine). Where those circumstances are present, the monopolist's refusal to deal with the rival constitutes actionable antitrust misconduct, and the harm it causes to the rival constitutes compensable antitrust harm. *See id.* The evidence in this case fairly establishes precisely these circumstances: AMN, which holds monopoly positions, cut off Aya to retaliate against it and deter others from emulating its example. By so doing, it disrupted services to customers (e.g., Johns Hopkins) and ended a highly successful, longstanding collaboration with a smaller rival

in order to harm the rival and further its monopolistic practices. (*See* pp. 16-17, *supra*.) Those facts support a recovery under *Aspen Skiing*. *See id.*

**D.    AMN's Argument on Retaliatory Damages Lacks Merit**

AMN concedes that (1) Aya can seek retaliatory damages under *Hammes* if it can prove that it defected from a cartel, and (2) Aya can recover damages under *Aspen Skiing* if it can prove *inter alia* that AMN is a monopolist. But AMN urges that (1) there is no employers' cartel; and (2) AMN is not a monopolist. Aya's evidence, however, proves the opposite on both points (*see* pp. 4-7, *supra*.) AMN's arguments therefore serve only to highlight disputes of material fact that can be properly resolved only at trial.

1.    This Is Not a Hub-and-Spoke Case

Lastly, Aya need not prove a hub-and-spoke conspiracy in order to recover its losses. AMN's argument on this point is a mere confusion of issues. In some per se cases, a plaintiff can prevail only by proving the existence of a horizontal conspiracy in which direct competitors (the spokes) have knowingly colluded by making similar or identical vertical agreements with a common supplier or customer (the hub). *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) ("A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes.").

Aya's per se challenge requires no such showing. That is because AMN's No-Poaching Restraints ███████████████████████████████████████ ██████████████████████. AMN is not merely a customer of the agencies *but also their competitor*, and its No-Poaching Restraints are horizontal restraints between them even if they happen to be placed within AV Agreements that otherwise govern AMN's spillover assignments. *See* Areeda and Hovenkamp, *Fundamentals of Antitrust Law* (3d. ed. 2010) § 19.02(B) ("An arrangement is said to be 'horizontal' when (1) its participants are either actual or potential rivals at the time the agreement is made; and (2)

1  the agreement eliminates some avenue of rivalry among them.").

2      More generally, Aya does not allege that the other agencies have used AMN as an

3  intermediary so that they can collude against Aya (*see* Dkt. 37, *passim*). But proving such

4  an allegation would be the purpose served by evidence of a hub-and-spoke conspiracy.

5  AMN's argument on this point is misplaced.

6  **V.   AYA'S EVIDENCE SUPPORTS ITS PER SE CHALLENGE**

7  **UNDER SECTION 1 OF THE SHERMAN ACT**

8      Contrary to AMN's assertion, Aya has not abandoned its claim against AMN for

9  per se violations of Section 1, which is alleged at Dkt. 37 ¶¶ 294-307. Indeed, Aya served

10  a lengthy interrogatory response that explains its per se challenge. (Markham Ex. 30.)

11  **A.   Elements of the Claim**

12      To prevail on this claim, Aya must prove the following: (1) AMN entered into a

13  contract, combination or conspiracy (an "agreement") with an independent entity, which

14  can be a coerced counterparty; (2) the agreement is unlawful *per se*; and (3) Aya has

15  suffered antitrust injury in consequence. *See* 15 U.S.C. § 1 (to prove unlawful restraint

16  of trade, plaintiff must prove *inter alia* that the defendant has entered into a "contract,

17  combination or conspiracy" with another); *Law v. NCAA,* 134 F.3d 1010, 1016 (10th Cir.

18  1998) ("Once a practice is identified as illegal *per se* [under Section 1]," the court will

19  properly find on this basis alone that the practice violates Section 1.); *Rebel Oil Co. v.*

20  *Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (when a private plaintiff proves

21  a *per se* antitrust violation, it must further show that the *per se* offense has caused it to

22  suffer antitrust injury).

23  **B.   Aya Can Challenge Contracts that AMN Required It to Accept**

24      Contrary to AMN's arguments, a party that enters into a contract offered by a

25  counterparty with superior bargaining power can later challenge the contract on antitrust

26  grounds. That is well-settled law. *See Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d

27  1137, 1138 (10th Cir. 1997) (a party obliged by its counterparty to assent to an

28  anticompetitive contract can challenge it on antitrust grounds, alleging that the

counterparty is unlawfully restraining trade by its contractual restraints); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 48-49 (2d Cir. 2019) (affirming right of plaintiff, an airline carrier, to allege that its counterparty's standard contractual terms restrain trade in violation of Section 1).

