# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AYA HEALTHCARE SERVICES, INC., and AYA HEALTHCARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AMN HEALTHCARE, INC., et al., <br><br> Defendants. | Case No.: 17cv205-MMA (MDD) <br><br> **REDACTED**[1] <br><br> **ORDER DISMISSING PLAINTIFFS' CLAIM FOR EXCLUSIONARY DAMAGES** |

---

[1] The Court has implemented redactions to portions of its opinion in accordance with the Court's prior orders on the parties' sealing requests.

On September 17, 2019, Defendants AMN Healthcare, Inc., AMN Healthcare Services, Inc., AMN Healthcare Services LLC, Medefis, Inc. ("Medefis"), and Shiftwise Inc. ("Shiftwise"), (collectively, "Defendants" or "AMN") moved for summary judgment on each of the claims asserted by Plaintiffs Aya Healthcare Services, Inc. and Aya Healthcare, Inc.'s (collectively, "Plaintiffs" or "Aya"). *See* Doc. No. 98. On May 12, 2020, the Court granted in part and denied in part Defendants' motion for summary judgment, dismissing Plaintiffs' claim for retaliatory damages and ordering the parties to show cause as to whether Plaintiffs' claim for exclusionary damages should also be dismissed. *See* Doc. No. 202 ("Order"). For the reasons set forth below, the Court, pursuant to Rule 56(f)(2), **GRANTS** AMN's motion for summary judgment on Aya's claim for exclusionary damages.

## BACKGROUND[2]

The material facts are set forth in the Court's Order and need not be re-summarized in detail here. In short, Aya brings this action against AMN asserting claims pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-7, as amended by the Clayton Act, 15 U.S.C. §§ 12-27, California's Cartwright Act, Cal. Bus. & Prof. Code § 16750(a) and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, as well as a common law claim of tortious interference with prospective economic relations. *See* Doc. No. 37 ("TAC"). It complains of non-solicitation provisions in AMN's agreements with other healthcare staffing agencies, including Aya, as well as AMN's termination of the parties' collaborating relationship. Aya asserts that these non-solicitation provisions are reinforced by other contractual provisions that AMN implements in its agreements with its employees and customers. *See* Doc. No. 217 ("Pl. Supp. Br.") at 5-9.

///

---

[2] Unless the Court indicates otherwise: (1) the abbreviations henceforth used in this Order shall refer to the sources specified in the Court's prior Order, *see* Doc. No. 202; and (2) the Court's citations to documents filed on the Court's docket refer to the pagination assigned by the document's author.

# DISCUSSION

As an initial matter, the Court notes that Aya no longer pursues its monopolization or attempted monopolization claims pursuant to Section 2 of the Sherman Act. *See* Pl. Supp. Br. at 1, n. 2 ("[T]he Court has found that Aya cannot show that AMN has durable monopoly or near-monopoly power required to support its claims under Section 2. *See* Dkt. 202. Aya respectfully preserves its prior arguments on these points and here explains why its rule of [] reason claim under Section 1 remains tenable."). Therefore, the Court finds that summary judgment in favor of AMN is appropriate as to Aya's Sherman Act Section 2 claims. The only remaining issue is whether summary judgment in favor of AMN is appropriate as to Aya's claim for exclusionary damages under Section 1 of the Sherman Act.

### 1. Legal Standard

Summary judgment is appropriate where there is no genuine dispute of material fact such that a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A district court may, after giving notice and a reasonable time to respond, grant a motion for summary judgment on grounds not raised by a party. Fed. R. Civ. P. 56(f). "Before *sua sponte* summary judgment against a party is proper, that party must be given reasonable notice that the sufficiency of his or her claim will be in issue: [r]easonable notice implies adequate time to develop the facts on which the litigant will depend to oppose summary judgment." *Albino v. Baca*, 747 F.3d 1162, 1176 (9th Cir. 2014) (internal quotation marks and citation omitted).