### C. Aya's Evidence Supports Its Per Se Challenge

The evidence vindicates Aya's per se challenge. As shown above, AMN's No-Poaching Restraints are independent, naked covenants: ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ These restraints thus proscribe two kinds of competition between existing and potential rivals and are therefore horizontal restraints. *See* Areeda and Hovenkamp, *Fundamentals of Antitrust Law*, § 19.02(B) (quoted above).

████████████████████████████████████████████

███████████████████████████████████. (*See* Markham Ex. 31 § VII.F.) On this ground alone, these restraints are independent, perpetual covenants that happen to be ██████████████████. *See Blackburn v. Sweeney*, 53 F.3d 825, 828–29 (7th Cir. 1995) ("Defendants' contention that the advertising Agreement is a legitimate covenant not to compete, ancillary to the dissolution of the partnership, is further undermined by the Agreement's infinite duration.... There is no time limit attached to the advertising restrictions. (....) The restriction on advertising is thus naked, not ancillary, and *per se* illegal to boot.").

These restraints are otherwise egregiously overbroad, ████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████. (*See* pp. 9-10, *supra*.) On this further ground, these restraints are per se unlawful. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986) ("To be ancillary, and hence exempt from the per se rule, an agreement eliminating competition must be subordinate and collateral to

a separate, legitimate transaction.... If it is so broad that part of the restraint suppresses competition without creating efficiency, the restraint is, to that extent, not ancillary.").

AMN's No-Poaching Restraints are therefore unlawful per se under Section 1. *See United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038-39 (N.D. Cal. 2013) (a naked agreement among employers not to solicit one another's employees is a *per se* violation of Section 1); *In re High-Tech Empl. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122–23 (N.D. Cal. 2012) (same); *see also* Areeda & Hovenkamp, *Fundamentals of Antitrust Law*, § 20.05c ("An agreement among employers competing in the labor market is clearly covered by § 1 of the Sherman Act.... [A] naked agreement among employers ... is unlawful *per se*.").

AMN has used these unlawful restraints in ███████████████████████, ████████████████████████████████████████████████. (Markham Ex. 81 ¶ 13, Table 1.) Aya was one of the rival employers/rival providers bound by AMN's No-Poaching Restraints. (Markham Ex. 30; Braynin ¶¶ 27-28.) Aya suffered exclusionary harm while it acquiesced in these restraints, then suffered much larger retaliatory damages after it ceased to do so. (Markham Ex. 81 ¶¶ 174-189, Table 3.)

Aya's proofs thus make a *prima facie* showing for its per se claim against AMN. That claim (Aya's First Cause of Action) should not be dismissed on summary judgment in the face of such evidence.

## VI. AYA'S EVIDENCE SUPPORTS ITS QUICK-LOOK CHALLENGE UNDER SECTION 1 OF THE SHERMAN ACT

Aya has also challenged AMN's No-Poaching Restraints and reinforcing no-hire/no-poaching pacts under the quick-look standard. *See* Dkt. 37 ¶¶ 308-328.

### A. Elements of the Claim

To prevail on this claim, Aya must show that (1) AMN has entered into an agreement with another; (2) the agreement is "obviously" anticompetitive in purpose or effect; and (3) Aya has suffered antitrust harm because of AMN's use of the challenged

agreement. *See* 15 U.S.C. § 1 (any claim under Section 1 requires proof of an agreement between two parties); *Law*, 134 F.3d at 1020 ("[W]here a practice has obvious anticompetitive effects ... there is no need to prove that the defendant possesses market power. Rather, the court is justified in proceeding directly to the question of whether the procompetitive justifications advanced for the restraint outweigh the anticompetitive effects under a 'quick look' rule of reason."); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (private plaintiff must always prove its own antitrust injury to prevail on any antitrust claim for treble-damages).

### B.    The Evidence Supports Aya's Quick-Look Claim

The very proofs that suffice to support Aya's per se challenge (see above) also support this lesser challenge. If for any reason the Court declines to allow Aya to challenge AMN's No-Poaching Restraints as per se violations, it should permit Aya to challenge them under the quick-look standard, since they are "obviously" anticompetitive in apparent purpose and effect. As Aya's experts have made clear, there is no conceivable legitimate business purpose that reasonably requires the use of such expansive restraints. (Markham Ex. 81 ¶¶ 158-164; Markham Ex. 83 ¶¶ 84-98.)