Here, Aya has been on notice that its claim for exclusionary damages will be at issue since September 17, 2019, when AMN moved for summary judgment on all of Aya's claims. *See* Doc. No. 98. On May 12, 2020, the Court found that AMN's asserted grounds for summary judgment as to Aya's claim for exclusionary damages were without merit. *See* Doc. No. 202 at 18-23. However, the Court put Aya on notice that its claim for exclusionary damages remained at issue when the Court ordered the parties to "show cause on or before June 1, 2020 as to whether summary judgment should be granted in

1  AMN's favor with respect to Aya's Sherman Act Sections 1 and 2 claims for
2  exclusionary damages." *Id.* at 37.  Aya responded to the Court's Order and has not
3  requested additional time to develop facts in its favor or further brief the Court on the
4  viability of its claim for exclusionary damages.  Accordingly, the Court concludes that
5  Aya had reasonable notice that the sufficiency of its claim for exclusionary damages will
6  be at issue.

**2. Aya's Section 1 Claim**

Aya argues that it has a viable claim for exclusionary damages pursuant to Section 1 of the Sherman Act.  *See* Pl. Supp. Br. at 1.  AMN disagrees, arguing that Aya's Section 1 claim fails because it cannot demonstrate AMN has market power or has harmed competition.  *See* Doc. No. 220 ("Def. Supp. Br.") at 1.

a. <u>Relevant Law</u>

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1. To prove a Section 1 claim, a plaintiff must show (1) that there was a contract, combination, or conspiracy, *i.e.*, an agreement or concerted action toward a common goal, (2) that the agreement unreasonably restrains trade, under either a *per se* rule of illegality or a rule of reason analysis, and (3) that the restraint harmed competition, not just competitors.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988).

Section 4 of the Clayton Act authorizes a private right of action for private parties "injured in [their] business or property by reason of anything forbidden in the antitrust laws . . . ."  15 U.S.C. § 15.  As with all federal claims, a plaintiff must establish Article III standing, which requires proof of (1) injury-in-fact, (2) causation, and (3) redressability.  *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008).  "For Article III purposes, an antitrust plaintiff establishes injury-in-fact when he has suffered an injury which bears a causal connection to the alleged antitrust violation."  *Id.* (internal

quotation marks and citation omitted). Private antitrust plaintiffs must make that showing of causal antitrust injury by demonstrating they suffered (1) "injury of the type the antitrust laws were intended to prevent" that also (2) "flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 921-22 (9th Cir. 2015).

b. <u>Analysis</u>

Aya argues that it is entitled to exclusionary damages for its Sherman Act Section 1 claim because the evidence purportedly shows that AMN's conduct is anticompetitive under the rule of reason. *See* Pl. Supp. Br. at 1, n. 2. AMN responds that Aya's remaining claim fails because it cannot show AMN has market power or that AMN's conduct has harmed competition. *See* Def. Supp. Br. at 1. The Court addresses each argument in turn after providing the applicable framework for analyzing the viability of Aya's Section 1 claim.

i. *Section 1 Framework*

As the Court previously explained, in determining whether a plaintiff was injured by a defendant's alleged anticompetitive conduct, the focus is whether the injury results from harm to competition—not the elimination or reduction of competition with rivals, but harm to consumer welfare. *See* Doc. No. 202 at 29-30 (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("[R]eduction of competition does not invoke the Sherman Act until it harms consumer welfare.") (citation omitted)). Consumer welfare is maximized when economic resources are allocated to their best use and consumers are assured competitive prices and quality of goods or services. *Id.* (citations omitted). "Accordingly, an act is deemed *anticompetitive* under the Sherman Act only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their quality." *Id.* (emphasis in original, citation omitted).

The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (quoting *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768 (1984)). "The goal is to 'distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" *Id.* (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007)).

To determine whether a restraint violates the rule of reason, a three-step, burden-shifting framework applies. First, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id*. "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id*.

At issue here is the first step of the burden-shifting framework: Aya must carry its burden to demonstrate sufficient facts showing that a reasonable jury could find the challenged restraints have a substantial anticompetitive effect that harms consumers in the relevant markets. *See id*. Aya can make this showing in two ways. The first way is to present direct evidence of substantial anticompetitive effects, *i.e.*, proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market. *See id.* (citations omitted). The second way is to present indirect evidence of substantial anticompetitive effects, which "would be proof of market power *plus* some evidence that the challenged restraint harms competition." *Id.* (citations omitted, emphasis added). For example, proof of market power plus a showing of "the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market" may constitute sufficient indirect evidence of a substantial anticompetitive effect that harms competition. *Tops Markets, Inc. v. Quality Markets,*

*Inc.*, 142 F.3d 90, 97 (2d Cir. 1998) (citing *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir.1995)); *see also Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1573 (11th Cir.1983) (requiring plaintiff to show high market share and that intrabrand competition was impeded, and that "the interbrand market structure was such that intrabrand competition was a critical source of competitive pressure on price, and hence, of consumer welfare").