### VII.    AYA'S EVIDENCE SUPPORTS ITS RULE-OF-REASON CHALLENGE UNDER SECTION 1 OF THE SHERMAN ACT

Aya's second cause of action states a claim against AMN for violating Section 1 under the structured rule of reason. *See* Dkt. 37 ¶¶ 308-328. By this claim, Aya has challenged the way AMN uses all of its above trade restraints to impede competition in the affected labor markets and service markets.

### A.    Elements of the Claim

To prevail on this claim, Aya carries the initial burden of showing that (1) AMN has entered into an agreement with another; and (2) the effect of this agreement is to impair competition in a properly defined relevant market. If Aya makes this showing, AMN must come forward to show why the agreement in question furthers procompetitive aims (i.e., why the agreement improves its offerings). In rebuttal, Aya can show that

AMN's procompetitive justifications are either pretexts or could be reasonably accomplished by less restrictive means. After these showings are made, the finder of fact must decide whether on balance the challenged agreement is anticompetitive. If it makes this finding, the agreement must be condemned as an unlawful trade restraint under Section 1. *See generally* Areeda and Hovenkamp, *Fundamentals of Antitrust Law*, §§16.09 *et seq*. (explaining the "structured rule of reason," which entails the above-listed, shifting burdens of proof); *Law*, 134 F.3d at 1019 ("Courts have imposed a consistent structure on rule of reason analysis by casting it in terms of shifting burdens of proof."); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1412-13 (9th Cir. 1991) (explaining the shifting burdens of proof); *United States v. Brown Univ.*, 5 F.3d 658, 668-69 (3d Cir. 1993) (same).

### B. Aya's Evidence Establishes a Section 1 Claim Under the Structured Rule of Reason

Aya's evidence meets the foregoing criteria.

First, the evidence shows that AMN has entered into thousands of written contracts with its professional employees and other agencies, and that all of these contracts include restrictive covenants that limit how these counterparties may compete against AMN. Those are the challenged trade restraints. (*See* pp. 8-11, *supra*.)

Second, substantial evidence shows that (1) the relevant service markets are various regional markets for the *sale of travel-nurse services to hospitals*; and (2) the relevant labor markets are for travel-nurse recruiters (national), account managers (regional), and travel nurses (regional). Aya has provided voluminous expert and percipient evidence to support its market definitions strictly in accordance with the exacting DOJ-FTC standards for market definition in antitrust cases. (Markham Ex. 81 Appx. C ¶¶ 1-55.)[12]

//

---

[12]    Except to offer inaccurate asides, AMN has not challenged Aya's market definitions by its present motion, or Aya would offer more commentary to support them.

Third, both direct and circumstantial evidence show that AMN's trade restraints have harmed competition in the above markets.

1.  <u>Direct Proof of Harm to Competition</u>. Aya's expert has empirically demonstrated the following points: (1) prices that hospitals pay for travel-nurse services are generally higher in markets in which AMN has substantial market power than they are in other markets; (2) the price discrepancy increases as AMN's market share increases; and (3) the likely or necessary cause of this price discrepancy is AMN's use of its trade restraints. (Markham Ex. 82 ¶¶ 11-19.) AMN's trade restraints have thus accomplished their intended purpose: they have blocked rivals' access to key inputs (trained professionals covered by AMN's trade restraints) and sales outlets (hospitals covered by AMN's trade restraints), making it more difficult and therefore more costly for rivals to evolve into efficient competitors. (Markham Ex. 81 ¶¶ 124-157; Markham Ex. 83 ¶¶ 84-114.) That has resulted in less competitive pressure in the markets for travel-nurse services and higher prices for these services, and the effect is most pronounced in those markets where AMN has the strongest presence. (Markham Ex. 81 ¶¶ 124-157; Ex. 82 ¶¶ 11-19).

That evidence constitutes *direct proof* that AMN's challenged trade restraints have impaired competition in at least one relevant market. *See MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole."); *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) (a contractual restraint "can be harmful when it allows a monopolist to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors.").

2.  <u>Circumstantial Proof of Harm to Competition</u>. Aya's circumstantial evidence of harm to competition is as follows:

(A)  AMN has had substantial market power in numerous regional markets for the sale of travel-nurse services to hospitals, making 30% or more of overall placements

in 25 of these markets as of 2015 and in 35 of these markets as of 2017. AMN's market positions have been protected by substantial market barriers: (1) the chronic shortage of nurses and nurses willing to work as travel nurses; (2) AMN's trade restraints and other anticompetitive practices; and (3) the requirement of establishing a brand that hospitals trust, which makes quick entry impossible for any newcomer. (Markham Ex. 81 ¶¶ 104-107.)