      ii. *Direct Evidence*

Aya doubles down on its theory of harm to competition by direct evidence: supracompetitive pricing in certain regional markets. It argues that the study performed by its expert economist, Dr. Dov Rothman, shows that the prices for travel nurse services "are significantly higher in 35 relevant service markets in which AMN makes at least 30% of overall sales," compared to prices in "markets in which AMN's overall share of sales was less than 15%." Pl. Supp. Br. at 3 (citing Markham Decl., Ex. 81 at ¶¶ 11-19). AMN responds that "there is no coherent relationship between AMN's supposed 'market shares' and competitive harm." Def. Supp. Br. at 2.

Aya's theory is deficient primarily for one of the reasons mentioned in the Court's prior Order: "Aya provides no support whatsoever that such non-solicitation provisions (or any contract provision for that matter) raise rivals' costs." Doc. No. 202 at 34. The Court recognizes that Aya complains of contractual provisions that appear in AMN's agreements with not only AVs, but also its employees and customers. *See, e.g.,* Pl. Supp. Br. at 3. Still, Aya fails to proffer any evidence to support its assertion that higher prices in certain markets are attributable to the challenged provisions. The only purported support for the assertion is Aya's say-so: that the contractual provisions somehow "impede[] rivals' ability to compete in different ways and . . . undercut[] [AMN's] prices . . . ." *Id.* (citing Markham Decl., Ex. 82 at ¶¶ 14-15, 19; Markham Decl., Ex. 81 at ¶¶ 30, 37-39, 48, 112-157). Aya's reliance on Dr. Rothman's expert reports fares no better, as he similarly makes the bare assertion that "AMN's restraints make it more difficult for AMN's rivals to compete—the restraints raise AMN's rivals' costs." Markham Decl.,

Ex. 81 at 74. One would think an economist such as Dr. Rothman would support such an assertion with some economic analysis, especially since he could have analyzed Aya's financial information, including how its costs have changed since 2013. *See* Fitzsimmons Decl., Ex. 8. At a minimum, Aya's "raising rivals' costs" theory must be supported by evidence providing some kind of showing as to how *any* rival has experienced increased costs, or an inability to lower its prices to better challenge AMN, on account of the provisions at issue.[3] Aya's and Dr. Rothman's failure to proffer any evidentiary support for these contentions is telling; the Court declines to accept their unsupported assertions, which are insufficient at the summary judgment stage.

Moreover, as AMN recognizes, Aya's theory of harm to competition remains deficient because Dr. Rothman's study allegedly showing supracompetitive prices is seriously flawed. *See* Def. Supp. Br. at 6 (citing Doc. No. 202 at 34-35). As the Court previously explained, Dr. Rothman's study, purportedly drawing a correlation between AMN's market share and supracompetitive prices, is unreliable and of marginal relevance. The reason is because Dr. Rothman's market share calculations capture AMN's direct placements even though they "do not involve AMN collaborating with and imposing non-solicitation covenants on AVs . . . ." Doc. No. 202 at 34-35. Aya fails to address this deficiency in Dr. Rothman's framework; it merely notes Dr. Rothman "concluded that the probable cause of the higher prices in [certain] markets was AMN's use of its interlocking contractual restrictions . . . ." Pl. Supp. Br. at 3. However, the issue continues to lie with Dr. Rothman's methodology, as it is unclear whether it is actually measuring a correlation between increasing prices and AMN's contractual

---

[3] Even conceptually, the source of the alleged harm is far too attenuated from Aya's "raising rivals' costs" theory. It is unclear how, to prevent their costs from increasing and to undercut AMN on price, Aya and other agencies require not only the ability to conduct "general advertising," Braynin Decl., Ex. 1 at AMN0000102620, but also the ability to solicit a subset of AMN's employees and each other as AVs. Further blurring the connection to any harm to competition is Aya's own admission that AMN will only take action to enforce the restraints when "a threatening rival has breached its associate-vendor restraints by soliciting and hiring its recruiters in substantial numbers." Pl. Supp. Br. at 7, n. 4.

provisions, which purportedly raise rivals' costs by preventing them from:

- "█████████████████████████████████████," Braynin Decl., Ex. 1;
- "█████████████████████████████████████" for a certain amount of time, *see* Pl. Supp. Br. at 8 (describing AMN's "platform restraints" as "█████████████████████████████████████ █████████████████████████████████"); and
- in the case of Medefis, "█████████████████████████ █████████████████████████████████████ ███████████████████████████████"

*Id*.