AMN therefore has sufficient market power for purposes of a Section 1 claim made under the rule of reason. *See Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1042 (10th Cir. 2017) (a 30% market share protected by market barriers is the usual "benchmark" or minimal required market share in rule-of-reason claims made under Section 1, but a lesser percentage may be sufficient in some cases).

(B) Alternatively, and *regardless of AMN's market power*, AMN's No-Poaching Restraints and Platform Restraints have been binding ████████████████████ ██████████████ (measured by the volume of travel-nurse placements made in hospitals). ████████████████████████████████████████████████████ ████████████████████████████████████████████████████. (Markham Ex. 81 ¶¶ 10, 13, Table 1, Exs. H-1–H-3.) AMN's restraints have therefore had *marketwide impact* in the affected labor markets and travel-nurse service markets without regard to AMN's independent market power in any of these markets, and no matter what are the geographic boundaries of these markets.

The marketwide reach of AMN's contractual restraints is sufficient by itself to trigger an antitrust review of them under the structured rule of reason. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303 (9th Cir. 1982) (antitrust plaintiff can prevail on rule-of-reason claim by showing that the defendant uses "single contracts that belong to a pattern of contractual relations that significantly restrain trade in a relevant market."); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1361-62 (N.D. Cal. 2013) (offers an extended discussion of "contract aggregation" in rule-of-reason case brought under Section 1 and concludes that

a single defendant can unlawfully restrain trade by using numerous contracts that cumulatively restrain trade in a market); *William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*, 561 F.3d 1004, 1010 (9th Cir. 2009), *opinion withdrawn and superseded on unrelated ground*, 588 F.3d 659 (9th Cir. 2009) ("A defendant who restrains trade by an obvious pattern and practice of entering into individual contracts should not be allowed to do piecemeal what he would be prohibited from doing all at once.") (reasoning on this point expressly affirmed by *Orchard Supply Hardware*, 967 F. Supp. 2d at 1362).[13]

(C)     Since AMN's trade restraints have the potential to harm competition in the affected labor and service markets, they can be condemned if they are "apparently" anticompetitive in purpose and likely effect. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998) ("A plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior....").

AMN's above trade restraints meet this criterion: marketwide in reach, they exist principally or only to prevent rivals from doing any of the following: (a) soliciting, collaborating with, or placing numerous staffing and healthcare professionals; (b) forming their own provider networks; and (c) soliciting and serving hospitals. (*See* pp. 8-11, *supra*.)

Aya has thus shown by both direct and circumstantial evidence that AMN's trade restraints have harmed competition in numerous relevant markets.

3.     <u>AMN Must Justify Its Restraints, After Which Aya Can Rebut</u>. Since Aya has made the above showings, the burden must therefore pass to AMN at trial to justify its restraints, after which Aya can show that its justifications are either pretexts or could

---

[13]     If contractual restraints of trade bind most sellers in a market, they have the *potential* to harm competition in that market. That answers the market-power inquiry by itself. *See FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460-61 (1986) ("[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition....").

be readily accomplished by lesser restraints. *See Bhan*, 929 F.2d at 1413 (explaining the shifting burdens of proof under the structured rule of reason). Aya has offered its anticipated rebuttal in the present submission. (Braynin ¶¶ 101-111.)

Aya has also shown how it has suffered exclusionary harm and retaliatory harm because of AMN's enforcement of its challenged trade restraints. (Markham Ex. 81 ¶¶ 174-189, Table 3, Ex. VII-1.) Aya has therefore made a *prima facie* showing of its necessary proofs to support its rule-of-reason challenge under Section 1.

## VIII. AYA'S EVIDENCE SUPPORTS ITS CLAIMS FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION

Aya also claims that AMN has unlawfully monopolized and attempted to monopolize numerous regional markets for the sale of travel-nurse services to hospitals and has thereby violated Section 2. *See* Dkt. 37 ¶¶ 329-341, 358-365.

### A. Elements of the Claims

To prevail on its claim for monopolization, Aya must define a relevant market (which it has done) and then prove the following: (1) AMN possesses monopoly power in the relevant market, which can be proved by a market share of 65% that is protected by substantial market barriers; (2) AMN has acquired or maintained its monopoly power by using anticompetitive business practices; and (3) Aya has suffered antitrust injury in consequence. *See, e.g.*, *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980) (listing elements of the claim); *Image Tech. Servs.* 125 F.3d at 1206 ("Courts generally require a 65% market share" protected by market barriers to show that defendant has monopoly power.).