AMN argues that even putting Dr. Rothman's deficient study aside, increased billing rates would not cause injury to Aya because it would stand to gain from higher prices. *See* Def. Supp. Br. at 6-7 (citing *Amer. Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999) ("There can be no antitrust injury if the plaintiff stands to gain from the unlawful conduct.")). The point has some appeal; however, it does not entirely capture Aya's position, which is that AMN is able to charge supracompetitive prices to hospitals while excluding rivals—hence, the alleged "exclusionary damages" in the form of lost profits. *See* Pl. Supp. Br. at 3-4 (arguing that the contractual provisions at issue result in supracompetitive prices while "imped[ing] rivals' ability to compete in different ways and thereby prevent[ing] them from evolving into more efficient competitors that could better challenge AMN by undercutting its prices . . .."). As Aya would have it, the absence of the provisions at issue would allow AMN's rivals, such as Aya, to act as a competitive constraint on AMN, capture increased profits, and render prices competitive. Yet, as discussed above, Aya's "raising rivals' costs" theory suffers from a problem of proof: Aya proffers no supporting evidence from which a reasonable juror could conclude that prices in certain markets are supracompetitive or that rival agencies are otherwise prevented from undercutting AMN on price.

Therefore, for the reasons discussed above, the Court finds that Aya fails to proffer direct evidence of harm to competition.

### iii. *Indirect Evidence*

As discussed *supra*, Aya may also make the requisite showing of harm to competition indirectly by demonstrating AMN has market power plus other indicia of harm to competition. *See Am. Express Co.*, 138 S. Ct. at 2284 ("Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition.") (citations omitted). Aya argues it has made this showing here because the evidence reflects that AMN "enter[ed] into bilateral contracts with numerous sellers or customers;" the "contracts cumulatively bind a large percentage of overall sellers or customers in the relevant market; and the "contracts include restrictive covenants that are apparently anticompetitive in design and probable effect." Pl. Supp. Br. at 4-5 (citations omitted). AMN argues that there is no indirect evidence of harm to competition, given there is no proof of "market power plus some evidence that the challenged restraint harms competition." Def. Supp. Br. at 9.

The first step in demonstrating harm to competition by indirect evidence is to define the relevant markets in order to determine whether AMN has market power.[4] Aya defines the following relevant markets:

1. Regional service markets[5] for the sale of travel nurses to hospitals;

---

[4] Aya argues that it need not show market power to prove harm to competition, but in any event, it has made that showing. Pl. Supp. Br. at 9, n. 5. Because the Court has already found that Aya presented insufficient direct evidence of harm to competition, Aya must demonstrate that AMN has "market power plus some evidence that the challenged restraint[s] harm[] competition." *Am. Express Co.*, 138 S. Ct. at 2284.

[5] The following states are relevant geographic markets for this service market: "Los Angeles, CA; Riverside, CA; Sacramento, CA; San Diego, CA; San Franscisco [*sic*], CA; San Jose, CA; Washington, D.C.; Indianapolis, IN; Louisville/Jefferson County, KY; Boston, MA; Baltimore, MD; Detroit, MI; St. Louis, MO; Raleigh, NC; Cleveland, OH; Columbus, OH; Portland, OR; Houston, TX; Richmond, VA; Virginia Beach, VA; Seattle, WA; and Alaska, Arkansas, Delaware, Hawaii, Iowa, Maine, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, South Dakota, Vermont, and Wyoming." Markham Ex. 81 at Appendix C, ¶ 19.

  2. Regional labor markets[6] for the labor of travel nurses; and

  3. A national labor market for the labor of travel-nurse recruiters.

Pl. Supp. Br. at 1, n. 1 (citing Markham Decl., Ex. 81 at Appendix C).

  The next step is to determine whether AMN has market power in the defined markets. As the Court previously explained, "market power" refers to a firm's "ability to raise prices above those that would be charged in a competitive market." Doc. No. 202 at 30 (citing *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 109 n.38 (1984)). Market power can be demonstrated by "direct evidence of the injurious exercise of market power," such as restricting output and charging supracompetitive prices, or by circumstantial evidence: a well-defined relevant market, defendant's dominant share of that market, and the existence of significant barriers to entry and expansion. *Id.* (citing *Rebel Oil,* 51 F.3d at 1434 (citations omitted)). Aya does not attempt to demonstrate by direct evidence AMN's market power, nor could it, as the only purported direct evidence it proffers is the deficient showing of "supracompetitive prices" already discussed.

  Rather, Aya contends that it has offered sufficient evidence of AMN's market power for two reasons. "First, AMN has been able to impose onerous, non-reciprocal contractual restraints on all of its recruiters and nearly all rival employers/providers precisely because it wields extraordinary control over the available workflow and plum assignments in the regional service markets." Pl. Supp. Br. at 10 (citing Markham Decl., Ex. 81 at ¶¶ 112, 118-20, 122). The argument is misplaced. Even given the fact that AMN executes contracts containing non-solicitation and confidentiality provisions with its recruiters and rival agencies, it does not follow that AMN possesses market power. Aya's reliance on *Eastman Kodak Co. v. Image Tech. Servs., Inc.* is similarly misplaced.

---

[6] The following states are relevant geographic markets for this labor market: "Alaska, Arkansas, Delaware, District of Columbia, Hawaii, Iowa, Maine, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, South Dakota, Vermont, and Wyoming." *Id*. at Appendix C, ¶ 28.

1  There, the Supreme Court had before it direct evidence of market power: the
2  "[r]espondents offer[ed] evidence that consumers have switched to [the defendant's]
3  service even though they preferred [the respondents'] service, that [the defendant's]
4  service was of higher price and lower quality than the preferred [respondents'] service,
5  and that [the respondents] were driven out of business by [the defendant's] policies." 504
6  U.S. 451, 465 (1992). Evidence that AMN implements non-solicitation and
7  confidentiality provisions in its agreements with employees and AVs is a far cry from the
8  evidence of consumer preference, supracompetitive prices, and lower quality services
9  proffered in *Eastman Kodak*. The presence of such contractual provisions does not speak
10 to whether AMN has any ability to charge supracompetitive prices or that it actually did.
11 *Cf. Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*, 642 F. App'x 665, 667
12 (9th Cir. 2016) (rejecting as insufficient allegations of monopoly power that the
13 defendant is affiliated and has contracts with a number of hospitals).

14 Aya's second argument on market power is also insufficient. It asserts that AMN
15 has "commanding, increasing market shares . . . protected by substantial barriers to entry
16 and expansion, especially its own trade restraints and a chronic shortage of nurses." Pl.
17 Supp. Br. at 10. In support of its contention, Aya relies on Dr. Rothman's calculated
18 shares for AMN in the defined geographic markets from 2013 to 2017, even though Aya
19 only claims exclusionary damages from 2013 to 2015. *See* Markham Decl., Ex. 81 at Ex.
20 V-2, Table 3.[7] The same chart purports to provide AMN's market shares in 35 state or
21 regional markets, even though Aya claims that it suffered damages in only 13 of the
22 geographic markets. *Compare* Markham Decl., Ex. 81 at Ex. V-2 *with id*. at Table 3. For
23 each of these 13 geographic markets, however, Dr. Rothman's chart does show that AMN

---

[7] The Court notes that the chart purports to provide AMN's market shares for certain regions without differentiating between the three service or labor markets proposed by Aya here. Apparently, Dr. Rothman was of the opinion that AMN's market share remains the same regardless of whether the market encompasses the sale of travel nurses or the labor of travel nurses or recruiters. Notwithstanding the Court's reservations about the matter, the Court proceeds in its analysis based on these market share calculations.

1  has a 30% share or higher for at least one year between 2013 and 2015.  Thus, while the
2  Court agrees with AMN that there are some flaws in Dr. Rothman's market share
3  calculations, the Court will nevertheless proceed with the remainder of its analysis.
4       Next, as the Court explained in its prior Order, market share calculations alone are
5  insufficient to demonstrate a defendant's market power.  Doc. No. 202 at 31 (citing *Rebel*
6  *Oil*, 51 F.3d at 1439 ("A mere showing of substantial or even dominant market share
7  alone cannot establish market power sufficient to carry out a predatory scheme.")).
8  Rather, Aya must also "show that new rivals are barred from entering the market and
9  show that existing competitors lack the capacity to expand their output to challenge the
10 predator's high price."  *Id*. at 31-32 (citing *Rebel Oil*, 5 F.3d at 1439).  The Court
11 previously found that "[w]hile Aya argues that market barriers are high, *see* Opp. at 34,
12 Dr. Rothman identified only two barriers to entry and expansion: access to key inputs and
13 brand recognition. *See* Markham Decl. Ex. 81 at 53-54."  Doc. No. 202 at 32 ("A nursing
14 shortage may prove to be a peculiar market barrier, but the same cannot be said with
15 respect to brand recognition, which is typically important in many industries.").  The
16 Court went on to find that "evidence of Aya's tremendous success and dramatically
17 increasing number of placements demonstrates that barriers to expansion are low."  *Id*.
18 Aya now argues that "its own recent success does not prove a lack of market barriers."
19 Pl. Supp. Br. at 10, n. 6 (emphasizing its unsuccessful bidding for "large hospital
20 systems" as evidence that Aya still suffers from the "persistent, pervasive effect of
21 AMN's trade restraints").
22      The Court cannot conclude that there is sufficient evidence of *significant* barriers
23 to entry or expansion.  *See Rebel Oil*, 51 F.3d at 1434 (citations omitted).  First, "Aya has
24 come forward with no evidence of would-be rivals passing on opportunities to enter the
25 market or existing rivals lacking the capacity to expand output to challenge AMN."  Doc.
26 No. 202 at 32.  Second, the evidence shows that Aya has experienced tremendous growth
27 since 2013, including "rapid growth in profits and travel nurse placements," *id.* at 32
28 (citing Doc. No. 150-1 at 1-9), thus belying its contention that there are substantial

market barriers at issue. Indeed, such growth demonstrates that any nurse shortage is not a significant barrier to expansion. Similarly, the parties both recognize that there are "hundreds of rival staffing companies,"[8] a fact that further undermines Aya's contention that there are "substantial barriers to entry and expansion . . . ." Pl. Supp. Br. at 10.

     Aya's argument that it still "has been unable to win contracts with very large hospital systems" is not well-taken. Unsuccessful bidding can be the result of a myriad of procompetitive reasons—the consumer might prefer a rival's lower price or more diverse offering. For example, Dr. Rothman's report recounts an instance in which Aya's bid for a Kaiser Permanente hospital was unsuccessful because of "Kaiser's preference for . . . AMN's larger travel nurse pool and/or network of subvendors . . . ." Markham Decl., Ex. 81 at 82-84. In other words, the unsuccessful bidding here was the result of a customer's preference for greater choice: AMN offered a larger selection of travel nurses and associate vendors. Such preferences do not speak to whether Aya (or any existing competitor) is able to expand output to act as a competitive constraint on AMN, the firm with alleged market power. Therefore, Aya's complaint of an inability to win certain bids for the business of "very large hospital systems," without more, does not show it lacks the capacity to expand output, especially where the evidence shows its number of travel nurse placements and overall business have been on the rise since 2013. *See* Doc. No. 150-1 at 1-9.

     Further, Aya's assertion that AMN's "own trade restraints" is a substantial market barrier, Pl. Supp. Br. at 10, is unsupported by the evidence. As discussed above, Aya does not proffer any direct evidence in support of its contention that such trade restraints harm competition, other than its contention that the restraints "impede[] rivals' ability to compete in different ways . . . ." Pl. Supp. Br. at 3. Aya does not argue that the obstruction allegedly caused by the contractual provisions affect market entry or output

---

[8] Def. Supp. Br. at 9, n. 7; *see also* Markham Decl., Ex. 81 (listing agencies subject to non-solicitation provisions with AMN).

1  expansion.  Rather, the provisions in AV agreements place a limit on an AV's ability to
2  solicit AMN employees and, in the case of AMN's platforms, ▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮. *See* Pl. Supp. Br. at 5-9.  Moreover, the non-solicitation and non-disclosure
5  provisions in AMN's employee agreements similarly place a temporary limitation on a
6  former employee's ability to solicit AMN's employees or misappropriate information that
7  AMN deems to be proprietary.  *See* Pl. Supp. Br. at 5-6.  While the Court understands
8  these provisions limit the ability of AMN's rivals and former employees to actively
9  solicit AMN's employees, customers, and other AVs, there is no evidence indicating that
10 such limitations impede market entry or the ability of rival agencies to expand output.
11         Finally, Aya has failed to proffer some evidence of anticompetitive effects, which
12 is required, in addition to a showing of market power, for a plaintiff attempting to
13 demonstrate harm to competition by indirect evidence.  As discussed above, a showing of
14 "the inherent anticompetitive nature of the defendant's behavior or the structure of the
15 interbrand market"[9] may constitute sufficient indirect evidence of a substantial
16 anticompetitive effect that harms competition.  *Tops Markets*, 142 F.3d at 97 (citing
17 *K.M.B. Warehouse Distribs.*, 61 F.3d at 129).  Here, there is nothing inherently
18 anticompetitive about the contractual provisions at issue here, including the non-
19 solicitation provisions within an agreement reflecting the terms under which rivals are
20 willing to collaborate to meet customer demand.  Indeed, even Aya's expert economist,
21 Dr. Rothman, found that such collaboration takes place "to offer customers a better
22 product" and that "[a] provider might not want to place a travel nurse through a
23 competitor's platform if the competitor might use the travel nurse's information to solicit
24 and hire her for future placements."  Markham Decl., Ex. 81 at 87-88 ("If the provisions

---

27 [9] Interbrand market refers to the state of competition among sellers of various brands of the same
28 product or service—in this case, temporary travel nurse services.  *See Cont'l T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 52, n. 19 (1977).

reasonably prohibit what is necessary to promote a collaboration that ultimately benefits customers, then these provisions are potentially procompetitive."). The inverse is equally true: an MSP or agency providing a platform for travel nurse placement might be deterred from collaboration with other agencies if there is no protection against the agencies "us[ing] the travel nurse's information to solicit and hire her for future placements." *Id*.

Dr. Rothman's observations also underscore that there is nothing inherently anticompetitive about the interbrand market structure at issue. As Dr. Rothman found, agencies place travel nurses directly and indirectly, with most placements taking place indirectly via platforms and MSP programs. *See id*. at 19-20 ("The share of travel nurse revenue billed through platforms and MSP programs has grown from 58 percent in 2013 to nearly 70 percent in 2017."). In other words, collaboration among agencies is common in the industry. Therefore, in this market structure, the use of contractual provisions, such as those at issue here, is not indicative of anticompetitive effects. Rather, the use of such provisions suggests an effort to stimulate interbrand competition, as the provisions can help agencies guard against the risks associated with competitor collaborations, such as free-riding and misappropriation of proprietary information. *See id.* at 87-88; *see also* Doc. No. 202 ("[A]s the undisputed facts clearly demonstrate, competitiveness in the healthcare staffing industry depends in large part on an agency's ability to establish networks that include recruiters, travel nurses, AVs, and of course, hospital customers.") (citing Markham Decl., Ex. 81 at 59-61). Similarly, the non-solicitation and non-disclosure provisions in AMN's employee agreements suggest additional efforts to stimulate interbrand competition by attempting to limit free-riding and inadvertent information-sharing with competitors through defecting employees.

In sum, the Court finds that Aya has failed to carry its burden of demonstrating that a triable issue of fact exists with respect to harm to competition. First, it is unable to do so through direct evidence of anticompetitive effects because it only points to Dr. Rothman's unreliable study from which no reasonable juror could infer supracompetitive pricing. Second, Aya fails to raise a genuine issue of material fact regarding whether

AMN has market power.  It is unable to demonstrate significant market barriers or indicia of anticompetitive effects by reference to the nature of AMN's contractual provisions or the interbrand market structure.  Thus, no reasonable jury would find that Aya has suffered antitrust injury, as its alleged lost profits do not stem from any anticompetitive conduct on AMN's part, or from harm that the antitrust laws were intended to prevent.  Summary judgment is therefore appropriate on Aya's claim for exclusionary damages.

## CONCLUSION

Based on the foregoing, and pursuant to Rule 56(f)(2), the Court **GRANTS** AMN's motion for summary judgment on Aya's claim for exclusionary damages. Having dismissed Aya's federal claims, the Court declines to exercise supplemental jurisdiction over Aya's state law claims.  *See* 28 U.S.C. § 1367(c)(3); *see also Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988) ("[I]n the usual case in which federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").  There being no remaining claims in this case, the Court **DIRECTS** the Clerk of Court to enter judgment for Defendants and close the case.

**IT IS SO ORDERED.**

Dated:  June 22, 2020

HON. MICHAEL M. ANELLO
United States District Judge