To prevail on its claim for attempted monopolization, Aya must define a relevant market, then show that by anticompetitive practices AMN intends to acquire a monopoly position in the market, and that there exists a "dangerous probability" that it will succeed in the effort – a point that can be shown if AMN has a market share of 44% or higher that is protected by substantial market barriers. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (explaining the foregoing points); *Rebel Oil*, 51 F.3d at 1438 (a

market share of 44% protected by market barriers is sufficient to show a dangerous probability of acquiring monopoly power).

## B. The Evidence Supports Aya's Claims for Monopolization and Attempted Monopolization

The available evidence suffices to establish these two related claims.

First, in strict accordance with the controlling antitrust principles, Aya has properly defined numerous regional and local markets for the sale of travel-nurse services to hospitals. (Markham Ex. 81 Appx. C.)

Second, AMN has acquired near-monopoly or monopoly power in several of these markets, including some of the largest markets in the country for travel-nurse services (by sales revenue). As of 2017, which is the last year for which AMN produced sales data, AMN's market shares ranged from 86.7% to 67.4% in six regional markets for travel-nurse services and from 56.6% to 44.9% in seventeen additional regional markets for these services. (Markham Ex. 81 Ex. V-2.) In addition, AMN's market shares in the travel-nurse markets have been generally increasing (Markham Ex. 81 ¶ 103, Ex. V-2), and they are protected by high market barriers. (Markham Ex. 81 ¶¶ 104-107). That evidence is sufficient to show that AMN has monopoly power in the first set of markets (*see Image Tech. Servs.,* 125 F.3d 1206) and near-monopoly power in the second (*see Rebel Oil*, 51 F.3d at 1438).

Third, AMN has used the following anticompetitive practices to acquire or preserve a monopoly these markets: its trade restraints, sham litigation, retaliatory blacklisting, and opportunistic acquisitions and subsequent anticompetitive exploitation of two leading platforms. (*See* pp. 8-18, *supra*.) Each of the above commercial practices is a recognized category of anticompetitive conduct sufficient by itself to support a Section 2 claim. *See Cal. Computer Prods., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 737 (9th Cir. 1979) (an unlawful trade restraint can serve as predicate anticompetitive conduct that supports a claim under Section 2); *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir. 1998) (predicate conduct can be a firm's

litigation of objectively baseless claims against a rival in order to disrupt its operations); *Aspen Skiing,* 472 U.S. at 605-11 (predicate conduct can be a predatory refusal-to-deal); *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1181 (N.D. Cal. 2012) (predicate conduct was Defendants' acquisition of rival provider in furtherance of antitrust scheme).

Lastly, Aya has suffered compensable antitrust injury in the form of exclusionary and retaliatory losses because of AMN's attempted and actual monopolization. (*See* pp. (Markham Ex. 81 ¶¶ 174-189, Table 3.) Aya has thus provided sufficient proofs of its Section 2 claims.

## IX. AMN HAS NOT CHALLENGED AYA'S DEMAND FOR INJUNCTIVE RELIEF, AND AYA'S STATE-LAW CLAIMS SHOULD BE PRESERVED

Aya also seeks permanent injunctive relief under 15 U.S.C. § 26 (Section 16 of the Clayton Act) to prevent AMN from continuing to use its challenged trade restraints. That request is a core part of Aya's case. *See* Dkt. 37, Prayer for Relief.  Aya has made a *prima facie* showing that (1) AMN's trade restraints are unlawful under Section 1 (pp. 8-18, *infra*); and (2) Aya will likely suffer antitrust harm if these trade restraints are not permanently reformed or enjoined  (Braynin ¶¶ 77-99; Markham Ex. 81 ¶¶ 150-157; Ex. 83 ¶¶ 106-113.) Those are the only showings that Aya need make to proceed to trial on this part of its case. *See In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 130 (9th Cir. 1973) ("Section 16 [of the Clayton Act] is far broader than § 4. Any person may secure injunctive relief against threatened loss or damage by violation of the antitrust laws. Section 4 provides for recovery of treble damages only by a person injured in his business or property by reason of such a violation.").

As for Aya's state-law claims, each of them is tenable if supported by a finding that AMN violated federal antitrust law as alleged in this case. Aya respectfully refers the Court to its prior briefing of these points. *See* Dkt. 17, p. 25:11-26.

## X. CONCLUSION

AMN's motion has failed to meet its burden and should therefore be denied.

| | |
|---|---|
| 1 | DATED: November 4, 2019      Respectfully submitted, |
| 2 | /s/ William Markham |
| 3 | By:    William A. Markham, |
| 4 | LAW OFFICES OF WILLIAM MARKHAM, P.C. Attorneys for Plaintiffs |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |